UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

**FAMILY CHRISTIAN, LLC** *et al.* [1]

Debtors.

_____/

CHAPTER 11

CASE NO. 15-00643-jtg
(Joint Administration Proposed)

HON. JOHN T. GREGG

DECLARATION OF CHUCK BENGOCHEA
IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, CHUCK BENGOCHEA, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the President and Chief Executive Officer of the debtors Family Christian, LLC and Family Christian Holding, LLC, and I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the Debtors to commence their Chapter 11 cases and in support of (i) the Debtors' petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (ii) the relief requested by the Debtors pursuant to various motions filed contemporaneously herewith (collectively, the "**First Day Motions**").

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. The Debtors have authorized me to submit this Declaration on their behalf.

---

[1] The Debtors are: Family Christian, LLC(Case No. 15-00643-jtg), Family Christian Holding, LLC (Case No. 15-00642-swd), and FCS Giftco, LLC (Case No. 15-00644-swd).

22474186 v13

3.     Further, I have reviewed generally the First Day Motions and affirm that the facts set forth therein are true and correct to the best of my knowledge.

## BACKGROUND

**Corporate Structure**

4.     Family Christian, LLC, a Georgia company (sometimes referred to as the "**Operating Debtor**") conducts most all business operation through a chain of retail stores known as *Family Christian*®, and it is wholly owned by Family Christian Holding, LLC (sometimes referred to as the "**Holding Company**"). The Holding Company does not conduct any business operations, and its asset is the ownership of all the membership interests of the Operating Debtor.

5.     The Holding Company is owned 100% by a separate, non-debtor company known as Family Christian Resource Centers, Inc. a/k/a "*Family Christian Ministries*," ("**FCRC**") a 501(c)(3) tax exempt, non-profit Georgia corporation which is the ultimate parent company that serves as the organization for coordinating and supporting the charitable causes and ministries supported through any profits of the Debtors and their collection of donations that are described herein. FCRC also owns a separate, non-debtor company known as iDisciple LLC, a Georgia company ("iDisciple").

6.     Additionally, the Operating Debtor wholly owns an inactive company called FCS Giftco, LLC, a Colorado company that currently conducts no business and, to the best of my knowledge, has no meaningful assets or liabilities.

7.     Set forth below is a flow chart summarizing the corporate structure (not intended to be an exhaustive listing of all holdings or interests of FCRC).

22474186 v13



**Business Operations**

8.  *Family Christian*® is one of the largest retail sellers of Christian books, music, DVDs, church supplies, and other merchandise related to the Christian faith.  The company has approximately 3,100 employees and 266 stores in 36 states operating under the name.  Sales are also generated through direct mail catalogs and internet purchases (https://familychristian.com).  In 2014, the Operating Debtor had gross sales approximating $216 million.

9.  The Debtors operate as non-profit companies.  As a result, any available and legally disposable profits of the Debtors and their collected donations go to supporting "Family Christian Ministries," a non-profit, charitable organization dedicated to sharing and promoting

22474186 v13

the Christian message and lifestyle, and supporting charitable causes and missionary goals. A non-exhaustive sampling of such past and present activities include (with the majority of these activities occurring prior to the current ownership's acquisition in 2012 described below):

- <u>Bible donations</u>. To date the company has donated over 120,000 bibles to military members and their families, and over 800,000 bibles to children and students in Latin America and Africa.

- <u>Orphanage / Widow Support</u>. Since 2003, the company and its employees have raised and donated over $10 million dollars and needed supplies to organizations and ministries that care for orphans and widows or facilitate adoptions in countries across the globe, including China, Haiti, Mexico and the Dominican Republic. They have likewise raised funds to support ministries aimed at rescuing persons enslaved in the sex trafficking industry.

- <u>Missions</u>. The company has sent over 1,300 employees on mission trips across the USA and other countries, sharing the Christian faith and distributing needed supplies and goods to many persons, such as building 108 homes for widows and restoring 32 more, while also supplying fuel efficient stoves and water purifiers.

