UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re: | CHAPTER 11 |
| **FAMILY CHRISTIAN, LLC** *et al.* [1] | CASE NO. 15-00643-jtg<br>(Joint Administration Proposed) |
| **Debtors.** / | HON. JOHN T. GREGG |

### DEBTORS' EMERGENCY MOTION FOR AN ORDER
### AUTHORIZING THE USE OF CASH COLLATERAL

COME NOW the above-captioned debtors (the "**Debtors**"), pursuant to 11 U.S.C. §§ 105, 361, and 363 and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure, and hereby move the Court for the entry of an order authorizing the Debtors' use of cash collateral. In further support of this Motion, the Debtors incorporate the *Declaration of Chuck Bengochea In Support Of Chapter 11 Petition And First Day Motions*, (the "**Bengochea Declaration**") filed contemporaneously herewith, and the Debtor respectfully states as follows:

### Jurisdiction and Background

1. On February 11, 2015 (the "**Petition Date**"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330, *et seq.* (the "**Bankruptcy Code**").

2. The Debtors are continuing in possession of their property and operating and managing their businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[1] The Debtors are: Family Christian, LLC(Case No. 15-00643-jtg), Family Christian Holding, LLC (Case No. 15-00642-swd), and FCS Giftco, LLC (Case No. 15-00644-swd).

22471929 v6

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this case is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested herein are §§ 361 and 363 of the Bankruptcy Code and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure.

5.      The factual background relating to the Debtors' business and the commencement of these chapter 11 cases is set forth in detail in the Bengochea Declaration.

6.      Family Christian Holding, LLC (the "**Holding Company**") is the sole owner and member of Family Christian, LLC (the "**Operating Debtor**"), which operates and runs *Family Christian*® stores, one of the largest retail sellers of Christian books, music, DVDs, church supplies, and other faith based merchandise.  The company has approximately 3,100 employees and 266 stores in 36 states operating under the name.  Sales are also generated through direct mail catalogs and internet purchases (https://familychristian.com).  In 2014, the Operating Debtor had gross sales approximating $216 million.  The Debtors' headquarters are located in Grand Rapids, Michigan, as too are the roots and origins of the Debtors' business which date back to the 1930's when the "*Zondervan*" stores were first founded in Grand Rapids.

7.      The Debtors operate as non-profit companies.  As a result, any available and legally disposable profits of the Debtors and their collected donations go to supporting "Family Christian Ministries," a non-profit, charitable organization dedicated to sharing and promoting the Christian message and lifestyle, and supporting charitable causes and missionary goals.  A non-exhaustive sampling of such past and present activities include (with the majority of these activities occurring prior to current ownership's acquisition in 2012):

22471929 v6

2

- <u>Bible donations</u>.  To date the company has donated over 120,000 bibles to military members and their families, and over 800,000 bibles to children and students in Latin America and Africa.

- <u>Orphanage / Widow Support</u>.  Since 2003, the company and its employees have raised and donated over $10 million dollars and needed supplies to organizations and ministries that care for orphans and widows or facilitate adoptions in countries across the globe, including China, Haiti, Mexico and the Dominican Republic.  They have likewise raised funds to support ministries aimed at rescuing persons enslaved in the sex trafficking industry.

- <u>Missions</u>.  The company has sent over 1,300 employees on mission trips across the USA and other countries, sharing the Christian faith and distributing needed supplies and goods to many persons, such as building 108 homes for widows and restoring 32 more, while also supplying fuel efficient stoves and water purifiers.

- <u>Giving</u>.  In addition to the funds and gifts noted above, the company has given several hundred thousand "shoe box" gifts and gospel tracks to needy families in their annual "Operation Christmas Child."  After Hurricane Alex in 2010, the Debtors' supported ministries and relief efforts to aid squatters' communities in Monterrey, Mexico.  Since 2003, Family Christian Ministries and its ministry partners or predecessor company have impacted over 4.5 million lives.

