## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

---

In re:                                          **CHAPTER 11**

**FAMILY CHRISTIAN, LLC** *et al.* [1]              **CASE NO. 15-00643**
                                                **(Joint Administration Proposed)**
                                  **Debtors.**

_____/                **HON. JUDGE JOHN T. GREGG**

---

**DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING PROCEDURES
FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES (B) APPROVING THE ESTABLISHMENT
OF CURE AMOUNTS, AND (C) SCHEDULING A FINAL SALE HEARING AND
APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND**

**(II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS AND (B)
AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors (the "Debtors"), hereby file this motion (the "Motion")

pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101, et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9006 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), requesting (I) an order (a) approving

procedures (the "Sale Procedures") for the sale of substantially all of the assets of the Debtors'

assets, the assumption and assignment of certain executory contracts and unexpired leases and

related relief, (b) approving the establishment of cure amounts with respect thereto, and (c)

scheduling a final hearing date for the approval of the sale (the "Sale Hearing") and approving

the form and manner of notice thereof, and (II) an order (a) authorizing the sale of substantially

all of the Debtors' assets free and clear of liens, claims, interests and encumbrances pursuant to

Section 363(f) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain

---

[1]  The Debtors are: Family Christian, LLC;  Family Christian Holding, LLC; and FCS Giftco, LLC.

executor contracts and leases, and (c) granting related relief to all of the foregoing.  In support of this Motion, the Debtors respectfully state as follows:

## BACKGROUND

### A.    The Chapter 11 Filing

1.    On February 11, 2015 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330, *et seq.* (the "Bankruptcy Code").  The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.    As of the date hereof, a creditors' committee (the "Committee") has not been appointed yet in these chapter 11 cases (the "Chapter 11 Cases") by the United States Trustee.  No trustee or examiner has been appointed in these Chapter 11 Cases.

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006.

### B.    Background and Business Operations

5.    The factual background relating to the Debtors' business and the commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Chuck Bengochea In Support Of Chapter 11 Petition And First Day Motions* (the "Bengochea Declaration") filed contemporaneously herewith.

6.      The Debtors operate a non-profit business.   Family Christian, LLC, a Georgia company (sometimes called the "Operating Debtor") conducts most all business operation through a chain of retail stores known as *Family Christian*® stores, and it is wholly owned by Family Christian Holding, LLC (sometimes called the "Holding Company").   The Holding Company does not conduct any business operations, and its primary asset is the ownership of all the membership interests of the Operating Debtor.  The Holding Company is owned 100% by a separate, non-debtor company known as Family Christian Resource Centers, Inc. a/k/a "*Family Christian Ministries*," ("FCRC"), a 501(c)(3) tax exempt, non-profit Georgia corporation that is the ultimate parent company that serves as the organization for coordinating and supporting the charitable causes and ministries supported through any profits of the Debtors and their collection of donations that are described herein.

7.      *Family Christian* stores is one of the largest retail sellers of Christian books, music, DVDs, church supplies, and other merchandise related to the Christian faith.   The company has approximately 3,100 employees and 266 stores in 36 states operating under the name.   Sales are also generated through direct mail catalogs and internet purchases (https://familychristian.com). In 2014, the Operating Debtor had gross sales approximating $216 million.

8.      The Debtors operate as non-profit companies.   As a result, any available and legally disposable profits of the Debtors and their collected donations go to supporting "Family Christian Ministries," a non-profit, charitable organization dedicated to sharing and promoting the Christian message and lifestyle, and supporting charitable causes and missionary goals. Based upon the lack of profits, however, for reasons explained below, since 2012, the Debtors have only paid an approximate amount of $300,000 to FCRC for charitable donations to its

missionally-aligned causes (exclusive of any third-party donations collected in the retail stores).

A non-exhaustive sampling of such past and present activities include (with the majority of these

activities occurring prior to the 2012 acquisition described below):

- <u>Bible donations</u>.   To date the company has donated over 120,000 bibles to military members and their families, and over half a million bibles to children and students in Latin America and Africa.

