# EXHIBIT "A"

Asset Purchase Agreement from FCS Acquisition, LLC

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), is entered into this __ day of ____, 2015, by and among (a) FAMILY CHRISTIAN HOLDING, LLC, a limited liability company formed under the laws of the State of Georgia ("Parent"), and FAMILY CHRISTIAN, LLC, a limited liability company formed under the laws of the State of Georgia, (together with Parent, the "Sellers," and each, individually, a "Seller"), (b) FCS GIFTCO, LLC, a limited liability company formed under the laws of the State of Colorado ("Giftco"), and (c) FCS ACQUISITION, LLC, a limited liability company formed under the laws of the State of Georgia (the "Buyer"). The Sellers, Giftco and the Buyer are referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Sellers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on February 11, 2015 (the "Petition Date") in the United States Bankruptcy Court for the Western District of Michigan (the "Bankruptcy Court"), and such bankruptcy cases are jointly administered under Case No. 15-00643-jtg and are hereinafter referred to as the "Cases;" and

WHEREAS, the Buyer is a subsidiary of Family Christian Resource Centers Inc., a charitable organization exempt under Section 501(c)(3) of the Internal Revenue Code; and

WHEREAS, each of the Sellers wishes to sell, transfer, convey, assign and deliver to the Buyer, and the Buyer wishes to purchase, assume and acquire, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, the Assets (as hereinafter defined), together with the Assumed Liabilities (as hereinafter defined), upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, subject to the Bankruptcy Court's entry of the Sale Order (as hereinafter defined) as set forth herein, the Buyer shall purchase from the Sellers, and the Sellers shall sell, transfer, convey, assign and deliver to the Buyer, the Assets together with the Assumed Liabilities, upon the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS

1.1    Defined Terms.  All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth for such terms in Article 13.

1

1.2    <u>Purchase and Sale</u>.    Subject to the terms and conditions set forth in this Agreement, the Sellers hereby agree that at the Closing, or such other date or dates provided in Section 1.4, they shall sell, transfer, convey and assign to the Buyer, free and clear of all Liens (except for Permitted Liens) and Excluded Liabilities, and the Buyer shall purchase, assume and acquire from the Sellers all right, title and interest of the Sellers in, to and under all of the business, properties, assets and goodwill of whatever kind and nature, real or personal, tangible or intangible, actual or contingent, which are owned or held by the Sellers, other than the Excluded Assets (collectively, the "<u>Assets</u>"), including the following:

(a)    All of the interest of the Sellers in and to the Assumed Real Property Leases;

(b)    All of the interest of the Sellers in and to the Assumed Contracts, which shall include the Revenue Sharing Agreement between the Sellers and iDLLC, dated February 2, 2014, and the insurance policies listed on <u>Schedule 4.13</u>;

(c)    All of the interest of the Sellers in and to all (i) Equipment and leasehold improvements in the Transferred Stores, Distribution Center(s), and the Home Office, and (ii) Equipment at the Excluded Leased Property (collectively, the "<u>Transferred Equipment and Improvements</u>");

(d)    All Licenses (to the extent such Licenses are freely transferable), other than Licenses relating exclusively to any Excluded Leased Property (the "<u>Excluded Licenses</u>");

(e)    All of the interest of the Sellers in Intellectual Property;

(f)    All Inventory (the "<u>Transferred Inventory</u>");

(g)    All security and other deposits and advances and all pre-paid expenses maintained by the Sellers, other than the deposits, advances and pre-paid expenses relating exclusively to any Excluded Leased Property (the "<u>Excluded Deposits</u>");

(h)    All Accounts Receivable arising prior to the Closing Date (the "<u>Transferred Accounts Receivable</u>");

(i)    All goodwill of the Sellers associated with the Business as a going concern;

(j)    All of the Sellers' books, records, files, documents and other written or electronic materials, including customer lists, except those related solely to the Excluded Assets or the Excluded Liabilities or expressly included in the Excluded Assets pursuant to Section 1.3;

(k)    All claims, deposits, prepayments, prepaid assets, refunds, causes of action, credits, choses in action, rights of recovery, rights of set off and rights of recoupment relating primarily to any of the other Assets, including all rights of the Sellers under any property, casualty, workers' compensation or other insurance policy (and any collateral

2

underlying any such policy, including the collateral securing the workers' compensation policy) or related insurance services contracts affecting any of the Assets;

(l)     All rights to receive payments from iDisciple LLC, a limited liability company formed under the laws of the State of Georgia ("iDLLC"), pursuant to the Revenue Sharing Agreement between the Sellers and iDLLC, dated February 2, 2014, whether such payments relate to sales made prior to or after the Closing Date;

(m)     All Avoidance Actions, Released Matters, Resulting Claims and any and all claims and causes of action regarding in any way the FC Debt or FC Special Funding, LLC;

(n)     All claims, actions, and rights of recovery any Seller may have with credit card companies;

(o)     All rights of the Sellers in the Employee Plans; and

(p)     All Sellers' Cash, including Cash on Premises, other than the Cash Component.

1.3     Excluded Assets.  Notwithstanding anything to the contrary contained herein, expressly excluded from the Assets are all of the right, title and interest of the Sellers in and to the following (collectively, the "Excluded Assets"):

(a)     All corporate and Tax records of the Sellers, including corporate charters, corporate minute and stock books and records, and other documents and instruments relating solely to the organization, maintenance and existence of the Sellers or the Taxes of the Sellers;

(b)     All claims (including any litigation or arbitration claims and any refunds and deposits), rights, rights of offset or causes of action that the Sellers or their Affiliates may have against or from any Person relating to any of the Excluded Assets or the Excluded Liabilities;

(c)     All refunds, pre-payments, net operating losses and claims relating to federal, state or municipal income Taxes of the Sellers or their Affiliates for any period, or portion of any period, ending on or prior to the Closing Date;

(d)     The membership interests of the Sellers and all equity securities owned or held by any member of the Sellers;

(e)     All causes of action and claims that may be asserted under this Agreement or any Ancillary Agreement or any other agreements or instruments otherwise delivered in connection with this Agreement or any Ancillary Agreement against the Buyer and all rights of the Sellers therein;

(f)     All of the interest of the Sellers in and to all Real Property Leases other than the Assumed Real Property Leases (the "Excluded Real Property Leases");

3

(g)     All of the interest of the Sellers in and to all Contracts other than the Assumed Contracts (the "<u>Excluded Contracts</u>");

(h)     All leasehold improvements in the Excluded Leased Property;

(i)     All Excluded Licenses;

(j)     All Excluded Deposits;

(k)     All confidential personnel and medical records of employees who do not become Transferred Employees;

(l)     All assets and other rights relating to the Business sold or otherwise transferred or disposed of during the period from the date of this Agreement through and including the Closing Date, in any event in accordance with the provisions of this Agreement;

(m)     All assets of Giftco;

(n)     All of the other assets, rights and properties set forth on <u>Schedule 1.3(n)</u>; and

(o)     The Cash Component.

1.4     <u>Assumed and Rejected Leases and Contracts</u>.

(a)     At Closing, the Buyer shall have the right to designate any Real Property Lease or Contract (i) for immediate assumption by the Sellers and assignment to the Buyer effective as of the Closing (an "<u>Initial Assumed Real Property Lease</u>" or "<u>Initial Assumed Contract</u>") or (ii) for removal from the list of Real Property Leases or Contracts that may be potentially assumed by the Sellers and assigned to the Buyer (a "<u>Removed Real Property Lease</u>" or a "<u>Removed Contract</u>"). Any Real Property Lease that as of Closing is neither an Initial Assumed Real Property Lease nor a Removed Real Property Lease is referred to as a "<u>Remaining Real Property Lease</u>" and any Contract that as of Closing is neither an Initial Assumed Contract nor a Removed Contract is referred to as a "<u>Remaining Contract</u>".

(b)     The Buyer shall have a period of time which shall begin at Closing and end at 5:00 p.m. Eastern Time on the date that is 90 days after the Closing (the "<u>Designation Period</u>") to designate any Remaining Real Property Lease or Remaining Contract to be assumed and assigned to the Buyer (a "<u>Designated Real Property Lease</u>" or a "<u>Designated Contract</u>") or to be a Removed Real Property Lease or Removed Contract.   Any such designation shall be effective upon delivery of a notice given to the Sellers in accordance with Section 12.1 (a "<u>Designation Notice</u>"). Subject to Section 1.4(g), the Sellers shall not reject any Remaining Real Property Leases or Remaining Contract during the Designation Period unless the Buyer provides a Designation Notice to the Sellers that such Remaining Real Property Lease or Remaining Contract is designated as a Removed Real Property Lease or Removed Contract.   Any Remaining Real Property Lease or Remaining Contract that is not designated by the end of the

4

Designation Period shall be treated as a Removed Real Property Lease or Removed Contract, as applicable.

(c)    In addition to any other obligations the Buyer may have with respect to the Remaining Real Property Leases or Remaining Contracts, the Buyer shall be obligated to reimburse the Sellers, within five (5) Business Days after demand by Sellers, for rent and real property Taxes that first arise and become due under the Remaining Real Property Leases, and for any obligations that first arise and become due under the Remaining Contracts, for the period commencing upon the Closing Date and ending on the later of (i) the date of delivery to Sellers of an applicable Designation Notice and (ii) the conclusion of the Post-Closing Occupancy Period.

(d)    As of the Closing Date in the case of the Initial Assumed Real Property Leases and the Initial Assumed Contracts, and as of the date of delivery of an applicable Designation Notice pursuant to Section 1.4(b) for each of the Designated Real Property Leases and Designated Contracts, the Sellers shall assume and assign to the Buyer such Assumed Real Property Leases and Assumed Contracts in accordance with Section 365 of the Bankruptcy Code, and the Sale Order shall so authorize such assumption and assignment. On the date of the assignment thereof to the Buyer, the Sellers shall be released from any further liability under the Assumed Real Property Leases and Assumed Contracts, and all right, title and interest of the Sellers in and to any Assets located at any Store subject to such Assumed Real Property Lease shall be deemed sold, transferred, conveyed and assigned to the Buyer, except to the extent any such Assets are otherwise Excluded Assets hereunder. Within three (3) Business Days after the end of the Designation Period, the Sellers shall file with the Bankruptcy Court a complete list of the Initial Assumed Real Property Leases and the Designated Real Property Leases (collectively, the "Assumed Real Property Leases") and the Initial Assumed Contracts and the Designed Contracts (collectively, the "Assumed Contracts").

(e)    Subject to Section 1.4(g), as of the Closing Date in the case of the Removed Real Property Leases and the Removed Contracts, and as of the date of delivery of an applicable Designation Notice pursuant to Section 1.4(b) for each of the subsequently designated Removed Property Leases and Removed Contracts, or in either case if applicable, upon the conclusion of the Post-Closing Occupancy Period, Sellers shall be deemed to have rejected such Removed Real Property Leases and Removed Contracts in accordance with Section 365 of the Bankruptcy Code, and the Sale Order shall so authorize such rejection.

(f)    To the extent that any Assumed Real Property Lease or Assumed Contract is subject to a cure (pursuant to Section 365 of the Bankruptcy Code and described in any Order of the Bankruptcy Court relating to such cure liability), the Buyer shall be obligated to timely pay the Cure Costs as a condition to such assumption and assignment to the Buyer. A Schedule of such Cure Costs is on file in the Cases at Docket No. 694.  To the extent that the Cure Costs for any Assumed Real Property Lease or Assumed Contract are determined by a Final Order of the Bankruptcy Court to exceed such good faith estimate, Buyer shall have fourteen (14) days from the entry of such Final Order to elect to treat such Assumed Real Property Lease or Assumed Contract as a Removed Real Property Lease or Removed Contract.

