# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In re:

**FAMILY CHRISTIAN, LLC** *et al.* [1]

Debtors.

/

CHAPTER 11

**CASE NO. 15-00643**
**(Jointly Administered)**

**HON. JOHN T. GREGG**

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF

The above-captioned debtors (the "**Debtors**"), respectfully submit this memorandum of law in support of their motion (the "**Sale Motion**") seeking an order (the "**Sale Order**"): (a) authorizing the sale of substantially all of the Debtors' assets free and clear of liens, claims, interests and encumbrances pursuant to Section 363(f) of Title 11, United States Code (the "**Bankruptcy Code**"), subject to final Court approval, (b) authorizing the assumption and assignment of certain executory contracts and leases, and (c) granting related relief to all of the foregoing. In support of this Motion, the Debtors respectfully state as follows:

---

[1]  The Debtors are: Family Christian, LLC (Case No. 15-00643-jtg), Family Christian Holding, LLC (Case No. 15-00642-jtg), and FCS Giftco, LLC (Case No. 15-00644-jtg).

## PRELIMINARY STATEMENT

In a vigorously competitive, at times heated, bidding process, the Debtors had to weigh and compare apples to oranges: (I) speculative liquidation bids that would force the Debtors' closure and loss of thousands of jobs, which bids are memorialized by byzantine "Agency Agreements" that cast purchase consideration not in terms of simple, flat dollars, but complex formulas based upon percentages of the counts of ever-shifting inventory levels, with potential contingencies here[2], possible offsets and deductions there[3], with the net bottom line that the liquidator payment amount is not a guaranteed sum certain, but is only a guarantee they will pay no more than a capped, maximum, and best case dollar amount that can only be, and likely would be, adjusted downward as the result of a physical inventory taking, actual liquidation expenses, and subsequent negotiations over the actual effect of various defined terms and broad representations and; and (II) a going concern bid that expresses consideration in terms of an absolute minimum, guaranteed dollar amount, which is a floor that can only be adjusted upward above the minimum guaranteed amount, and carries with it many valuable intangibles -- the continuation of a large business, the preservation of several thousand jobs and myriad supplier-purchaser business relationships, the certainty of Chapter 11 administrative expense claims (including 503(b)(9) claims) being paid in full, the backing of the Official Committee of Unsecured Creditors (the "**Committee**") and the majority of the Debtors' consignment vendors,

---

[2]   The Debtors are unable to make several of the representations, warranties, and covenants that are conditions precedent in the Agency Agreements.  *See, e.g.*, GB-Hilco Agency Agreement, Section 11.

[3]   The maximum amount to be paid under the Agency Agreements is subject to reduction based upon concepts such as "Merchandise Threshold" and "Cost Factor of Merchandise" and "Defective Merchandise," which will be determined by a "Final Inventory Report" to be completed within 30 days after Closing.  Additionally, the maximum amount is subject to further offset based upon in-transit and on-order inventory delivery times, percentage rents above per diem occupancy expenses, occupancy expenses for certain closed stores, carrying costs and expenses for real property leases and intellectual property, legal fees and expenses incurred for assumption or rejections of leases, employee benefits above a certain threshold, and membership rewards discounts.

24301570 v3

and the preservation of the Debtors' non-profit charitable support of widows and orphans in need.[4]

When the Debtors concluded the Auction, the highest liquidation bid was from a joint venture: Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC ("**GB-Hilco**"); but the highest and best bid, a going concern bid, was from FCS Acquisition, LLC ("**FCSA**").  The face amount of maximum value ascribed by the Debtors to the GB-Hilco bid was $43,926,776, which represents the sum of the Debtors' view of the "best case scenario" capped amount under the Agency Agreement ($42,433,144) and the estimated remaining cash in the estate at the end of the liquidation ($1,493,632), but remains fraught with many areas of uncertainty and anticipated reductions in value as a wind down liquidation would play out over the next few months.  The amount of value for the FCSA bid ranges from a guaranteed minimum amount of $42,000,000 to an estimated high of $43,661,000, but with no caps of the dollar amounts of assumed liabilities (with limited exception for professional fees and expenses and wind down expenses).  *See* Exhibit "A" (Final Bid Analysis).

Credit Suisse has summarized the "Available Funds" from the Bid Analyses as follows:

| | GB-Hilco | FCSA |
|---|---|---|
| Available Funds | $49,876,776 | $46,865,000 |

*See Credit Suisse Objection,* ¶ 28 (doc. No. 842).  However, the foregoing summary is only one factor in the Debtors' determination of the highest **and** best bid.  Since the FCSA bid provides for the assumption of administrative claims regardless of the amount, the Debtors' consideration of the FCSA bid likewise has a range of values for the bid.  Credit Suisse has ignored the reality of this range in the above summary.   A more instructive, although certainly not exhaustive,

---

[4]  *See* http://www.familychristian.com/about for a description of the Debtors' charitable mission.

summary of items considered by the Debtors and the Consultation Parties (with the possible exception of Credit Suisse) would be as follows:

| | GB-Hilco | FCSA |
|---|---|---|
| Available Funds | $49,876,776 | $46,865,000 - $48,526,000 |
| Guaranteed Minimum Price | None | $42,000,000 |
| Postpetition claims exceed projected amounts | No change in Available Funds | Purchase price adjusted upwards to Increase in Available Funds |
| Postpetition cash below projected amounts | Decrease in Available Funds | No Change in Available Funds |
| Inventory shrink exceeds estimate | Decrease in Available Funds | No Change in Available Funds |
| Agency related expenses exceed projected amounts | Decrease in Available Funds | No Change in Available Funds |
| Inventory cost factor below projected amounts | Decrease in Available Funds | No Change in Available Funds |
| Post-Vacate, Pre-Designation rent exceeds $0 | Decrease in Available Funds | No Change in Available Funds |
| Reduced rent reimbursement for not closing on June 6th | Decrease in Available Funds | No change in Available Funds |
| Cash in advance inventory not timely delivered | Decrease in Available Funds | No change in Available Funds |

Based upon a consideration of all of the salient factors, the Debtors selected the FCSA bid as the highest **and** best bid given the stronger certainty of the absolute, minimum consideration to be received in the amount of $42 million, and the equally strong value ascribed to a going concern offer. The FCSA bid assumes (a) all liabilities and obligations owed to FC Special Funding, LLC ("**Senior Lender**"), which are valued at approximately $23.4 million; (b) all anticipated administrative expense claims, including without limitation, (i) all allowed 503(b)(9) claims to be paid within 10 business days of allowance, which are presently estimated at $7 million, (ii) all post-petition operating expenses, which are presently estimated at $5.4 million, (iii) the Debtors' and Committee's professional fees and expenses in the amount of $1.8

million, less amounts actually paid as of the closing, (iv) post-closing wind-down expenses in the amount of $250,000, and (v) the fees and expenses of the consumer privacy ombudsman not to exceed $25,000; (c) the payment to consenting consignment vendors of $500,000 cash to the initial plaintiffs in the pending consignment adversary proceeding with respect to consigned goods (the "**Consignment Litigation**") upon the dismissal with prejudice of the adversary proceeding, which is to be no later than 10 business days after closing, plus, at the election of the consenting consignment vendors, either (i) the sum of their allowed 503(b)(9) claim to be paid within 10 business days of allowance and 10% of the Debtors' book value of their transferred inventory to be paid within 30 days after the sale of such items or (ii) 35% of the Debtors' book value of their transferred inventory to be paid within 30 days after the sale of such items; (d) the return to all consenting consignment vendors of their respective unsold consigned goods remaining after 1 year from closing with shipping charges to be paid by FCSA; (e) all liabilities and obligations under the assumed real property leases, which is estimated to be approximately $43 million; (f) all liabilities and obligations of the Debtors with respect to gift cards, loyalty programs, and customer presells as of the closing; (g) all liabilities and obligations with respect to returned inventory after the closing; (h) all liabilities and obligations with respect to transferred employees, including any obligations under employee benefit plans; (i) all liabilities and obligations to iDisciple, LLC, which is estimated to be approximately $80,000; (j) all liabilities and obligations for U.S. Trustee quarterly fees; (k) all liabilities and obligations as of closing with respect to donations collected on behalf of Family Christian Resource Centers, Inc.; and (l) a minimum cash payment of $2.7 million to the estate, which will be supplemented in 18 months by any amount necessary to achieve a net purchase price of $42 million (presently estimated as an additional $500,000).

24301570 v3

The FCSA bid is far and away the highest and best bid received by the Debtors for substantially all of their assets.  Contrary to the GB-Hilco bid, the FCSA bid has **no caps** on its maximum purchase price (with the exception of professional fees and expenses, wind down expenses, and consumer privacy ombudsman fees and expenses).  To the extent the assumed liabilities and obligations are greater than these estimated amounts, FCSA is 100% responsible for the payment of such amounts without any purchase price adjustment.  The Debtors have been able to shift nearly all of the risk related to its outstanding administrative liabilities and obligations to FCSA Including the payment of all 503(b)(9) claims), which is a far cry from the risks facing the Debtors under the speculative GB-Hilco bid.  Not surprisingly, the FCSA bid has the full support and backing of the Senior Lender, the Committee, and the consignment vendors in the Consigned Litigation.

Credit Suisse opposes the FCSA bid as a *sub rosa* plan that allegedly violates protections available to it under a Chapter 11 plan process.  Ignoring the inherent risks in an Agency Agreement, Credit Suisse asserts it may receive a higher recovery from the combination of a GB-Hilco bid and the estimated cash remaining in the estate at the end of the liquidation period, both of which variables are based on assumptions and best-guess estimates.  For these stated reasons, Credit Suisse supports the GB-Hilco bid and advocates for the shutdown of the Debtor's business operations and the termination of over 3,000 employees.