- <u>Giving</u>. In addition to the funds and gifts noted above, the company has given several hundred thousand "shoe box" gifts and gospel tracks to needy families in their annual "Operation Christmas Child." After Hurricane Alex in 2010, the Debtors' supported ministries and relief efforts to aid squatters' communities in Monterrey, Mexico. Since 2003, Family Christian Ministries and its ministry partners or predecessor company have impacted over 4.5 million lives.

10. The Debtors' headquarters and primary management offices are located at 5300 Patterson Avenue SE, Grand Rapids, Michigan, 49530. The Debtors lease all of their retail store locations.

11. The Operating Debtor also generates revenues pursuant to a promotion and marketing agreement with iDisciple, a company whose business centers around the sale of applications that can be downloaded to iOS and Android devices. In exchange for the Operating Debtor's promotion of iDisciple's products in the *Family Christian* stores and on its website, a percentage of iDisciple's revenues are shared with the Operating Debtor.

4

**Business History**.

12. The Debtors' origins dated back to 1931 when the "*Zondervan*" stores were first established, and that store chain grew over time and began operating its stores under the name "Family Bookstores." The business was sold and acquired more than one time and changed its name to Family Christian Stores in the 1990s.

13. In 2012, *Family Christian Stores* was purchased by its current ownership and has operated since early 2013 as a non-profit organization through which any available and legally disposable profits and donations raised by the Debtors are paid over to FCRC for charitable donations to missionally-aligned causes. To facilitate the 2012 acquisition, Family Christian, LLC and Family Christian Holding, LLC were formed, both being organized under the laws of the State of Georgia.

14. Since the 2012 acquisition, the Debtors have only paid an approximate amount of $300,000 to FCRC for charitable donations to its missionally-aligned causes (exclusive of any third-party donations collected in the retail stores).

**Debt Structure**

15. To facilitate the acquisition of the business in 2012 and provide for general working capital, the Operating Debtor obtained two loans, both of which were guaranteed by the Holding Company. Pursuant to such loans, the Operating Debtor, as borrower, is indebted to FC Special Funding, LLC, as assignee of JP Morgan Chase Bank, N.A., individually and in its role as agent (the "**Senior Lender**") under a "**Credit Agreement**" dated November 14, 2012 (the "**Revolver**") that provides a revolving line of credit up to a maximum of $40 million, which loan provides working capital for the Operating Debtor's business operations. Upon information and belief, the Revolver is secured by a security interest and lien upon substantially all of the

Operating Debtor's assets, including without limitation, its accounts receivable, inventory, and cash collateral; provided nothing herein constitutes a stipulation as to any liens or a waiver of the Debtors' right to challenge or dispute the perfection, amount or other aspects of any asserted liens upon the Debtors' property.

16. Additionally, the Operating Debtor, as borrower, is indebted to Credit Suisse AG, Cayman Island Branch, individually and in its role as agent for Credit Suisse Loan Funding, LLC, Medley Capital Corporation, Congruent Credit Opportunities Fund II, LP, and Main Street Mezzanine Fund, LP (the "**Junior Lenders**" and together with the Senior Lender, the "**Secured Lenders**") under a "**Term Loan Credit Agreement**" dated November 14, 2012 (the "**Term Loan**") for the loan amount of $38 million, which loan provided part of the acquisition financing for the 2012 acquisition. Upon information and belief, the Term Loan is secured by a security interest and lien upon substantially all of the Operating Debtor's assets; provided nothing herein constitutes a stipulation as to any liens or a waiver of the Debtors' right to challenge or dispute the perfection, amount or other aspects of any asserted liens upon the Debtors' property.

17. As of the Petition Date, the amount owed under the Revolver is approximately $24 million, while the amount owed under the Term Loan is approximately $34 million.