**<u>The Debtor's Pre-Petition Secured Financing</u>[2]**

8.    The Operating Debtor, as borrower, is indebted to FC Special Funding, LLC, as assignee of JP Morgan Chase Bank, N.A., individually and in its role as agent (the "**Senior Lender**") under a **"Credit Agreement"** dated November 14, 2012 (the "**Revolver**") that provides a revolving line of credit up to a maximum of $40 million, which loan provides working capital for the Operating Debtor's business operations.  Upon information and belief, the Revolver is secured by a security interest and lien upon substantially all of the Operating Debtor's assets, including without limitation, its accounts receivable, inventory, and cash collateral; provided nothing herein constitutes a stipulation as to any liens or a waiver of the

---

[2] The Credit Agreement, the Term Loan Credit Agreement, the Intercreditor Agreement, and the other agreements, documents, and instruments executed in connection with the Revolver and Term Loan are collectively referred to as the "**Loan Documents.**"  The Debtors will provide copies of the Loan Documents upon request to any party receiving notice of the Motion.

Debtors' right to challenge or dispute the perfection, amount or other aspects of any asserted liens upon the Debtors' property.

9. Additionally, the Operating Debtor, as borrower, is indebted to Credit Suisse AG, Cayman Island Branch, individually and in its role as agent for Credit Suisse Loan Funding, LLC, Medley Capital Corporation, Congruent Credit Opportunities Fund II, LP, and Main Street Mezzanine Fund, LP (the "**Junior Lenders**" and together with the Senior Lender, the "**Secured Lenders**") under a "**Term Loan Credit Agreement**" dated November 14, 2012 (the "**Term Loan**") for the loan amount of $38 million, which loan provided part of the acquisition financing for the 2012 acquisition. Upon information and belief, the Term Loan is secured by a security interest and lien upon substantially all of the Operating Debtor's assets; provided nothing herein constitutes a stipulation as to any liens or a waiver of the Debtors' right to challenge or dispute the perfection, amount or other aspects of any asserted liens upon the Debtors' property.

10. The Secured Lenders are parties to an "**Intercreditor Agreement**" dated November 14, 2012 pursuant to which, among other things, the Secured Lender's acknowledged and agreed that (a) the Senior Lender would hold a senior security interest and lien in and to the Operating Debtor's accounts receivable, inventory, cash, deposit accounts, securities accounts, prepaid expenses, instruments, documents, chattel paper and supporting obligations, all books and records related to the foregoing, and all proceeds of the foregoing (collectively, the "**Senior Lender Prepetition Collateral**") and the Junior Lenders would hold a junior security interest and lien in and to the Senior Lender Prepetition Collateral; and (b) the Junior Lenders would hold a senior security interest and lien in and to the Operating Debtor's copyrights, domain names, patents, trademarks and licenses, equipment, fixtures, general intangibles, goods, pledged collateral, letter-of-credit rights, and commercial tort claims (the "**Junior Lender Prepetition**

Collateral") and the Senior Lender would hold a junior security interest and lien in and to the Junior Prepetition Collateral (the Senior Lender Prepetition Collateral and the Junior Prepetition Lender Collateral are sometimes collectively referred to as the "**Collateral**").

11. As of the Petition Date, the amount owed under the Revolver is approximately $23 million, while the principal amount owed under the Term Loan is approximately $34 million.

12. The funds used by the Debtors to operate their business, including cash on hand, collections from accounts receivable and the sale of inventory, and other revenues derived from the Collateral may constitute "**Cash Collateral**" within the meaning of Sections 363(a) and 363(c)(2) of the Bankruptcy Code.

13. The Debtors need to use Cash Collateral to meet the ordinary operating expenses of their business. Without such funds, the Debtors will not be able to pay wages, taxes and operating expenses or purchase the supplies and inventory needed for the routine maintenance of the Property. Allowing the Debtors' use of Cash Collateral will also minimize the disruption of the Debtor as a "going concern" and will increase the possibility for a successful reorganization. Thus, the use of Cash Collateral is necessary to avoid irreparable harm to the Debtor. Attached hereto as Exhibit "A" is a copy of Debtors' budget of projected income and disbursements (the "**Budget**").