- <u>Orphanage / Widow Support</u>.   Since 2003, the company and its employees have raised and donated several hundred thousand dollars and needed supplies to organizations and ministries that care for orphans and widows or facilitate adoptions in countries across the globe, including China, Haiti, Mexico and the Dominican Republic.   They have likewise raised funds to support ministries aimed at rescuing persons enslaved in the sex trafficking industry.

- <u>Missions</u>.   The company and its employees have supported and travelled on more than 48 mission trips across the USA and other countries, sharing the Christian faith and distributing needed supplies and goods to many persons, such as building 16 homes for widows in other countries, restoring 32 more widow's homes, and supplying fuel efficient stoves and water purifiers.

- <u>Giving</u>.   In addition to the funds and gifts noted above, the company has given several hundred thousand "shoe box" gifts and gospel tracks to needy families in their annual "Operation Christmas Child."   After Hurricane Alex in 2010, the Debtors' supported ministries and relief efforts to aid squatters' communities in Monterrey, Mexico.   Since 2003, Family Christian Ministries and its ministry partners or predecessor company have impacted over 4.5 million lives.

9.      The Debtors' headquarters and primary management offices are located at 5300

Patterson Avenue SE, Grand Rapids, Michigan, 49530.   The Debtors lease all of their retail store

locations.

10.     The Debtors' origins dated back to 1931 when the "*Zondervan*" stores were first

established, and that store chain grew over time and began operating its stores under the name

"Family Bookstores."   The business was sold and acquired more than one time and changed its

name to Family Christian stores in the 1990s.

11.     In 2012, *Family Christian Stores* was purchased by its current ownership and has

operated since early 2013 as a non-profit organization through which, as explained above, 100%

of any available and legally disposable profits and donations raised by the Debtors are paid over to FCRC for charitable donations to missionally-aligned causes. To facilitate the 2012 acquisition, Family Christian, LLC and Family Christian Holding, LLC were formed, both being organized under the laws of the State of Georgia.

**C.    Prepetition Debt and Capital Structure**

12.    To facilitate the acquisition of the business in 2012 and provide for general working capital, the Operating Debtor obtained two loans, both of which were guaranteed by the Holding Company. Pursuant to such loans, the Operating Debtor, as borrower, is indebted to FC Special Funding, LLC, as assignee of JP Morgan Chase Bank, N.A., individually and in its role as agent (the "Senior Lender") under a "Credit Agreement" dated November 14, 2012 (the "Revolver") that provides a revolving line of credit up to a maximum of $40 million, which loan provides working capital for the Operating Debtor's business operations. Upon information and belief, the Revolver is secured by a security interest and lien upon substantially all of the Operating Debtor's assets, including without limitation, its accounts receivable, inventory, and cash collateral; provided nothing herein constitutes a stipulation as to any liens or a waiver of the Debtors' right to challenge or dispute the perfection, amount or other aspects of any asserted liens upon the Debtors' property.

13.    Additionally, the Operating Debtor, as borrower, is indebted to Credit Suisse AG, Cayman Island Branch, individually and in its role as agent for Credit Suisse Loan Funding, LLC, Medley Capital Corporation, Congruent Credit Opportunities Fund II, LP, and Main Street Mezzanine Fund, LP (the "Junior Lenders" and together with the Senior Lender, the "Secured Lenders") under a "Term Loan Credit Agreement" dated November 14, 2012 (the "Term Loan") for the loan amount of $38 million, which loan provided part of the acquisition financing for the 2012 acquisition. Upon information and belief, the Term Loan is secured by a security interest

and lien upon substantially all of the Operating Debtor's assets; provided nothing herein constitutes a stipulation as to any liens or a waiver of the Debtors' right to challenge or dispute the perfection, amount or other aspects of any asserted liens upon the Debtors' property.

14.     As of the Petition Date, the amount owed under the Revolver is approximately $23 million, while the amount owed under the Term Loan is approximately $34 million.