5

(g)     Subject to the access provisions relating to time, day and manner in the applicable lease, Buyer shall have reasonable access for thirty (30) days following any Real Property Lease becoming a Removed Real Property Lease (the "Post-Closing Occupancy Period") for the purposes of disassembling, packing, loading and removing the Assets located at such Removed Real Property Lease. During the Post-Closing Occupancy Period, Buyer, by notice to Sellers, may elect to treat any Asset located at a Removed Real Property Lease as an Excluded Asset retroactive to the Closing Date, and the Buyer shall have no obligation to remove or otherwise dispose of such Excluded Asset.

# ARTICLE 2

## PURCHASE PRICE AND PAYMENT

2.1     Purchase Price.

(a)     The aggregate consideration to be provided by the Buyer for the sale of the Assets is estimated between $42,000,000 and $43,661,000 (as projected on Schedule 2.1(a), and inclusive of the Cash Component and the categories of Assumed Liabilities listed on Schedule 2.1(a), net of Sellers' Cash), plus certain other Assumed Liabilities including related to the Assumed Real Property Leases (collectively, the "Purchase Price").

(b)     In the event that the Purchase Price is less than $42,000,000, the Buyer will add an amount to the Cash Component such that when that additional amount is added to the Cash Component, the Purchase Price shall equal $42,000,000.  The calculation shall be performed as of the date that is eighteen (18) months following the Closing Date.  The Buyer shall provide to the Sellers within thirty (30) days following such calculation date any additional amount along with detail of the calculation. The Bankruptcy Court shall resolve any dispute between the Buyer and the Sellers regarding the calculation.

(c)     Because Buyer is buying all the Assets of the Business and is not willing to sever its bid to purchase only certain Assets, the Purchase Price shall be allocated to the Assets in whatever reasonable manner is proposed by the Sellers, provided that no less than the amount of the FC Debt shall be allocated to the Working Capital Collateral, and the Cash Component shall be allocated to Credit Suisse AG.

2.2     Payment and Discharge of Assumed Liabilities; Avoidance Actions.

(a)     Except as otherwise provided herein, the Buyer shall discharge the Assumed Liabilities in the ordinary course of the Buyer's business as and when the Sellers would have been obligated to discharge such liabilities.

(b)     The Sellers shall assign to the Buyer any and all of the Sellers' and the Sellers' estates' rights, claims and defenses with respect to any and all Assumed Liabilities.

6

(c)    The Buyer shall be granted all rights of the Debtors and their estates, including derivative standing pursuant to Sections 105 and 1109 of the Bankruptcy Code, with respect to all Assumed Liabilities, Avoidance Actions and Consignment Goods Litigation, with the right and power to initiate, prosecute and settle any and all rights, claims, defenses, causes of action and objections related to any and all such Assumed Liabilities, Avoidance Actions and Consignment Goods Litigation, and neither the Debtors' nor their estates, nor any other party granted derivative standing thereof, shall settle or otherwise validate or compromise any of the Assumed Liabilities, Avoidance Actions or Consignment Goods Litigation without the prior written consent of the Buyer.

(d)    The Buyer covenants and agrees that it will not assert, initiate, institute, prosecute, participate in or maintain any Avoidance Action against any Trade Creditor.

2.3    <u>Assumed Liabilities and Excluded Liabilities</u>.

(a)    Subject to the terms and conditions set forth in this Agreement, the Buyer hereby agrees that at the Closing, or such other date or dates provided in Section 1.4, it shall assume and become responsible for the following liabilities and obligations of the Sellers existing as of such time and arising from the operation of the Business prior to the Closing or the other date or dates provided in Section 1.4, as applicable (collectively, the "<u>Assumed Liabilities</u>"):

(i)    All liabilities and obligations with respect to the FC Debt, estimated at Closing to be approximately $23,400,000;

(ii)    All liabilities and obligations with respect to 503(b)(9) Owned Claims, paid within ten (10) Business Days after such claim is Allowed.

(iii)    That portion of the liabilities and obligations owed as of the Petition Date by the Sellers to each Trade Creditor equal to five (5%) percent of the amount, after reduction for any such Trade Creditor's 503(b)(9) Owned Claim and 503(b)(9) Consignment Claim, (A) set forth in the Sellers' bankruptcy schedules; or (B) of such Trade Creditor's Claim as may otherwise be agreed to by the Buyer and such Trade Creditor, to be paid by December 31, 2015; <u>provided</u> that such Trade Creditor agrees to provide to the Post-Closing Business Trade Terms for no less than one (1) year following the Closing Date;

(iv)    That portion of the liabilities and obligations regarding Consignment Goods only as follows:

(1) The amount of $500,000 for Consenting Consignment Vendors that were initial plaintiffs in Adversary Proceeding No. 15-80062 inclusive of the fees and expenses incurred by a professional representing the initial set of plaintiffs in such Adversary Proceeding, upon the voluntary dismissal with prejudice of such Adversary Proceeding no later than ten (10) Business Days following the Closing Date; and

7

(2) for each Consenting Consignment Vendor either:

Option I - their 503(b)(9) Consignment Claim paid within ten (10) Business Days after such claim is Allowed, plus an amount equal to ten (10%) percent of the Sellers' book value for such Consenting Consignment Vendor's Consignment Goods that are Transferred Inventory, paid within thirty (30) days of when such individual items of Transferred Inventory are sold by the Post-Closing Business, or

Option II - an amount equal to thirty-five (35%) percent of the Sellers' book value for such Consenting Consignment Vendor's Consignment Goods that are Transferred Inventory, paid within thirty (30) days of when such individual items of Transferred Inventory are sold by the Post-Closing Business.

(3) Consenting Consignment Vendors who fail to notify the Buyer in writing within thirty (30) days following the Closing Date of their selection between Option I and Option II above will be deemed to have selected Option I.

(4) In either case of Option I or Option II above, Buyer shall have no liability for failure to market or sell any Consignment Goods that are Transferred Inventory, and if any such Consignment Goods remain unsold one (1) year following the Closing Date, the Buyer shall return to each such Consenting Consignment Vendor their respective unsold Consignment Goods that are Transferred Inventory at no further cost or obligation to the Buyer other than the Buyer arranging and paying for shipment to return such Transferred Inventory to the applicable Consenting Consignment Vendor;

(v)    All liabilities and obligations as of the Closing Date with respect to the Post-Petition Operating Expenses;

(vi)    [Intentionally Blank];

(vii)    All liabilities and obligations with respect to Debtor-In-Possession Professional Fees in an amount not to exceed $1,250,000, less the amount of any fees and expenses of such professionals that were already paid as of the Closing;

(viii)    All liabilities and obligations with respect to Pre-Closing Creditor Professional Fees in an amount not to exceed $575,000, less the amount of any fees and expenses of such professionals that were already paid as of the Closing;

(ix)    All liabilities and obligations with respect to Wind Down Expenses in an amount not to exceed $250,000;

8

(x)    All liabilities and obligations under the Assumed Real Property Leases and Assumed Contracts that are assumed and assigned to the Buyer in accordance with Section 1.4, whether at the Closing or thereafter, including all related Cure Costs, having an estimated value, subject to Section 1.4, of $43,000,000;

(xi)    All liabilities and obligations with respect to any gift cards outstanding on the Closing Date and issued by CardFact, Ltd., and all liabilities with respect to other loyalty programs and customer presells outstanding on the Closing Date;

(xii)    All liabilities and obligations with respect to Inventory returned to the Stores after the Closing Date;

(xiii)    All liabilities and obligations with respect to the Transferred Employees, including any obligations Sellers may have under the Employee Plans, to the extent set forth in Section 7.4;

(xiv)    All obligations to iDLLC as set forth on Schedule 2.3(a)(xiv) (the "iDLLC Obligations");

(xv)    All liabilities and obligations of the Debtors and their estates for US Trustee quarterly fees for the Cases;

(xvi)    All liabilities and obligations with respect to any consumer privacy ombudsman appointed under Section 332 of the Bankruptcy Code in an amount not to exceed $25,000; and

(xvii)    All liabilities and obligations as of the Closing Date with respect to donations collected on behalf of Family Christian Resource Centers, Inc.

(b)    Except for the Assumed Liabilities, the Buyer shall not be subject to and shall not assume nor be liable for any liabilities of any kind or nature, whether absolute, contingent, accrued, known or unknown, of the Sellers, Giftco, or related to the Assets or the Business, including the following (collectively, the "Excluded Liabilities"):

(i)    Any obligation or liability in respect of Outstanding Indebtedness to the extent not specifically included in the Assumed Liabilities;

(ii)    Any obligation or liability of the Sellers for Taxes to the extent not specifically included in the Assumed Liabilities;

(iii)    Any pre-petition obligation or liability of the Sellers and any obligation or liability of the Sellers that constitutes a claim or interest against the Sellers under Sections 502 or 503 of the Bankruptcy Code to the extent not specifically included in the Assumed Liabilities;

9

(iv)    Subject to Section 1.4(c), any obligation or liability in respect of the Excluded Real Property Leases and the Excluded Contracts to the extent not specifically included in the Assumed Liabilities;

(v)    Any obligation or liability in respect of statutory or professional fees and expenses incurred by the Sellers, a creditor, a trustee, an examiner or any other similar party or party in interest in the Cases, to the extent not specifically included in the Assumed Liabilities;

(vi)    Any obligation or liability in respect of any contingent or success-based fees payable by the Sellers in connection with the Closing to the extent not specifically included in the Assumed Liabilities;

(vii)    Any obligation or liability of the Sellers to their respective shareholders or equity holders or Affiliates of the Sellers, except for the iDLLC Obligations;

(viii)    Any obligation or liability in respect of any current or former employee of the Sellers, or their dependents and beneficiaries, other than the obligations and liabilities set forth in Section 7.4;

(ix)    Any obligation or liability in respect of any gift cards issued by Giftco;

(x)    Any obligation or liability in respect of trade accounts payable to the extent not specifically included in the Assumed Liabilities;

(xi)    Any obligation or liability arising from or related to current litigation involving Sellers, including the matter set forth on <u>Schedule 4.6</u> regarding Illinois sales Taxes; and

(xii)    All liabilities and obligations in respect of Consignment Goods including for the purchase or sale of Consignment Goods by the Sellers, Buyer or the Post-Closing Business, to the extent not specifically included in the Assumed Liabilities pursuant to Section 2.3(a)(iv).

2.4    <u>Non-Assignable Assets</u>.  If any Asset that is not material in the Buyer's sole discretion to the operation of the Business is by its terms or by Applicable Law non-assignable or non-transferable, to the extent such terms are not superseded by the terms of the Sale Order, the Sellers shall use their reasonable best efforts to obtain, or cause to be obtained, on or prior to the Closing, any approvals or consents necessary to convey to the Buyer the benefit thereof. The Buyer shall cooperate with the Sellers in such manner as may be reasonably requested in connection therewith.  In the event any consent or approval to an assignment contemplated hereby is not obtained on or prior to the Closing Date, the Sellers shall continue to use reasonable best efforts to obtain any such approval or consent after the Closing Date and the Sellers agree to enter into any appropriate and commercially reasonable arrangement to provide

10

that the Buyer shall receive the Sellers' interest in the benefits under any such Asset; *provided* that the Buyer shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent the Buyer would have been responsible therefor if such consent or approval had been obtained.