Credit Suisse's objection and perspective are erroneous.  The FCSA bid does not deprive Credit Suisse of any Chapter 11 plan protections.  The FCSA bid assumes the payment of all administrative expense claims, including 503(b)(9) claims, as noted by the Court at the April 14, 2015 hearing and in cases from other districts.[5]  Consistent with the Bankruptcy Code, the FCSA bid, on its face, pays all of the administrative expense claims, including 503(b)(9) claims, in

---

[5] *See Creditor Committee Objection*, ¶ 48 (Doc. No. 812).

these Chapter 11 cases. As set forth above, the FCSA bid assumes all liabilities and obligations for the vast majority of administrative expense claims. Far from subverting the Bankruptcy Code, the FCSA bid is paying claims in accordance with the Bankruptcy Code's priority scheme. The administrative expense claims are being paid, the Senior Lender's claim is being assumed with its consent, and Credit Suisse is receiving an amount that exceeds the value of its remaining collateral (i.e., the Debtor's furniture, fixtures, and equipment and general intangibles, less the customer list). By virtue of the Senior Lender's consent to the FCSA bid, Credit Suisse is deemed to have consented to the sale of the Senior Lender's collateral (i.e., the Debtor's cash, accounts, inventory, and customer list) and released its liens in this collateral.

On the other hand, the GB-Hilco bid, with the support of Credit Suisse, attempts to re-order priorities under the Bankruptcy Code to selectively choose one class of administrative expense claimants to pay to the exclusion of others. Specifically, the GB-Hilco bid provides for the payment of the Consignment Litigation settlement (which was added after the conclusion of the Auction), but not for other categories of administrative expense claims, including 503(b)(9) claims. *See GB-Hilco Objection*, p. 5, n. 3 and p. 13 (Doc. No. 845). Neither the GB-Hilco bid nor Credit Suisse's objection provides any guarantee or assurance that any of the administrative expense claims, including 503(b)(9) claims, in these cases will be paid from the GB-Hilco bid proceeds and remaining cash of the estate. In fact, the GB-Hilco bid expressly excludes the payment of the Brookwood Associates Success Fee. *See id*. at p. 13. Indeed, Credit Suisse would be able to reap a substantial windfall if it were able to avoid the payment of administrative expense claims *outside of Chapter 11 plan confirmation requirements* and leap frog over administrative expense claims that would otherwise have to be paid in a Chapter 11 plan

confirmation process.  It is the GB-Hilco bid, not the FCSA bid, which is an impermissible *sub rosa* plan.

Credit Suisse has already consented to the sale to FCSA of the Working Capital Collateral (as defined below), which includes the Debtors' inventory, pursuant to the Intercreditor Agreement between the Senior Lender and Credit Suisse.  A remaining issue is whether Credit Suisse consents to the sale of the Term Loan Collateral (as defined below) or whether the Debtors may sell the Term Loan Collateral over Credit Suisse's objection.  As discussed further below, the Debtors assert they have authority to sell the Term Loan Collateral over any Credit Suisse objection pursuant to Sections 363(f)(3) and (5).

Credit Suisse's true objection (or regret), and the reality of the situation, is that its remaining collateral is not worth more than $2.7 million, if that much.  Pursuant to the Intercreditor Agreement, which was freely negotiated and entered into between sophisticated parties, Credit Suisse agreed that its liens in the Working Capital Collateral would be released in any 363 sale supported by the Senior Lender.  The Senior Lender supports the proposed sale to FCSA.  Consequently, Credit Suisse's claims are to be satisfied from the proceeds of the Term Loan Collateral.  Unfortunately, the Term Loan Collateral is not worth more than $2.7 million, but this is the bargain Credit Suisse struck under the Intercreditor Agreement.  At end of day, Credit Suisse is only entitled to the value of its Term Loan Collateral, and the value of the Term Loan collateral does not exceed $2.7 million.

## **ARGUMENT**

## I.   THE COURT SHOULD APPROVE THE PROPOSED SALE OF ASSETS PURSUANT TO THE ASSET PURCHASE AGREEMENT WITH FCSA

### A.   The Goal of Chapter 11 Is Reorganization And Not Liquidation

The overriding objective of Chapter 11 is to preserve the debtor's business as a going concern. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources").[6]

### B.    The Selection of FCSA's Going Concern Bid Over A Liquidation Bid Represents A Valid Exercise Of The Debtors' Business Judgment

In the event of competing bids, the Bankruptcy Court has "broad discretion and flexibility" to determine the outcome, particularly where bids are complex and the determination of which is the "highest" and "best" bid is not always clear. *See In re Financial News Network, Inc.,* 980 F.2d 165, 169-70 (2d. Cir. 1992); *see also In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d. Cir. 1983) (bankruptcy courts should "consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor" and other constituencies in ruling on a sale of the debtor's assets pursuant to Section 363(b)). Courts defer to a debtor's business judgment when weighing the debtor's selection of competing bids for the sale of assets. *In re After Six*, 154 B.R. 876, 882, 884 (Bankr. E.D. Pa. 1993)("It is only in the context of a strong and unusual case to the contrary in which a bankruptcy court should approve a sale to a party which the DIP does not deem the highest and/or best bidder in an auction sale"); *In re Quality Stores, Inc.*, 272 B.R. 643, 647-48 (Bankr. W.D. Mich. 2002) (approving the sale of substantially all assets and noting the court was in part "[d]eferring to the business judgment of the Debtor, the Committee and the Lenders," all of whom supported the sale).[7]  As discussed more fully below, a sale to an insider of the debtor's bankruptcy estate is not per-se prohibited,

---

[6]  *See also*, 7 COLLIER ON BANKRUPTCY ¶ 1100.01 (15th ed. rev. 2008) ("Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue to operate and to reorganize its business rather than simply to liquidate a troubled business.").

[7]  *See also, In re Diplomat Const., Inc.*, 481 B.R. 215, 219 (Bankr. N.D. Ga 2012)("The Trustee is responsible for the administration of the estate and his judgment on the sale and the procedure for the sale is entitled to respect and deference from the Court, so long as the burden of giving sound business reasons is met.")

but is instead simply subject to heightened scrutiny. *See, e.g.*, *In re Med. Software Solutions,* 286 B.R. 431, 445 (Bankr. D. Utah 2002) (holding that under Section 363(b) when transactions benefit insiders, "the purchaser [of the asset] has a heightened responsibility to show that the sale is proposed in good faith and for fair value").

Courts also recognize that "[t]he highest bid does not always equate to the best bid for the estate." *In re Diplomat Const., Inc.*, 481 B.R. 215, 219.(Bankr. N.D. Ga. 2012) (citing *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 517 (Bankr. N.D. Ala. 2002)) ("The First Circuit, as does this Court, acknowledged that the 'highest bid is not always the best bid.'").

Several strong reasons support the Debtors' selection of FCSA as the best bid.   First, it is a going concern bid that preserves the Debtors' business operations, and with it the jobs of several thousand employees and the continued business relations with numerous vendors, suppliers, and landlords.  Giving deference to a bid that will preserve jobs is of vital importance when selecting the best bid. *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820326, *14 (Bankr. D. De. 2001) ("there is a substantial public interest in preserving the value of TWA as a going concern and facilitating a smooth sale of substantially all of TWA's assets to American. This includes the preservation of jobs for TWA's 20,000 employees[.]"). This selection of a going concern bid is a valid exercise of business judgment, even if the bid is nominally lower than a competing bid.  *See, e.g., In re After Six,* 154 B.R. 876, 882, 884 (Bankr. E.D. Pa. 1993).

The facts in *After Six* were the flip of the present situation.  There the debtor conducted an auction for the sale of its business and selected a slightly higher offer of $7.1 million from one bidder ("**AS**"), while the creditors committee urged approval of a slightly lower bidder ("**Genesco**"), whose "offer [was] almost $1 million short" but included "a commitment to

attempt to hire the debtor's former union employees." *Id.* at 879.    The bankruptcy court noted it was well prepared to approve the lower bidder:

> Contrary to the arguments of AS [the facially higher bidder], which suggest that we must approve its bid solely because it is the highest, we find the Committee's position not only appropriate but socially responsible. . . .  We therefore have no doubt that, in an appropriate setting, **a bankruptcy court . . . could appropriately award a bid to a lower bidder, when that lower bidder had other factors, including even an element as lacking in direct economic impact as 'societal needs,' in its favor**. . . . [W]e have little doubt that, if the Debtor as well as the Committee preferred Genesco's bid, this court should and would proceed to confirm the sale to Genesco.

*Id.* at 882 (emphasis added).  Indeed, with open criticism to the debtor's selection, the court found it "disturbing to perceive a [debtor] which appears to accord so little consideration" to the job preservation goals of Chapter 11, and the court was "somewhat appalled at the [debtor's] unwillingness to consider employment prospects for the debtor's former employees as at least a factor in the debtor's choice for a successful bidder".  *Id.* at 883.[8]   Nonetheless, the court concluded it had to defer to the debtor's business judgment.  *Id.* at 884 ("Our heart is heavy in rendering this decision, because we would not have been inclined to exercise our discretion as the debtor did . . . However, the discretion in what we find is a relatively close case is not, as we perceive it, ours to exercise. . . . [W]e conclude that we must defer to the debtor's discretion and approve its [bid selection]").