18. The Secured Lenders are parties to an "**Intercreditor Agreement**" dated November 14, 2012 pursuant to which, among other things, the Secured Lender's acknowledged and agreed that (a) the Senior Lender would hold a senior security interest and lien in and to the Operating Debtor's accounts receivable, inventory, cash, deposit accounts, securities accounts, prepaid expenses, instruments, documents, chattel paper and supporting obligations, all books and records related to the foregoing, and all proceeds of the foregoing (collectively, the "**Senior Lender Prepetition Collateral**") and the Junior Lenders would hold a junior security interest

6

22474186 v13

and lien in and to the Senior Lender Prepetition Collateral; and (b) the Junior Lenders would hold a senior security interest and lien in and to the Operating Debtor's copyrights, domain names, patents, trademarks and licenses, equipment, fixtures, general intangibles, goods, pledged collateral, letter-of-credit rights, and commercial tort claims (the "**Junior Lender Prepetition Collateral**") and the Senior Lender would hold a junior security interest and lien in and to the Junior Prepetition Collateral (the Senior Lender Prepetition Collateral and the Junior Prepetition Lender Collateral are sometimes collectively referred to as the "**Collateral**").

19. In the ordinary course of the Operating Debtor's business it is often necessary and appropriate to order, purchase and take delivery of supplies, inventory and other goods on credit from various suppliers and vendors. The Operating Debtor currently owes approximately $40 million in outstanding debt to its trade suppliers and vendors (the "**Trade Debt**").

20. In addition to the Trade Debt, the Operating Debtor's business takes delivery of supplies, inventory and other goods on "consignment" from various suppliers and vendors; provided nothing herein constitutes a stipulation as to any liens or a waiver of the Debtors' right to challenge or dispute the perfection, amount or other aspects of any asserted liens or ownership rights upon the Debtors' property related to any such consignment arrangements. The Operating Debtor currently has on hand approximately $20 million in consignment inventory (the "**Consignment Inventory**").

**Events Leading To Chapter 11 Filing**

21. The Operating Debtor's sales have been in steady decline since 2008. For fiscal year ending (FYE) 2008, the Operating Debtor's annual sales were $305,000,000. For FYE 2014, the annual sales were $230,000,000. The Operating Debtor projects a further decline in annual sales for FYE 2015 with a forecasted amount of $216,000,000.

22. Some of the factors for the declining sales include the "Great Recession" that started in 2008 and general industry trends in both the music industry and book industry that have resulted in fewer consumer purchases at the retail store level. The declining sales have deprived the Operating Debtor of the liquidity necessary for capital and infrastructure improvements in the retail stores. As a result, the Operating Debtor has struggled in meeting staffing needs for some of the *Family Christian* stores or making certain improvements necessary to update the appearance and appeal of the stores.

**Stalking Horse Sale Agreement**

23. As a result of the factors described above, in late 2014, the Operating Debtor and its management team began evaluating a number of options to respond to their operational and liquidity issues. To this end, the Operating Debtor engaged multiple professionals to evaluate the Debtors' business and to propose potential strategies, including but not limited to, the raising of additional capital, a sale of some or all assets, or a restructuring transaction.

24. One of the professionals engaged to serve as a financial advisor to the Operating Debtor was Gary Murphey of Resurgence Financial Services, Ltd. ("**Resurgence Financial**"). Among other activities performed in connection with its engagement, Resurgence Financial evaluated the Operating Debtor's retail business and financial performance to determine if there were alternative business models that could lead to improved financial strength. Resurgence Financial modeled store closings and infrastructure changes to determine if there was a better path to profitability. Their ultimate conclusion was that there was not a better model. The primary issue, per their assessment, was not closing "unprofitable stores" or making additional infrastructure cuts, but rather, reducing the size of the debt load burdening the company.

22474186 v13

25. Additionally, the Operating Debtor retained Fair Value Advisors ("**Fair Value Advisors**") to take a comprehensive look at the company's financial situation and determine its fair market value.

26. Notwithstanding these industry and financial challenges, the Operating Debtor strongly believes there is a viable place for the *Family Christian* brand and its mission in today's marketplace. In consultation with its advisors, the Operating Debtor decided upon a Chapter 11 bankruptcy and sales process to effect a balance sheet restructuring that would provide the business with the best chance for greater success and prosperity.

27. Lacking any other firm offers for the business assets, the Debtors engaged in good faith negotiations with FCRC, which resulted in a firm bid for the purchase of the Debtors' business on a going concern basis through a sale conducted under Section 363 of the Bankruptcy Code.