## RELIEF REQUESTED

14. The Debtors seek authorization to use Cash Collateral on an interim basis in accordance with the Budget for the purpose of operating their businesses and meeting the general and administrative expenses as set forth in the Budget pending a final hearing on this Motion. A proposed "Interim Order Authorizing Use of Cash Collateral" (the "**Proposed Order**") is

attached hereto as Exhibit "B". At the final hearing on this Motion, the Debtors will be seeking use of Cash Collateral on a final basis through the completion of its requested Section 363 sale process, which is anticipated to close by the end of April.

15. The Debtors have immediate need for the use of Cash Collateral in light of the irreparable harm that will be suffered by the Debtors' estates if they do not have access to the cash necessary to sustain their businesses as a going concern. The Debtors urgently need to use Cash Collateral for, among other things, continuing the operation of the company in an orderly manner, maintaining business relationships with vendors, suppliers, and customers, providing for the payment of employees, and satisfying other working capital and operational needs--all of which are vital to preserving and maintaining the Debtors' going-concern value and, ultimately, effectuating a successful reorganization for the benefit of all creditors and parties in interest.

16. The proposal for interim use of Cash Collateral is intended to provide sufficient working capital while the Debtors operate in chapter 11. The Debtors' use of Cash Collateral will be governed by the proposed Budget and will be used mainly to preserve and maintain the value of the Debtors' assets for the benefit of their estates and creditors.

17. Immediate access to Cash Collateral will enable the Debtors to demonstrate to their vendors, suppliers, customers and employees that they have sufficient capital to ensure ongoing operations.

**BASIS FOR RELIEF REQUESTED**

18. Bankruptcy Code Section 363(c)(2) provides that a debtor in possession may not use Cash Collateral unless an entity that has an interest in such Cash Collateral consents or the Court approves the use. Section 363(o) provides that at a hearing on the use of Cash Collateral, the entity asserting an interest in the Cash Collateral has the burden of proof on the issue of the

validity, priority, or extent of such interest, and the debtor in possession has the burden of proof on the issue of adequate protection. Rule 4001(b)(2) provides that the Court may not hold a final hearing on a motion to use Cash Collateral earlier than 14 days after service of the motion, but may authorize the use of Cash Collateral prior to a final hearing as necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

**Adequate Protection, Generally**

19. In order to provide adequate protection to Secured Lenders for the Debtors' use of Cash Collateral, the Debtors propose the following adequate protection package: (a) granting the Secured Lenders with replacement liens on the Operating Debtor's post-petition assets of the same type, nature, validity, priority, extent, and amount that may secure the Secured Lenders' pre-petition claims against the Debtors; and (b) granting the Senior Prepetition Lender an administrative expense claim under Section 507(b) of the Bankruptcy Code for the diminution in value, if any, resulting from the Debtors' use of the Senior Lender's Prepetition Collateral.[3] No liens will be granted on any avoidance actions of the Debtors or any other causes of action arising under Chapter 5 of the Bankruptcy Code.

---

[3] The Debtors assert the Junior Lenders are wholly unsecured with respect to any interest in the Cash Collateral (and any other Senior Prepetition Collateral) so are not entitled to any award of adequate protection with respect to their junior security interests and liens in the Senior Lender Prepetition Collateral. *See In re Levitt and Sons, LLC*, 384 B.R. 630, 642 (Bankr. S.D. Fla. 2008)([T]he Court finds as a matter of law that the junior lien holders are not entitled to adequate protection because they would receive nothing under non-bankruptcy law."); *see also In re Malamatos*, 2010 WL 3724202, *4 (Bankr. S.D. Cal. 2010)("Having determined that [Junior] Lender is wholly unsecured, [Junior] Lender has no secured claim entitled to adequate protection. [Junior] Lender's right to adequate protection is limited to the amount of the secured claim. Since Lender has no secured claim, it is not entitled to adequate protection . . ." (internal citations omitted). Moreover, pursuant to the Intercreditor Agreement, the Term Lenders have agreed they shall not seek or accept any adequate protection with respect to the Senior Lender Prepetition Collateral, which includes Cash Collateral. Nevertheless, for purposes of the requested interim relief, the Debtors propose granting the Junior Lenders a replacement lien in the Operating Debtor's post-petition assets of "the same type, nature, validity, priority, extent, and amount" that may have secured the Junior Lenders' prepetition claims against the Debtors; provided that, nothing herein is a waiver of the Debtors' right to challenge or dispute the perfection, amount, or other aspects of any asserted liens upon the Debtors' property.