15.     In the ordinary course of the Operating Debtor's business it is often necessary and appropriate to order, purchase and take delivery of supplies, inventory and other goods on credit from various suppliers and vendors.  The Operating Debtor currently owes approximately $40 million in outstanding debt to its trade suppliers and vendors (the "Trade Debt").

16.     In addition to the Trade Debt, the Operating Debtor's business takes delivery of supplies, inventory and other goods on "consignment" from various suppliers and vendors; provided nothing herein constitutes a stipulation as to any liens or a waiver of the Debtors' right to challenge or dispute the perfection, amount or other aspects of any asserted liens or ownership rights upon the Debtors' property related to any such consignment arrangements.  The Operating Debtor currently has on hand approximately $20 million in consignment inventory.

**D.     Events Leading to a Chapter 11 Filing and Negotiation of Sale Agreement**

17.     The Operating Debtor's sales have been in steady decline since 2008.  For fiscal year ending (FYE) 2008, the Operating Debtor's annual sales were $305,000,000.  For FYE 2014, the annual sales were $230,000,000.  The Operating Debtor projects a further decline in annual sales for FYE 2015 with a forecasted amount of $216,000,000.

18.     Some of the factors for the declining sales include the "Great Recession" that started in 2008 and general industry trends in both the music industry and book industry that have resulted in fewer consumer purchases at the retail store level.  The declining sales have

deprived the Operating Debtor of the liquidity necessary for capital and infrastructure improvements in the retail stores.  As a result, the Operating Debtor has struggled in meeting staffing needs for some of the *Family Christian* stores or making certain improvements necessary to update the appearance  and appeal of the stores.

19.     As a result of the factors described above, in late 2014, the Operating Debtor and its management team began evaluating a number of options to respond to their operational and liquidity issues.  To this end, the Operating Debtor engaged multiple professionals to evaluate the Debtors' business and to propose potential strategies, including but not limited to, the raising of additional capital, a sale of some or all assets, or a restructuring transaction.

20.     One of the professionals engaged to serve as a financial advisor to the Operating Debtor was Gary Murphey of Resurgence Financial Services, Ltd. ("Resurgence Financial"). Among other activities performed in connection with its engagement, Resurgence Financial evaluated the Operating Debtor's retail business and financial performance to determine if there were alternative business models that could lead to improved financial strength.  Resurgence Financial modeled store closings and infrastructure changes to determine if there was a better path to profitability.  Their ultimate conclusion was that there was not a better model.  The primary issue, per their assessment, was not to close "unprofitable stores" or make additional infrastructure cuts, but rather to reduce the size of the debt load burdening the company.

21.     Additionally, the Operating Debtor retained Fair Value Advisors to take a comprehensive look at the company's financial situation and determine its fair market value.

22.     Notwithstanding these industry and financial challenges, the Operating Debtor strongly believes there is a viable place for the *Family Christian* brand and its mission in today's marketplace.  In consultation with its advisors, the Operating Debtor decided upon a Chapter 11

bankruptcy and sales process to effect a balance sheet restructuring that would provide the business with the best chance for greater success and prosperity.

23.    Lacking any other firm offers for the business assets, the Debtors engaged in good faith negotiations with the Buyer (defined below), which resulted in a firm bid for the purchase of the Debtors' business on a going concern basis through a sale conducted under Section 363 of the Bankruptcy Code.

24.    As described further below, the bid is memorialized by an Asset Purchase Agreement (the "Purchase Agreement") with FCS Acquisition, LLC, a newly-formed subsidiary of FCRC (the "Buyer"), for the sale and purchase of substantially all of the assets of the Operating Debtor, which in turn would allow *Family Christian* stores to continue operating as a non-profit, charitable organization dedicated to the sharing and promoting of the Christian message and lifestyle, and supporting charitable causes and missionary goals. The Buyer, as the proposed stalking horse bidder, is not seeking a break-up fee or expense reimbursement in connection with its bid.