2.5     Transfer Taxes.  To the extent the transactions contemplated hereby are not exempt under Section 1146 of the Bankruptcy Code, the Buyer shall be liable for and pay any sales and transfer Taxes, filing fees, documentary fees or other similar Taxes payable in connection with the purchase, sale or transfer of the Assets to, and the assumption of the Assumed Liabilities by, the Buyer pursuant to this Agreement. The Buyer and the Sellers shall use reasonable best efforts to minimize the amount of all the foregoing Taxes and shall cooperate in providing each other with any appropriate resale exemption certifications, Tax clearance certificates and other similar documentation. The Party that is required by Applicable Law to make the filings, reports, or returns and to handle any audits or controversies with respect to any of the foregoing Taxes shall do so, and the other Party shall cooperate (and make reimbursement) with respect thereto as necessary.

2.6     Deposit.  The Buyer shall deposit with the Escrow Agent (as defined in the Bid Procedures Order) an amount equal to $1,000,000 (the "Deposit"), pursuant to an escrow agreement in customary commercial form and that is not inconsistent with the terms herein (the "Escrow Agreement").  If the Closing takes place as provided herein, then the Deposit shall be credited against the Cash Component pursuant to Section 2.1.  If this Agreement is terminated in accordance with Article 10 for any reason other than pursuant to Section 10.1(g), then the Escrow Agent shall within five (5) days of termination return the Deposit to the Buyer.  If this Agreement is terminated pursuant to Section 10.1(g), the Escrow Agent shall promptly deliver the Deposit to the Sellers, which shall be the sole and exclusive remedy of the Sellers for any breach by Buyer of this Agreement. The Deposit shall not be considered property of the Sellers' bankruptcy estates unless and until the Deposit is delivered to Sellers in accordance with this Section 2.6.

2.7     Release of Directors and Officers.  Notwithstanding anything herein to the contrary, upon the Closing Date, and without the need for the execution and delivery of additional documentation or the entry of any additional Orders of the Bankruptcy Court other than the Sale Order, and notwithstanding anything contained in any other Order of the Bankruptcy Court to the contrary:

(a)     Each Seller and Giftco, along with any Person acting for, derivatively, on behalf of, or claiming through them, including any committee appointed in any of the Cases, and any trustee or examiner whether appointed in any of the Cases or any subsequent case, for themselves and their respective past and present officers, directors, shareholders, partners, principals, members, managers, subsidiaries, parent companies, Affiliates, agents, employees, successors and predecessors-in-interest, advisors, accountants, attorneys, representatives, and assigns ("Releasing Parties") irrevocably and unconditionally forever releases, acquits and forever discharges each of the Directors and Officers (and their properties) of and from any and all past, present and future legal actions, choses in action, causes of action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, amounts paid in

11

settlement, costs, fees, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind, character or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, and interest or other costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue (collectively, a "Charge") against any of the Directors and Officers, whether held in a personal or representative capacity occurring from the beginning of time to and including the date of the release including, but not limited to, in any way, directly or indirectly arising out of, connected with or relating to any or all of the Sellers, their estates or the Cases (collectively, the "Released Matters"). Further, notwithstanding anything contained herein to the contrary, this release is not intended to, nor shall it have the effect of releasing, any claim or cause of action, if any, arising under this Agreement or precluding the Releasing Parties from offering into evidence the fact and/or terms of this Agreement in connection with any action to enforce the same, provided that the fact of the negotiation of this Agreement shall not be admissible in any action and shall not form the basis for any claim or recovery therein.

(b)      The Releasing Parties, and each of them, further covenant and agree that neither they, nor any of them, will assert, initiate, institute, prosecute, participate in or maintain, or will instigate, abet or encourage any other person or entity to assert, initiate, institute, prosecute, participate in or maintain, any Charge, currently or in the future, against the Directors and Officers, or any of them, with respect to any of the Released Matters.

(c)      In addition to, and without in any way limiting the scope of, Section 2.7(a) above, each Releasing Party severally agrees that such Releasing Party shall not commence, assert, maintain, continue or pursue any claim, demand or cause of action of any type or nature that such Releasing Party may have, claim to have or assert to have, of any type or nature, (including any such claims, demands and causes of action that have not been discharged that may hereafter accrue or arise or which they may in the future acquire in any way) against any Person, that seeks damages, contribution, indemnity, right of set off or any other economic benefit or recovery with respect to in any way, directly or indirectly, arising out of, connected with or relating to any or all of the Sellers, Giftco and their estates and the Cases, if such claim, demand or cause of action (a "Resulting Claim") would result in any liability or an indemnity or any payment obligation of any type or nature on the part of any of the Directors and Officers (or a good faith claim, demand, action or proceeding for such liability, indemnity or payment obligation), unless such Releasing Party shall have executed an indemnity in favor of, and in form and substance satisfactory to, the Directors and Officers, as applicable, for payment (not collection) of any liability, payment obligations and costs (including, without limitation, advancement of attorneys' and other litigation advisory fees and expenses) that may be incurred in connection with such Resulting Claim.

# ARTICLE 3

# CLOSING

3.1 <u>Closing</u>. Consummation of the transactions contemplated hereby (the "<u>Closing</u>") shall occur as soon as practicable after the date the conditions to Closing set forth in this Agreement are satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing), but in any event no later than June 19, 2015, unless Buyer specifies a later date. The Parties anticipate that the Closing Date shall occur on June 8, 2015. The Closing shall begin at 10:00 a.m. Eastern Time at the offices of Kilpatrick Townsend & Stockton, LLP, 1100 Peachtree Street NE, Atlanta, GA 30309, or at such time and place as the Buyer and the Sellers may otherwise agree. The date on which the Closing actually takes place is referred to in this Agreement as the "<u>Closing Date</u>." The Closing shall be effective as of 11:59 p.m. on the Closing Date (the "<u>Closing Time</u>").

3.2 <u>Deliveries by the Sellers at Closing</u>.    At the Closing, the Sellers shall each execute, acknowledge and deliver to the Buyer the following (each being deemed to have occurred simultaneously with the others):

(a)    A Bill of Sale in a form reasonably satisfactory to the Buyer and its counsel and the Sellers and their counsel;

(b)    An Assignment and Assumption Agreement in one or more forms reasonably satisfactory to the Buyer and its counsel and the Sellers and their counsel, pursuant to which the Sellers shall assign to Buyer the Initial Assumed Real Property Leases, Initial Assumed Contracts and Assumed Liabilities from the Sellers (as may be amended from time to time to include Designated Real Property Leases and Designated Contracts, the "<u>Assignment and Assumption Agreement</u>");

(c)    A copy of the Sale Order;

(d)    Trademark, patent and domain name assignments in a form reasonably satisfactory to the Buyer and its counsel and the Sellers and their counsel, pursuant to which the Sellers shall assign the Transferred Intellectual Property to the Buyer (the "<u>IP Assignments</u>");

(e)    A copy of the resolutions adopted by the Sellers' governing board authorizing the transactions contemplated hereby and the consummation thereof, certified by a secretary or assistant secretary of the Sellers to be a true and correct copy;

(f)    A certificate of incumbency as to those officers of the Sellers executing instruments in connection with this Agreement;

(g)    An affidavit of each Seller in a form reasonably satisfactory to Buyer certifying that such Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended; and

13

(h)    All other documents, certificates, instruments or writings, including the Ancillary Agreements, reasonably requested by the Buyer in connection herewith, including all information related to the Assumed Liabilities.

3.3    <u>Deliveries by the Buyer at Closing</u>.  At the Closing, the Buyer shall execute, acknowledge and deliver to the Sellers the following (which events shall occur, each being deemed to have occurred simultaneously with the others):

(a)    A duly executed Assignment and Assumption Agreement;

(b)    The Bill of Sale and the IP Assignments, if any, that call for a signature by the Buyer;

(c)    A copy of the resolutions adopted by the Buyer's governing board authorizing the transactions contemplated hereby and the consummation thereof, certified by a secretary or assistant secretary of the Buyer to be a true and correct copy;

(d)    A certificate of incumbency as to those officers of the Buyer executing instruments in connection with this Agreement; and

(e)    All other documents, certificates, instruments or writings, including the Ancillary Agreements, reasonably requested by the Sellers in connection herewith.

3.4    <u>Deemed Consents and Cures</u>. The Sellers shall be deemed to have obtained all required consents, as applicable, in respect of the assignment of any of the Assumed Real Property Leases and Assumed Contracts and all defaults thereunder shall be deemed to have been cured if, and to the extent that, pursuant to the Sale Order or another Order of the Bankruptcy Court, the Sellers are authorized to assume and assign any such Assumed Real Property Leases and Assumed Contracts to the Buyer pursuant to Section 365 of the Bankruptcy Code.

3.5    <u>Subsequent Documentation; Further Assurances</u>. The Buyer and the Sellers shall, at any time and from time to time after the Closing Date, upon the reasonable request of the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such further (a) assignments, transfers and conveyances as may be required for assigning, transferring, granting, conveying and confirming the transactions contemplated hereby, including aiding and assisting the Buyer in collecting and reducing to possession any or all of the Assets and (b) documents and instruments as may be reasonably necessary for the further completion of any of the transactions contemplated hereby.

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers, jointly and severally, represent that the following are true and correct as of the date hereof and shall be true and correct at the date of the Closing after giving effect to the

14

Sale Order (taking into account any updates to Sellers' Disclosure Schedules contemplated by Section 6.10 hereunder):

4.1    Organization and Power.  Each Seller (a) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of its organization, (b) is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not have a Material Adverse Effect, (c) has all requisite limited liability company power and authority to carry on its business as currently conducted, and (d) has the requisite limited liability company power and authority to own, lease, operate or hold the applicable Assets.

4.2    Authority; No Conflicts.  Subject to the Bankruptcy Court's approval and entry of the Sale Order, each Seller has the authority to enter into and consummate this Agreement and the Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby. Subject to the Bankruptcy Court's approval and entry of the Sale Order, the execution, delivery and performance by each Seller of this Agreement and of the Ancillary Agreements to which it is a party (a) do not and shall not violate or conflict with any provision of the articles of organization or limited liability company agreement of such Seller, (b) do not and shall not violate any provision of any Applicable Law or any order, judgment or decree of any Governmental Entity or any Governmental Authority, (c) do not and shall not violate or result in a material breach of or constitute (with due notice or lapse of time or both) a material default under any Assumed Contract that is a Material Contract, and (d) shall not result in the creation or imposition of any Lien upon any of the Assets.

4.3    Execution and Delivery.  Subject to the Bankruptcy Court's approval and entry of the Sale Order, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by the Sellers have been duly authorized by all necessary company action, and the execution and performance of the Ancillary Agreements by the Sellers has been or shall be authorized by all necessary company action prior to the Closing Date. Subject to the Bankruptcy Court's approval and entry of the Sale Order, this Agreement constitutes, and upon execution of each of the Ancillary Agreements such agreements shall constitute, valid and binding obligations of the Sellers, enforceable against the Sellers in accordance with their respective terms.

4.4    Sale Free and Clear of Liens.  On the Closing Date or such other applicable date as provided in Section 1.4, after giving effect to the Sale Order, (a) the Assets shall be transferred to the Buyer free and clear of all Liens (except for Permitted Liens) and Excluded Liabilities and (b) the Buyer shall obtain good title to the Assets free and clear of all Liens (except for Permitted Liens) and Excluded Liabilities.

15

4.5    <u>Ownership of Assets; Sufficiency; Subsidiaries</u>.

(a)    Except as set forth on <u>Schedule 4.5</u>, the Sellers collectively have good title to, or valid leasehold interests in, the Assets.

(b)    No Seller has any equity participation in any Person that is not another Seller.

(c)    Parent is the holder of all ownership interests of Family Christian, LLC and Family Christian, LLC is the parent of Giftco.