In the case of *In re United Healthcare*, 1997 WL 176574 (D.N.J. March 26, 1997), the debtor operated a children's hospital and an adult acute hospital.  Prior to bankruptcy, the debtor received bids from four different bidders and the debtor's board of trustees selected a bidder ("**Saint Barnabas**") that "was committed to keeping a Children's Hospital in one location and

---

[8]  The Debtors share similar dismay to the U.S. Trustee's callous disregard for the Debtors' attempt to preserve jobs as a factor in its decision to select FCSA as the highest and best bid.  The Debtors are equally concerned by the U.S. Trustee's lack of neutrality over the course of these proceedings.

providing $5 million in future investments." *Id.* at *6. The debtor filed chapter 11 to consummate the sale through a Section 363 process, and the bankruptcy court rejected the board's bid selection as an abuse of discretion, primarily because the bankruptcy court viewed the offer of a competing bidder ("**UMDNJ/Cathedral**") "was for more money." *Id.* The district court reversed the bankruptcy court's ruling, stating that the bankruptcy court improperly "substituted its judgment for that of the Board," that the bankruptcy court had "overwhelmingly focused on the monetary aspects of the competing bids," and that the debtor's board of trustees could properly select the winning bidder based upon non-monetary factors, such as "a public need for the children's hospital to be operated as a unit in northern New Jersey." *Id.* at *6-*7.

A second factor supports the Debtors' selection of FCSA's bid, namely the uncertainties associated with the actual payment amount to be received under the GB-Hilco bid. FCSA's offer includes a minimum payment guaranty of $42 million. In contrast, the offer from GB-Hilco does not guaranty the payment of a minimum dollar amount, but instead places a cap on the absolute, best-case, maximum amount possible of being paid under the bid. In fact, the complex contingencies of the intentionally byzantine Agency Agreement are such that the Debtors do not believe the offer will actually result in the receipt of $42 million at the end of the day.

For example, the Debtors are very concerned by several provisions of the GB-Hilco Agency Agreement that are anticipated to result in negative adjustments to the "Guaranteed Amount" payable by GB-Hilco to the Debtors. The following is an illustrative, non-exhaustive list of risk factors in the GB-Hilco Agency Agreement:

1.  Merchandise Threshold, Section 3.1(b) - Although the Merchandise Threshold is based upon the Debtor's projections, GB-Hilco has set the low end of the threshold right at the Debtor's projected inventory levels. There is no margin for error and without taking into account increased shrinkage or any of the other risk factors, the Guaranty Percentage is likely to be reduced based upon the actual Inventory Taking numbers coming in below the projections.

2.     <u>Payroll Benefits Cap, Section 4.1(b)</u> - The Payroll Benefits Cap has been reduced from 24.0 to 20.0% for each Retained Employee in the Stores.  Although this adjusted percentage is pegged right at historical levels, this percentage is highly dependent on worker's compensation and medical claims during the subject period.  There is no margin for error since any expenses above the Payroll Benefits Cap are borne by the Debtors and will reduce the net recovery payable by GB-Hilco to the Debtors.

3.     <u>Percentage Rent, Section 4.1(c)</u> - The Occupancy Expenses being paid by GB-Hilco do not include any allowance for increases in percentage rents as a result of higher sales volumes.  The GB-Hilco liquidation sales could generate sales volumes double the Debtor's normal sales volumes.  Since the Occupancy Expenses being paid by GB-Hilco do not include any allowance for percentage rents, any overage would be an expense borne by the Debtors and a reduction of the net recovery payable by GB-Hilco to the Debtors.

4.     <u>Distribution Center Merchandise and On-Order Merchandise, Section 5.2(a)</u> - To be included in the definition of "Merchandise" and counted toward the Merchandise Threshold, Distribution Center Merchandise and On-Order Merchandise must be received in Stores no later than 14 days after the Sale Commencement Date.  If the Distribution Center Merchandise and On-Order Merchandise is received in Stores after such 14-day period, but on or before 28 days after the Sale Commencement Date, then the Cost Value and Retail Price of such item will be discounted by the inverse of the prevailing Sale discount for such item.  After the 28th day from the Sale Commencement Date, Distribution Center Merchandise and On-Order Merchandise are completely excluded from Merchandise and the Merchandise Threshold calculation.  Since GB-Hilco controls the timing and selection of Stores to send Distribution Center Merchandise and has an incentive to sell these goods first from the Distribution Center in order to lower its Guaranty Percentage, this is an area of concern and will reduce the net recovery payable by GB-Hilco to the Debtors.

5.     <u>Defective Merchandise, Section 5.2(b) and 5.3(c)</u> - The identification of "Defective Merchandise" is completely subjective and GB-Hilco will be incentivized to increase this bucket of goods.  The Cost Value of "Defective Merchandise" is subject to post-closing negotiation and is likely to result in a reduction of the net recovery payable by GB-Hilco to the Debtors.  If the parties do not agree on the Cost Factor, the item of Defective Merchandise shall be treated as Excluded Defective Merchandise (see below).

6.     <u>Excluded Defective Merchandise, Section 5.2(b)</u> - The identification of "Defective Merchandise" is completely subjective and GB-Hilco will be incentivized to increase this bucket of goods.  The extent of "Excluded Defective Merchandise" and its potential effect on the "Guaranteed Amount" through adjustments to the Merchandise Threshold and Cost Factor Threshold are

-13-

unknown at this time and will not be known until the time of the Inventory Taking.  This is likely to be an area of post-closing negotiation by GB-Hilco, which will result in a reduction of the net recovery payable by GB-Hilco to the Debtors.

7.  Membership Program Benefits, Section 8.2 and 8.6(b) - "Merchant Discounts," which includes membership program benefits and valid coupons will be honored during the liquidation and either the entire Merchant Discount or the value/differential between applicable Merchant Discount and the then-prevailing Sale Discount (Section 8.2 and 8.6(b) appear internally inconsistent) are subject to reimbursement by the Debtors, which will result in a reduction of the net recovery payable by GB-Hilco to the Debtors.

8.  Additional Agent Goods, Section 8.6(a) - Although there is potential upside in the form of 3% of the gross proceeds (excluding Sale Taxes) from the sale of Additional Agent Goods, there is significant expense exposure since there is no reimbursement of Distribution Center Expenses or credit card, bank card fees, chargebacks, or credit/bank card discounts related to the sale of Additional Agent Goods (cf., Sections 4.1(a)(f) and 4.3).  GB-Hilco is incentivized to sell all Additional Agent Goods out of the Distribution Center to minimize their exposure to increased expenses.  As a result, the additional expense burden from the sale of Additional Agent Goods may outweigh any potential upside and result in a reduction of the net recovery payable by GB-Hilco to the Debtors.

9.  Designation Rights Expenses, Sections 17.12 (c), (d), (g), (h), and (k) - During the Designation Rights Period, the Debtors are responsible for the payment of (a) all expenses incurred in connection with the assumption and assignment or rejection of real property leases or intellectual property, including without limitation, legal fees and expenses, (b) the carrying costs and expenses for the real property leases and intellectual property, and (c) all occupancy expenses after the effective date of the Dropout Notice.  *See Proposed Order Approving Sale of All or Substantially All of Debtor's Assets and Granting Related Relief,* ¶¶ 38, 41-42, and 44 (Doc. No. 876).

The foregoing risk factors severely undercut the contention that the GB-Hilco bid is "higher" given the various contingencies and negative adjustments riddled throughout the Agency Agreement.  But, *assuming arguendo*, that the GB-Hilco bid were "higher," several cases affirm a debtor's ability to choose a lower bid offer when the nominally higher offer is subject to conditions, contingencies, or uncertainties that render it less attractive. *In re Broadmoor Place Invs. LP*, 994 F.2d 744, 745 (10th Cir. 1993) (approving the bankruptcy

-14-

court's decision to award a sale to a lower bidder because "it provided fewer contingencies and facilitated a more immediate closing."); *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (approving trustee's selection of lower bid since the facially higher offer was subject to greater uncertainty); *In re Diplomat Const., Inc*., 481 B.R. 215, 219(Bankr. N.D. Ga 2012)(approving trustee's selection of lower bid offer because the higher offer was subject to conditions and deficiencies that rendered it less appealing).

Moreover, and importantly, at the time the Auction concluded, the GB-Hilco bid did not contain a resolution of the consignment inventory.   Rather, the GB-Hilco bid treated consignment inventory no different from inventory owned by the Debtors for purposes of calculating the Merchandise Threshold.   Absent a consensual resolution of the consignment issues, the Debtors would not have been able to close under the GB-Hilco bid as the penalty under the Merchandise Threshold absent inclusion of the consignment inventory would have significantly decreased the value of the GB-Hilco bid.   On the other hand, once the FCSA going concern bid had been significantly improved, the Debtors determined that moving forward with the FCSA bid was in the best interests of the Debtors.   The fact that the FCSA bid was propounded by an insider was not the Debtors' focus.   The Debtors would have selected the going concern bid of FCSA whether such bid was submitted on behalf of an insider or an entity wholly unrelated to the Debtors.   A going concern bid is of primary importance to the Debtors, regardless of the proponent of such a bid, and the Debtors as debtors-in-possession have the discretion to select to whom they wish to sell their assets, subject to the Bankruptcy Court to approve or deny such a request.[9]

---

[9]  *See* 11 U.S.C. § 363(b)(1) ("the [debtor in possession], after notice and a hearing, may … sell"]; *see also* Bidding Procedures, Art. VII, p. 7, made part of the Bid Procedures Order (Doc. No. 597): "The Debtors reserve the right to and may, after consultation with the Consultation Parties, reject at any time before entry of the relevant Sale Order (as defined below) any bid that, in the Debtors' judgment, is: (A) inadequate or insufficient; (B) not in conformity

24301570 v3

II.    **THE PROPOSED SALE SATISFIES SECTION 363(b)**

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

A debtor may sell substantially all assets outside of the ordinary course where it represents an exercise of the debtor's sound business judgment. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.1986) ("We adopt the Second Circuit's reasoning in *In re Lionel Corporation, supra*, and conclude that a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under Section 363(b)(1) when a sound business purpose dictates such action.") (citing *Committee of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Quality Stores, Inc.*, 272 B.R. 643, 647-48 (Bankr. W.D. Mich. 2002)("[A] sale of assets is appropriate if all provisions of Section 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors.") (quoting *In re Embrace Systems Corp.*, 178 B.R. 112, 124 (Bankr. W.D. Mich. 1995)) ("In this circuit, a bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under Section 363(b)(1) when a sound business purpose dictates such action.").