28. The bid is memorialized by an Asset Purchase Agreement with FCS Acquisition Holdings, LLC, a newly-formed subsidiary of FCRC, for the sale and purchase of substantially all of the assets of the Operating Debtor, which in turn would allow *Family Christian* stores to continue operating as a non-profit, charitable organization dedicated to the sharing and promoting of the Christian message and lifestyle, and supporting charitable causes and missionary goals. The stalking horse bidder is not seeking a break-up fee or expense reimbursement in connection with its bid.

29. Consequently, after taking stock of the financial landscape, the Debtors decided it was in the best interest of the Debtors, their business operations, their employees and creditors to seek the protection of Chapter 11 in order (i) to stabilize or enhance business operations and achieve positive cash flow, (ii) to provide for an expeditious restructuring of its debt through a

Section 363 sale of its business, and (iii) to retain and preserve relationships with suppliers and customers.

30. In order to insure a fulsome marketing process that generates the maximum value for its assets, the Operating Debtor has retained Brookwood Associates, L.L.C. to assist in the marketing and sale of the company. The Operating Debtor has legitimate concerns that given the general industry trends, the company's operating losses, and its not-for-profit status, there would be very little outside interest in the company. Nevertheless, the Operating Debtor believes it is critical to examine every possible option in maximizing the value of *Family Christian* stores. As a result, the Operating Debtor has decided to hire Brookwood Associates, L.L.C. as its investment banker to coordinate the 363 sale and marketing process.

31. Accordingly, on February 11 , 2014, (the "**Petition Date**"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

## FIRST DAY MOTIONS

32. To minimize the adverse effects of the commencement of their chapter 11 cases on their business and employees, the Debtors filed several First Day Motions, including those listed below:

- Debtors' Motion For An Order Authorizing Payment of (A) Prepetition Employee Wages, Salaries and Related Items; (B) Prepetition Contributions Under Employee Benefit Plans; and (C) Prepepetition Employee Payroll Deductions (the "**Employee Wages Motion**");

- Debtors' Emergency Motion For An Order Authorizing The Use Of Cash Collateral (the "**Cash Collateral Motion**");

- Debtors' Motion For An Order Authorizing Continued Use of Their Exising Bank Accounts, Business Forms and Cash Management System (the "**Cash Management Motion**");

- Debtors' Motion For An Order Authorizing Them to Honor and Perform Certain Prepetition Customer Programs In The Ordinary Course of Business (the "**Customer Programs Motion**");

- Debtors' Motion For An Order (A) Prohibiting Utilities From Terminating Services to the Debtors, and (B) Establishing Procedures for Resolving Disputes Relating to Adequate Assurance Requests (the "**Utilities Motion**");

- Debtors' Motion For An Order Authorizing Them To (I) Maintain and Continue Their Insurance Programs, Including Workers Compensation, and (II) Honor and Pay Any Prepetition Obligations in Respect Thereof (the "**Insurance Programs Motion**");

- Debtors' Motion For An Order Authorizing Them To Pay Prepetition Sales and Use Taxes, Franchise Taxes, Business License Fees and Other Trust Fund Taxes (the "**Trust Fund Taxes Motion**")

33. I have reviewed the First Day Motions and believe the facts set forth therein are true and correct to the best of my knowledge, although in some instances I have relied upon information provided by the Operating Debtor's senior management team with respect to certain pre-petition dollar amounts listed in the First Day Motions. I believe that the relief requested in each of the First Day Motions is necessary, appropriate, and is in the best interest of the Debtors' estates, creditors, and other parties in interest.

A.  **Employee Wages Motion**

34. In the ordinary course of their businesses, the Debtors incur payroll obligations to their employees (the "**Employees**"). The Debtors' employ approximately 600 full-time Employees and 2,500 part-time Employees (a total 3,100 Employees). The Employees perform critical functions for Debtors day to day business operations. Payroll is made every second Friday.