20. What constitutes adequate protection must be evaluated on a case-by-case basis. *In re Swedeland Dev. Group Inc.,* 16 F.3d 552, 564 (3rd Cir. 1994) *citing In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. l987).

21. The focus of adequate protection is to protect the secured creditor from any decline in value of its collateral during the bankruptcy period. *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich.1988).

22. The Bankruptcy Code expressly provides that replacement liens and periodic cash payments constitute a means of adequate protection. 11 U.S.C. § 361; *In re Club Associates*, 107 B.R. 385, 394 n.13 (Bankr. N.D. Ga 1989)("In some instances, a creditor can be adequately protected by means other than payments to the secured creditor. For example, a creditor may be offered a replacement lien in other unencumbered property.").

23. Moreover, courts have found that the use of Cash Collateral to preserve and maintain a debtor's business, and hence preserve the value of the creditor's collateral, also provides a form of adequate protection to a secured creditor. *See In re Constable Plaza Associates*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991)("debtor's plowing back rents solely for the purpose of maintaining and operating its office building will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage.").

24. Accordingly, the Debtors have reached an agreement with the Secured Lenders, with respect to the use of Cash Collateral on an interim basis. That agreement is reflected in the attached proposed interim order (the "**Interim Order**") and Budget. Through this Motion, the Debtors intend to provide adequate protection, to the extent of the aggregate diminution in value of Cash Collateral and other Collateral from and after the Petition Date, to Secured Lenders by:

(a) subject to the "**Carveout**" (as defined in the Interim Order) the granting of post-petition replacement liens on all of the Operating Debtor's assets of the same type, nature, validity, priority, extent, and amount that may secure the Secured Lenders' pre-petition claims against the Debtors[4];

(b) maintaining the going concern value of the Collateral by using the Cash Collateral pursuant to the proposed Budget in order to continue operating the business and administering these chapter 11 cases; and

(c) granting an administrative expense claim under Section 507(b) to the Senior Lender to the extent of any diminution in value of the Senior Lender's collateral resulting from the Debtors' use of such collateral.

25. Nothing contained herein is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim or security interest; or (c) an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code.

26. In light of the fact that the use of Cash Collateral is essential to the Debtors' reorganization and that the Secured Lenders will be adequately protected, this Court should authorize the use of Cash Collateral in accordance with the proposed Budget.

## NOTICE

27. In accordance with Rule 4001(b)(1), notice of this Motion has been provided to (a) the United States Trustee's office, (b) the Senior Lender, (c) the Junior Lenders, (d) the Debtor's 20 largest unsecured creditors, and (e) any parties that have filed notices of appearance or request for notice.

---

[4] *See* n. 3, supra.

WHEREFORE, the Debtors respectfully pray that the Court (a) schedule an interim and final hearing on this Motion on an expedited basis, (b) authorize the Debtors to use Cash Collateral on an interim basis by entering an order granting substantially the same relief contained in the proposed order attached hereto, and (c) grant the Debtors such other and further relief as the Court deems just and proper.

Dated:  February 11, 2015

    Respectfully submitted,

    KELLER & ALMASSIAN, PLC

    /s/  A. Todd Almassian
    A. Todd Almassian (P55467)
    Greg J. Ekdahl (P67768)
    230 East Fulton Street
    Grand Rapids, MI 49503
    (616) 364-2100
    ecf@kalawgr.com

    - and -

    BURR & FORMAN LLP
    Erich Durlacher (Ga Bar No. 235563)
    Brad Baldwin (Ga Bar No. 034220)
    Bryan Glover (Ga. Bar No. 993070)
    *Pro hac applications pending*
    171 17th Street, N.W. - Suite 1100
    Atlanta, Georgia  30363
    Telephone:  (404) 815-3000
    Facsimile:   (404) 817-3244
    *Proposed Attorneys To The Debtors and Debtors-in-Possession*