**E.    Proposed Stalking Horse Purchase Agreement**

25.    A. copy of the Purchase Agreement is attached hereto as **Exhibit "A"**.

26.    The principal terms of the Purchase Agreement are summarized below.  To the extent there are any discrepancies between the following summary and the Purchase Agreement, the Purchase Agreement shall govern and control. For purposes of the Purchase Agreement, "Sellers" means the Operating Debtor and Family Christian Holding, LLC.

   A.    Assets to be Sold.  The "Assets" to be sold consist of substantially all of the operating assets of the Sellers, as encompassing: those certain real property leases to be scheduled and assumed, operating contracts to be scheduled and assumed, all equipment, all inventory (including "consignment" inventory in the possession of the Sellers as of the Petition Date that is transferred to the Buyer at Closing, as more particularly described in

paragraph 48 below), rights to intellectual property including licenses, prescribed employee benefit plans, certain prepaid items, cash in stores, books and records, "avoidance actions" arising under the Bankruptcy Code, and goodwill. Such Assets also include the Sellers' business relationship with iDisciple LLC. Certain assets to be retained by the Sellers as "Excluded Assets" include its tax attributes for pre-closing periods, contract rights not assumed by the Buyer, and cash in bank accounts.

B.  <u>Free and Clear</u>.   The Assets are to be sold free and clear of all liens, claims, encumbrances and interests (including "consignment" inventory in the possession of the Sellers as of the Petition Date that is transferred to Buyer at Closing, as more particularly described in paragraph 48 below).

C.  <u>Purchase Price</u>.   The aggregate consideration for the Assets is specified in the Purchase Agreement as $73,773,000, consisting of: (a) $28,000,000 in Cash; (b) the assumption by the Buyer of the Assumed Real Property Leases that the Parties estimate the present value of to be $43,773,000, and (c) the assumption of other accrued operating liabilities related to employees, gift cards and other items described in the Purchase Agreement that the Parties estimate to be $2,000,000 (the estimates in clauses (b) and (c) to be finalized by agreement of the Sellers and Buyer prior to Closing).

D.  <u>Deposit</u>.   The Buyer will advance a deposit of $1,000,000, subject to the terms of the Purchase Agreement.

E.  <u>Breakup Fee/Expense Reimbursement</u>.   None.

F.  <u>Closing</u>.  Subject to the Bankruptcy Court approval referenced below, the Purchase Agreement contemplates a closing of the sale and purchase of the Assets on or before May 4, 2015, with a targeted closing date of April 30, 2015.

G.  <u>Assumption of Liabilities</u>. The Buyer agrees to assume certain prescribed liabilities of the Operating Debtor as would exist at the closing time from the operation of the business, as encompassing: liabilities related to real property leases and assumed contracts; liabilities with respect to any gift cards issued by CardFact, Ltd. or other loyalty programs involving presells; liabilities with respect to the transferred employees; liabilities relating to accrued and unpaid  property taxes or sales taxes; certain liabilities to consignment vendors only with respect to certain of the transferred assets (as more particularly described in paragraph 48 below); and obligations with respect to donations collected on behalf of Family Christian Resource Centers, Inc.  Other than the prescribed liabilities to be assumed, the Sellers are retaining all other liabilities, including without limitation, indebtedness to lenders holding a security interest in the assets, income taxes, certain post-petition trade accounts, obligations to former employees, certain post-petition lease obligations and claims arising under Section 503(b)(9) of the Bankruptcy Code. The Purchase Agreement specifies all such liabilities, whether assumed or excluded, in greater detail.

22674786 v9

H.  Lease Designation Rights.  Although the Buyer intends to finalize the majority of its assumption or rejection decisions by the Closing, the Buyer shall have the right to designate any unexpired real property lease or executory contract for assumption or rejection for a period of time not to exceed sixty days after Closing.  The Buyer shall reimburse the Sellers for rent and real property taxes that arise and become due during the designation period and any applicable post-closing occupancy period.