4.6    <u>Taxes</u>.  Except as set forth on <u>Schedule 4.6</u>, the Sellers have timely filed all Tax returns required to be filed prior to the date hereof, and have paid (or shall pay on or before the Closing) all Taxes shown to be due thereon, and with respect to real property Taxes, to the extent due and payable. The amount of Taxes of whatever kind pertaining to the Assets and the Business and required to be paid by the Sellers for all periods up to and including the Closing Date (including all material ad valorem and other property Taxes relating to the Assets) shall be accurately reflected in the schedules filed by the Sellers with the Bankruptcy Court.

4.7    <u>Material Contracts</u>.  <u>Schedule 4.7</u> sets forth a list of the Material Contracts. Each Assumed Contract that is a Material Contract is valid, binding and enforceable against the Sellers, as applicable, in accordance with its terms, and is in full force and effect on the date of this Agreement.

4.8    <u>Permits; Compliance with Laws</u>.

(a)    The Sellers possess all permits, Licenses, approvals, authorizations, consents or filings with Governmental Authorities necessary for the conduct of the Business (the "<u>Permits</u>") other than Permits that (a) are not customarily required to be obtained in connection with businesses having operations similar to those of the Business, (b) could, in the reasonable judgment of the Sellers, be obtained in the ordinary course of business after Closing through routine, administrative filings, and (c) if not obtained, would not, individually or in the aggregate, materially and adversely affect the Buyer, the Assets or the Business.  All material Permits issued to the Sellers are in full force and effect.

(b)    The operation of the Business by the Sellers complies in all material respects with all Applicable Laws and the requirements and conditions of all Permits, including all applicable operating certificates and authorities, and all other rules, regulations, directives and policies of all Governmental Authorities having jurisdiction over the Business.

4.9    <u>Third Party Approvals</u>.  Except for (a) entry of the Sale Order, and (b) approvals or consents set forth on <u>Schedule 4.9</u>, the execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby do not require any material consent, waiver, authorization or approval of, or filings with, any Person (including any Governmental Authority) that has not been obtained or is not deemed to be superseded by

16

applicable provisions of the Bankruptcy Code (the matters described in this Section 4.9, collectively referred to as the "Consents").

      4.10    Real Estate. The Sellers do not own any real property. Schedule 4.10 sets forth a list of the Real Property Leases. Except as set forth on Schedule 4.10, the Sellers have, and at Closing, or as of the assignment date pursuant to Section 1.4, shall transfer to the Buyer, a valid leasehold interest in the premises subject to the Assumed Real Property Leases, free and clear of any Liens that have been granted by Sellers (except for Permitted Liens) and Excluded Liabilities.

      4.11    Employment and Benefit Matters.

      (a)    All Employee Plans sponsored or contributed to by the Sellers, covering employees of the Sellers, or for which the Sellers may have any liability are set forth on Schedule 4.11(a), including its 401(k) plan. Schedule 4.11(a) identifies the plan sponsor for each such Employee Plan.  Except as provided on Schedule 4.11(a) and except for health continuation coverage as required by Section 4980B of the Code or Part 6 of Title I of ERISA, the Sellers do not have any liability for severance, life, health, medical or other welfare benefits to former employees or beneficiaries or dependents thereof that shall affect the Buyer or the Assets.

      (b)    The Sellers do not have any employment agreements with any of its employees that are not terminable at will without material cost or expense at the election of Sellers, except for those set forth on Schedule 4.11(b).

      (c)    Within five (5) Business Days prior to the Closing Date, Sellers shall provide to Buyer Schedule 4.11(c) which shall list all employees of Sellers.

      (d)    All contributions, premiums and expenses to or in respect of each Employee Plan for any period through the Closing Date have been timely made or paid in full or, to the extent not required to be made or paid on or before the Closing Date, and a Schedule of such amounts shall be provided to Buyer within five (5) Business Days prior to the Closing Date.

      4.12    Intellectual Property.

      (a)    Schedule 4.12(a) includes a listing of all of the patents, trademark, service mark and copyright registrations, domain names and the pending patent, trademark and copyright applications for Intellectual Property that are owned by the Sellers.

      (b)    Schedule 4.12(b) includes a listing of all licenses and other agreements to which any Seller is a party that are material to the operation of the Business and pursuant to which any Seller authorizes any other Person to use any Intellectual Property, and also includes a listing of all licenses and other agreements pursuant to which Intellectual Property that is used in and material to the operation of the Business and owned by Persons other than the Sellers is licensed to the Sellers (excluding in each instance licensed software related to back office systems that is not customized for Sellers and is generally available for purchase or lease).

(c)     Each material item of Transferred Intellectual Property owned by the Sellers is valid, subsisting and in full force and effect. The Sellers have taken reasonable measures to protect and maintain all of the Sellers' rights in the Transferred Intellectual Property.

4.13    Insurance.  Schedule 4.13 contains an accurate and complete list of all material policies or binders of property, general liability, workmen's compensation, automobile liability and pollution legal liability insurance held by or on behalf of the Sellers in connection with the Business.

4.14    Accounts Receivable and Assumed Liabilities. All Transferred Accounts Receivables represent bona fide transactions and have arisen in the ordinary course of business. All of the Assumed Liabilities represent bona fide transactions and have arisen in the ordinary course of business, taking into account the pendency of the Cases.

4.15    Termination of Representations and Warranties Upon Closing.   The representations and warranties of the Sellers in this Article 4 shall not survive the Closing Date and shall be null and void *ab initio* and of no further force or effect immediately after the Closing Date.

4.16    Disclaimer of Other Representations and Warranties.   The representations and warranties set forth in this Article 4 are the only representations and warranties made by the Sellers with respect to the Business, the Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement.  Except as specifically set forth in this Article 4: (a) the Sellers are selling the Assets to Buyer  "as is" and "where is" and with all faults, and make no warranty, express or implied, as to any matter whatsoever relating to the Business, the Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by Buyer after the Closing in any manner or (iii) the probable success or profitability of the Business after the Closing, and (b) none of the Sellers, any of their Affiliates, or any of their respective officers, directors, employees, agents, representatives, members or managers will have, or will be subject to, any liability or indemnification obligation to Buyer or any other Person resulting from the distribution to Buyer or its Affiliates or representatives of, or the Buyer's use of, any information relating to the Business including any descriptive memoranda, summary business descriptions or any information, documents or material made available to Buyer or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of Buyer or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers that the following are true and correct as of the date hereof and shall be true and correct at the date of the Closing:

18

5.1     Organization and Power. The Buyer (a) is a duly organized, validly existing entity under Applicable Laws and in good standing in the State of its organization, (b) has all requisite power and authority to carry on the business in which it is now engaged, and (c) has taken all action required by Applicable Law, and by the Buyer's organizational documents, to authorize the execution and delivery of this Agreement and the purchase of the Assets and assumption of the Assumed Liabilities in accordance with this Agreement.

5.2     Authority; No Conflicts. The Buyer has the requisite power and authority (including full limited liability company power and authority) to execute this Agreement and each Ancillary Agreement to which the Buyer is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Buyer of this Agreement and each Ancillary Agreement to which the Buyer is a party (a) do not and shall not violate or conflict with any provision of the articles of organization or limited liability company agreement of the Buyer, and (b) do not and shall not violate any provision of any Applicable Law or any order, judgment or decree of any Governmental Entity or any Governmental Authority.

5.3     Execution and Delivery. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary limited liability company action on the part of the Buyer, and the execution and performance of each Ancillary Agreement to which the Buyer is a party has been or shall be authorized by all necessary limited liability company action on the part of the Buyer prior to the Closing Date. This Agreement constitutes, and upon execution by the Buyer of each of the Ancillary Agreements to which it is a party, such agreements shall constitute, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms.

5.4     Litigation. There is no claim, litigation, action or legal proceeding before a Governmental Authority or Governmental Entity or, to the Buyer's knowledge, threatened against the Buyer, adversely affecting the Buyer's ability to perform its obligations hereunder.

5.5     No Brokers. The Buyer has not utilized the services of or contracted or dealt with a broker or finder in connection with any of the transactions contemplated by this Agreement, including the Buyer's purchase of the Assets or any portion thereof, and no commission or other compensation is or shall be due or owed from the Buyer to any Person with respect to the purchase and sale of the Assets.

5.6     Termination of    Representations and Warranties Upon Closing.    The representations and warranties of the Buyer in this Article V shall not survive the Closing Date and shall be null and void *ab initio* and of no further force or effect immediately after the Closing Date.

# ARTICLE 6

## COVENANTS OF THE SELLERS

Each Seller covenants and agrees with the Buyer that:

6.1     Access. Prior to the Closing, and on the basis that the Buyer shall have executed a Non-Disclosure Agreement in customary form and otherwise consistent with Section 6.9 hereof, the Sellers shall afford to the authorized representatives of the Buyer reasonable access during normal business hours to the Business, Leased Real Property, facilities, books and records (regardless of form or medium, which shall include source code and related documentation, databases, and other electronic media), and senior management so as to afford the Buyer reasonable opportunity to make such review, examination and investigation of the Business as the Buyer reasonably determine is necessary in connection with the consummation of the transactions contemplated hereby and the financing thereof, and during such period the Sellers shall furnish, as reasonably promptly as practical, to the Buyer and its representatives any information they may reasonably request; *provided* that (a) the Buyer shall provide the Sellers with sufficient advance notice of such access (which shall be no less than two (2) Business Days) to permit the Sellers to designate a party to accompany the Buyer when they are visiting the Sellers' facilities should they so desire, and (b) the foregoing right of access shall not be exercisable in such a manner as to interfere in a material way with the normal operations and business of the Sellers. The Buyer shall be permitted to make extracts from or to make copies of such books and records as may be reasonably necessary in connection therewith; provided that in the event that either Seller has executed an agreement with a third party providing that any information in its possession from such third party is covered by confidentiality protections, such Seller shall not provide access to such information to the Buyer until such Seller has obtained the necessary waivers from such third party to permit the disclosure to the Buyer of such information and such Seller shall use its reasonable best efforts to obtain such waivers.  All requests for information pursuant to this Section 6.1 shall be directed to any of the persons listed on Schedule 6.1 hereto or any other such additional person as may be designated by the Sellers. All information received pursuant to this Section 6.1 shall be governed by the confidentiality provisions of Section 6.9. In addition, the Sellers shall allow the Buyer and its representatives access after the Closing to the Tax records of the Business retained by the Sellers, as specified as an Excluded Asset pursuant to Section 1.3(a), to the extent necessary by the Buyer in its ongoing Tax compliance procedures.

6.2     Reasonable Best Efforts.  Each Seller shall use its reasonable best efforts to cause, to the extent within such Sellers' control, the conditions set forth in Article 8 to be satisfied and to facilitate and cause the consummation of the transactions contemplated hereby.

6.3     Notice to the Buyer.  Each Seller agrees to promptly notify the Buyer in writing of any information it obtains or becomes aware of that would indicate that a representation and warranty of the Sellers made herein or in any Schedule hereto is not correct in all material respects or that any of the conditions to Closing shall not be satisfied.

6.4     New Commitments.  Without the prior written consent of the Buyer (which shall not be unreasonably withheld), no Seller shall prior to the Closing (a) other than in accordance with the Bid Procedures Order, enter into any new agreement or commitment with respect to the Assets or the Business other than in the ordinary course operation of the Business, (b) modify or terminate any existing agreements relating to the Assets other than in the ordinary course operation of the Business, or (c) encumber, sell or otherwise dispose of any of the Assets other than personal property that is replaced by equivalent property or consumed in the normal, ordinary course operation of the Business, except for any commitment as set forth on Schedule 6.4 sought pursuant to motions pending with or approved by the Bankruptcy Court as of the date hereof.