Courts generally consider four factors in determining whether a proposed sale satisfies the sound business purpose standard:  (a) whether a sound business justification exists for the sale, (b) whether accurate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith.  *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Daufuskie Island Props., LLC*, 431 B.R. 626, 637 (Bankr. D.S.C. 2010).   When

---

with the requirements of the Bankruptcy Code, these Bidding Procedures or the terms and conditions of the Sale; or (C) contrary to the best interests of the Debtors and their estates."

the proposed transaction would benefit an insider, the court gives heightened scrutiny to the fair value and good faith factors. *See, e.g.*, *In re Med. Software Solutions,* 286 B.R. 431, 445 (Bankr. D. Utah 2002) (holding that under Section 363(b) when transactions benefit insiders, "the purchaser [of the asset] has a heightened responsibility to show that the sale is proposed in good faith and for fair value"). Each of these elements is satisfied.

Courts recognize that a sound business justification exists for a sale outside of a plan where delay threatens to erode the value of debtor's property, or the debtor lacks sufficient liquidity to continue normal operations and faces likely liquidation. *Stephens Industries*, 789 F.2d at 390 (sale justified where the facts showed "[t]he trustee had been unable to operate the radio station at a profit . . . [and] the trustee faced the prospect of ceasing [the debtors'] operations."); *Lionel*, 722 F.2d at 1066-69. Hence, courts routinely approve sales to avoid liquidation.[10] The testimony will show the Debtors are facing similar liquidity issues and the prospect of liquidation if the sale to FCSA is not consummated.

When faced with a choice between preserving a going concern and putting a company in liquidation, a court is well-justified in taking into account the benefits associated with preserving going concern value. As stated by the court in *In re Trans World Airlines, Inc.*:

> [T]here is a substantial public interest in preserving the value of TWA as a going concern and facilitating a smooth sale of substantially all of TWA's assets to American. This includes the preservation of jobs for TWA's 20,000 employees, the economic benefits the continued presence of a major air carrier brings to the St. Louis region, and preserving consumer confidence in purchased TWA tickets American will assume under the sale.

---

[10] *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 244 (Bankr. S.D. W.Va. 1996) (approving sale of coal producer that could not fund operations and was nearly out of cash needed to operate pumps that prevented mines from flooding); *In re WBQ P'ship*, 189 B.R. 97, 102-03 (Bankr. E.D. Va. 1995) (approving sale of nursing homes as necessary to protect going concern value); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992) (approving sale of ice cream producer that lacked cash needed to perform maintenance necessary to continue operations); *In re Titusville Country Club*, 128 B.R. 396, 400 (Bankr. W.D. Pa. 1991) (approving sale of golf course where debtor had inadequate funds to maintain course for the golf season).

24301570 v3

> I also believe the Sale Order implements the public interest that
> favors an organized rehabilitation ... of a financially distressed
> corporation which lies at the core of chapter 11. I conclude that the
> alternative to the Sale Order in this case is a free-fall chapter 11
> leading to a liquidation with the subsequent substantial disruption
> of diverse economic relationships and likelihood of material
> adverse harm to a very broad spectrum of creditor constituencies.

*In re Trans World Airlines, Inc.* 2001 WL 1820326, *14 (Bankr. D. De. 2001). For those

reasons, the *TWA* court held that the going concern bid was the highest and best bid. *Id.*

The evidence will also show the other factors for approving the sale are satisfied.

Sufficient notice of the sale has been provided. With respect to the sufficiency of the sale price,

the FCSA bid constitutes the most fair and reasonable price for the assets. Due to the inherent

risks associated with an Agency Agreement and the corresponding contingencies, deductions,

and uncertainty associated with the bottom line payment amount not being guaranteed, any

suggestion that the GB-Hilco bid constitutes the highest and best bid merely because the face

amount may be slightly higher than the amount of FCSA bid rings hollow.

Moreover, during the entire pendency of the Auction, GB-Hilco had no deal in place with

the Ad Hoc Consortium of Consignment Vendors to ensure an agreed upon and orderly

liquidation of their property. It was not until the day *after* the Auction had closed were the

Debtors informed of a deal between the consignment vendors and GB-Hilco. *See* Exhibit "B",

Email from Credit Suisse counsel, sent on May 28, 2015 at 9:57 PM (Eastern). With no such deal

in place, how could the Debtors ensure that these vendors' property could be sold? Additionally,

a selection of the GB-Hilco bid would give rise to the loss of the Debtors' business as a going

concern and over 3,000 employees would lose their jobs. Given the certainty of the minimum

consideration amount associated with the FCSA bid and the resulting preservation of the going

concern of the business, the selection of this bid, even under heightened scrutiny, falls within the

Debtors' sound business judgment. Moreover, only the FCSA bid leaves the estate administratively solvent and ensures payment of allowed administrative expense claims. The parties have acted in good faith, and a fair and reasonable price for the assets has been obtained following an open and active marketing campaign and a robust, competitive bidding.

Despite innuendo and ad hominem attacks from GB-Hilco and Credit Suisse, the 363 sale process was transparent and conducted in good faith. The Debtors have provided a free flow of information to both the Consultation Parties and the Potential Bidders during the entire 363 sale process. The Debtors engaged Brookwood Associates as its investment banker to conduct a robust sale and marketing process. As acknowledged by Credit Suisse, FCSA did not interfere with this process or attempt to influence Brookwood Associates in any manner.[11] After thoughtful analysis and review of all of the Qualified Bids, the Debtor notified the Consultation Parties on its opinion of the Baseline Bid -- the FCSA bid valued at the projected midpoint value of the bid -- and solicited feedback and comments from the Consultation Parties. The Debtors postponed the announcement of the Baseline Bid a day in order to give the Consultation Parties additional time to discuss the selection of the Baseline Bid **before** any announcement was made to other Qualified Bidders. Credit Suisse did object to the selection of FCSA as the Baseline Bid, but the other two Consultation Parties supported the Debtors' decision so the announcement was made to the Qualified Bidders. *See* Composite Exhibit "C", Various Emails between Debtors' counsel and Credit Suisse's counsel regarding selection of the Baseline Bid.

Prior to the commencement of the Auction, the Debtors met with all of the Consultation Parties and with each Qualified Bidder to walk them through the Debtors' methodology and bid

---

[11] What is described as "collusion" and "freezing" is also easily interpreted as respect and deference to the 363 sale process after the litany of initial objections over "insider involvement." The 363 sale process and auction resulted in FCSA increasing its bid by at least $14 million compared to the proposed stalking horse bid submitted earlier in these bankruptcy cases by FCSA. Credit Suisse's bald statements that the FCSA bid was not "maximized" are without merit or support.

analyses.   On both days, the Auction started several hours late on account of this inclusive process.   Throughout the Auction, the Consultation Parties were regularly convened to discuss the implementation and execution of the bid procedures and weighing of various bids.   The Debtors even re-formatted their bid analyses after thoughtful comments from Credit Suisse's financial advisor.

When GB-Hilco complained about the process being unfair in the early hours of the morning on Day 1 of the Auction, the Consultation Parties and the U.S. Trustee were consulted, and the Debtors made the decision to adjourn the Auction and request a status conference the very next morning.   When the Judge ordered the parties to reconvene the Auction, the Debtors consulted with the Qualified Bidders and Consultation Parties to pick the earliest date mutually agreeable to all of the parties.

Credit Suisse and GB-Hilco spend a lot of time asserting something "unfair" or "not in good faith" about the Debtors' inability to ascribe a dollar amount to the value of a going concern bid.   When is being honest construed as unfair or in bad faith?   The Debtors have wrestled with ascribing a dollar amount to the value of a going concern business and were unable to do so.   This is no different from Credit Suisse's inability to ascribe a value to its "IP bundle" collateral, notwithstanding that Credit Suisse has an appraisal of this collateral and the engaged services of a well-respected financial advisor.   The Debtors appreciated the difficulty of Credit Suisse's position and did not cry foul at their agreement to let the market "monetize the value of the IP bundle." *Transcript of Auction, May 26, 2015* at 37: 9-14 (Doc. No. 807-5).

This is no different from allowing the market to monetize the value of the going concern premium.   GB-Hilco was free to continue bidding on the assets.   The Debtors welcomed GB-

Hilco's highest and best offer and invited them to continue bidding on the assets.[12]   Would the process have been fair if the Debtors announced an arbitrary dollar amount to the value of a going concern business and then told GB-Hilco they had to beat this amount?   The Debtors were uncomfortable with this approach and were concerned that it would unfairly and artificially inflate the bids, which could lead to similar attacks of unfairness or lack of good faith.   The Debtors elected to be honest and forthright with the parties, which was appreciated by GB-Hilco as noted in the transcript excerpts cited in their objection.