35. Through the Employee Wages Motion, Debtors seek authority to pay certain pre-petition obligations owing with respect to the Employees but not yet been paid as of the Petition Date:

11

    (a)    wages, salaries, commissions, holiday pay and other similar forms of earned compensation, (the "**Prepetition Compensation**") which the Debtors estimate to total approximately $900,000.00 in "net" compensation as of the Petition Date;

    (b)    reimbursement of expenses incurred by employees in connection with services rendered for the benefit of the Debtors, including travel, meals, and lodging ("**Expense Reimbursements**") that are generally paid in tandem with each payroll, and the Debtors estimate the accrued, unpaid pre-petition Expense Reimbursements to total approximately $15,000.00 as of the Petition Date;

    (c)    deductions collected by Debtors from Employees' paychecks but not yet paid by the Debtors for the purposes of (i) income tax withholdings, (ii) employee contributions towards the 401(k) savings program, (iii) insurance premiums relating to certain health benefit plans and (iv) certain garnishments, child support or other employee wage deduction orders (collectively, the "**Prepetition Deductions**") which the Debtors estimate to total approximately $300,000.00 as of the Petition Date;

    (d)    monetary obligations owed by the Debtors with respect to certain employee benefit programs, including health, dental, 401(k) retirement plans, and life and disability insurance for their hourly and salaried Employees, and other similar programs (collectively, the "**Prepetition Benefits**") which the Debtors estimate to total approximately $312,000.00 as of the Petition Date;

36.    The Debtors' records indicate that the amount of Prepetition Compensation and Prepetition Benefits owing to or on account of any one particular Employee will not exceed the sum of $12,475 allowable as a priority claim under Sections 507(a)(4) and (a)(5) of the Bankruptcy Code (with the possible exception of one or two employees who may slightly exceed the priority amount).

37.    The Debtors also utilize temporary staffing agencies and approximately 55-60 temporary workers (the "**Temporary Workers**") to staff and operate a large distribution center that is vitally important to their operations and the supply of their stores. Accordingly, the Debtors also seek Court permission to pay an estimated $31,356.00 in pre-petition payments that may be owed in connection with the labor and services provided by the Temporary Workers at

12

the distribution center (the "**Temporary Worker Payments**"). Of that sum, the average amount allocable to each Temporary Worker is less than $500 per person.

38. The Debtors request the Court to authorize the payments described in the Employee Wages Motion. Granting such relief will help ensure the uninterrupted delivery of the Employees' services to the Debtors as well as help create normality and aid in the Debtors maintaining a "business as usual" atmosphere. Otherwise, the Debtors face the risk that their operations and customers relations may be jeopardized through reduced employee morale and possible attrition.

B. <u>**Cash Collateral Motion**</u>

39. Through the Cash Collateral Motion, the Debtors seek Court approval to use cash in which the Secured Lenders (as defined in such motion) may assert a lien (the "**Cash Collateral**"). Such cash collateral consists primarily of a small amount of cash on hand plus the normal income received from the Debtors' customers and through the collection of the Debtors' accounts receivable.

40. The Debtors have an immediate need for the use of Cash Collateral and will suffer irreparable harm if they are not allowed urgently to use Cash Collateral for, among other things, continuing their regular business operations in an orderly manner; maintaining business relationships with vendors, suppliers, and customers, providing for the payment of employees, and satisfying other working capital and operational needs--all of which are vital to preserving and maintaining the Debtors' going-concern value and, ultimately, effectuating a successful reorganization for the benefit of all creditors and parties in interest.

41. The Debtors intend to use cash collateral consistent with a proposed budget (the "<u>Budget</u>") attached to the Cash Collateral Motion. Such Budget covers the expenses necessary

to meet the normal operations of the Debtors' businesses and to properly administer the Debtors' bankruptcy estates while in the protections of chapter 11.

42. As may be set forth in more detail in the Cash Collateral Motion, I believe the Secured Lenders will not be prejudiced by the Debtors' use of Cash Collateral, but will be adequately protected. Utilizing cash collateral will help to maintain the Debtors' business operations, to continually replenish its accounts receivable and inventory stocks, and thereby preserve and enhance the value of the Secured Lender's collateral. In a forced shutdown or liquidation of the Debtors' business, the value of collateral would decline dramatically.