I.  Release of Directors and Officers. The Purchase Agreement provides that, upon the closing as occurring subject to the Sale Order, each of the Debtors, along with any person or entity acting for, derivatively, on behalf of, or claiming through them, including any committee appointed in any of the Cases or prescribed trustee or examiner, along with their affiliates or advisors as described, unconditionally release the Debtor's directors and officers (and affiliates) from any past, present and future claims (as defined per custom, in a long-form list of possible items). The release includes a covenant that the releasing parties will not assert or otherwise participate in or maintain (by themselves or encouragement of others) in any such claim against the directors of officers with respect to the matters so released.

J.  Representations and Warranties.  The Assets will be sold "AS IS, WHERE IS," and Debtors will not make any representation or warranty as to the Assets to be sold, or their suitability for any particular purpose or merchantability, except as to certain representations or warranties set forth in the Purchase Agreement, as supplemented by Disclosure Schedules, which do not survive the closing.

K.  Other Customary Provisions. The Purchase Agreement has what are believed to be other customary provisions for a sale of this nature, including procedures for assumption or rejection of leases and contracts, closing deliveries, conditions to closing and termination rights, and stalking horse procedures.

L.  Bankruptcy Court Approval.  The Sale and the transactions contemplated therein are subject to approval by the Bankruptcy Court pursuant to the entry of an order authorizing the sale of assets free and clear of liens pursuant to Section 363(f) of the Bankruptcy Code.

27.    The Debtors believe that the best way to maximize the value of its estate for the benefit of creditors is to preserve the going concern value of the Company and to conduct a sale of substantially all the Debtors' assets, to the Buyer or a third party submitting a competing proposal with superior terms, with the goal of stabilizing and deleveraging the Company.

## **RELIEF REQUESTED**

28.    <u>Summary Overview</u>.    The Debtors' seek the entry of the following orders in connection with a proposed two-step process for the requested sale of their assets:

a.    An order in the form attached hereto as **Exhibit "B"** (the "<u>Bidding Procedures Order</u>") that (i) approves the proposed process for the marketing and sale of the Debtors' assets, including procedures attached as Schedule 1 thereto establishing a bidding process and auction for the sale (the "<u>Bidding Procedures</u>");  (ii) approves the form of notice to parties regarding the sale (the "<u>Sale Notice</u>") attached as Schedule 2 thereto; (iii) approves the form of notice to contract parties whose executory contracts and leases are to be assumed and assigned pursuant to the Purchase Agreement and the form of notice regarding the establishment of cure amounts with respect thereto, such form being attached as Schedule 3 thereto (the "<u>Cure Notice</u>"); and (v) schedules a hearing (the "<u>Sale Hearing</u>") for the purpose of approving the sale of the Assets pursuant to the Purchase Agreement with Buyer or a higher and better bidder at the auction; and

b.    At the time of the Sale Hearing, an order in substantially the same form as that attached hereto as **Exhibit "C"** (the "<u>Sale Order</u>") approving the sale of Assets free and clear of liens, claims and encumbrances, approving the assumption and assignment of the Debtors' executory contracts and unexpired leases and granting other relief.

29.    <u>Proposed Sale Procedures and Bidding Procedures</u>.    The Debtors propose to engage the services of a professional business broker and investment banker (the "<u>Broker</u>"), through which the Debtors will provide solicitation packages, along with the Sale Notice, to any parties who have previously expressed an interest in the Assets and to potential bidders and interested parties identified by the Broker who may be interested in purchasing the Assets.  The

Debtors also intend to publish a form of the Sale Notice in the *Wall Street Journal* or such other publication as recommended by the Broker.

30. In conjunction with the sale process, the Debtors shall be represented by the Debtors' Broker, the Operating Debtor's CEO, Chuck Bengochea, and the Debtors' financial advisor, Gary Murphy (collectively the "Debtor Auction Team") for all purposes in publicizing the Sale, evaluating bids and generally guiding the course of the auction process.