6.5     Maintenance of Interests.  The Seller shall use their reasonable best efforts from the date of execution of this Agreement until the Closing to maintain and operate the Business and Assets (or cause the Business and Assets to be maintained and operated) in the ordinary course of business consistent with past practice, in a reasonable and prudent manner, in full compliance with Applicable Law, to maintain insurance now in force with respect to the Assets, and, subject to applicable bankruptcy law, to pay when due all costs and expenses coming due and payable in connection with the employment of employees and normal maintenance and operation of the Assets, including the Employee Plans.  Without limiting the generality of the foregoing and without the prior written consent of the Buyer, neither Seller shall, except for the items set forth on Schedule 6.5 which are being sought pursuant to motions pending with or approved by the Bankruptcy Court as of the date hereof:  (a) introduce any materially new or different method of maintenance, operation or accounting with respect to the Business and the Assets, (b) incur any liabilities other than in the ordinary course of business, (c) enter into, amend or terminate any employment, bonus, severance or retirement contract or arrangement, nor increase any salary or other form of compensation payable or to become payable to any executives or employees of the Business other than in the ordinary course of business consistent with past practice, or (d) sell, lease or otherwise dispose of or agree to sell, lease or otherwise dispose of, any of its assets, properties, rights or claims, except for sales of Inventory in the ordinary course of business consistent with past practice.

6.6     Reports and Information.  Each Seller shall, promptly on receipt, deliver to the Buyer copies of all notices, reports, demands, claims, appraisals, and similar information supplied by any Person asserting a Lien, or by any Governmental Authority making a claim outside the ordinary course of business, respecting the Assets, or their ownership or operation.  Prior to Closing, the Sellers shall deliver to the Buyer monthly financial statements within thirty (30) days of the applicable month-end, which financial statements shall be similar in scope to and shall be prepared on a consistent basis with, the monthly financial statements previously provided to the Buyer.

6.7     Consents and Approvals.  The Sellers shall use their reasonable best efforts to obtain all Consents required by the Bankruptcy Code or other Applicable Law to be obtained by the Sellers to effect the transactions contemplated hereby.  Without limiting the foregoing, as soon as practicable after the date of this Agreement, the Sellers shall make or cause to be made all such further filings and submissions, and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis.

6.8    <u>Employee and Employee Benefits Obligations</u>. Other than the liabilities and obligations with respect to the Transferred Employees that the Buyer has expressly agreed to assume, perform and become responsible for in accordance with Section 7.4, the Sellers shall retain and be responsible for all liabilities and obligations with respect to its current and former employees and their dependents and beneficiaries, including, without limitation, all liabilities and obligations for wages and all liabilities and obligations arising under any Employee Plan sponsored, maintained or contributed to (or to which there has been an obligation to contribute) at any time by the Sellers.

6.9    <u>Confidentiality</u>. From and after the Closing, the Sellers, on the one hand, and the Buyer, on the other hand, shall, and shall cause their respective directors, officers, employees, agents, brokers, advisors (including attorneys, accountants, lenders, consultants, and any representatives of such advisors), representatives, investment and commercial bankers, and Affiliates (collectively, "<u>Representatives</u>"), to keep confidential all, and not use or divulge to any Person (other than to the other party and its Representatives) any of the trade secrets or private or confidential information relating to the Assets, the Business, or Buyer, including private, secret and confidential information relating to such matters as the finances, methods of operation and competition, marketing plans and strategies, equipment and operational requirements and information concerning personnel, customers, and suppliers of the Sellers or Buyer generally (collectively "<u>Confidential Information</u>"), unless such information (i) is or becomes generally available to the public other than as a result of a disclosure by such party or their respective Representatives, (ii) is legally compelled to be disclosed whether by Applicable Law or order of a Governmental Authority; *provided*, however that the affected party shall provide to the other with prompt written notice of such legal compulsion so that such other party may seek a protective order or other available remedy.  If a protective order or other remedy is not obtained and the affected party does not obtain from the other party a waiver of compliance with this section, the affected party nevertheless may disclose such information that knowledgeable counsel advises the affected party in writing must be disclosed lest the affected party stand liable for contempt or other material censure or penalty.  The affected party will use their best efforts to obtain reliable assurance that information so disclosed will be treated confidentially by any disclosee.  The obligations of non-use and non-disclosure contained in this shall cease to apply as of the third (3rd) anniversary of the Closing Date with respect to any such information that does not constitute a trade secret under Applicable Law.  Nothing herein shall be deemed to abridge or lessen any greater or larger protections afforded to trade secrets under applicable Law.

6.10    <u>Update to Disclosure Schedules</u>. From the date hereof until the Closing Date, the Sellers shall disclose to the Buyer in writing (in the form of a supplement to the Disclosure Schedules): (i) Disclosure Schedules which are expressly contemplated to be delivered after the date hereof, or (ii) any newly arising or occurring fact, condition, event or occurrence that will or is reasonably likely to cause any of the representations and warranties contained in Article 4 hereof to be untrue or inaccurate in any material respect at any time from the date hereof until the Closing Date. Such disclosures pursuant to this Section 6.10 shall amend, cure and supplement the appropriate Disclosure Schedules delivered on the date hereof and attached hereto.

22

## ARTICLE 7

## COVENANTS OF THE BUYER

The Buyer covenants and agrees with the Sellers that:

7.1   <u>Reasonable Best Efforts</u>. The Buyer shall use its reasonable best efforts to cause, to the extent within the Buyer's control, the conditions set forth in Article 8 to be satisfied and to facilitate and cause the consummation of the transactions contemplated hereby.

7.2   <u>Notice to the Sellers</u>. The Buyer agrees to promptly notify the Sellers in writing of any information the Buyer obtains or becomes aware of that would indicate that a representation and warranty of the Buyer made herein or in any Schedule hereto is not correct in all material respects.

7.3   <u>Bankruptcy Court Approval and Related Matters</u>. The Buyer shall use reasonable best efforts to assist the Sellers in obtaining any Orders necessary to consummate the transactions contemplated hereby and any Orders ancillary hereto and agree to provide the Sellers with information necessary to obtain such Orders.

7.4   <u>Transferred Employees</u>.

(a)   At least five (5) days prior to (i) the Closing Date with respect to those Stores or Distribution Centers subject to Assumed Real Property Leases to be assigned to the Buyer on the Closing Date or (ii) the expected assignment date with respect to those Stores and Distribution Centers subject to Assumed Real Property Leases to be assigned to the Buyer after the Closing Date in accordance with Section 1.4, the Buyer shall deliver, in writing individually or generally, an offer of employment commencing on the Closing Date or assignment date, as applicable, and contingent upon the Closing or such assignment, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by the Buyer and such employee),  to substantially all of the employees who remain employed by the Sellers and are employed at the applicable Store or Distribution Center. In addition, the Buyer may deliver such offers of employment to other employees of the Sellers, including at the Home Office, at the sole discretion of the Buyer.  The Buyer shall extend an offer of employment to employees normally employed at the Stores and Distribution Centers who are on an approved leave of absence for workers compensation, disability, military, family illness or parental leave as of the Closing Date or applicable assignment date to at least the same extent, if any, as such employees would be entitled to reemployment under Applicable Law. The individuals who accept offers of employment extended by the Buyer pursuant to this Section 7.4(a) are hereinafter referred to as the "<u>Transferred Employees</u>." In supplement of the foregoing, Buyer convenants to offer sufficient offers of employment so as not to trigger any notification obligations under the WARN Act.

(b)   The Buyer shall assume and be responsible for the payment of (i) all wages due to the Transferred Employees accrued since the last regular payroll date prior to the Closing Date or assignment date, as applicable, (ii) all amounts due to the Transferred

Employees (or to service providers for benefits provided to Transferred Employees or their dependents) under the employment policies and Employee Plans of the Sellers immediately prior to the Closing Date or assignment date, as applicable, with respect to all benefits provided under the Employee Plans, including accrued and unused vacation, sick days and personal days, medical and dental (including incurred but not reported claims and claims reported but not yet paid), (iii) all workers' compensation liabilities relating to the Transferred Employees (including incurred but not reported claims and claims reported but not yet paid) as shown on Schedule 7.4(b), and (iv) all severance obligations with respect to the Transferred Employees whose employment with the Buyer or its Affiliates terminates for any reason other than cause within 12 months after the Closing Date or assignment date, as applicable. All such liabilities shall be deemed to be Assumed Liabilities. The Buyer shall be responsible for all compensation and benefits payable or provided to the Transferred Employees and any other employees of the Buyer or its Affiliates from and after the Closing Date or applicable assignment date.

(c)    Buyer or an entity affiliated with Buyer shall assume the Employee Plans sponsored by Sellers identified on Schedule 4.11(a). The Transferred Employees shall continue participation in all such assumed Employee Plans and in all Employee Plans sponsored by Family Christian Resource Center, Inc. effective as of the Closing Date in accordance with the terms of such Employee Plans.

## ARTICLE 8

## CONDITIONS TO CLOSING

8.1    Sellers' Conditions to Closing.  The obligations of the Sellers at the Closing are subject, at the option of the Sellers, to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)    All representations and warranties of the Buyer contained in this Agreement shall be true in all material respects at and as of the Closing and the Buyer shall have performed and satisfied all material obligations in all material respects required by this Agreement to be performed and satisfied by the Buyer at or prior to the Closing.  The Buyer shall have provided the Sellers with certificates executed by a responsible officer of the Buyer to such effect;

(b)    No stay or injunction shall have been obtained by a court of competent jurisdiction restraining, prohibiting or declaring illegal the purchase and sale contemplated by this Agreement;

(c)    The Bankruptcy Court shall have entered the Sale Order; and

(d)    The Buyer shall have executed and delivered the documents required to be executed and delivered pursuant to Section 3.3.

24

8.2    Buyer's Conditions to Closing.  The obligations of the Buyer to consummate the transactions contemplated hereby at the Closing are subject, at the option of the Buyer, to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)    All representations and warranties of the Sellers contained in this Agreement  and the Ancillary Agreements shall be true in all material respects at and as of the Closing and the Sellers shall have performed and satisfied in all material respects all obligations required by this Agreement and the Ancillary Agreements to be performed and satisfied by the Sellers at or prior to the Closing.  The Sellers shall have provided the Buyer with certificates executed by a responsible officer of the Sellers to such effect;

(b)    No stay or injunction shall have been obtained by a court of competent jurisdiction restraining, prohibiting or declaring illegal the purchase and sale contemplated by this Agreement;

(c)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order;

(d)    All material Consents required to be obtained by the Sellers for the Closing shall have been obtained;

(e)    [Intentionally Blank];

(f)    No less than 75% of the Consignment Vendors, based upon the aggregate Sellers' book value of all of the Consignment Goods that are Transferred Inventory, are Consenting Consignment Vendors;

(g)    No less than 65% of the Trade Creditors supplying goods and/or services to the Sellers within 12 months before the Petition Date based upon the aggregate Sellers' book value of the goods and/or services supplied to the Sellers within 12 months before the Petition Date, including all of the original members of the Official Committee of Unsecured Creditors appointed in the Cases, agree in writing to provide Trade Terms to the Post-Closing Business for no less than one (1) year following the Closing Date;

(h)    Prior to the hearing on the Sale Motion, the Official Committee of Unsecured Creditors appointed in the Cases files a document in the Bankruptcy Court satisfactory to the Buyer restating and correcting certain factual allegations contained in its prior filings regarding the ownership and control of certain entities;

(i)    The Sellers shall have executed and delivered the documents required to be executed and delivered pursuant to Section 3.2; and

(j)    The Sellers shall have obtained from the Bankruptcy Court an Order pursuant to Section 365(d)(4)(B)(i) of the Bankruptcy Code extending for 90 days the time to assume or reject unexpired leases of nonresidential real property.