One thing GB-Hilco could have done, but refused to do, to enhance the value of their bid was guarantee that the estate would receive at least the projected dollar amount of their bid.   GB-Hilco refused to do so and even said at one point, "**So I don't think anyone at the end of the day is guaranteeing you that you are going to get 41 million dollars.**"   *Transcript of Auction, May 21, 2015* at 42: 18-20 (emphasis added)(Doc. No. 802-1).   After such a statement, how could the Debtors have any faith in the true value of the GB-Hilco bid?   If GB-Hilco cannot even guarantee the estate will receive $41 million, why should the Debtors trust any statements or projections that the estate will receive amounts in excess of $41 million from GB-Hilco?   This defies logic.   To base a decision to shut down a business, terminate employees, and liquidate assets based on GB-Hilco's ephemeral promise of some dollar amount calculated as a percentage of an inventory projection to be finalized a month after the liquidation process has commenced, the Debtors would have to abandon their business judgment and fiduciary duties to the estate. The toothpaste would be out of the tube at this point and there would be no turning back if the GB-Hilco bid did not live up to projections.   Based on these uncertainties in the GB-Hilco bid,

---

[12]   At one point in the auction process, after consulting with the Consultation Parties, the Debtors suggested a round of best and final sealed bids in an attempt to solicit the very highest bids from the bidders, a process recently sanctioned by the bankruptcy court in Delaware overseeing the sale of assets in the Radio Shack case.   *See Transcript of Auction, May 26, 2015* at 37: 14-20 (Doc. No. 802-5).   This proposal was abandoned in the face of strong opposition from the bidders.   *See id.* at 6-21.

24301570 v3

the Debtors selected the FCSA bid as the highest and best bid for all stakeholders in this Chapter 11 case.

There are no valid objections that the 363 sale process was unfair to any of the bidders. When you strip away all of the rhetoric, the sole complaint is with the Debtors' selection of the FCSA bid as the highest and best bid. Reasonable minds may disagree on the Debtors' final selection, but under the Court-approved bidding procedures and established precedent, the Debtors possess the ability to make this decision and come to this Court for approval of its decision. A disagreement on the determination of "highest **and** best" does not impugn the entire 363 sale process as being unfair or conducted in bad faith by the Debtors. These arguments are red herrings, which distract from the legitimate issues of whether the proposed sale to FCSA may be approved under the Bankruptcy Code. For the reasons set forth in the next section of the brief, the Debtors emphatically state that the FCSA bid can and should be approved by this Court.

### III.  THE SALE OF ASSETS FREE AND CLEAR IS AUTHORIZED BY  11 U.S.C. § 363(f)

The Debtors seek to sell the Assets free and clear of all liens, claims, interests and encumbrances (collectively, the "**Liens**"). Section 363(f) of the Bankruptcy Code provides that property may be sold free and clear of any interest in the property if:

> (1)     applicable nonbankrupcty law permits sale of such property free and clear of such interest;

> (2)     such entity consents;

> (3)     such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

> (4)     such interest is in bona fide dispute; *or*

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest

11 U.S.C. § 363(f).  Only one of the noted conditions need be satisfied to approve the sale.  *In re Wolverine Radio Co.,* 930 F.2d 1132, 1148 (6th Cir. 1991).

The chart below summarizes the two lenders' liens on the assets and their proposed treatment under the FCSA bid and the GB-Hilco bid:

| | **DEBTORS' ASSETS** | |
|---|---|---|
| | **"Working Capital Collateral"** | **"Term Loan Collateral"** |
| | All cash, Deposit Accounts, Securities Accounts, Accounts, Inventory, prepaid expenses, Instruments, Documents, Chattel Paper and Supporting Obligations, all books and records related to the foregoing (including without limitation all books, databases, customer lists, engineer drawings, and Records, whether tangible or electronic which contain any of the foregoing), and all Proceeds of any of the foregoing (including without limitation, all insurance proceeds) and all collateral security and guarantees given by any person with respect to any of the foregoing. | All Collateral that is not Working Capital Collateral, which is all Copyrights, Domain Names, Patents, Trademarks and Licenses, all Equipment, all Fixtures, all General Intangibles, all Goods, all Pledged Collateral, all Letter-of-Credit Rights,[13] and all Commercial Tort Claims as specified from time to time in Schedule IV of the Term Loan Pledge and Security Agreement.<br><br>(Note, Schedule VI is blank and lists no commercial tort claims). |
| 1st Lien | FC Special Funding (Senior Lender) | Credit Suisse |
| 2nd Lien | Credit Suisse | FC Special Funding (Senior Lender) |

In addition certain vendors (the "**Consignors**") that delivered goods (the "**Consigned Inventory**") to the Debtors pursuant to consignment agreements and have filed objections (or an adversary proceeding) asserting interests in the Consigned Inventory that they claim are superior to the Debtors or the Secured Lenders' rights in such Consigned Inventory.

---

[13] Letter-Of-Credit Rights are limited to letters of credit where the Debtors are the beneficiary, which excludes the letter of credit posted by the Debtors for workers compensation claims.  Under that letter of credit, the Debtors are the maker, not the beneficiary.

24301570 v3

## A.   Any Interests In The Consignment Inventory Are Addressed Under 11 U.S.C. § 363(f)(2)

With respect to the Consignment Inventory, the Debtors dispute the claims of the Consignors but nonetheless believe they have obtained (or will obtain) the consent of most, if not all, objecting Consignors to the sale and to the proposed treatment of their claims under both the FCSA offer and the GB-Hilco offer. With respect to any Consignors that have not formally objected, their consent is implied for purposes of Section 363(f)(2). *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) ("lack of objection (provided of course there is notice) counts as consent" for Section 363(f) sale).[14]   Alternatively, there is no question the alleged rights of Consignors are in dispute, satisfying Section 363(f)(4).

## B.   Liens On The Working Capital Collateral Are Addressed By 11 U.S.C. § 363(f)(2)

FC Special Funding consents to the FCSA sale.   Pursuant to Section 4.4(e) of the Intercreditor Agreement between the two lenders:

> In an Insolvency Proceeding and solely with respect to matters relating to the Working Capital Collateral, neither the Term Loan Agent nor any Term Loan Lender **shall oppose any sale or disposition of any assets of the Obligor that is supported by the Working Capital Lenders, and the Term Loan Agent and each Term Loan Lender will be deemed to have consented under Section 363 of the Bankruptcy Code** (and otherwise) to any sale supported by the Working Capital Lenders and to have released their Liens on such assets. In an Insolvency Proceeding and solely with respect to matters relating to the Term Loan Collateral, neither the Working Capital Agent nor any Working Capital Lender shall oppose any sale or disposition of any assets of any Obligor that is supported by the Term Loan Lenders, and the Working Capital Agent and each Working Capital Lender will be

---

[14]   *See also In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997) (secured creditor "implicitly conveyed its consent to the [Section 363(f)] sale" where it failed to object).   *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (because tax lien holder did not object to sale, it "may be deemed to have consented to the sale for purposes of section 363(f)(2)"); *In re Elliot*, 94 B.R. 343, 345-46 (E.D. Pa. 1988) (consent implied under Section 363(f)(2) where non-debtor "received notice of the proposed sale and also admits that it did not file any timely objection"); *In re Gabel*, 61 B.R. 661, 664-65 (Bankr. W.D. La. 1985) (properly noticed secured creditor that did not object to sale was estopped from denying its implied consent).

> deemed to have consented under Section 363 of the Bankruptcy
> Code (and otherwise) to any sale supported by the Term Loan
> Lenders and to have released their Liens to such assets.

(emphasis added).

As a result of this provision in the Secured Lenders' Intercreditor Agreement, because the Senior Lender (defined therein as the Working Capital Lenders) supports the selection of the FCSA bid as the highest and best bid, so does Credit Suisse.

Additionally, the junior liens of Credit Suisse on the Working Capital Collateral are further addressed under Sections 363(f)(3) and (f)(5), which are elaborated below with respect to the treatment of the liens on the Term Loan Collateral.

### C.    Liens On The Term Loan Collateral Are Addressed By 11 U.S.C. § 363(f)(3) and (f)(5)

#### (i)    Section 363(f)(3) Is Satisfied As To Credit Suisse Because The Sale Proceeds To Credit Suisse Exceed The Value of Its Liens.

Section 363(f)(3) is satisfied if the sale proceeds to a lienholder equal or exceed "the aggregate value of all [its] liens on such property." Though the interpretation of 363(f)(3) has produced some division in the courts, the majority and better-reasoned view is that the "aggregate value of all liens" means the actual economic value placed on the liens – not the face amount of the liens. *In re Beker Indus., Inc.*, 63 B.R. 474, 477 (Bankr. S.D.N.Y. 1986). As stated by Credit Suisse in its objection, "[i]f the Debtors were truly proceeding in good faith, they would at least attempt to distribute the proceeds in accordance with the priority of their various creditors. In such a scenario, the Term Lenders would receive the **value** of their secured claim . . .." *Credit Suisse Objection*, ¶ 60 (Doc. No. 842). The Debtors agree that Credit

Suisse's recovery on their secured claim should be limited to the value of their claim, which is accomplished under the FCSA bid.[15]

In *Beker*, the court approved the sale of real property free and clear of liens, even though the total sale price was less than the total face amount of the liens on the property. Noting that Section 363(f)(3) uses the term "value" of liens, the *Beker* court noted that under Section 506(a), the "value" of a secured creditor's claim "means its actual value as determined by the court, as distinguished from the amount of the lien." *Id.* at 476. The court concluded that the "value" of a lien under 363(f)(3) should be similarly interpreted, *id.*, a conclusion further supported by the fact that chapter 11 allows the sale of encumbered property for less than the face amount of a lien, 11 U.S.C. § 1129(b)(2)(A)(ii), and that a lienholder is protected by its credit bid rights under Section 363(k) if it believes the property can be sold for a higher price. *Id.* at 476-77. Many other courts have followed this reasoning and approach.[16]

A recent case taking the contrary position is *Clear Channel Outdoor, Inc., v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (9th Cir. BAP 2008) ("**Clear Channel**"). *Clear Channel* interpreted the term "value," as used in section 363(f)(3), to refer to the face amount of the lien. Accordingly, under this analysis, the sale could not be approved unless both lenders are paid in full, requiring here an extra $31.5 million in sales proceeds to pay Credit Suisse in full. This approach would be fatal for most financially unstable companies, would not permit a sale to any of the bidders in this case, and *Clear Channel* has for that reason (and others) been criticized by

---

[15] Credit Suisse's objection is conspicuously silent on the Debtors' ability to sell the Term Loan Collateral pursuant to Section 363(f)(3) of the Bankruptcy Code.