C. **Cash Management Motion**

43. As noted in the Cash Management Motion, the Operating Debtor utilizes in the ordinary course of business a centralized cash management system (the "**Cash Management System**") commonly used by comparably sized companies to collect, transfer, concentrate and disburse funds as needed throughout the Debtors' operations.

44. In the Cash Management Motion, Debtors ask the Court (a) to authorize the Debtors to maintain their existing bank accounts, checks and business forms without being required to close such accounts and forms and re-open new ones, (b) to authorize the Debtors to continue using its centralized cash management system, and (c) to authorize the Debtors' banks to accept and rely upon Debtors' notices and instructions as to which pre-petition checks can be honored pursuant to any order(s) entered by this Court and which checks must be dis-honored.

45. The Operating Debtor's Cash Management System, or a similar variation of it, has been employed for some time and constitutes an essential business practice. It allows the Debtors to control and monitor corporate funds, to ensure cash availability and to reduce administrative expenses by facilitating the movement of funds. The forced closure and

22474186 v13

reopening of such accounts and systems would be very costly to the Debtors, significantly disruptive to their operations, and potentially damaging to their business relations with customers, vendors and employees.

D. **Customer Programs Motion**.

46. The Operating Debtor has historically implemented and maintained certain customer programs ("**Customer Programs**") described more fully in the Customer Programs Motion and briefly summarized below:

- Rewards Program: The Operating Debtor's *1:27 Rewards* and *Catalyst* programs (the "**Rewards Program**") enable customers to receive certain credits based upon the dollar amounts spent by customers. The Debtors anticipate the amount of rewards dollars earned for pre-petition purchases but not yet redeemed as of the Petition Date is expected to aggregate approximately $15,000.

- Gift Cards. Pursuant to a card services agreement with CardFact, Ltd., the Operating Debtor sells gift cards to customers that are redeemable in exchange for the Debtors' merchandise. The Debtor's best estimate of the amount of Gift Cards purchased pre-petition but not yet redeemed as of the Petition Date is approximately $350,000.

- PreSells. Customers are sometimes afforded opportunities to pay in advance for merchandise before such items are generally available for release to the public ("**PreSells**"), such as movie DVDs, books, CDs or concert tickets. The Debtors' estimate that, as of the Petition Date, they have received approximately $7,500 in PreSells from customers who have not yet obtained or retrieved their merchandise.

- Customer Donations. At the time of purchase of certain merchandise, the Operating Debtor allows customers the option of donating extra funds to be delivered specifically to one or more of the *Family Christian Ministries* programs or ministry partners described herein. Usually, such donations are in small amounts, but represent an important component of building loyalty and trust with customers.

- Return Program. Like many retail stores, the Debtors have a policy allowing customers to return certain merchandise purchased online or at store locations (the "**Return Policy**"). Generally, a customer may receive a full refund on merchandise returned within 90 days of purchase. Sometimes customers may receive a store credit for items returned more than 90 days after purchase.

15

- Credit/Debit Card Processing Fees. The Operating Debtor is party to one or more processing agreements (the "**Processing Agreements**") with merchants that issue credit and debit cards and allow customers to buy merchandise from the Debtors using their personal credit and debit cards. The Debtors estimate that as of the Petition Date, the sum of approximately $37,000 will be owed under the Processing Agreements. Because credit and debit card sales account for approximately 80% of the Debtors' total sales, it is critical that no disruption occur in these payments.

47. The Debtors seek Court authorization to maintain and continue the Customer Programs, and to honor, in their sole discretion, any pre-petition obligations arising thereunder. Doing so will help the Operating Debtor maintain a "business as usual" atmosphere with customers and avoid any disruption to its sales and general revenue stream of the Debtors.

E. **Utilities Motion**

48. Because there are 266 *Family Christian* stores in 36 states, the Debtors have relationships with over 200 utility companies (collectively, the "Utility Companies") for the provision of telephone, electric, gas, water, sewer, waste management, and similar utility services. Any interruption of utility service would severely disrupt and diminish the Debtors' chance for a successful reorganization. Accordingly, the Debtors request the Court enter an order (a) prohibiting the Utility Companies from altering or discontinuing utility services based upon the chapter 11 filing, and (b) establishing procedures as described in the Utilities Motion for determining requests for assurance of payment.