31. The Debtors request that this Court set April 8, 2015, 5:00 p.m. (prevailing Eastern time), as the deadline (the "Bid Deadline") by which a competing bid for the Assets must be submitted in writing to the Notice Parties (defined in paragraph 36 below).  Additionally, the Debtor requests that, April 13, 2015, be set as the date for any auction to occur (the "Auction Date") if the Debtors receive one or more Qualifying Bids (as defined in the Bidding Procedures) with such Auction to occur at the offices of Debtors' counsel, A. Todd Almassian, Esq., Keller & Almassian, PLC, 230 East Fulton Street, Grand Rapids, Michigan 49503, at 10:00 a.m. (prevailing ET).

32. The requested Bidding Procedures are set forth on Schedule 1 to the proposed Bidding Procedures Order at attached Exhibit "B".  Generally summarized, the Debtor Auction Team, in consultation with any appointed Committee and the Debtors' secured lenders, will consider any Qualified Bids.

33. The proposed Bidding Procedures provide in summary, among other things:

(a) The proposed Purchase Agreement with Buyer is deemed a Qualified Bid.

(b) The Secured Lenders shall have the right, but not the obligation, to credit bid to the extent allowable under § 363(k) of the Bankruptcy Code, subject to the Bidding Procedures, unless the Court for cause orders otherwise.

(c)    In order to be considered, all bids must be delivered in writing by the Bid Deadline to the following (collectively, the "Notice Parties"): (a) the Debtors, 5300 Patterson Ave. SE, Grand Rapids, Michigan 49530, Attn: Chuck Bengochea, CEO; (b) the Debtors' counsel, A. Todd Almassian, Esq., Keller & Almassian, PLC, 230 East Fulton Street, Grand Rapids, Michigan 49503, (talmassian@kalawgr.com) and Erich Durlacher, Burr & Forman LLP, 171 17th Street, NW, Atlanta, Georgia 30363 (edurlacher@burr.com); (c) counsel to the Senior Lender, [ to be inserted ] ; (d) counsel to the Junior Lender, [ to be inserted ]; (e) counsel for any appointed Committee [ to be inserted ], and (f) counsel to the Buyer, Kilpatrick Townsend & Stockton LLP, Suite 2800, 1100 Peachtree Street, Atlanta, Georgia 30309-4528 (Attn: Todd C. Meyers, Esq. and Paul M. Rosenblatt, Esq.).

(d)    Any overbids shall be made in overbid increments of at least $100,000.00 or greater than the Best Qualified Bid.

34.    Assumption and Assignment of Contracts and Leases.  In connection with the sale, the Debtors also seek to assume and assign certain of its executory contracts and unexpired leases (collectively, the "Executory Contracts") to Buyer.  The Buyer will cure all monetary defaults under such Executory Contracts to the extent required by Section 365(b) of the Bankruptcy Code and as set forth in the Purchase Agreement.

35.    Not less than thirty (30) days before the Sale Hearing, the Debtors will file with the Court and serve on each party to an Executory Contract a notice setting forth the amount of cure owed thereunder according to the Debtors' books and records (the "Cure Notice").  The Cure Notice will state the amount that the Debtors believe is necessary to assume such contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"), and notify each party that such party's lease or contract may be assumed and assigned to the Buyer.

36.     The Cure Notice will require that any objection to the Cure Amount be filed on or before a deadline prior to the Sale Hearing that is established by the Court (the "Cure Objection Deadline").  The Cure Notice will also provide that any objection to the Cure Amount must state with specificity what cure the party to the Executory Contract believes is required with appropriate documentation in support thereof.  The Debtors request that, if an objection is timely filed, the Court resolve any dispute regarding the amount of any disputed Cure Amount or objection to the assumption and assignment of an Executory Contract at the Sale Hearing.  If no objection is timely received, the Debtors request that the Cure Amount set forth in the Cure Notice be controlling notwithstanding anything to the contrary in any assumed contract or other document.

### BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**A.      The Sale**

37.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363(b), does not provide an express standard for determining whether the Court should approve any particular purchase or sale.