# ARTICLE 9

## ADDITIONAL OBLIGATIONS AFTER CLOSING

The Parties shall have the following additional obligations after the Closing:

9.1    Execution; Delivery of Instruments and Assistance. The Sellers and the Buyer shall each execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments and take such other actions as may be necessary or advisable to carry out their obligations under this Agreement and under any document, certificate or other instrument delivered pursuant hereto or thereto or required by Applicable Law.

9.2    Name Change.  The Sale Order shall require that, promptly after the Closing Date each Seller shall change its name to a name that is not (and that is not confusingly similar to) "Family Christian" or "FCS", and each Seller shall correspondingly change the caption of each of the Cases to reflect such new names, it being the intent of the Parties that from and after the Closing, the Buyer shall have the sole right to conduct business under such name.

9.3    Access to Records.  From and after the Closing Date, the Sellers on the one hand and the Buyer on the other hand shall afford each other and their respective Representatives such access to records in respect of the Sellers' businesses which, after the Closing, are in the custody or control of the other Party and which such Party reasonably requires, including in order to comply with its obligations under Applicable Law, including, but not limited to, audits by Tax authorities, or which the Buyer reasonably requires to comply with its material obligations under the Assumed Liabilities. Each Party may require the other Party or its Representatives to enter into a confidentiality agreement in customary form in connection with providing access to the records of such Party.

9.4    Turnover of Assets Post-Closing. The Sellers shall promptly deliver to the Buyer any Cash, checks, Inventory or other property they may receive or that are determined to be owned by the Sellers after the Closing in respect of the Assets, including the Transferred Accounts Receivable, credit card receipts and any Consignment Goods that are determined by an Order of the Bankruptcy Court to be owned by the Sellers.

9.5    Privacy.  On or prior to the Closing Date, the Buyer shall adopt a written policy with respect to protection of the confidentially of personally identifiable information regarding the customers and employees of the Business and other Persons not affiliated with the Sellers that initially includes provisions substantially similar to those included in the written privacy policies of the Sellers in effect as of the date of this Agreement.  From and after the Closing Date, the Buyer shall comply with such policy, or such successor policies adopted by Buyer from time to time, and Applicable Law with respect to the protection of such personally identifiable information.

26

## ARTICLE 10

## TERMINATION

10.1    <u>Termination</u>. This Agreement may be terminated as follows:

(a)    At any time by the mutual written agreement of the Sellers and the Buyer;

(b)    Intentionally blank;

(c)    Automatically, upon either any of the Sellers' entry into any agreement seeking to consummate any Acquisition Transaction between any of the Sellers and a party other than the Buyer, or the Bankruptcy Court entering an order authorizing any of the Sellers to enter into any such agreement;

(d)    By the Buyer, at its sole election, in the event that the Closing shall not have occurred on or before June 19, 2015; provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 10.1(d) if the failure of the Closing to occur on or prior to such date results primarily from the Buyer itself materially breaching any representation, warranty or covenant contained in this Agreement;

(e)    By the Sellers, at their sole election, in the event that the Closing shall not have occurred on or before June 19, 2015; provided that the Sellers shall not be entitled to terminate this Agreement pursuant to this Section 10.1(e) if the failure of the Closing to occur on or prior to such date results primarily from the Sellers materially breaching any representation, warranty or covenant contained in this Agreement;

(f)    By the Buyer, at its sole election, in the event of a material breach of this Agreement by the Sellers that has not been cured, or if any representation or warranty of the Seller shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured by the later of (i) June 19, 2015 and (ii) fifteen (15) days after written notice of such breach; provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 10.1(f) if such termination right results primarily from the Buyer itself materially breaching any representation, warranty or covenant contained in this Agreement;

(g)    By the Sellers, at their sole election, in the event of a material breach of this Agreement by the Buyer that has not been cured, or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured by the later of (i) June 19, 2015 and (ii) fifteen (15) days after written notice of such breach; provided that the Sellers shall not be entitled to terminate this Agreement pursuant to this Section 10.1(g) if such termination right was caused by the Sellers or results primarily from the Sellers materially breaching any representation, warranty or covenant contained in this Agreement;

27

(h)     By the Buyer, at its sole election, upon the granting of any motion for relief from the automatic stay which would have a Material Adverse Effect, the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, the dismissal of any of the Cases, the filing of any plan of reorganization by any party in interest that does not incorporate this Agreement or the filing of any motion by a party in interest in any of the Cases to liquidate the Assets or any similar commencement of liquidation proceedings relating to Sellers, other than as contemplated herein;

(i)     By the Buyer upon the entry of an order by the Bankruptcy Court for the appointment of a trustee or examiner, other than at the request of the Buyer;

(j)     By the Buyer if any of the Sellers breaches or violates any Order entered in any of the Cases authorizing the use of cash collateral or the obtaining of financing, or if any Sellers become prohibited from using cash collateral or financing under any such order;

(k)     By Buyer or Sellers if there is in effect a Final Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(l)     By Buyer if the hearing on the Sale Motion is not concluded by June 5, 2015; or the Sale Order is not entered by June 5, 2015;

(m)     By Buyer, if the Bid Procedures Order or Sale Order is vacated, stayed or reversed, or supplemented, amended, or modified in a manner detrimental to Buyer, in Buyer's sole discretion; or

(n)     By Buyer, if the Buyer is not selected as the Successful Bidder at the conclusion of the Auction, it being agreed that Buyer shall in no event, absent further agreement in its sole discretion, be required to serve in the role of Next Highest Bidder.

10.2     <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with Section 10.1, the Parties shall be relieved of any further obligations or liability under this Agreement other than (a) confidentiality obligations contained in Section 6.9, (b) any obligations for material breach of this Agreement occurring prior to such termination, (c) obligations contained in Section 2.6 and (d) any obligations contained in Article 11.  Notwithstanding the foregoing, the forfeiture of all of the Deposit shall be the sole and exclusive remedy of the Sellers for any breach by Buyer of this Agreement.

# ARTICLE 11

## CHAPTER 11 BANKRUPTCY PROCEEDING

11.1     <u>Sale Order; Notices to Third Parties</u>.

(a)     Sellers shall seek prompt entry of the Sale Order pursuant to the Sale Motion after sufficient notice has been given, which Sale Order shall include, among other things, findings of fact and conclusions of law that the Buyer is not a successor in interest to the

28

Sellers or any Affiliate of Sellers, that the Buyer is a good faith purchaser pursuant to Bankruptcy Code Section 363 and the other findings of fact and conclusions of law set forth in Exhibit A to this Agreement.

(b)    The Sellers shall promptly provide Buyer with drafts of all documents, motions, orders, filings, or pleadings that Sellers propose to file with the Bankruptcy Court or any other court or tribunal that relate in any manner, directly or indirectly, to (i) this Agreement or the transactions contemplated hereby; (ii) the Sale Motion; or (iii) entry of the Sale Order, and will provide Buyer with at least 48 hours, or as much notice as is possible under the circumstances, to review such documents in advance of their service and filing. The Sellers shall consult and cooperate with Buyer, and consider in good faith the views of Buyer, with respect to all such filings. The Sellers shall not make any disclosures (including any statements or schedules) in connection with the Cases that are inconsistent in any material respect with the representations, warranties or related Disclosure Schedules set forth in or delivered in connection with this Agreement. Seller will give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and Buyer will have the right to attend and seek to be heard at any such hearings.

11.2    <u>Information</u>.  The Sellers shall supply to the Buyer within 24 hours any information not heretofore already given to the Buyer regarding the Business that the Sellers supply to any other bidder.

11.3    <u>Defense of Orders</u>.  The Sellers, at their sole cost and expense, shall diligently defend the Bid Procedures Order and the Sale Order in the event that any motion for reconsideration or appeal of either such Order is filed.

## ARTICLE 12

## GENERAL PROVISIONS

12.1    <u>Notice</u>.  All notices hereunder shall be in writing, dated and signed by the Party giving the same.  Each notice shall be either (a) delivered in person to the address of the Party for whom it is intended at the address of such Party as shown below, (b) delivered to the United States Postal Service in a secure and sealed envelope or other suitable wrapper addressed to the Party for whom it is intended at the address of such Party as provided below, with sufficient postage affixed, certified or registered mail, return receipt requested, (c) transmitted via telecopy (or other facsimile device) or electronic mail to the number or e-mail address set out below if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid) or (d) delivered to a nationally recognized overnight courier service that traces any such notice. The effective date of such notice shall be the date of delivery in the event of delivery in accordance with (a) or (c), five (5) days after deposit in the U.S. Mail in the event of delivery in accordance with (b), the next Business Day and in the event of delivery in accordance with (d). The address at which any Party hereto is to receive notice may be changed from time to time by such Party by giving notice of the new address to all other parties hereto. The addresses of the Parties, until changed in accordance with the foregoing, are:

29

The Sellers:                Family Christian Holding, LLC
                            5300 Patterson Ave. SE
                            Grand Rapids, Michigan 49530
                            Attn:  Chuck Bengochea, President
                            Facsimile: 616-554-8608
                            Email:   chuck.bengochea@familychristian.com


And copies (which
shall not constitute
notice) to:                 Burr & Forman LLP
                            171 17th Street, NW
                            Suite 1100
                            Atlanta, GA 30363
                            Attn:  Eric Durlacher, Esq.
                            Facsimile: (404) 817-3244
                            Email:  edurlacher@burr.com


The Buyer:                  FCS Acquisition, LLC
                            2655 Northwinds Parkway
                            Alpharetta, GA 30009
                            Attn: Dennis Stockwell, Esq.
                            Facsimile: 678-658-4521
                            Email: dstockwell@jacksonhealthcare.com


And copies (which
shall not constitute
 notice) to:                Kilpatrick Townsend & Stockton LLP
                            1100 Peachtree St. NE, Suite 2800
                            Atlanta, Georgia 30309
                            Attn: David Stockton, Esq.
                            Facsimile:  (404) 541-3402
                            Email: Dstockton@kilpatricktownsend.com


    12.2   <u>Amendment</u>.  This Agreement may not be amended nor any rights hereunder waived except by an instrument in writing signed by the Parties.

    12.3   <u>Payment of Costs</u>.  Except as otherwise set forth herein, the Parties shall each pay their own costs incurred in negotiating this Agreement and in consummating the transactions contemplated hereby, including any fees or commission payable to any party representing them in connection with arranging or negotiating this Agreement and transactions contemplated hereby.

12.4    Headings. The headings of the sections of this Agreement are for convenience or reference only and shall not affect any of the provisions of this Agreement.

12.5    References.    References made in this Agreement, including use of a pronoun, shall be deemed to include, where applicable, masculine, feminine, singular or plural, individuals, partnerships or corporations.

12.6    Applicable Law. This Agreement and the transactions contemplated hereby shall be construed in accordance with and governed by the laws of the State of Georgia.  Each of the Parties agrees that any proceeding brought to enforce the rights and obligations of any Party under this Agreement (including the schedules attached hereto) or any Ancillary Agreement shall be commenced and maintained exclusively in the Bankruptcy Court and that the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.

12.7    Entire Agreement. This Agreement, the Disclosure Schedules attached hereto, and the Ancillary Agreements (in each case incorporated herein by this reference) contain the entire agreement and understanding of the Parties hereto with respect to the transactions contemplated hereby, and supersede any and all prior agreement, arrangements, and understandings, whether oral or written, between the Parties.