[16] *In re WPRV-TV, Inc.*, 143 B.R. 315, 320 n. 14 (D.P.R. 1991) (citing *Beker* as "better reasoned view" and describing face value interpretation as "highly criticized and unduly strict"); *In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) (the "better reasoned solution" interprets section 363(f)(3) as authorizes sale free and clear where the price is lower than face amount of liens but greater than the secured value of claims); *In re WBQ P'ship*, 189 B.R. at 105-06 (Bankr. E.D. Va. 1995) (sale permitted under section 363(f)(3) if purchase price equals or exceeds value of liened property); *In re Microwave Prods. of Am., Inc.*, 102 B.R. 659, 660-61 (W.D. Tenn. 1989) (if debtor realizes from sale an amount equal to value of encumbered property, it satisfies liens under section 363(f)(3)); *In re Terrace Gardens Park P'ship*, 96 B.R. 707 (Bankr. W.D. Tex. 1989).

a number of courts. For example, the court in *In re Boston Generating, LLC*, 440 B.R. 302, 332

(Bankr. S.D.N.Y. 2010) recently stated as follows:

> I decline to follow *Clear Channel;* rather, on the whole, the Court finds cases such as *In re Beker Industries Corp.,* 63 B.R. 474 (Bankr. S.D.N.Y. 1986) to be more persuasive than *Clear Channel* in their interpretations of a less than perfect statutory provision. As this Court held in *Beker Industries,* section 363(f)(3) should be interpreted to mean that "the price must be equal to or greater than the aggregate **value** of the liens asserted against it, not their **amount**.
>
> To hold otherwise would effectively mean that most section 363 sales of encumbered assets could no longer occur either (a) absent consent of all lienholders (including those demonstrably out of the money) or (b) unless the proceeds of the proposed sale were sufficient to pay the face amount of all secured claims in full. If section 363(f)(3) and (as discussed below) section 363(f)(5) are read in the manner suggested by the Second Lien Lenders, it seems unlikely that a Court, under any circumstance, could approve a non-consensual section 363 sale.  As both a practical matter and a matter of statutory construction, that cannot be the case. **It is hard to imagine that Congress intended to so limit a debtor's power to dispose of encumbered assets, particularly where such disposition otherwise satisfies the requirements of section 363(b).**

(emphasis added).

The upshot is this:  Section 363(f)(3) is satisfied as to Credit Suisse since the amount of

the  proceeds to be received by the estate on account of Credit Suisse's Term Loan Collateral

under the sale ($2.7 to $3.2 million) equals and exceeds the aggregate value of Credit Suisse's

lien in the Term Loan Collateral.  First, the Debtors' expert testimony to be offered at the Sale

Hearing will value the "Term Loan Collateral" between $995,000 and $1,900,000.   *See*

Composite Exhibit "D" – Debtors' Valuation Reports.  Second, the Debtors, after consultation

with the Consultation Parties (including Credit Suisse), agreed to allow the Auction process to

"monetize the value of the IP bundle."  *Transcript of Auction, May 26, 2015* at 37: 9-14 (Doc.

No. 807-5).  Third, when GB-Hilco increased their bid to include the "IP bundle" (including the

customer list that is part of the Working Capital Collateral), GB-Hilco's percentage change to their "guaranteed amount" equated to a dollar change of approximately $163,000. *Id*. at 46:13-17. Fourth, GB-Hilco previously ascribed a value of $888,000 to the Debtor's FF&E. *Transcript of Auction, May 25, 2015* at 1616:23 - 17:2. (Doc. No. 802-1). Fifth, and importantly, Credit Suisse passed on the opportunity to credit bid on the "IP bundle" and FF&E in order to preserve any objection to the value placed on the Term Loan Collateral at the Auction. *Transcript of Auction, May 26, 2015* at 56:4 (Doc. No. 807-5).

Consequently, FCSA's allocation of $2.7 million to the Term Loan Collateral far exceeds the economic value of Credit Suisse's lien in this collateral, which is supported by both expert testimony and the Auction process, and the sale of the Term Loan Collateral is authorized under Section 363(f)(3) of the Bankruptcy Code.

**(ii)      Section 363(f)(5) Allows The Sale Free And Clear Of Credit Suisse's Lien**

Section 363(f)(5) allows a debtor to sell property free and clear of liens when a legal or equitable proceeding exists that will force the lienholder to accept less than full money satisfaction for its interest. *In re James*, 203 B.R. 449, 453 (W.D. Mo. 1997); *In re Grand Slam USA, Inc.*, 178 B.R. 460, 463-64 (E.D. Mich. 1995). By "its express terms, Section 363(f)(5) permits a sale free and clear if the trustee can demonstrate the existence of another legal mechanism by which a lien could be extinguished without full satisfaction of the secured debt." *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002) (internal quotations omitted). Satisfaction of the standard requires only that a party could be compelled, not that it is being, or will be, compelled to accept a money satisfaction. *See Gulf States*, 285 B.R. at 508 ("the phrase 'could be compelled' only requires 'that the interest in question be subject to final satisfaction on a hypothetical basis, not that there be an actual payment in

satisfaction of the interest from the proceeds of the sale in question'") (internal citations omitted). Simply put, section 363(f)(5) does not require that the sale price for the assets to be sold exceed the value of the claims against it. *See, e.g., Gulf States*, 285 B.R. at 508; *Grand Slam U.S.A., Inc.,* 178 B.R. at 463. Cases requiring full payment under Section 363(f)(5) are "obsolete, inasmuch as [they are] inconsistent with the bankruptcy code." *Grand Slam U.S.A. Inc.*, 178 B.R. at 462.

There are at least two legal mechanisms by which Credit Suisse could have its lien extinguished without full satisfaction of its debt. First, courts considering this issue have held that the "cram down" provision under the Bankruptcy Code constitutes such a "legal or equitable proceeding" and permits a sale under Section 363(f)(5) where a secured creditor may receive less than the value of its claim. *Grand Slam USA, Inc.*, 178 B.R. at 464; *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993); *WPRV-TV, Inc.,* 143 B.R. at 321; *In re Healthco International, Inc.,* 174 B.R. 174, 176 (Bankr. D. Mass. 1994). Second, the non-judicial foreclosure provisions found in Article 9 of the Uniform Commercial Code ("**UCC**") allow a senior secured lender to sell property free and clear of a junior secured creditor's lien. This non-bankruptcy law also allows for the Debtors' sale to fall within the purview of Section 363(f)(5). *See In re Boston Generating, LLC,* 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010) ("the existence of judicial or nonjudicial foreclosure and enforcement actions under state law can satisfy section 363(f)(5).").

The first mechanism by which the Debtors could compel Credit Suisse to accept a money satisfaction is a cram down under section 1129(b) of the Bankruptcy Code. Under section 1129(b)(2)(A), a chapter 11 plan proponent can satisfy a secured claim, over the objection of the claimant, by cash payments having a present value equal to the value of the security interest.

*Grand Slam U.S.A., Inc*, 178 B.R. at 462 (citing *Healthco*, 174 B.R. at 176); *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821 (N.D. Ill. 1993)("cram downs" are legal proceedings within the meaning of section 363(f)(5)). In a cram down procedure, a trustee or debtor in possession may sell assets free and clear, without the consent of a secured creditor, if the present or future payments are made to the secured creditor in an amount equal to the present value of the collateral, even if such value is less than the debt. *Grand Slam U.S.A., Inc.,* 178 B.R. at 462. Courts within this Circuit have authorized a sale free and clear of all interests pursuant to Section 363(f)(5) in the Chapter 11 context so long as the Debtor can show that the lienholder is receiving the indubitable equivalent of the present value of its claim. *See, e.g., In re Hunt Energy Co., Inc.*, 48 B.R. 472, 485 (Bankr. N.D. Ohio 1985).

FCSA is paying a minimum of $2.7 million to the estate at closing on account of Credit Suisse's Term Loan Collateral, with any additional shortfall to be paid in 18 months.  While it is understandable that Credit Suisse is upset over the relative amount of recovery they may receive, the Bankruptcy Code authorizes and directs this treatment because this amount exceeds the aggregate value of Credit Suisse's lien in the Term Loan Collateral.

The second mechanism by which the Debtors could compel Credit Suisse to accept a money satisfaction is through a foreclosure sale of the Term Loan Collateral under Article 9 of the UCC. As stated by the court in *In re Jolan*, 403 B.R. 866, 868-70 (Bankr. W.D. Wash. 2009):

> [T]here are legal and equitable proceedings in Washington in which a junior lienholder could be compelled to accept a money satisfaction: a senior secured party's disposition of collateral after under the default remedies provided in part VI of Article 9, Secured Transactions, of Washington's Uniform Commercial Code, RCW 62A.9A.
>
> And a receiver may sell free and clear of liens under RCW 7.60.260, with the liens attaching to the proceeds. Since a receivership can be commenced by parties having interests in less

> than all of a debtor's property, and the receivership estate may be an entire business with numerous properties, RCW 7.60.025, the receiver may sell free and clear of even the interests of first lienholders.
>
> . . .
>
> And were the trustee proposing to sell real property, judicial and nonjudicial foreclosures in Washington operate to clear junior lienholders' interests, and their liens attach to proceeds in excess of the costs of sale and the obligation or judgment foreclosed. RCW 61.12 and 61.24. Likewise, a real property tax sale. *See* RCW 84.64.080.
>
> **Because there are in Washington legal and equitable proceedings by which lienholders may be compelled to accept money satisfactions, § 363(f)(5) here permits a sale free and clear of liens, with the liens attaching to the proceeds, notwithstanding that those proceeds may be insufficient to pay all liens.**

(emphasis added). Just as in *Jolan*, there are state law remedies that would allow for a sale of the property free and clear of Credit Suisse's junior interest. Consequently, Section 363(f)(5) authorizes the sale of the Term Loan Collateral free and clear of the liens of Credit Suisse. *See id*; *see also Boston Generating*, 440 B.R. at 333.