F. **Insurance Programs Motion**

49. The Debtors maintain various liability, property, and other insurance programs (collectively the "**Insurance Programs**"), as summarized in Exhibit "A" to the Insurance Programs Motion. To the best of the Debtor's information and belief, they are current for the premiums owed with respect to insurance policies for Executive Risk, Property/Cargo, and Casualty, although four monthly payments of $3,093.00 each relating to auto coverage, and four

additional monthly payments of $13,306.50 each relating to general liability coverage, will come due post-petition in the normal course for the months of February 2015 - May 2015.

50.  Workers Compensation Insurance.  Additionally, the Debtors maintain insurance programs relating to workers' compensation programs, under which the Debtors are generally obligated to reimburse the insurer for claims up to a certain dollar amount.  The insurance policy with Liberty Mutual covers workers compensation claims after September 2014, and the premiums for such policy is current, but Debtors estimate having obligations (i) for four monthly payments of $18,857 each for insurance premiums that will come due post-petition for the current policy with Liberty Insurance, and (ii) approximately $15,000.00 in estimated payments that will be owed to Liberty Mutual under the terms of the insurance coverage in connection with pre-petition workers compensation claims.  The Debtors' payment obligations to Liberty Mutual are secured by a letter of credit in the amount of $350,000.00.

51.  Similarly, workers compensation claims prior to September 2014 are covered by an insurance policy with CNA insurance.  No premiums are owed with respect to such policy, but the Debtors estimate owing reimbursement obligations that will come due post-petition and relate to pre-petition claims in an amount aggregating approximately $182,000.00.  Such payment obligations to the insurer are secured by a letter of credit in the amount of $1,128,273.

52.  In approximately five (5) states, the Debtors are required by state law to participate in "monopolistic" workers' compensation insurance programs (the "**State Funded Programs**"), which are administered by state agencies.  The Debtors pay certain premiums to the appropriate state agency and estimate that approximately $56,000 in monthly expenses will come due post-petition that relate to pre-petition workers compensation claims.

53. The Debtors ask that the Court enter an order authorizing them to maintain their Insurance Programs and to pay all prepetition obligations (if any such amounts are due) necessary to maintain insurance coverage in its current effect. Such Insurance Programs are essential to the preservation of the Debtors' businesses, properties, and assets, and, in many cases, coverage is required by various laws and contracts that govern the Debtors' business.

   G.  **Trust Fund Taxes Motion**

54. The Debtors collect certain sales and use taxes, income withholding taxes, franchise taxes, and other possible trust fund taxes (collectively, the "**Trust Fund Taxes**") from their customers or employees and ultimately remit them to the appropriate taxing authorities. As of the Petition Date, the Debtors estimate that the collected but unpaid prepetition Trust Fund Taxes aggregate approximately $1,100,000.00 for sales / use taxes, an additional $115,000.00 in franchise taxes, and approximately $200,000.00 for withholding taxes.

55. Also, the Debtors customarily incur certain business license charges required by law or local ordinance to operate their businesses ("**License Fees**"). The Debtors believe they are current on their License Fees with no pre-petition amounts owing. However, License Fees are due throughout the year, and the monthly amount paid for License Fees in February 2014 was approximately $42,000.00. To the extent any unpaid pre-petition License Fees are discovered to exist, the Debtors request authority to pay such amounts and expect any such amounts to be small or *de minimus*.

56. The Debtors request Court approval to pay any pre-petition License Fees and Trust Fund Taxes that may be owing in order to avoid the disruption to their chapter 11 cases, which would result from the nonpayment of such items, including the distractions that could result from liability for nonpayment imposed upon the Debtors' officers and directors.

**Conclusion**

57. I believe the relief sought in the First Day Motions is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy, to avoid irreparable harm to their businesses and estates, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

58. Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in their entirety, together with such further relief as the Court deems just and proper.

22474186 v13

Dated:  February 11, 2015

                                /s/Chuck Bengochea
CHUCK BENGOCHEA
President and Chief Executive Officer
Family Christian, LLC
Family Christian Holding, LLC