38.     A broad consensus of courts, including the Sixth Circuit and this District, hold that a debtor may sell property of the estate outside of the ordinary course of its business where such use represents an exercise of the debtor's sound business judgment. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.1986) ("We adopt the Second Circuit's reasoning in *In re Lionel Corporation, supra*, and conclude that a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action."); *citing, Committee of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Quality Stores, Inc.*, 272 B.R. 643, 647-48 (Bankr.

W.D.Mich.2002)("[A] sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors.") *quoting, In re Embrace Systems Corp.*, 178 B.R. 112, 124 (Bankr. W.D. Mich. 1995) ("In this circuit, a bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under Section 363(b)(1) when a sound business purpose dictates such action.").

39.    Courts often consider the following factors in determining whether a proposed sale satisfies the sound business purpose standard:  (a) whether a sound business justification exists for the sale, (b) whether accurate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith.  *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991);  *In re Daufuskie Island Props., LLC*, 431 B.R. 626, 637 (Bankr. D.S.C. 2010) (citing same four factors).

40.    In *Stephens Industries*, the Sixth Circuit concluded the standards for approving a sale were satisfied where the facts showed "[t]he trustee had been unable to operate the radio station at a profit . . . [and] the trustee faced the prospect of ceasing [the debtors'] operations." *Stephen Industries,* 789 F.2d at 390.

41.    Indeed, some courts have held the approval of a proposed transaction "should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. . . ." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (quoting *Allied Technology, Inc. v. R.B. Brunemann & Sons*, 25 Bankr. 484, 495 (Bankr.S.D. Ohio 1982).   Similarly, in *Quality Stores*, this court approved the sale of substantially all assets and noted it was in part "[d]eferring to the business judgment of the Debtor, the Committee and the Lenders," all whom supported the sale.  *Quality Stores*, 272

B.R. at 647-48.

42.    The Debtors have a sound business justifications for selling the Assets at this time pursuant to the Sale Procedures outlined above.  As set forth in the Bengochea Declaration, the Debtors have experienced declining sales for several years due to several factors including the general economy and specific trends with the book and music industry.  In order to make the company viable and profitable, Debtors' management team, in consultation with professionals engaged pre-petition to evaluate their business and business model, determined a reduction of the debt load burdening the company was needed, which could best be accomplished through a sale of the assets conducted under Section 363 of the Bankruptcy Code.

43.     The Debtors have acted in good faith, and the proposed sale process and Sale Procedures will provide accurate and reasonable notice of the sale to interested parties.

44.    The Debtors have therefore determined, based upon their sound business judgment, that the most viable option for maximizing the value of their estates is through a sale of substantially all of its assets based upon the Sale Procedures.

**B.**    **Sales "Free and Clear of Liens, Claims and Encumbrances"**

45.    The Debtors seek permission to sell the Assets free and clear of all liens, claims and encumbrances (collectively, the "Liens"), with such Liens attaching to the proceeds applicable the Assets encumbered by the Liens.  Section 363(f) of the Bankruptcy Code provides that property may be sold free and clear of any  interest in the property if:

> (1)    applicable nonbankrupcty law permits sale of such property free and clear of such interest;

> (2)    such entity consents;

> (3)    such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

> (4)    such interest is in bona fide dispute; *or*

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest

11 U.S.C. § 363(f).

46.    The Debtors need only satisfy one of the noted conditions.  *In re Wolverine Radio Co.,* 930 F.2d 1132, 1148 (6th Cir. 1991).  The Debtors believe the Secured Lenders will consent to the proposed sale.

47.    Otherwise, Section 363(f)(5) allows a debtor to sell property free and clear of Liens when a legal or equitable proceeding exists that will force the lienholder to accept less than full money satisfaction for its interest.  *In re James*, 203 B.R. 449, 453 (W.D. Mo. 1997); *In re Grand Slam USA, Inc*, 178 B.R. 460, 463-64 (E.D. Mo. 1995).  Courts considering this issue have held that the "cram down" provision under the Bankruptcy Code constitutes such a "legal or equitable proceeding" and permits a sale under Section 363(f)(5) where a secured creditor may receive less than the value of its claim.  *Grand Slam USA, Inc.*, 178 B.R. at 464; *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993); *WPRV-TV, Inc.,* 143 B.R. at 321; *In re Healthco International, Inc.,* 174 B.R. 174, 176 (Bankr. D.Mass. 1994).