12.8    Authorization of Parent as Representative of the Sellers.

(a)    By entering into and executing this Agreement, the Sellers irrevocably appoint Parent as their agent, effective as of the date hereof, and authorize and empower Parent to fulfill the role of the Sellers' representative hereunder, and each Seller appoints Parent as such Person's true and lawful attorney in fact and agent, for all purposes necessary or desirable in order for Parent to take all actions contemplated by this Agreement, with the ability to execute and deliver all instruments, certificates and other documents of every kind incident to the foregoing for all purposes and with the same effect as such Seller could do personally, including to give and receive notices and communications; to object to such deliveries, to agree to, negotiate, enter into settlements and compromises of, and comply with orders of courts with respect to such claims; and to take all actions necessary or appropriate in the judgment of Parent for the accomplishment of the foregoing.  The power of attorney granted in this Section 12.8(a) is coupled with an interest and is irrevocable.

(b)    The Buyer shall be entitled to rely exclusively upon any communication given or other action taken by Parent pursuant to this Agreement, and shall not be liable for any action taken or not taken in good faith reliance on a communication or other instruction from Parent.

12.9    Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the Parties and, except as otherwise prohibited, their respective successors and assigns, including any trustee, liquidating agent or similar entity.  Nothing contained in this Agreement, or implied herefrom, is intended to confer upon any Person other than the Parties any benefits, rights, or remedies.

31

12.10  Assignment.  No Party may assign all or any portion of its respective rights or delegate any portion of its duties hereunder without (a) the approval of the Bankruptcy Court and (b) the written consent of the other Parties; *provided* that (i) the Buyer may collaterally assign this Agreement to its lenders without the consent of the Sellers, and (ii) the Buyer may assign this Agreement in whole or in part to any Affiliate of the Buyer so long as the Buyer retains its obligations under this Agreement, subject to the terms and conditions hereof, to effect the consummation of the transactions contemplated hereby. All of the terms, provisions and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors, assigns and legal representatives.

12.11  Severability.  If a court of competent jurisdiction determines that any provision of this Agreement is void, illegal or unenforceable, the other provisions of this Agreement shall remain in full force and effect and the provisions that are determined to be void, illegal or unenforceable shall be limited so that they shall remain in effect to the extent permissible by Applicable Law.

12.12  Publicity.  Prior to the Closing, no Party shall issue any press release or similar public announcement concerning the transactions contemplated hereby or the contents of this Agreement without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, nothing in this Section 12.12 shall preclude any Party (or Person controlling such Party) from making disclosures required by Applicable Law or Governmental Authority (or of any applicable stock or securities exchange or otherwise), or appropriate filings with the Bankruptcy Court in connection with the Cases or necessary and proper in conjunction with the filing of any Tax return or other document required to be filed with any Governmental Authority; *provided* that the Party required to make the release or statement shall allow the other Party reasonable time to comment on such release or statement in advance of such issuance.

12.13  Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local or foreign statute shall be deemed to refer to such statute as amended and to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "include" or "including" means include or including, without limitation. All references in this Agreement to Sections and Schedules shall be deemed references to Sections of, and Disclosure Schedules to, this Agreement unless the context shall otherwise require.

12.14  Specific Performance.  Each Party acknowledges that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by such Party in accordance with their specific terms or were otherwise breached by such Party.  Each Party accordingly agrees that, prior to the termination of this Agreement pursuant to Article 10, in addition to any other remedy to which the other Parties are entitled at law or in equity, the other Parties are entitled to injunctive relief to prevent breaches of this Agreement by such Party and otherwise to enforce specifically the provisions of this Agreement against such Party.  Each

Party expressly waives any requirement that any other Party obtain any bond or provide any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.  Notwithstanding the foregoing, the forfeiture of all of the Deposit shall be the sole and exclusive remedy of the Sellers for any breach by Buyer of this Agreement.

12.15   <u>Applicability of Agreement to Giftco</u>.   This Article 12, Section 2.7 and any applicable defined terms in Article 13 shall apply to Giftco.

# ARTICLE 13

## DEFINITIONS

"<u>503(b)(9) Consignment Claims</u>" shall mean all Allowed claims pursuant to Section 503(b)(9) of the Bankruptcy Code that arise from Consignment Goods (including from those Consignment Goods that are determined by an Order of the Bankruptcy Court to be owned by the Sellers).

"<u>503(b)(9) Owned Claims</u>" shall mean all Allowed claims pursuant to Section 503(b)(9) of the Bankruptcy Code, but only with respect to goods or other products that the Sellers prior to the commencement of the Cases reflected on their books and records as being owned by the Sellers.

"<u>Accounts Receivable</u>" shall mean all accounts and notes receivable of the Sellers.

"<u>Acquisition Transaction</u>" shall mean any sale, transfer or other disposition (not involving the Buyer or its Affiliates), in one transaction or a series of transactions, of all or any substantial portion of the Assets or the Business, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Sellers.

"<u>Affiliate</u>" shall mean, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Allowed</u>" shall mean either (1) approved by a Final Order of the Bankruptcy Court or (2) agreed to by the Buyer in its sole discretion.

"<u>Ancillary Agreements</u>" shall mean any ancillary agreements hereto to which each Party is or may be a party.

"<u>Applicable Law</u>" shall mean, with respect to any Person, any federal, state or local law (including common law), statute, code, ordinance, rule, regulation, or other requirement enacted,

33

promulgated, issued or entered by a Governmental Authority, that is applicable to such Person or its business, properties or assets.

"Assets" shall have the meaning set forth in Section 1.2.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 3.2(b).

"Assumed Contracts" shall have the meaning set forth in Section 1.4(d).

"Assumed Liabilities" shall have the meaning set forth in Section 2.3(a).

"Assumed Real Property Leases" shall have the meaning set forth in Section 1.4(d).

"Auction" shall have the meaning set forth in the Bid Procedures Order.

"Avoidance Actions" shall mean any and all actions which a trustee, debtor-in-possession or other appropriate party in interest (including any Person given standing to act for such party in interest) may assert on behalf of the Sellers or their estate under applicable state statute or Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bid Procedures Order" shall mean that certain Order including all schedules and exhibits thereto of the Bankruptcy Court dated April 16, 2015 [ECF No. 597].

"Business" shall mean the business conducted by the Sellers utilizing the Assets and the Assumed Liabilities.

"Business Day" shall mean any day other than Saturday, Sunday or any day on which banking institutions in the United States are closed either under Applicable Law or action of any Governmental Authority.

"Buyer" shall have the meaning set forth in the Preamble.

"Cases" shall have the meaning set forth in the Recitals.

"Cash" shall mean all cash and cash equivalents (including checks, marketable securities and short-term investments) calculated in accordance with GAAP applied on a basis consistent with the financial statements.

"Cash Component" shall mean $2,700,000.

"Cash on Premises" shall mean all Cash on the premises of the Stores as of the Closing Time, whether in the cash register, safe, donation box or otherwise.

34

"Charge" shall have the meaning set forth in Section 2.7(a).

"Closing" shall have the meaning set forth in Section 3.1.

"Closing Date" shall have the meaning set forth in Section 3.1.

"Closing Time" shall have the meaning set forth in Section 3.1.

"Confidential Information" shall have the meaning set forth in Section 6.9.

"Consenting Consignment Vendor" shall mean a Consignment Vendor that does not object to the entry of the Sale Order approving this Agreement and affirmatively consents in writing prior to the Closing to (1) the terms set forth in Sections 2.3(a)(iv) and 2.3(b)(xii), (2) the treatment of any remaining claims arising from Consignment Goods as general unsecured non-priority claims in the Cases, including for the purchase or sale of Consignment Goods by the Sellers and (3) waiver of any additional claims and rights related to the Consignment Goods not expressly set forth in or inconsistent with Section 2.3(a)(iv).

"Consignment Goods" shall mean goods or other products provided to the Sellers that (1) prior to the commencement of the Cases were reflected on the Sellers' books and records as not being owned by the Sellers or (2) were provided to the Sellers pursuant to a consignment or similar agreement regardless of the enforceability of any such agreement or the priority of such consignment rights or (3) are otherwise alleged to have been provided to the Sellers on consignment or similar arrangement.

"Consignment Goods Litigation" shall mean any contested matter, adversary proceeding or other judicial or non-judicial proceeding in which a determination is sought as to the rights of Consignment Vendors or any other entity regarding Consignment Goods.

"Consignment Vendors" shall mean vendors that provided Consignment Goods.

"Consents" shall have the meaning set forth in Section 4.9.

"Contract" shall mean any agreement, arrangement, contract, lease, purchase order, sale order or commitment, or any series of related agreements, arrangements, contracts, leases, purchase orders, sale orders, or commitments.

"Cure Costs" shall mean, in the aggregate, any and all costs and expenses for any available cures (pursuant to Section 365 of the Bankruptcy Code and described in any Order of the Bankruptcy Court relating to such cure liability) of any Assumed Real Property Leases or Assumed Contacts.

"Debtor-In-Possession Professional Fees" shall mean the Allowed fees and expenses incurred by a professional representing one or more of the debtors-in-possession in the Cases and whose retention was approved by an Order of the Bankruptcy Court.

"Deposit" shall have the meaning set forth in Section 2.6.

35

"Designated Contract" shall have the meaning set forth in Section 1.4(b).

"Designated Real Property Lease" shall have the meaning set forth in Section 1.4(b).

"Designation Notice" shall have the meaning set forth in Section 1.4(b).

"Designation Period" shall have the meaning set forth in Section 1.4(b).

"Directors and Officers" shall mean each and every of the past and present officers, directors, shareholders, members, managers, partners, principals, subsidiaries, parent companies, affiliates, agents, employees, successors and predecessors-in-interest, advisors, accountants, attorneys, representatives and assigns of the Sellers.

"Disclosure Schedules" shall mean the schedules of Sellers delivered to the Buyer concurrently with the execution and delivery of this Agreement (as may be updated pursuant to Section 6.10), a copy of which is attached to this Agreement and incorporated by reference.

"Distribution Centers" shall mean the distribution centers operated by the Sellers.

"Employee Plans" shall mean each plan, program, agreement or other arrangement, whether or not set forth in a collective bargaining agreement, providing for employment, compensation, pension, profit-sharing, retirement savings, vacation, sick leave, health, life insurance, scholarship, tuition reimbursement, welfare benefits, deferred compensation, severance, termination pay, performance awards, bonus, commission, incentive compensation, equity or equity-related awards, change in control, retention, or employee benefits, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"Equipment" shall mean (a) the furniture, machinery, equipment, tables, chairs, cash registers, computer equipment and license of related software, display cases, shelves, lights, uniforms, signs, cabinets, racks, ornaments and any similar items used in the Business, and (b) any of the foregoing which are leased by the Sellers.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" shall have the meaning set forth in Section 2.6.

"Escrow Agreement" shall have the meaning set forth in Section 2.6.

"Excluded Assets" shall have the meaning set forth in Section 1.3.

"Excluded Contracts" shall have the meaning set forth in Section 1.3(g).

"Excluded Deposits" shall have the meaning set forth in Section 1.2(g).

"Excluded Liabilities" shall have the meaning set forth in Section 2.3(b).

36

"Excluded Licenses" shall have the meaning set forth in Section 1.2(d).

"Excluded Leased Property" shall mean any Store or Distribution Center that is not a premises subject to an Assumed Real Property Lease.  To the extent any such premises becomes subject to an Assumed Real Property Lease after the Closing Date in accordance with Section 1.4, such premises shall cease to be an Excluded Leased Property as of the date of the assignment of such Assumed Real Property Lease to the Buyer pursuant to Section 1.4.

"Excluded Real Property Leases" shall have the meaning set forth in Section 1.3(f).

"Excluded Taxes" shall have the meaning set forth in Section 2.3(b)(ii).