## IV.    APPROVAL OF THE FCSA BID SHOULD NOT BE DENIED BASED UPON CREDIT SUISSE'S ALLEGATION IT IS A *SUB ROSA* PLAN

Credit Suisse and several others argue the FCSA bid should be denied based upon Credit Suisse's allegation that the bid is an impermissible *sub rosa* chapter 11 plan.

A debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization," which circumvents or denies fundamental protections afforded under the chapter 11 requirements for confirmation of a plan of reorganization. *Motorola v Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007). If, however, the transaction has "a proper business justification" that does not deprive a party of fundamental chapter 11 protections, the transaction may be authorized. *Id*. at 467.

On the issue of chapter 11 plan protections, the Fifth Circuit court stated:

> [W]e hold that when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied. If the court concludes that there has in actuality been such a denial, it may then consider fashioning appropriate Protective measures modeled on those which would attend a reorganization plan.

*In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1228 (5th Cir. 1986).

A section 363 sale may be "objectionable as a *sub rosa* plan if the sale itself seeks to allocate or dictate the distribution of sale proceeds among different classes of creditors." *In re GSC, Inc.,* 453 B.R. 132, 179-80 (Bankr. S.D.N.Y. 2011) (citing *In re Gen. Motors,* 407 B.R. at 495). *See also In re Braniff Airways,* 700 F.2d 935, 939-40 (5th Cir. 1983) (denying approval of a transfer agreement that attempted to "dictat[e] some of the terms of [a] future reorganization plan. The [subsequent] reorganization plan would have to allocate the [proceeds of the sale] according to the terms of the [transfer] agreement or forfeit a valuable asset."). However, according to the *GSC* court, "so long as the proceeds from the sale are distributed in lien priority, the plan is not one that violates the confirmation process in the *Braniff* sense." *Id.*; *see also In re Motors Liquidation Co.,* 430 B.R. 65, 84 (S.D.N.Y. 2010) (finding the sale was not a *sub rosa* plan where it did not "specifically dictate, or arrange ex ante, by contract, the terms of any subsequent plan.").

Simply because the proceeds of a Section 363 sale may be used to pay creditors in accordance with lien priority does not mean that the sale is tantamount to a *sub rosa* plan. As aptly explained in *Trans World Airlines*:

> [N]othing in § 363 suggests that disparate treatment of creditors, such as is likely to occur here, disqualifies a transaction from court approval. The purpose of a § 363(b) sale is to transform assets . . . into cash in an effort to maximize value. Distribution of the value

> generated in accordance with § 1129 and other priority provisions occurs and is intended to occur subsequent to the sale.
>
> . . .
>
> The treatment of creditors in a § 363(b) context is dictated by the fair market value of those assets of the debtor that the purchaser in its business judgment elects to purchase. A purchaser cannot be told to assume liabilities that do not benefit its purchase objective. Thus, the disparate treatment of creditors occurs as a consequence of the sale transaction itself and is not an attempt by the debtor to circumvent the distribution scheme of the Code.
>
> . . .
>
> It is true, of course, that TWA is converting a group of volatile assets into cash. It may also be true that the value generated is not enough for a dividend to certain groups of unsecured creditors. It does not follow, however, that the sale itself dictates the terms of TWA's future chapter 11 plan. The value generated through the Court approved auction process reflects the market value of TWA's assets and the conversion of the assets into cash is the contemplated result under § 363(b).

2001 WL 1820326, at *11–12.

Here, a review of FCSA's bid confirms that it is not a *sub rosa* plan, and moreover that Credit Suisse is not being deprived of any protections it would otherwise have in a chapter 11 plan context.   Indeed, Credit Suisse is potentially receiving a larger recovery through the proposed FCSA bid than it might receive if the same transaction were proposed through a chapter 11 cram down, as the value of the Term Loan Collateral is much less than the amount Credit Suisse is receiving in connection with the FCSA bid.

Under similar facts the Bankruptcy Court approved a sale in *In re Boston Generating, LLC,* 440 B.R. 302 (Bankr. S.D.N.Y. 2010). In *Boston Generating*, the debtors filed bankruptcy in August 2010 after entering into an asset purchase agreement that required a sale of substantially all of their assets under Section 363. *Id.* at 310.  The debtors had undergone over a year of restructuring that eventually led to marketing of their assets for sale. Financial projections showed that the debtors would run out of cash in April 2011. *Id.* at 315. The court

approved the sale and held there was a good business reason for the sale that would pay 98.5% of the first lien holders' debt but would not pay anything to the debtors' second lien holders or unsecured creditors. *Id*. at 310. While the court found that the debtors would not "die" if the sale was not approved, a good business justification existed for an immediate sale because the debtors' assets would decrease in value if the debtors waited to sell. *Id*. at 329.  Finally, the court held that the proposed sale was not a *sub rosa* plan. *Id*. at 331. The sale was not calculated to evade the plan confirmation and "[t]he Debtors' assets [were] simply being sold" and "the First Lien Lenders [would] receive most of the proceeds in accordance with their lien priority...." *Id*.

While it is unfortunate that the sale proceeds (under any bid offered by any party to the Auction) are insufficient to pay all creditors in full, the Debtors have identified a bid as being the highest and best bid and propose to distribute the sales proceeds in a manner entirely consistent with the Bankruptcy Code. While there are some creditors who are being paid directly by the purchaser FCSA, but other unsecured creditors are to receive nothing from the sale, this does not reflect an intent by the Debtors to "allocate or dictate the distribution of sale proceeds among different classes of creditors," as the court in *Braniff* found problematic.  Instead, this result is simply a by-product of the purchaser's decision to assume certain contracts and the corresponding obligations and liabilities running with these contracts, turning such liabilities and obligations into administrative claims, while significantly reducing the unsecured creditor body by eliminating certain rejection damage claims. Plus, it is the purchaser, not the debtor, who is directly making these payments to creditors. The purchaser is free to pay its vendors in the manner it so chooses, particularly where the purchaser is seeking to obtain favorable trade terms post-closing, and such a decision does not make this transaction a *sub rosa* plan. *See GSC*, 453 B.R. at 180 (finding transaction not to amount to *sub rosa* plan in part because "the payment to

-34-

unsecured creditors is coming directly from the Purchaser"). Every single disbursement of the sale proceeds received by the Debtors' estate shall be consistent with the Bankruptcy Code.

To the contrary, the Debtors are concerned that the GB-Hilco bid may give rise to a *sub rosa* plan. Under this bid, Credit Suisse would seemingly obtain a larger recovery, to the detriment of 503(b)(9) and other administrative claimants, by seeking to circumvent the payment of administrative expense claims *outside of Chapter 11 plan confirmation requirements* and leap frog over administrative expense claims that would otherwise have to be paid in a Chapter 11 plan confirmation process. Credit Suisse's careful choice of words in its objection are revealing on this point: "the Term Lenders would receive the value of their secured claim after **taking into account** payment of administrative and other claims required to be paid upon plan confirmation." *Credit Suisse Objection*, ¶ 60 (Doc. No. 842)(emphasis added). Credit Suisse could have easily stated after "payment in full" of administrative expense claims as required by the Bankruptcy Code as a condition to plan confirmation; however, they did not and this omission speaks louder than words. Credit Suisse goes on to say that "allowed administrative expenses must be paid, or otherwise consensually treated in order to confirm a plan and distribute assets to creditors." *Id.*, ¶ 67, n. 10.[17] Notably, the Court previously indicated it might

---

[17] Counsel for Credit Suisse has recently ruminated on this issue in open court in another district:

> There is no basis for a provisional distribution based on any sort of notion or argument that the secured lenders are either required by the Code to guarantee payment of 503(b)(9) claims, or that somehow at its barest, the 503(b)(9) claims jump the secured claims, the valid claims, the prepetition term loan and the DIP loans. There is nothing in the Bankruptcy Code or in published case law in this district that requires the payment of 503(b)(9) claims in order to approve a sale of all the assets. In fact, everybody should be wildly happy that there's significant net proceeds about which they can negotiate a final resolution of this case. **And frankly if they can't negotiate it and I guess they want to convert the case and see what happens to the 503(b)(9)s then, the estate has that option as well.**

*See In re AFA Investment, Inc.,* Case No. 12-11127 (Bankr. D. Del. 2012) (Dkt. No. 485 – July 12, 2012 Hearing Transcript), 35:17-36:6, relevant portions of which are attached hereto as Exhibit "E" (emphasis added).

not approve a 363 sale absent administrative claims being paid in full.[18] The FCSA bid does just that, but there is no such commitment under the GB-Hilco bid.

The Debtors are concerned that Credit Suisse's support of the GB-Hilco bid is not motivated by a concern for the greatest recovery to the estate, but merely the greatest recovery to Credit Suisse. This level of self-interest in not objectionable, but the Debtors need to select the **highest and best bid for the entire estate**. This is another reason why the Debtors, with the support of the Committee, selected the FCSA as the highest and best bid since it is the only bid that guarantees the payment of all administrative expense claims, including without limitation, 503(b)(9) claims.