48.    The Debtors are also seeking to sell to the Buyer supplies, inventory and other goods delivered to the Debtors on "consignment" free and clear of such alleged consignment rights to the extent that such items were delivered to the Debtors prior to the commencement of the Chapter 11 Cases and are transferred to Buyer at Closing.  To the extent that such items were delivered to the Debtors after the commencement of the Chapter 11 Cases, the Purchase Agreement provides that to the extent such items are transferred to the Buyer at Closing, the Buyer will honor the applicable consignment rights regarding such items and only with respect to such items actually transferred to the Buyer at Closing.  The Purchase Agreement also provides

22674786 v9

that the Buyer is not assuming any liabilities or obligations regarding consignment items that were sold by the Sellers at any time prior to the Closing.

49.     The Debtors propose that any valid Liens shall attach to the sales proceeds attributable to the Asset(s) being sold and encumbered by such Liens and in the same priority as such Liens.

## C.     The Assumption and Assignment of the Executory Contracts Should be Authorized

50.     Section 365(f)(2) of the Bankruptcy Code provides that:

> [t]he trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

51.     Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

52.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *See*, *e.g.*, *EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

53.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

54.     To the extent that any defaults exist under any of the Executory Contracts to be assumed and assigned in connection with the Sale, the Buyer shall cure any such default in connection with such assumption and assignment subject to the terms and conditions of the Purchase Agreement.  Moreover, the Debtors will present evidence at the Sale Hearing demonstrating the financial wherewithal of the Buyer, and its willingness and ability to perform under the Executory Contracts to be assumed and assigned.

55.     The Sale Hearing will therefore provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer to provide

adequate assurance of future performance under the Executory Contracts to be assumed and assigned.

**D.     Form and Manner of Notice**

56.     The Debtors will provide the Sale Notice to any parties who have previously expressed an interest in the Assets or who may be interested in purchasing the Assets and all creditors of the Debtors and all contract parties, in accordance with Bankruptcy Rule 2002(a)(2), by mailing such notice more than thirty (30) days prior to the Sale Hearing.  In addition, the Debtors will publish a form of the Sale Notice in the *Wall Street Journal* or some similarly suitable publication.

57.     The Debtors submit that the form and manner of service of the Sale Notice is appropriate under the circumstances and complies with all applicable Bankruptcy Rules.

58.     Finally, the Debtors request that the Court waive any 14-day stay that might be imposed under Bankruptcy Rules 6004(h) and 6006(d) for any order authorizing the sale of property and the assignment of the Executory Contracts such that the Debtors can close the Sale promptly after the entry of the Sale Order.

**WHEREFORE**, the Debtors respectfully request the Court grant the relief requested within this Motion, including (a) entry of the Bidding Procedures Order approving the Sale Procedures, approving the Sale Notice and Cure Notice, and setting a date for the Sale Hearing; (b) at the conclusion of the Sale Hearing, entry of the Sale Order; and (c) granting such other and further relief as is necessary.

22674786 v9

Dated:  February 12, 2015

Respectfully submitted,

KELLER & ALMASSIAN, PLC

/s/  A. Todd Almassian
A. Todd Almassian (P55467)
Greg J. Ekdahl (P67768)
230 East Fulton Street
Grand Rapids, MI 49503
(616) 364-2100
ecf@kalawgr.com

- and -

BURR & FORMAN LLP
Erich Durlacher (Ga Bar No. 235563)
Brad Baldwin (Ga Bar No. 034220)
*Pro hac applications pending*

171  17th Street, N.W. - Suite 1100
Atlanta, Georgia  30363
Telephone:  (404) 815-3000
Facsimile:  (404) 817-3244
*Proposed Attorneys To The Debtors and*
*Debtors-in-Possession*