"FC Debt" shall mean all Outstanding Indebtedness as of the Closing Date owed by the Sellers to FC Special Funding, LLC.

"Final Order" shall mean an order of the Bankruptcy Court or other court of competent jurisdiction: (1) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial, request for stay, motion or petition for reconsideration, application or request for review, or other similar motion, application, notice or request (collectively, a "Challenge") has been timely filed, or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further Challenge thereon, (2) as to which the time for instituting or filing a Challenge shall have expired, and (3) as to which no stay is in effect.  Nothing herein shall prohibit the parties, by mutual written consent, from Closing the transactions contemplated hereby, in the absence of a Final Order, so long as the Sale Order is not then subject to a stay from a Governmental Authority.

"GAAP" shall mean United States generally accepted accounting principles.

"Giftco" shall have the meaning set forth in the Preamble.

"Governmental Approvals" shall mean those approvals, authorizations, confirmations, consents, exemptions and orders from Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities) and the taking of all reasonable steps as may be necessary (a) to consummate the transactions contemplated hereby under Applicable Law or (b) for the Buyer to operate the Business after Closing.

"Governmental Authority" shall mean any national, federal, state, provincial, local or foreign government, or any subdivision, agency, instrumentality, authority, department, commission, board or bureau thereof, or any federal, state, provincial, local or foreign court, tribunal, or arbitrator, including the Bankruptcy Court.

"Governmental Entity" shall mean any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign.

"Home Office" shall mean the facility located at 5300 Patterson Avenue SE, Grand Rapids, Michigan 49530.

"iDLLC" shall have the meaning set forth in Section 1.2(l).

"iDLLC Obligations" shall have the meaning set forth in Section 2.3(a)(xiv).

"Initial Assumed Contract" shall have the meaning set forth in Section 1.4(b).

"Initial Assumed Real Property Lease" shall have the meaning set forth in Section 1.4(a).

"Intellectual Property" shall mean all patents, trademarks, trade names, service marks, trade dress, copyrights, applications for registration of any of the foregoing, and brand names, inventions, processes, know how, trade secrets, all databases, data collections, source code, all domain names and websites and related URLs, any moral and economic rights of authors and inventors, however denominated, throughout the world, and any similar or equivalent rights to any of the foregoing anywhere in the world. Without limiting the generality of the foregoing, the Intellectual Property includes the name and phrase "Family Christian Stores" and "FCS" and derivatives, such as "Family Christian" and all rights to the names and websites set forth on Schedule 4.12(a).

"Inventory" shall mean all inventories in the possession of the Sellers, including all merchandise (including Consignment Goods), as of the Closing Date.

"IP Assignments" shall have the meaning set forth in Section 3.2(d).

"Knowledge of the Sellers" (or "the Sellers' Knowledge") shall mean the actual knowledge of the officers of the Sellers listed on Schedule 13.1, after reasonable inquiry.

"Leased Real Property" shall mean each parcel of real estate leased by the Sellers or in which the Sellers have a leasehold, subleaseholder or other interest, including (a) those on which a Store of the Sellers is located and (b) those used in connection with the Business.

"Licenses" shall mean all business licenses, occupancy permits and other permits, authorizations or approvals held by the Sellers.

"Liens" shall mean any and all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, retiree healthcare or life insurance claims of the Sellers, and any transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these cases, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise.

"Material Adverse Effect" shall mean with respect to the Sellers, the Assets or the Business, as the context requires, any event or occurrence which shall materially affect the

38

business, operations, properties, Assumed Liabilities, as the case may be, taken in each case as a whole; *provided* that any (a) change in general economic or industry-wide conditions that does not affect the Business disproportionately, (b) change in law or accounting standards or interpretations thereof that is of general application, or (c) adverse effect that is solely the result of the execution or announcement of this Agreement or the transactions contemplated hereby or the consummation thereof, shall not be taken into account for purposes of determining a Material Adverse Effect hereunder.

"Material Contracts" shall mean (a) any Contract requiring payments by the Sellers, or resulting in receipts or disbursements by the Sellers of amounts, in excess of $50,000.00 during the 2015 fiscal year of the Sellers, (b) any Contract that is material to the operation of the Business, (c) all agreements imposing on the Sellers any non-competition or similar obligation, (d) any employment contract or agreement with any current employee of the Sellers, that is currently in effect, in whole or in part, under which the employment of such employee (i) is not "at will" or requires any payment by the Sellers to such employee on termination of employment or a change of control of the Sellers, or (ii) cannot be cancelled by the Sellers without penalty, (e) each contract or agreement with any retired employee, or consulting contract or agreement which in such case cannot be cancelled by the Sellers without penalty or liability and upon not more than sixty (60) days' notice, or (f) any joint venture Contract or other Contract that has involved or is expected to involve a sharing of profits with other Persons.

"Next Highest Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Order" shall mean any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Entity (in each case whether preliminary or final).

"Outstanding Indebtedness" shall mean (a) all debts, liabilities, losses, bank indebtedness, mortgages and guarantees, (b) all other obligations for borrowed money, (c) all obligations evidenced by bonds, debentures, notes, or other similar instruments, (d) all reimbursement or other obligations in respect of letters of credit, bankers' acceptances, interest rate swaps, or other financial products, (e) all obligations under capital leases (other than the Assumed Real Property Leases), (f) any other obligation guaranteeing or intended to guarantee any obligation or liability, (g) all obligations of the types described in the foregoing (a) through (d) that are secured by a Lien, or (h) interest, fees, fines, pre-payment penalties or other similar payments related to the foregoing (a) through (g).

"Parent" shall have the meaning set forth in the Preamble.

"Party" and "Parties" shall have the meanings set forth in the Preamble.

"Permits" shall have the meaning set forth in Section 4.8(a).

"Permitted Liens" means (i) statutory Liens for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (ii) zoning, entitlement and other land use and

39

environmental regulations by any Governmental Authority provided that such regulations have not been violated; and (iii) title of a lessor under a capital or operating lease if such lease is an Assumed Contract; provided that, in the case of each of clauses (i) – (iii), none of such items secures any Outstanding Indebtedness or Excluded Liabilities.

"Person" shall mean any individual, corporation, partnership, joint venture, trust, limited liability company, business association, Governmental Entity or other entity.

"Petition Date" shall have the meaning set forth in the Recitals.

"Post-Closing Business" shall mean the Business as operated by the Buyer after Closing.

"Post-Closing Occupancy Period" shall have the meaning set forth in Section 1.4(g).

"Post-Petition Operating Expenses" shall mean all bone fide liabilities and obligations of the Sellers incurred in the ordinary course of the Sellers' business that first arose and are related to the period of time between the commencement of the Cases and the Closing, including operating expenses, inventory purchases, employee expenses and taxes; *provided* that such Post-Petition Operating Expenses shall not include any tort liabilities, breach of contract liabilities, causes of action against any one or more of the Sellers, Pre-Closing Creditor Professional Fees, Debtor-In-Possession Professional Fees, Wind Down Expenses, all Excluded Liabilities and liabilities unknown or not disclosed to the Buyer prior to the Closing Date.

"Pre-Closing Creditor Professional Fees" shall mean the Allowed fees and expenses incurred prior to the Closing Date by a professional whose retention was approved by an Order of the Bankruptcy Court pursuant to Section 1103 of the Bankruptcy Code.

"Purchase Price" shall have the meaning set forth in Section 2.1.

"Real Property Leases" shall mean all agreements or documents under which the Sellers claim or hold a leasehold, subleasehold or other interest or right to the use of the Leased Real Property.

"Released Matter"  shall have the meaning set forth in Section 2.7(a).

"Releasing Parties" shall have the meaning set forth in Section 2.7(a).

"Remaining Contract" shall have the meaning set forth in Section 1.4(b).

"Remaining Real Property Lease" shall have the meaning set forth in Section 1.4(a).

"Removed Contract" shall have the meaning set forth in Section 1.4(b).

"Removed Real Property Lease" shall have the meaning set forth in Section 1.4(a).

"Representatives" shall have the meaning set forth in Section 6.9.

40

"Resulting Claim" shall have the meaning set forth in Section 2.7(c).

"Sale Motion" shall mean that certain Motion filed in the Cases on March 31, 2015 [ECF No. 487].

"Sale Order" shall mean an Order of the Bankruptcy Court entered pursuant to Bankruptcy Code Sections 363 and 365 that (a) is in substantially the form set forth as Exhibit A to this Agreement or otherwise in a form reasonably satisfactory to the Sellers and satisfactory to the Buyer in its sole discretion, (b) approves the sale of the Assets to the Buyer pursuant to the terms of this Agreement and the provisions of the Bankruptcy Code (including Bankruptcy Code Section 363), and (c) approves the Sellers' assignment of the Assumed Contracts to the Buyer pursuant to Section 365 of the Bankruptcy Code.

"Seller" or "Sellers" shall have the meaning set forth in the Preamble.

"Stores" shall mean the retail book stores that are operated at the leased premises subject to the Real Property Leases.

"Successful Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Tax" or "Taxes" shall mean (a) all taxes, charges, fees, levies, penalties or other assessments of any kind whatsoever imposed by an federal, state, local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalties or additions attributable thereto or (b) liability for the payment of any amounts of the type described in clause (a) above as a result of being a party to any agreement or any express or implied obligation to indemnify or otherwise succeed to the liability of any other Person.

"Tax Code" shall mean the Internal Revenue Code of 1986, as it has been and may be amended.

"Trade Creditor" shall mean an entity that provided raw materials, goods, inventory or services to a Seller on credit terms, other than pursuant to the type of agreement described in Section 365(c)(2) of the Bankruptcy Code.

"Trade Terms" shall mean the normal and customary trade terms, practices, and programs provided to the Sellers by a Trade Creditor that were most favorable to the Sellers and that were in effect within 12 months before the Petition Date, or such other trade terms that are acceptable to the Buyer.

"Transferred Accounts Receivable" shall have the meaning set forth in Section 1.2(h).

"Transferred Employees" shall have the meaning set forth in Section 7.4(a).

"Transferred Equipment and Improvements" shall have the meaning set forth in Section 1.2(c).

41

"Transferred Intellectual Property" shall mean all of the interest of the Sellers in Intellectual Property.

"Transferred Inventory" shall have the meaning set forth in Section 1.2(f).

"Transferred Stores" shall mean Stores that are operated at leased premises subject to Assumed Real Property Leases.

"Treasury Regulations" shall mean the federal income Tax regulations promulgated under the Tax Code, as amended, including any temporary and proposed regulations.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, and any similar Applicable Law.

"Wind Down Expenses" shall mean those fees, expenses and/or costs that are first incurred on or after the Closing Date and reasonably acceptable to the Buyer and that are (1) Allowed fees and expenses of a professional whose retention was approved by an Order of the Bankruptcy Court pursuant to Section 1103 of the Bankruptcy Code or (2) costs and expenses of winding down the Cases, *provided* that Wind Down Expenses shall exclude all Post-Petition Operating Expenses and exclusions thereto, and all Excluded Liabilities.

"Working Capital Collateral" shall have the meaning set forth in the Final Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 [ECF No. 593].

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

*SIGNATURES PAGES FOLLOW*

6878631V.25

This Asset Purchase Agreement is executed by the Parties on the date set forth above.

**SELLERS:**                                     **FAMILY CHRISTIAN HOLDING, LLC**

By: _____

Name: _____

Title: _____


**FAMILY CHRISTIAN, LLC**

By: _____

Name: _____

Title: _____


**FCS GIFTCO, LLC:**                             **FCS GIFTCO, LLC**

By: _____

Name: _____

Title: _____


**BUYER:**                                       **FCS ACQUISITION, LLC**

By: _____

Name: _____

Title: _____

6878631V.25