A number of parties have attacked the Debtors actions in these cases solely because the Debtors, the lender FC Special Funding, LLC, and the purchaser have affiliations involving Mr. Richard L. Jackson. Mr. Jackson does not legally own or individually control any of those entities. The Debtors, the Debtors' non-debtor parent Family Christian Resource Centers (d/b/a Family Christian Ministries) and the Buyer are considered public charities not owned by anyone. Unlike private corporations, public charity companies have no ownership interests or equity interests, and are prohibited by law from paying dividends. Mr. Jackson is one of three Board members of such public charities and has no legal ability to exercise individual control over those public charity entities nor does he receive compensation from such public charities.

These public charities were established under Georgia law. Georgia law provides immunity to officers and directors of nonprofit entities in the absence of willful or wanton misconduct:

> (a) A person serving with or without compensation as a member, director, or trustee, or as an officer of the board without compensation, of any nonprofit hospital or association or of any

---

[18] *See* Transcript of April 14, 2015 Hearing at 12:3-5, relevant portions of which are attached hereto as Exhibit "F".

> nonprofit, charitable, or eleemosynary institution or organization
> or of any local governmental agency, board, authority, or entity
> shall be immune from civil liability for any act or any omission to
> act arising out of such service if such person was acting in good
> faith within the scope of his or her official actions and duties and
> unless the damage or injury was caused by the willful or wanton
> misconduct of such person.

O.C.G.A. § 51-1-20.  Thus, the inclusion of a release in the FCSA bid, as well as the Debtors'

sale of any such alleged claims to FCSA, is merely belts and suspenders, and does not constitute

a *sub rosa* plan.  The parties alleging collusion or wrong doing have failed to set forth credible

facts of any corporate wrongdoing, let alone any indication of willful or wanton misconduct.

## V.   THE ASSUMPTION AND ASSIGNMENT OF THE EXECUTORY CONTRACTS SHOULD BE AUTHORIZED UNDER SECTION 365(f)

Section 365(f)(2) of the Bankruptcy Code provides that:

> [t]he trustee may assign an executory contract or unexpired lease
> of the debtor only if –
>
> (A) the trustee assumes such contract or lease in accordance with
> the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of
> such contract or lease is provided, whether or not there has been a
> default in such contract or lease.

Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor."   Section

365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired

lease or executory contract of a debtor as follows:

> (b)(1) If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume such
> contract or lease unless, at the time of assumption of such contract
> or lease, the trustee –
>
> > (A) cures, or provides adequate assurance that the trustee
> > will promptly cure, such default;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *See, e.g.*, *EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

To the extent there are any objections regarding FCSA's ability to provide adequate assurance of future performance, such adequate assurance will be established by the evidence and testimony submitted at the Sale Hearing. And the Court has already issued an Order stating that contested issues regarding timely filed cure objections will be addressed at a subsequent hearing.[19]

## VI.    THE SALE IS PROPOSED IN GOOD FAITH

---

[19] *See* Bid Procedures Order, ¶ 15.

As set forth herein, the sale process was conducted entirely in good faith and the Debtors respectfully request this Court to hold that the sale process was conducted in good faith. When "a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-150 (3d. Cir. 1986). To find that a sale was conducted in good faith, the Court should be satisfied that (a) there was no fraud or collusion between the purchaser and the seller or the other bidders and (b) the purchaser's actions did not constitute an attempt to take grossly unfair advantage of other bidders. *See In re Made in Detroit, Inc.*, 414 F.3d 567, 581 (6th Cir. 2005)**.**

In connection with the Auction, the Debtors exercised their business judgment that a sale as a going concern was the preferred course, especially in light of the inherent risks and uncertainties associated with the GB-Hilco bid. The FCSA bid is the only bid that results in the payment of all anticipated administrative expense claims and is carefully structured to comply with the Bankruptcy Code's priority scheme.

Despite much chest thumping and finger pointing from Credit Suisse, there is absolutely no evidence whatsoever of any misconduct occurring in connection with any aspect of the sale process.[20] The Debtors conducted a thorough and thoughtful marketing process through their investment banker. This marketing process produced only one prospective purchaser that was willing to purchase the Debtors' assets as a going concern. The Debtors made the good faith decision to choose that bid as highest and best, and the guaranteed minimum that came along with it, over a bid that would shut down the company, put over 3,000 people out of work, and

---

[20] In fact, counsel for Credit Suisse stated that members of the Debtor's Auction Team (as defined in the Bid Procedures Order), specifically Chuck Bengochea and Amy Forestall, had been "very responsive" in connection with the baseline bid selection process, which behavior was "much appreciated" by counsel for Credit Suisse. *See* Exhibit "G", May 20, 2015 Email from Jennifer Hagle to Erich Durlacher.

24301570 v3

potentially leave a substantial number of administrative claimants unpaid, all with the attendant

risks associated with a bid by someone that was either unwilling or unable to guarantee that the

Debtors would receive a minimum sum certain.

## VII.    AGGRIEVED BIDDERS LACK STANDING

GB-Hilco has objected to the proposed sale to FCSA.   Generally, "[f]rustrated bidders do

not have standing to object to the sale of property." *In re Moran*, 566 F.3d 676, 681 (6th Cir.

2009) quoting, *Squire v. Scher (In re Squire)*, 282 Fed. Appx. 413,416 (6th Cir.2008).[21] As stated

by one court within this circuit, "the purposes of [§ 363] would be hindered, not furthered, by

permitting a stranger to the estate to object to a sale to which no party in interest objected." *See*

*In re Planned Systems, Inc.*, 82 B.R. 919 (Bankr. S.D. Ohio 1988) (citing *In re Nepsco, Inc.*, 36

B.R. 25 (Bankr. D. Me. 1983)).

GB-Hilco is not a party in interest in these cases and therefore it does not have standing

to object to the approval of the sale. *See Id.*; *In re Am. Colonial Broadcasting Corp.*, 758 F.2d

794, 802 n. 9 (1st Cir. 1985) ("We note . . . that it is unlikely that Woods has standing to oppose

the order at all in his position as an unsuccessful and late bidder."); *In re New Energy Corp.*, 12-

33866, 2013 Bankr. LEXIS 3665, *8-9 (Bankr. N.D. Ind. Feb. 26, 2013), aff'd 739 F.3d 1077

(7th Cir. 2014) ("Unsuccessful bidders lack standing to challenge a bankruptcy court's approval

of a sale of a bankruptcy estate's assets."); *In re Quanalyze Oil & Gas Corp.*, 250 B.R. 83, 89

(Bankr. W.D. Tex. 2000) (noting that "[a] competing bidder normally lacks standing to even

challenge a sale"); *Delancy Invest. Grp. v. Mall at One Assocs., L.P. (In re Mall at One Case*

*Assocs., L.P.)*, 95-0262, 1995 Bankr. LEXIS 716, at *21 (Bankr. E.D. Penn. May 23, 1995)

---

[21]    *See also In re Broadmoor Place Invs., L.P.*, 994 F.2d 744, 746 n. 2 (10th Cir. 1993), cert. denied, 510 U.S. 1070
(1994); *In re Harwald Co.*, 497 F.2d 443, 444-45 (7th Cir. 1974); *In re Keim*, 212 B.R. 493 (Bankr. D. Md. 1997);
*In re Crescent  Mfg. Co.*, 122 B.R. 979, 981 (Bankr. N.D. Ohio 1990); *In re Atlanta Packaging Prods., Inc.*, 99 B.R.
124 (Bankr. N.D. Ga. 1988).

("[T]here are numerous authorities which hold that a non-creditor whose only connection with a bankruptcy case is that the party was an unsuccessful bidder at a bankruptcy sale lacks standing to challenge the right of other bidders to consummate the sale"); *see also Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)* 181 F.3d 527, 531 (3d. Cir. 1999) (in examining appellate standing, noting that generally "creditors have standing to appeal, but disappointed prospective purchasers do not"). Accordingly, the Debtors submit that GB-Hilco's objection to the sale may not be heard due to lack of standing.

The Sixth Circuit has held that an aggrieved bidder may have limited standing to object to a sale when the bidder is able to challenge "the intrinsic structure of the sale because it is tainted by fraud, mistake, or unfairness." *See Moran*, 566 F.3d at 681. However, as discussed above, the sale process was entirely fair, was done in good faith, and was conducted without fraud or mistake or unfairness.

## CONCLUSION

For the reasons set forth above, the proposed Section 363 sale to FCSA is authorized under Sections 363(b) and(f), and the Court should grant the Sale Motion.

Dated:  June 8, 2015

Respectfully submitted,

KELLER & ALMASSIAN, PLC

/s/  A. Todd Almassian
A. Todd Almassian (P55467)
Greg J. Ekdahl (P67768)
230 East Fulton Street
Grand Rapids, MI 49503
(616) 364-2100
ecf@kalawgr.com

- and -

24301570 v3

/s/  Erich N. Durlacher
BURR & FORMAN LLP
Erich Durlacher (Ga Bar No. 235563)
Brad Baldwin (Ga Bar No. 034220)
171  17th Street, N.W. - Suite 1100
Atlanta, Georgia  30363
Telephone:  (404) 815-3000
Facsimile:   (404) 817-3244
*Attorneys To The Debtors and Debtors-in-Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2015, the foregoing *Debtors' Memorandum Of Law In Support Of Debtors' Motion For An Order (A) Authorizing The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of Liens And (B) Authorizing The Assumption And Assignment Of Executory Contracts And Leases, And (C) Granting Related Relief* was filed with the clerk of the court using the ECF system, which will send electronic copies of such filing to all ECF participants in this case.

Dated:  June 8, 2015.

BURR & FORMAN LLP

/s/ Erich N. Durlacher
Erich N. Durlacher (Ga Bar No. 235563)
(*Admitted Pro Hac Vice*)
171 17th Street, N.W., Suite 1100
Atlanta, GA 30363
Phone:  (404) 815-3000 / Fax: (404) 817-3244
Email: bbaldwin@burr.com
*Attorneys To The Debtors*

24301570 v3