UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

FAMILY CHRISTIAN, LLC, *et al.*,[1]

Debtors.

_____/

Case No. GG 15-00643-jtg
(Jointly Administered)

Chapter 11

Hon. John T. Gregg

**MEMORANDUM DECISION REGARDING MOTION TO
SELL SUBSTANTIALLY ALL ASSETS OF DEBTORS**

---

**COUNSEL**

---

**APPEARING:** Erich Durlacher and Brad A. Baldwin, BURR & FORMAN, LLP, Atlanta, Georgia and A. Todd Almassian and Gregory J. Ekdahl, KELLER & ALMASSIAN, PLC, Grand Rapids, Michigan for the Debtors. Robert S. Hertzberg and Deborah Kovsky-Apap, PEPPER HAMILTON, Southfield, Michigan for Hilco/Gordon Brothers Joint Venture. Michael G. Menkowitz, FOX ROTHSCHILD LLP, Philadelphia, Pennsylvania, Paul J. Labov, FOX ROTHSCHILD LLP, New York, New York and John T. Piggins, MILLER JOHNSON, Grand Rapids, Michigan for the Official Committee of Unsecured Creditors. Jennifer C. Hagle and Gabriel R. Macconaill, SIDLEY AUSTIN, LLP, Los Angeles, California and Scott H. Hogan, FOSTER SWIFT COLLINS & SMITH, PC, Grand Rapids, Michigan for Credit Suisse AG, Cayman Islands Branch. Allison Bach, DICKINSON WRIGHT, PLLC, Detroit, Michigan for the Ad Hoc Consortium of Consignment Vendors. Steven L. Rayman, RAYMAN & KNIGHT, Kalamazoo, Michigan, Scott B. Lepene, THOMPSON HINE, LLP, Cleveland, Ohio and John F. Isbell, THOMPSON HINE, LLP, Atlanta, Georgia for FC Special Funding. Todd C. Meyers and Paul M. Rosenblatt, KILPATRICK TOWNSEND & STOCKTON, LLP, Atlanta, Georgia and Ronald A. Schuknecht, SMITH HAUGHEY RICE & ROEGGE PC, Traverse City, Michigan. Gordon J. Toering, WARNER NORCROSS & JUDD, LLP, Grand Rapids, Michigan for Infor (US), Inc. Thomas J. Salerno, STINSON LEONARD STREET, LLP, Phoenix, Arizona for Bridgestone Media. Marc M. Bakst, BODMAN, PLC, Detroit, Michigan for Provident Distribution, LLC. Ronald A. Clifford, BLAKELEY, LLP, Irvine, California for several consignment vendors. Michael V. Maggio and Michelle M. Wilson, OFFICE OF THE UNITED STATES TRUSTEE, Grand Rapids, Michigan for the United States Trustee. Robert F. Wardrop, II and Denise D. Twinney, WARDROP & WARDROP, PC, Grand Rapids, Michigan for Cole Mt. Clarksville, Indiana, LLC, Cole Mt. Canton Marketplace, LLC, Los Banos Gravel Company,

---

[1]      The Debtors are Family Christian, LLC (Case No. 15-00643-jtg), Family Christian Holding, LLC (Case No. 15-00642-jtg), and FCS Giftco, LLC (Case Doc. 15-00644-jtg).

Whitehall Crossing A, LLC, and GE Fleet Services.  David L. Pollack, BALLARD SPAHR, LLP, Philadelphia, Pennsylvania for Brixmor Property Group.  Dustin P. Branch, KATTEN MUCHIN ROSENMAN, LLP, Los Angeles, California for GEM Realty Capital, Inc., Starwood Retail Partners, LLC, Prudential Insurance Company of America, and Acadia Realty Trust.  Ronald E. Gold, FROST BROWN TODD, LLC, Cincinnati, Ohio for WP Glimcher and Belwether Enterprises.  Paul S. Magy, CLARK HILL, PLC, Birmingham, Michigan for several landlords. David Mollicone, DAWDA MANN MULCAHY & SADLER, PLC, Bloomfield Hills, Michigan for RPAI Southwest Management LLC and RPAI US Management LLC.  Eric Novetsky, JAFFEE RAITT HEUER & WEISS, PC, Southfield, Michigan for World Vision USA, IA South Frisco Village, LLC, IA Fultondale Promenade, LLC, MB Sioux City Lakeport, LLC, Greenville (Woodruff) WMB, LLC, and Inland Orland Lagrange Rd. Outlot, LLC.  Lisa A. Hall, PLUNKETT COONEY, Grand Rapids, Michigan for DDR Corp., Regency Centers, LP, Rouse Properties, Slawson Companies, and Weingarten Realty.  Elisabeth M. Von Eitzen, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan for MAG Jewelry Company, Inc.

---

This matter comes before the court in connection with a motion to sell substantially all of the Debtors' assets and assume and assign certain executory contracts and unexpired leases pursuant to sections 363 and 365 of the Bankruptcy Code [Dkt. No. 487] (the "Sale Motion"), filed by Family Christian, LLC (the "Operating Debtor"), Family Christian Holding, LLC and FCS Giftco, LLC (collectively, the "Debtors").[2]  For the following reasons, the court shall deny the Sale Motion.[3]

## INTRODUCTION

The sale process in these cases has been prolonged, controversial and contested.  The Debtors' proposed sale to the winning bidder, an indisputable insider, is subject to objection by

---

[2]     The Operating Debtor is wholly owned by Family Christian Holding, LLC, which in turn is wholly owned by a non-debtor parent company, Family Christian Resource Centers, Inc. (the "Non-Debtor Parent").  FCS Giftco, LLC is a non-operational entity wholly owned by the Operating Debtor.  The Non-Debtor Parent, which ultimately owns the Debtors, is controlled by Richard Jackson, a businessman from Atlanta, Georgia.

[3]     The findings of fact are based upon the testimony of the witnesses, the exhibits admitted into evidence, and judicial notice of background evidence on the docket.  Fed. R. Evid. 201.  The following constitutes this court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.  Because the court has prepared this Memorandum Decision on an expedited basis with the interests of the Debtors, their creditors, and thousands of employees in mind, the court respectfully requests that any typographical errors be received without harsh criticism.

the second highest bidder, a national liquidation firm whose participation the Debtors solicited in order to maximize the value to their estates.  The second highest bidder alleges that the sale process was "rigged" for the benefit of the winning bidder and insider.  After two days of robust bidding, the second highest bidder, for a second time, refused to continue to participate in the auction.  The second highest bidder demanded that the Debtors inform it of the value allocated to the going concern nature of the bid submitted by the winning bidder.  Because the Debtors declined to ascribe such a value, the second highest bidder contends that the auction was flawed.  The second highest bidder also objects to the structure of the proposed sale to the winning bidder.

The sale is also opposed by one of the Debtors' creditors who allegedly sold goods to the Debtors on consignment.  According to the consignment vendor, the structure of the proposed sale violates two fundamental tenets of the Bankruptcy Code, equality of distribution among similarly situated creditors, and the prohibition on the release of insider claims outside the context of a plan.

The Debtors' selection of the insider as the winning bidder is, importantly, supported by the Official Committee of Unsecured Creditors, the Debtors' two secured lenders, an ad hoc committee of consignment vendors holding approximately $14 million in consignment claims, and numerous other parties who desire the Debtors' business to continue as a going concern.

## JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(N).

## BACKGROUND

The Debtors sell religious merchandise such as books, music, movies and other supplies at more than 250 brick and mortar retail stores located throughout 36 states.  As of the petition date, the Debtors maintained a labor force of approximately 3,100 employees.  The Debtors operate as

non-profit organizations whose collective mission is to donate their profits to the Non-Debtor Parent for charitable purposes such as disseminating bibles, supporting orphans and others in need, funding mission trips, and orchestrating natural disaster relief efforts.

A.      *The Debtors' Prepetition Lending Relationships*

In 2012, the Debtors obtained a revolving line of credit up to the maximum principal amount of $40 million from JPMorgan Chase Bank, N.A. ("JP Morgan Chase"), as agent for a syndication of lenders.  As security for the line of credit, the Operating Debtor granted to JP Morgan Chase an alleged first priority security interest in certain of its assets, including accounts receivable, inventory and cash collateral, and a subordinated security interest on the majority, if not all, of its remaining assets.  At that time, the Debtors also received a term loan in the principal amount of $38 million from certain third party lenders (the "Term Lenders") for whom Credit Suisse AG, Cayman Islands Branch ("Credit Suisse") acts as agent.  As security for repayment of the term loan, the Debtors granted to Credit Suisse an alleged first priority security interest in those assets in which JP Morgan Chase allegedly held a subordinated security interest, and a subordinated security interest in those assets subject to the alleged first priority security interest of JP Morgan Chase.

The Debtors apparently began to suffer financial distress in 2014, if not before, and were at risk of JP Morgan Chase terminating the line of credit.  In order to allow for continued borrowing under the revolving line of credit, Richard Jackson, through his entity Jackson Investment Group, LLC, allegedly paid $7 million to JP Morgan Chase to avoid, or perhaps cure, an event of default. Thereafter, FC Special Funding, LLC ("FC Special Funding"), a special purpose entity under the control of Commenda Capital, LLC ("Commenda"), was created for the purpose of purchasing JP

Morgan Chase's position.[4]  In exchange for payment of all indebtedness owed by the Debtors to

JP Morgan Chase, FC Special Funding was assigned any and all rights under the revolving line of

credit loan documents, after which FC Special Funding began advancing funds to the Operating

Debtor.

B.      *The Debtors' Bankruptcy Filings*

On February 11, 2015, the Debtors each filed voluntary petitions for relief under Chapter

11 of the Bankruptcy Code.  As of the petition date, the Debtors estimated that they owed

approximately $24 million to FC Special Funding on the revolver, approximately $34 million to

the Term Lenders, and at least another $40 million to trade creditors.

Concurrently with their petitions, the Debtors filed various motions, including a motion for

the use of cash collateral on an expedited and interim basis.[5]  At the first day hearings, the parties

presented a modified agreement for the use of cash collateral.  The court, however, declined to

approve certain adequate protection proposed for the benefit of FC Special Funding, including,

among other things, a waiver of surcharge under section 506(c), without first hearing testimony.

The court's decision was driven, in large part, by the failure of the Debtors to disclose their

relationships with FC Special Funding and FCS Acquisition, LLC ("Acquisition") in their first day

---

[4]      Commenda has been referred to as a merchant bank.  FC Special Funding is a subsidiary of Commenda. Richard Jackson is the sole participant in the loans made by FC Special Funding to the Debtors.

[5]      Conspicuously absent from the first day motions filed by the Debtors was any express disclosure regarding the relationship among the Debtors, Richard Jackson, and FC Special Funding.  At the first day hearings, the Debtors advised the court and parties in attendance of the relationships by and among the Debtors, FC Special Funding, Richard Jackson, and FCS Acquisition, LLC, an entity created by Richard Jackson for the purpose of purchasing the Debtors' assets. (First Day Hearing Tr. at p. 58-59 [Dkt. No. 164].)  The Debtors' disclosure cannot be construed as entirely voluntary.  Rather, the disclosure was made only after the United States Trustee persisted in exploring such relationships.  Upon learning of these connections for the first time at the hearings, the United States Trustee proclaimed that Richard Jackson is wearing "three hats." (*Id.* at p. 71.)  Not surprisingly, Credit Suisse and numerous other parties expressed frustration, if not anger, with this lack of candor.

pleadings.[6]   In lieu of testimony, the parties again reformulated the interim cash collateral arrangement, which the court ultimately approved on the record [Dkt. No. 114].[7]

*C.*      *The Initial Sale Motion*

One day after filing for bankruptcy, the Debtors filed a motion seeking to sell substantially all of their assets [Dkt. No. 30] to Acquisition, which was identified as a "stalking horse" bidder in the sale motion and related bidding procedures.  The initial sale motion proposed to sell all of the Debtors' assets, including inventory allegedly sold on consignment to the Debtors by various vendors.  In response to the initial sale motion, an ad hoc committee of consignment vendors (the "Ad Hoc Consortium") commenced an adversary proceeding in which they contested the Debtors' ability to sell goods provided to the Debtors on consignment.[8]   Numerous creditors and other parties in interest, including the Ad Hoc Consortium, also objected to the proposed sale, because, among other things, the assets had not been properly marketed and the sale was to an insider.  The Debtors eventually voluntarily withdrew their sale motion on March 16, 2015 [Dkt. No. 358].

---

[6]      The court was particularly concerned because the Official Committee of Unsecured Creditors (the "Committee") had yet to be formed.  While the Debtors were only seeking to use cash collateral and grant adequate protection on an interim basis, the court believed that oversight from the Committee, even as to interim use, was required given the insider nature of the relationships. On February 23, 2015, the United States Trustee appointed the Committee [Dkt. No. 158].

[7]      Since the tumultuous beginning to their cases, the Debtors have diligently pursued consensual resolutions and compromises with various constituencies and stakeholders.  On multiple occasions, the Committee, the United States Trustee, the Ad Hoc Consortium and the Lenders have remarked that the Debtors have been transparent and extremely forthcoming with information.  The efforts of all parties to date have been impressive.

[8]      *United Methodist Publishing House Inc. v. Family Christian, LLC*, Adv. Pro. No. 15-80062 (Bankr. W.D. Mich.).  Since the initial filing of the adversary proceeding, several other consignment vendors have been permitted to intervene as plaintiffs [Adv. Dkt. Nos.  23, 53, 54].  Credit Suisse and FC Special Funding were also permitted to intervene as defendants to protect their alleged security interests in the consigned goods [Adv. Dkt. Nos. 51, 52].  The Committee, however, was not permitted to intervene.  *United Methodist Publishing House Inc. v. Family Christian, LLC (In re Family Christian, LLC)*, 530 B.R. 417 (Bankr. W.D. Mich. 2015).

*D.*     *The Second Sale Motion and Bidding Procedures*

Several weeks after the initial sale motion was withdrawn, the Debtors filed the Sale Motion.  The Sale Motion requests authority to sell substantially all of the Debtors' assets free and clear of any liens, claims, interests and other encumbrances.  The Sale Motion does not propose to sell the assets to Acquisition or any other stalking horse bidder; rather, as the Debtors explained in the Sale Motion and at various hearings before this court, the Debtors intended to expeditiously and aggressively market their assets through their investment banker, Brookwood Associates, LLC ("Brookwood") in order to identify potential bidders.  Although the bidding procedures portion of the Sale Motion drew numerous objections, the Debtors diligently worked to resolve these objections.  The court was ultimately presented with a consensual order establishing certain procedures, deadlines and rights in connection with the bidding and auction process, which the court entered on April 16, 2015 [Dkt. No. 597] (the "Bidding Procedures Order").[9]

The bidding procedures, which are incorporated into the Bidding Procedures Order, provide, among other things, the following:

- Potential bidders must disclose the true identity of the party submitting the bid, submit satisfactory evidence of financial ability to close, and demonstrate an ability to pay cure costs associated with assumption of leases or executory contracts in order to become a qualified bidder.

- In valuing "qualified bids," the Debtors, in consultation with the Consultation Parties (as defined below), may consider factors such as: (a) the purported amount of the bid, including its impact on all constituencies, any benefit to the Debtors' estates from assumption of liabilities or waiver of liabilities, and an analysis of non-cash consideration; (b) the value to be provided by the bid, including the net economic effect on the Debtors' estates; (c) contingencies with respect to the sale and ability to close the sale without delay, and any incremental costs to the Debtors resulting from

---

[9]     The court amended and/or clarified the Bidding Procedures Order on three separate occasions [Dkt. Nos. 749, 764, 800].

delays in closing; (d) the ability to obtain necessary antitrust approvals for the proposed transaction; and (e) any other relevant factors.

- The Debtors reserve the right, in consultation with the Consultation Parties, to impose additional terms and conditions on "qualified bidders," provided such terms are not materially inconsistent with the bidding procedures or Bidding Procedures Order.

- The Debtors, after consultation with the Consultation Parties, shall determine what they believe to be the highest and best "qualified bid" as a "baseline bid" that will serve as a starting point for the auction.

- Professionals and representatives of the Consultation Parties, certain consignment vendors, and the United States Trustee (the "UST") will be permitted to attend and observe the auction.

- The Debtors may adopt rules for the auction, in consultation with the Consultation Parties, that they believe promote the goals of the bidding process and are not inconsistent with the bidding procedures, including auctioning of a subset of the Debtors' assets.

- The Debtors, in consultation with the Consultation Parties, are permitted, but not required, to ascribe a liquidation value to certain assets to assist in bid comparison, but may decline to do so if such value would be overly speculative.

- The Debtors reserve the right, in consultation with the Consultation Parties, to reject any bid that in their judgment is inadequate or insufficient, not in conformity with the Bankruptcy Code or the bidding procedures, or contrary to the best interests of the Debtors' estates.

- Prior to the conclusion of the auction, the Debtors, in consultation with the Consultation Parties, will review and evaluate each bid made at the auction on the basis of its financial and contractual terms and other factors including those affecting the speed and certainty of the consummation of the sale, designate a highest and best bid and next highest bid, and present those bids at the sale hearing.

- No additional bids may be submitted or considered after the auction unless the court orders otherwise.

The bidding procedures also designated the following persons as representatives of the Debtors at the auction: (i) Chuck Bengochea, the Debtors' Chief Executive Officer, (ii) Amy Forrestal of Brookwood, and (iii) Gary Murphey of Resurgence Financial Services, LLC

("Resurgence"), a financial advisor employed by the Debtors in these cases (collectively, the "Auction Team").  Importantly, the bidding procedures required the Debtors to consult with FC Special Funding, Credit Suisse, and the Committee (collectively, the "Consultation Parties") in order to establish procedures for the auction and to evaluate bids both prior to and during the auction.  Upon request of the UST and the Ad Hoc Consortium, the Debtors agreed to permit them to attend the auction solely for purposes of monitoring the sale process and ensuring its fairness.

In sum, the bidding procedures establish certain rigid requirements while also granting the Debtors and the Consultation Parties some flexibility and discretion to ensure that the auction yields maximum value for the Debtors' estates.[10]

E.      *The "Qualified Bidders"*

The Debtors, after conferring with the Consultation Parties, identified the following "qualified bidders" as required by the Bidding Procedures Order: (i) Yellen, (ii) a joint venture between Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC ("GBH"), (iii) Great American Group, LLC ("Great American"), (iv) Acquisition, (v) Credit Suisse, and (vi) FC Special Funding.[11]  Acquisition proposed to purchase the Debtors' business as a going concern, while GBH, Great American and Yellen were all seeking to liquidate the Debtors' assets.

In accordance with the bidding procedures, all qualified bidders were required to submit to the Debtors and the Consultation Parties an agreement stating the terms of the proposed

---

[10]     With that in mind, the Debtors exercised their discretion when they agreed, but only after conferring with the Consultation Parties, to extend the bid deadline to permit Yellen Partners, LLC ("Yellen") to become a qualified bidder.  As another example of the Debtors' attempts to create a fair auction process, the Debtors also agreed to extend the deadline by which to declare a baseline bid so as to allow Credit Suisse to evaluate the decision of the Debtors after input from the other Consultation Parties.

[11]     FC Special Funding and Credit Suisse were permitted to credit bid the amount of their debt.  *See* 11 U.S.C. § 363(k); *see also generally* Paul R. Hage, *et al.*, Credit Bidding in Bankruptcy Sales – A Guide for Lenders, Creditors, and Distressed Debt Investors (Am. Bankr. Inst. 2015).  Although the Committee initially objected to the ability of Credit Suisse to credit bid, the parties resolved the issue at a hearing before this court on May 15, 2015.

transaction.  Acquisition submitted an asset purchase agreement which included a purchase price consisting of cash and the assumption of certain liabilities (the "Acquisition APA").  In the Acquisition APA, Acquisition committed to payment in full of all administrative expenses. [12]  In addition, Acquisition proposed a means by which to resolve the claims of the Ad Hoc Consortium, as well as other consignment vendors, without the need for further litigation.

GBH, Great American and Yellen also submitted agreements as required by the bidding procedures.  These agreements are not asset purchase agreements in the traditional sense.  Rather, they are agency agreements whereby GBH, Great American, and Yellen proposed to act as the agent of the Debtors for purposes of liquidating a majority of the Debtors' assets.  By their very nature, the agency agreements rely on a complex series of formulas and contingencies to arrive at an estimated amount of value for the Debtors' estates.  The projected value to the Debtors' estates is never a sum certain, however.  Instead, the agreements place a significant level of risk on the Debtors and their estates with respect to the sale of assets over a condensed period of time.  As expert testimony during the sale hearing revealed, the estimated or projected value to the Debtors' estates under these agreements might significantly increase.  As noted by the Debtors and other parties throughout this process, and conceded by that same expert, the estimated value could also significantly decrease.  It can be fairly said that the agreements are not designed to provide a concrete minimum value to the Debtors and their estates.  To do so would shift a significant portion of the risk from the liquidator to the Debtors' estates, which is seemingly exactly what these agreements are designed to avoid.[13]

---

[12]    On several occasions, this court has advised the parties that it is extremely concerned with the prospect of administratively insolvent estates.

[13]    The court's observations in this regard should not be viewed as a criticism of liquidators or the structure of their preferred agreements, which are designed to provide protection given the short time frames in which liquidators are asked to submit bids for assets.  To the contrary, these agreements are necessary to ensure that liquidators avoid losses from transactions offering limited recourse against bankruptcy estates.

*F.      The Auction (Day 1)*

As detailed below, the auction process was, at times, nothing short of chaotic.  The Debtors commenced the auction on May 21, 2015, with the Acquisition bid having been designated as the "baseline bid."  The transcript of the auction [Dkt. No. 802], which this court has read and reread, reveals that the auction began with extensive discussion among the Debtors and the Consultation Parties regarding the initial bid valuations and the auction procedures.[14]  With input from the Consultation Parties, the Debtors prepared initial valuation analyses in a spreadsheet format. These analyses were shared with all of the bidders, as well as the other parties in attendance.

The initial hours of the auction were, unfortunately, a sign of things to come.  After one round of bidding, the Debtors declared the bid submitted by Yellen to be the "highest."  However, GBH and Great American questioned such designation.  As reflected in the transcript of the auction, GBH and Great American expressed displeasure with the Debtors' failure to designate a "highest and best" bid from the first round.  In order to address these concerns, the Debtors engaged in a lengthy discussion with the Consultation Parties for approximately one hour.  Ultimately, the Debtors reiterated that they believed Yellen to be the winning bidder in round one, with a bid valued at approximately $40.3 million.[15]

The second round commenced with a bid from GBH.  GBH did not increase its bid by utilizing a cash component though.  Instead, GBH made adjustments to its prior bid by reworking certain line items that were projected to yield proceeds to the Debtors' estates, albeit in contingent and uncertain amounts.  The Debtors dutifully engaged in a discussion on the record with the

---

[14]     The court has attempted to decipher the auction transcript, which is fairly disjointed in places due to numerous off the record discussions.  As such, the court recognizes that its summary of the auction is also likely somewhat disjointed.

[15]     It should be noted that the Debtors also incorporated the suggestions of Credit Suisse to capture the value of funds that would remain in the Debtors' estates as contemplated by both the Yellen bid and the GBH bid.

representatives of GBH regarding expenses related to occupancy as reflected in the agency agreement submitted by GBH. After analyzing the increase in value to the GBH bid on the record, the Debtors turned to Great American.

Great American submitted a bid intended to top GBH's bid by slightly more than the required bid increment of $100,000. Like the revised GBH bid, the revised Great American bid was not based on a cash adjustment. Instead, like GBH, Great American reworked the formulas in its agency agreement to increase value, albeit on a contingent basis. GBH objected to the calculation of Great American's revised bid because it was unclear how the revised bid would affect the "guaranty percentage" and "cost factor threshold" as set forth in the Great American agency agreement.

As a byproduct of this objection, the Debtors, in the presence of the Consultation Parties and the other bidders, discussed with GBH the speculative nature of the liquidation bids.[16] The Debtors emphasized that because the liquidation bids were wholly contingent on estimated inventory levels and other complex formulaic adjustments, the Debtors were concerned with the level of risk that would be placed on the Debtors and their estates under the agency agreements. As such, the Debtors expressed concern with the lack of a minimum value to the Debtors' estates under all three agency agreements, and to some extent the Acquisition APA.

Eventually, the discrepancies with the Great American bid were resolved. Yellen then submitted a further revised bid. Notwithstanding the earlier discussion between GBH and the

---

[16] At one point, GBH, in response to the Debtors' concerns, commented that "I don't think anyone at the end of the day is guaranteeing you that you are going to get $41 million. They are putting in guaranteed percentages and changing things that they will pay for or not pay for based on how you evaluate the bid. I don't think anyone is going to say you are going to get this dollar amount." In response, the Debtors stressed "[t]hat is what makes all the bids very speculative." (Auction Day One Tr. at pp. 44-45 [Dkt. No. 802-1].)

Debtors to which Yellen was privy, Yellen declined to provide any assurance of a minimum value for the Debtors' estates. Instead, Yellen increased its bid by adjusting percentages.

After the Yellen bid, Acquisition offered $40 million in value to the Debtors' estates. The revised bid promised that the Debtors' estates would receive value equivalent to no less than $40 million, regardless of any contingencies that had initially been included in the Acquisition APA. Acquisition's decision to include a minimum floor can be characterized, at least based on the transcript, as an attempt to eliminate contingencies in reaction to the Debtors' concerns regarding risk to their estates. After conferring with the Consultation Parties, the Debtors selected the Acquisition bid of $40 million as the highest and best bid in the second round. Although Credit Suisse objected, the Committee, FC Special Funding and the Ad Hoc Consortium supported the Debtors' decision.

At this point during the auction, the Debtors again advised the bidders that the Debtors were placing a great deal of significance on a guaranteed value to the Debtors' estates, as opposed to bids that were based on formulas and contingencies. The Debtors expressly asked all of the bidders if they would be willing to guarantee a minimum floor amount for their bid, as a sum certain would be, in the Debtors' business judgment, extremely beneficial to the Debtors' estates. The response of the liquidation bidders was less than enthusiastic. Instead of responding to the question – would they submit a bid not subject to fluctuation, at least with respect to a minimum value – the liquidation bidders questioned the financial ability of Acquisition to ever pay $40 million. Specifically, the liquidation bidders demanded to know whether Acquisition had offered to support their revised bid with collateral, a letter of credit, a certificate of deposit, or some other form of security. The Debtors responded that, to their knowledge, none had been offered. Again declining to provide the Debtors with a minimum amount or otherwise address the Debtors'

concern with the contingent and formulaic nature of the agency agreements, the liquidation bidders concluded that their bids should be considered higher and better than the Acquisition bid.

Shortly after this contentious discussion, the Debtors attempted to commence a third round of bidding. The liquidation bidders, led by GBH, refused to participate and, instead, reserved their rights to object to the auction. After several more minutes of tense discussion, the liquidation bidders collectively asserted that the Acquisition bid could not be approved by the court because, among other things, the Debtors were ascribing value to an illusory "guarantee" in the Acquisition bid. The bidders, along with Credit Suisse, demanded that the auction be suspended so as to permit the parties to seek guidance from, or even intervention by, this court.[17]

G.     *The Emergency Status Conference*

One day after the auction was suspended and leading into the Memorial Day weekend, the court conducted an emergency status conference. At the status conference, GBH raised two objections to the sale process.[18] First, GBH asserted that the auction was unfair, if not fraudulent, because the Debtors had allegedly always conspired to select Acquisition as the winning bidder. Second, GBH contended that the Acquisition bid could never be approved because it was, among other things, nothing more than a *sub rosa* plan. Credit Suisse also objected by asserting that the insider relationships were compromising the Debtors' fiduciary duty to their estates and echoed GBH's concerns with the *sub rosa* nature of the Acquisition bid. The Committee, the Ad Hoc Consortium and FC Special Funding supported the Debtors' decision and defended the Debtors'

---

[17]     Notably, all bidders were required to sign a statement that any objections to the auction procedures would be preserved for the sale hearing [Dkt. No. 802-6].

[18]     Neither Great American nor Yellen attended the entire status conference, notwithstanding their refusal to continue the auction without further direction from the court.

conduct during the auction.  Credit Suisse, GBH and the UST requested that the court supervise the resumed auction to ensure its fairness.[19]

After a nearly two hour status conference, the court declined to supervise the auction and instructed the parties to recommence the auction in accordance with the Bidding Procedures Order as soon as possible.[20]  The court noted that although it had some concerns due to the allegations of GBH and Credit Suisse, it had no interest in exercising the business judgment of the Debtors (or any other estate representative, for that matter), thus placing itself in the unenviable position of approving its own decision.  The court also found any objections to be premature, as the court had no testimony or other evidence before it to consider.  Finally, the court noted that because the auction had technically only been suspended, no winning bidder had been identified.

### H.      The Auction (Day 2)

The auction resumed on May 26, 2015.  After a discussion with the Consultation Parties and the bidders off the record, the Debtors made an adjustment to the auction procedures whereby the liquidation bidders would compete in "liquidator-only" rounds.[21]  After completion of the liquidator-only rounds, the Debtors would evaluate the winning liquidator bid against any bid from Acquisition, FC Special Funding and/or Credit Suisse.  The Debtors also adjusted the format of their written bid analyses so that bidders could compare and contrast their bids more easily.

After four rounds of bidding, all three liquidators made various formulaic adjustments to their bids.  The court must again note that at no time did any of the liquidation bidders submit a

---

[19]     At the status conference, the court specifically asked the UST if he had witnessed any impropriety or misconduct.  The UST candidly advised the court that he had not, but also felt as though the accusations regarding the insiders were chilling the bidding.

[20]     The court made one change to the Bidding Procedures Order.  It required the Debtors to designate a third highest bid.

[21]     The liquidation bidders had no objection to this change.

bid with a minimum value, as the Debtors had requested.  At the conclusion of the fourth round, Yellen declined to increase its bid.  In the fifth round, Great American sought to include a breakup fee of $250,000 in its bid which was purportedly designed to compensate it in the event that the Debtors ultimately selected the going concern bid of Acquisition.  The Debtors took a recess and conferred with the Consultation Parties, after which they determined that the inclusion of a breakup fee would result in a material change to the bidding procedures which could not be accepted absent prior court approval.  The Debtors encouraged Great American to revise its bid to remove the request for a breakup fee.  Nonetheless, Great American declined to remove the breakup fee from the bid.  The Debtors therefore designated the GBH bid as the highest bid after the fifth round.

Before the sixth round commenced, however, Great American renewed its request for a breakup fee.  After another recess, the Debtors and the Consultation Parties again concluded that it would be improper to agree to a breakup fee without prior court approval.  Great American, although it disagreed with this decision, submitted a revised bid without the breakup fee.  This revised bid from Great American caused the Debtors to reconsider their previous selection of the GBH bid at the end of the fifth round.  The Debtors selected the Great American bid (without the breakup fee) as the highest bid in the fifth round.

GBH and Great American bid for yet another round, after which GBH requested that the Debtors ascribe a value on the intellectual property bundle because it was included in Great American's bid, but not in GBH's bid.  The Debtors and the Consultation Parties conferred, after which they reported that the Debtors would not ascribe a value to the intellectual property bundle.  Rather, the Debtors preferred instead to rely on the auction process to monetize the value of those assets.[22]

---

[22]    Seemingly in the interests of time, the Debtors also suggested that the remaining liquidator bidders submit simultaneous written bids in order to determine the highest and best bid.  Great American and GBH strenuously

GBH and Great American continued bidding, with Great American finally declining to increase its bid at approximately 8:00 p.m.  At the conclusion of the liquidation rounds, the value of GBH's bid was estimated to be approximately $43.9 million, while Great American's bid was estimated to be approximately $43.8 million.

At approximately 11:00 p.m., the auction resumed.  At this point, Acquisition submitted a going concern bid that increased the minimum value of its bid from $40 million to $42 million.  Acquisition also removed a condition in the Acquisition APA requiring the court to find that the consignment goods held by the Debtors are in fact property of the Debtors' estate, thereby eliminating any concern that the Debtors might have regarding title to the inventory.  The Consultation Parties, with the exception of FC Special Funding, conferred for another hour to evaluate the most recent bid from Acquisition against the bid from GBH with an estimated value of $43.9 million.  The Debtors, again with assistance from the Consultation Parties, selected the Acquisition bid as the highest and best bid.  Although the Committee and the Ad Hoc Consortium supported the Debtors' decision, Credit Suisse again disagreed because of the structure of the Acquisition APA.  According to Credit Suisse, the Acquisition APA violated the priority scheme of the Bankruptcy Code by allocating funds to subordinate creditors without first satisfying Credit Suisse in full.

At this point, GBH sought guidance from the Debtors by requesting that the Debtors ascribe a value to the going concern nature of the Acquisition bid.  The Debtors declined to do so, admitting that they had contemplated, but could not monetize, such value.  In the next round, GBH passed.  FC Special Funding submitted a hybrid credit bid.  The material terms of FC Special

---

objected to this change in the auction procedures, asserting that the liquidation bidding rounds were resulting in robust bidding.  The Debtors and the Consultation Parties reconvened, ultimately listening to the concerns of Great American and GBH.

Funding's bid can be summarized as (i) a credit bid of approximately $23.3 million, (ii) a cash payment of $6.3 million in exchange for a general release similar to that included in the Acquisition APA, (iii) assumption of various liabilities, (iv) a settlement with consignment vendors on similar terms as contained in the Acquisition APA, and (v) payment in full of administrative expenses.

The Committee then somewhat arbitrarily raised a concern with GBH's bid in light of the unsettled nature of the consignment inventory issues and related adversary proceeding. The Committee asserted that the GBH bid could be subject to a significant reduction if the consignment inventory was ultimately determined not to be property of the Debtors' estates.

After a lengthy meeting with the Consultation Parties (other than FC Special Funding), the Debtors returned at approximately 2:00 a.m. and declared the Acquisition bid as the current highest and best bid with a value of approximately $46.8 million, $42 million of which would not be subject to adjustment. The Debtors also identified the GBH bid as the next highest bid with a value of approximately $49.8 million, and the FC Special Funding bid third with a value between $41.6 and $44.3 million.[23] GBH once again questioned the Debtors whether they were able to place a value on the going concern nature of the Acquisition bid, to which the Debtors responded that they could not. Credit Suisse once again objected to the Debtors' selection of the highest and best bid, asserting that the GBH bid should be designated as the highest and best bid. At this point, GBH refused to bid further, reserving its rights to challenge the Acquisition bid as not being the highest and best bid at the sale hearing. The remaining bidders passed and the Debtors concluded the auction, with Acquisition designated as the winning bidder.

---

[23]   The auction transcript is less than clear at this point regarding the estimated values of the bids.

On May 27, 2015, the Debtors filed a notice of the auction results with the court [Dkt. No. 742].  The court has reviewed all three bids and their respective agreements, and summarizes them as follows:

1.    *Acquisition Bid*

- Estimated value to the estates:  $46.8 million

- Minimum amount of funds to the estates:  $42 million

- Assets remaining in estates post-closing:  none

- Administrative expenses:  paid in full, including professional fees, subject to certain caps, and 503(b)(9) claims

- Consignment inventory settlement: payment to professionals for consignment adversary plaintiffs and choice of two options for payment on consigned inventory

- Ability to perform: non-binding commitment letter from FC Special Funding for three years, $50 million credit facility to fund continued operations

- Distribution to unsecured creditors: 5% to trade creditors who agree to trade terms with the business post-closing

- Recourse to purchaser:  none

2.    *GBH Bid*

- Estimated value to the estates:  $49.8 million

- Minimum amount of funds to the estates:  none, dependent on inventory levels

- Assets remaining in estates post-closing:  causes of action, Debtors' cash on hand

- Administrative expenses:  unknown if to be paid in full

- Consignment inventory settlement: payment to professionals for consignment adversary plaintiffs and choice of two options for payment on consigned inventory

- Ability to perform: 77.4% of proceeds of inventory to be paid shortly after closing; remaining amount secured by two letters of credit

- Distribution to unsecured creditors: unknown, dependent on inventory levels

- Recourse to purchaser: estates must indemnify against loss

3. *FC Special Funding Bid*

- Estimated value to the estates: $41.6 million - $44.3 million

- Minimum amount of funds to the estates: $6.3 million for settlement and release of actions against FC Special Funding and its affiliates

- Assets remaining in estates post-closing: causes of action, including avoidance actions, except for those against FC Special Funding and its affiliates; intellectual property

- Administrative expenses: professional fees to be paid, subject to certain caps; 503(b)(9) claims not to be paid

- Consignment inventory settlement: payment to professionals for consignment adversary plaintiffs and choice of two options for payment on consigned inventory

- Ability to perform: no information provided

- Distribution to unsecured creditors: unknown

- Recourse to purchaser: none

I. *The Second Status Conference and the Emergency Hearing on the Motion to Compel*

The court conducted a second status conference related to the Sale Motion on May 28, 2015. During that status conference, the court decided to reschedule the sale hearing so as not to prejudice parties in interest, including counterparties to executory contracts and unexpired leases, who had negotiated for a period of time during which to evaluate the winning bidder. It was also clear at the status conference that the sale hearing would be contested. The court advised the parties that it expected them to engage in good faith abbreviated discovery in advance of the sale hearing. The court invited the parties to contact it in the event of a discovery dispute.

Not surprisingly, on June 4, 2015, a discovery dispute arose. At approximately 5:00 p.m., GBH filed an emergency motion to compel Acquisition to provide certain financial documents [Dkt. No. 849]. The court held an emergency telephonic hearing on June 5, 2015 at 11:00 a.m. on GBH's motion to compel. In its response to the motion to compel filed less than one hour prior to the hearing, Acquisition asserted that GBH, as a frustrated bidder, lacked standing to object to the sale and therefore was not entitled to any discovery. GBH responded that it had purchased an administrative expense [Dkt. No. 817] and therefore had standing as a creditor of the Debtors' estates. GBH further argued that under Sixth Circuit precedent, frustrated bidders may challenge a sale where there is an allegation of fraud, unfairness or mistake. The court ultimately found that GBH had standing for the reasons explained in its bench opinion given at the conclusion of the emergency hearing [Dkt. No. 878].

*J.     The Sale Hearing*

  *1.     The Settlements Placed on the Record*

On June 9, 2015, the court held a hearing on the Sale Motion. At the sale hearing, the parties requested additional time to attempt to resolve certain issues.[24] The Debtors eventually placed several significant settlements regarding the Acquisition bid on the record.[25] First, Credit Suisse agreed to withdraw its objection and support the sale to Acquisition in exchange for an increase in the "cash component" of the Acquisition APA that was allocated to Credit Suisse from

---

[24]     The hearing on the Sale Motion was scheduled to begin at 9:00 a.m., but did not start until sometime after 11:00 a.m. and lasted until sometime after 11:00 p.m. The court again extends its appreciation to the Court Security Officers and Ms. Gail Beach, the court reporter, for their services.

[25]     The court has summarized the material settlements placed on the record regarding the Acquisition bid; however, the Debtors also resolved several non-cure cost objections with counterparties to executory contracts and unexpired leases.

$2.7 million to $5.45 million.[26]  The cash component would be paid into the Debtors' estates and paid to Credit Suisse at closing.  Credit Suisse and the Debtors, on behalf of their estates, also agreed to execute mutual releases.  Second, the UST agreed to withdraw certain aspects of his objection if, within a reasonable time after the sale to Acquisition, the Debtors agreed to file a plan of liquidation.  Third, Acquisition agreed to increase the cap on the payment of professional fees by $75,000, presumably to account for the plan of liquidation.

Finally, with respect to the settlement with the consignment vendors contained in the Acquisition APA, the amount to be paid to the Ad Hoc Consortium was reduced from $500,000 to $475,000.  In addition, Acquisition agreed to remove a condition requiring dismissal of the consignment vendor adversary proceeding by all plaintiffs.[27]  Relatedly, the proceeds from post-petition sales of consigned goods currently being held in escrow by the Debtors pending resolution of the adversary proceeding would continue to be held in escrow by Acquisition for the benefit of any non-consenting consignment vendor.

After these settlements were placed on the record, only the objections of GBH and Bridgestone Multimedia Group ("Bridgestone"), a consignment vendor and intervening plaintiff in the consignment adversary proceeding, remained.  GBH's objections can be summarized as follows: (i) the auction was unfair; (ii) its bid was superior to the bid of Acquisition; and (iii) the Acquisition APA is a *sub rosa* plan.  Bridgestone contends that the releases to insiders are

---

[26]  At the hearing, the Debtors stated that the settlement with Credit Suisse increases the value of the Acquisition bid by at least $2.85 million.

[27]  The basic terms of the consignment settlement in the Acquisition APA are that the plaintiffs in the consignment adversary proceeding will receive $500,000 upon a voluntary dismissal of their claims against the Debtors.  In addition, a consenting consignment vendor may choose one of two options: (i) payment of its administrative expense under section 503(b)(9) within ten days of its allowance plus 10% of the book value of its transferred consigned inventory within thirty days of the sale of such inventory; or (ii) payment of 35% of the book value of its transferred consignment inventory within thirty days of the sale of such inventory.

inappropriate and without justification, and that the distribution of funds under the Acquisition APA is discriminatory.[28]  The UST also remained concerned about the incomplete auction and releases granted to insiders under the Acquisition APA.[29]

### 2.    Admission of Exhibits into Evidence

The parties filed a joint stipulation prior to the sale hearing [Dkt. No. 898] in which they stipulated as to the admissibility of seventy-two exhibits, some of which were duplicative. Although all of these exhibits were technically admitted into evidence, the parties only relied on the Acquisition APA, the GBH agency agreement, the Debtors' cash flow projections, the Debtors' bid valuations, GBH's bid analyses, and the transcripts of the auction and section 341 meeting.[30] In addition to the aforementioned exhibits, the court admitted two other exhibits into evidence – a loan commitment letter from FC Special Funding to Acquisition and a five year projection for Acquisition.

### 3.    Testifying Witnesses

During the sale hearing, the following persons testified:

- Amy Forrestal, Partner at Brookwood
- Chuck Bengochea, Chief Executive Officer of the Operating Debtor
- Ken Dady, Vice President of Finance for the Operating Debtor
- Thomas L. Minick, Managing Member of Commenda

---

[28]    Bridgestone also objected to the requirement in the Acquisition APA that the consignment vendor adversary proceeding be dismissed.  As noted above, the Debtors and Acquisition have since clarified that non-consenting consignment vendors are not required to dismiss their claims from the adversary proceeding.

[29]    Although the UST did not term himself as a *per se* objecting party, he did engage in cross-examination throughout the proceedings and provided a compelling and animated closing argument.

[30]    Although all of these exhibits were admitted into evidence pursuant to stipulation, the parties did not direct this court's attention to specific content within those exhibits.  The court declines to parse through thousands of pages of exhibits in order to determine the relevant portions thereof.  For the most part, the court is only considering the exhibits which were the subject of testimony or oral argument during the sale hearing.

- Benjamin Nortman, Executive Vice President of Hilco Merchant Resources, LLC[31]

- Thomas E. Pabst[32]

The testimony of each witness is summarized below.

> ### a.   Amy Forrestal

Amy Forrestal of Brookwood, the Debtors' investment banker, was the first witness called by the Debtors. The court found Ms. Forrestal to be credible. Ms. Forrestal testified as to the intense marketing efforts undertaken by Brookwood on behalf of the Debtors, including attempts to contact approximately 230 parties in order to gauge their interest in the Debtors' assets. According to Ms. Forrestal, fifty of the parties contacted could be described as potential going concern purchasers, with the remainder considered to be liquidators. Ms. Forrestal stated that although the Debtors and Brookwood received preliminary interest from several potential going concern purchasers, Acquisition was the only party to submit a going concern bid.

Ms. Forrestal testified that she was not involved in the negotiations of the Acquisition APA. Instead, Mr. Bengochea, the Debtors' CEO, was the primary contact person with respect to Acquisition. She also stated that she never spoke with Richard Jackson, the principal for Acquisition. Ms. Forrestal testified that as a member of the Auction Team, she recommended during the first round that the Debtors select the Yellen bid as the highest and best bid. In the

---

[31]   Mr. Nortman was qualified as an expert witness, albeit one with bias due to his position as an officer of Hilco and representative of the joint GBH bid. *See United States v. Jackson-Randolph*, 282 F.3d 369, 383 (6th Cir. 2002) (Quist, J.) (bias is a "relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party") (citing *United States v. Abel*, 469 U.S. 45, 52 (1984)); *see also Sharp v. Chase Manhattan Bank (In re Commercial Fin. Servs., Inc.)*, 350 B.R. 520, 526 n.1, 528-29 (Bankr. N.D. Okla. 2005) (probing cross-examination of expert witness will permit assessment of expert's credibility and potential bias, especially in bench trial).

[32]   At the hearing, GBH objected to the Debtors' attempt to qualify Mr. Pabst as an expert witness due to, among other things, his lack of recent experience with retail liquidations. After considering the testimony of Mr. Pabst during direct examination and cross examination, the court sustained GBH's objection. *See* Fed. R. Evid. 702.

second round, she stated that she agreed with the Debtors' conclusion that the Acquisition bid was the highest and best bid due to its minimum floor when compared to the contingencies and variables in the agency agreements utilized by the liquidating bidders. Ms. Forrestal also testified that she continued to view the Acquisition bid as superior on the second day of the auction due to the uncertainty of the liquidator bids.

### b.    *Chuck Bengochea*

The court found the testimony of Chuck Bengochea, the Debtors' CEO, to be credible, but incomplete and perhaps lacking in conviction. Mr. Bengochea explained that he was hired to become the Debtors' CEO by Richard Jackson, among others, in the summer of 2014. During that time, the Debtors were already in considerable financial distress. He testified that in order to address prepetition concerns by Credit Suisse, the Debtors presented a five-year plan proposing to, among other things, close approximately fifteen stores and improve sales by expanding the Debtors' online presence. Mr. Bengochea was unable to answer several questions by providing any specific detail, instead deferring to those who reported to him, including Ken Dady. According to Mr. Bengochea, the Debtors elected to file for bankruptcy after negotiations with Credit Suisse reached an impasse.

Mr. Bengochea stated that he believed that Acquisition would use the same modified business plan as the Debtors when operating the business post-closing. He testified that he was in close contact with Richard Jackson throughout his employment with the Debtors, speaking with Mr. Jackson approximately once per week. In addition, Mr. Bengochea testified that he expected to continue as CEO of Acquisition if it purchased the Debtors' assets.

Mr. Bengochea stated that he was unable to attend the first day of the auction due to a family conflict, but had been available by telephone. He admitted that he (i) had not reviewed a

financial statement for Acquisition, (ii) had not seen a commitment letter, (iii) was not aware of any collateral or other form of security supporting the bid, and (iv) had not seen any analysis regarding the value of avoidance actions and other causes of action, including those subject to releases, as contemplated by the Acquisition APA.  Mr. Bengochea explained that although he signed the Acquisition APA and was generally familiar with it, he lacked specific knowledge that the court would expect from the chief executive officer of a debtor in possession.  However, he also explained that he spoke weekly with Ms. Forrestal regarding identification of bidders, particularly going concern bidders.

Finally, Mr. Bengochea testified that he telephoned Richard Jackson and Larry Powell, another insider, at approximately 11:00 p.m. on the second day of the auction.  According to Mr. Bengochea, he simply asked Mr. Jackson to increase the Acquisition bid during the telephone call and did not discuss any other bids.

### c. Ken Dady

Ken Dady, the Debtors' Vice President of Finance, testified regarding the Debtors' past and current financial states, the projections presented to Credit Suisse prepetition, and, importantly, the Debtors' analysis with respect to the competing bids.  The court found Mr. Dady to be credible, convincing and extremely knowledgeable.  Mr. Dady testified that although the Debtors are currently cash positive, they will experience a liquidity crisis in July of 2015.  Mr. Dady stated that he and his financial department prepared the bid analyses provided to the bidders. He noted that he did not have experience working with agency agreements, and found all of the bids submitted by the liquidation bidders to be quite complex, notwithstanding his many years of finance experience.  Mr. Dady noted that although the Debtors had commenced an analysis with

respect to preferential transfers and the insider causes of action being released in the Acquisition APA, such analyses had not been completed before the auction.

Mr. Dady further testified as to the numerous risk factors in the GBH agency agreement, including (i) occupancy and other expenses that remained with the Debtors while GBH liquidated assets, (ii) caps on GBH's liability for certain expenses, and (iii) required reimbursements from the Debtors for the difference between liquidation sale prices and promotional sale prices. He also indicated that the Debtors viewed the GBH bid with a high degree of uncertainty because GBH had not, as of the date of the auction, resolved issues with consignment vendors so that GBH could sell, as property of the Debtors' estates, the consignment inventory. Absent a resolution with the consignment vendors, Mr. Dady believed that the value of the GBH bid to the Debtors' estates could be reduced substantially.[33] In addition, he was concerned that the agency agreement utilized by GBH placed GBH in a position of control and, thus could potentially be manipulated by GBH to reduce the value of the bid to the detriment of the Debtors' estates.

Mr. Dady stated that some, but not all, of these risk factors were discussed with GBH at the auction. He testified that in order to have addressed the Debtors' concerns, GBH could have submitted an asset purchase agreement (as opposed to an agency agreement) or, at the very least, committed a minimum value to the Debtors' estates. He also noted that the Debtors were concerned about ascribing a value to the going concern component of the bid, because they did not want to artificially inflate the Acquisition bid, thereby chilling other bids. Mr. Dady was uncertain about his future, as he had not discussed his potential employment with Acquisition if it was ultimately the winning bidder. Finally, Mr. Dady stated that he rarely spoke to Richard Jackson, and that he was unaware that Chuck Bengochea had called Mr. Jackson during the auction.

---

[33]     Although GBH later entered into a settlement with consignment vendors on similar terms to Acquisition, at the time of the auction, no such settlement had been reached.

d.      *Thomas L. Minick*

FC Special Funding called one witness, Thomas L. Minick, the managing member of Commenda.   Mr. Minick, a banker for more than thirty years, was credible, concise, and knowledgeable.  He stated that Commenda is a merchant bank that generally provides financing on a secured basis to various borrowers.  He explained that Commenda is the sole owner of FC Special Funding, and that FC Special Funding has agreed to provide a credit facility of $50 million to Acquisition.  Although the commitment letter between Acquisition and FC Special Funding was executed on June 3, 2015, Mr. Minick testified that drafts of the letter had actually been exchanged around the time of the auction.

e.      *Benjamin Nortman*

GBH called only one witness, Benjamin Nortman, an executive with Hilco Merchant Resources, LLC, and the representative of the GBH joint venture.  As noted above, the court qualified Mr. Nortman as an expert witness due to his extensive and recent experience in the retail liquidation field.  The court found Mr. Nortman's to be credible, candid, and knowledgeable.  His testimony was particularly credible because he acknowledged that the GBH agency agreement included potential fluctuations in value.  Mr. Nortman also admitted that ambiguities in the drafting of the agency agreement could lead to some apprehensions for the Debtors.  He expressed great frustration with the lack of information provided by the Debtors as to their concerns with the GBH bid and asserted GBH could have easily addressed these concerns had it been provided with this information.   Mr. Nortman also expressed skepticism regarding certain risk factors allegedly considered by the Debtors at the auction.  Mr. Nortman was adamant that these risk factors were created on a post-auction basis for the sale hearing.

Mr. Nortman noted that GBH had attempted to remain competitive at the auction by reacting to adjustments in other bids. He felt as though GBH had sufficiently addressed all concerns raised by the Debtors at the auction. He testified that 77.4% of the proceeds from the sale of the inventory of the Debtors would be paid in cash shortly after the closing of the "sale," and that the remaining amount of GBH's bid would be secured by two letters of credit. Mr. Nortman stated that the Debtors' failure to advise GBH of the amount by which to increase its bid to become the highest bidder caused GBH to stop bidding. Importantly, Mr. Nortman testified that GBH would be willing to resume bidding in the event that the auction is reopened.

At the conclusion of the sale hearing, the court took this matter under advisement. Upon careful consideration of the legal arguments presented, the exhibits admitted into evidence, and the testimony of all witnesses, the court concludes that it cannot grant the Sale Motion.

## DISCUSSION

*A.*     *GBH Has Standing to Object to the Sale*

As noted above, this court held that GBH had standing to file a motion to compel production of documents by Acquisition. In their brief and at the sale hearing, the Debtors sought to preclude GBH from objecting to the sale because it allegedly lacked standing. *Contra Pepper v. United States*, 562 U.S. 476, 506 (2011) (citation omitted) (when court decides upon rule of law, decision should govern same issues at later stages of same case); *Gen. Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine, Inc.)*, 143 B.R. 840, 853 (Bankr. W.D. Mich. 1992) (citation omitted) (purpose of "law of the case" doctrine is to promote finality and prevent the relitigation of adjudicated issues).[34]  Similar to the arguments made by Acquisition, the Debtors

---

[34]     The court issued an oral ruling on this issue at the sale hearing so as not to further delay the process. The court is incorporating that ruling into this Memorandum Decision.

contended that GBH lacked standing to object to the proposed sale to Acquisition because it is nothing more than an aggrieved bidder.[35]  Like Acquisition, the Debtors attempted to rely on two decisions from the Sixth Circuit in support of their position.  *See Stark v. Moran (In re Moran)*, 566 F.3d 676 (6th Cir. 2009); *Squire v. Scher (In re Squire)*, 282 Fed. Appx. 413 (6th Cir. 2008) (Suhrheinrich, J.).  Neither decision supports the Debtors' argument.  To the contrary, these decisions hold that an aggrieved bidder has standing to object to a sale where it either has a pecuniary interest or alleges that the sale process was flawed.

In this case, GBH purchased an administrative expense [Dkt. No. 817] which remained unpaid as of the sale hearing.  *See In re Embrace Sys. Corp.*, 178 B.R. 112, 120 (Bankr. W.D. Mich. 1995) (Gregg, J.) (Bankruptcy Code does not distinguish between prepetition creditors and administrative expense holders for purposes of pecuniary interest).  GBH therefore held a pecuniary interest as of the date of the sale hearing that conveyed standing to object to the Sale Motion.  *Id*. at 121.  In addition, GBH asserted during the emergency hearing on May 22, 2015 and in its objection to the Sale Motion that it believed the auction process to have been unfair.  The Sixth Circuit could not have been more clear – where a party has a pecuniary interest or challenges the fairness of an auction, such party has standing.  *See In re Moran*, 566 F.3d at 681; *In re Squire*, 282 Fed. Appx. at 416.  The court therefore rejects the Debtors' attempt to deny GBH standing at the sale hearing.[36]

---

[35]     The Debtors also asserted that a document executed by qualified bidders acknowledging that they hold no claim against the Debtors or their estates [Dkt. No. 802-6] precluded GBH from objecting at the sale hearing.  The court does not interpret this acknowledgement to deny GBH standing, as it expressly states that objections to the results and process of the auction are to be preserved for the sale hearing.

[36]     Although this court has recognized the standing of GBH given its allegations of unfairness and its pecuniary interest, GBH's standing does not exist in perpetuity.  *See In re Embrace Sys.*, 178 B.R. at 121 (improper motive such as purposely seeking to destroy debtor may result in denial of standing).  It is uncontroverted that the Debtors invited GBH to participate in the auction process.  This court will not permit the Debtors to now argue that GBH is acting in bad faith by seeking to ensure that its bid receives proper consideration.  At some point, however, GBH, which holds an allowed administrative expense, may lose its pecuniary interest or its standing due to improper motive.

B.       *The Auction Process Suffered from Mistakes*

In its brief in opposition to the Sale Motion, GBH has made serious allegations with respect to the fairness of the auction process. While the Debtors clearly made mistakes at the auction, this court concludes that the allegations of fraud and unfairness are, in large part, unfounded.

The Debtors, in conducting the sale process, have a fiduciary duty to maximize the value of their estates. *In re Embrace Sys.*, 178 B.R. at 123-24. However, as this court has previously noted, that fiduciary duty does not require the Debtors to mechanically accept a bid with the highest dollar amount. *See In re Quality Stores, Inc.*, 272 B.R. 643, 647 (Bankr. W.D. Mich. 2002) (Gregg, J.) (uncertainty regarding financial status justified decision to deem lower offer as "best" offer). The Debtors are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing. *See*, *e.g.*, *In re Scimeca Found., Inc.*, 497 B.R. 753, 779 (Bankr. E.D. Pa. 2013) (approving somewhat lower all-cash bid instead of higher bid with financing contingency); *In re Bakalis*, 220 B.R. 525, 532-33 (Bankr. E.D.N.Y. 1998) (approving lower bid instead of higher bid with contingencies and inherent risk).

If the court perceives any degree of fraud, unfairness or mistake with the sale, including any flaws with an auction process, the court should assess the impact of these factors on the sale when the offer is compared to the court's finding of valuation of the assets to be sold. *In re Embrace Sys.*, 178 B.R. at 123 (citation omitted). Where a proposed sale would benefit an insider of a debtor, the court is required to give heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction. *See Ricker & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002); *In re Embrace Sys.*, 178 B.R. at 126; *cf. Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*,

269 F.3d 726, 745 (6th Cir. 2001) ("Insider transactions are more closely scrutinized, not because the insider relationship makes them inherently wrong, but because insiders 'usually have greater opportunities for…inequitable conduct.'") (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)).

According to GBH, the auction was unfair because the risk factors identified by the Debtors at the sale hearing were nothing more than post-hoc rationalizations manufactured after the auction had closed to justify the Debtors' selection of the Acquisition bid. Even if these factors had been considered by the Debtors at the auction, GBH asserts that it was not informed of the risk factors by the Debtors so that it could increase the value of its bid. According to GBH, the Debtors improperly withheld information from GBH. GBH similarly faults the Debtors for failing to ascribe an exact monetary value to the going concern nature of the Acquisition bid. GBH also requests that this court infer that the previously undisclosed telephone call from Chuck Bengochea to Richard Jackson was an attempt to fix the auction to ensure that Acquisition was declared the winning bidder.

The UST separately asserts that the Debtors have not maximized the value for the estates because they closed the auction while parties were still willing to increase their bids, and they may have preferred insiders to the detriment of the other bidders by accepting a proposal which fails to ascribe value for avoidance actions and releases. As such, the UST suggests that the integrity of the bankruptcy sale process has been compromised.

The court does not find that the auction was unfair or fraudulent. After scrutinizing the transcripts of the auction and carefully listening to the testimony at the sale hearing, it appears that the Debtors properly conferred with the Consultation Parties throughout the process. Moreover, the Debtors attempted to prepare written analyses to facilitate bidding while, to the best of their

ability, addressing concerns of the bidders. Importantly, the Debtors consistently identified various risks that they perceived with the liquidating bids. On numerous occasions, the Debtors advised the liquidation bidders that the Debtors were concerned with the contingent nature of the agency agreements. The liquidation bidders, however, elected not to conform their bids by providing a minimum value. The court finds that although mistakes were made as discussed below, they are not related to the Debtors' failure to conduct a transparent process.

The court does not find the Debtors' failure to provide GBH with a line item analysis of the perceived risks of its bid to be improper in any way. First, the court notes that the agency agreement submitted by GBH is exceedingly complex and requires application of formulas and consideration of a multitude of risks and contingencies in order to arrive at a hypothetical value of the bid. The Debtors, to their credit, strained to provide a value to the GBH bid on their bid analysis form. In addition, the Debtors repeatedly requested that the bidders restructure their bids to include a minimum value to the Debtors' estates. For whatever reason, GBH declined to provide the Debtors with a minimum value and instead challenged the ability of Acquisition to perform under the Acquisition APA.

This court finds the reasoning in *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) to be instructive when considering GBH's arguments. In *Bakalis*, a Chapter 7 trustee requested the court approve a sale of stock that comprised a controlling interest in a bank. *Id.* at 527. The proposed winning bidder, an entity formed for the purpose of acquiring the controlling shares of stock, was comprised of several officers and directors of the bank, as well as other investors. *Id.* at 528. At the end of the auction, the winning bidder made a cash offer, which was contingent only on regulatory approval, and provided for reimbursement of accrued interest if closing did not occur. *Id.* at 529-30.

The second highest bidder, a competitor of the bank, objected to the proposed sale to the winning bidder, asserting that its bid offered a higher value. *Id.* at 533. The trustee recommended the lower bid as the highest and best because the second highest bid was subject to numerous contingencies, which the trustee viewed as a substantial gamble for the estate. *Id.* at 530-31. In addition, the trustee expressed concern that in the event of a legal battle over the proposed merger, the value of the bank stock could be significantly reduced if the sale to the second highest bidder was not timely consummated. *Id.* at 532. The second highest bidder contended, among other things, that the trustee failed to disclose certain components that would permit the second highest bidder to top the winning bid. *Id.* at 534.

The court found that the trustee had appropriately exercised his business judgment in selecting the facially lower bid, noting that the trustee carefully weighed the competing bids and chose the bid that he viewed as the least risky to the estate. *Id.* at 532. The court rejected the second bidder's assertion that the bidding process was unfair because the trustee did not give bidders a precise quantification of the non-monetary and structural components of the winning bid. *Id.* at 534-35. Instead, the court stated that there is no requirement that competing bidders be given precise valuations of all of the non-dollar aspects of their bids, especially where the bidders are sophisticated entities who can assess the risks and benefits of their bids and the limits of the consideration they offer. *Id.* at 534-35 (citing *Consumer News & Business Channel P'ship v. Financial News Network Inc. (In re Financial News Network, Inc.)*, 134 B.R. 737, 738 (S.D.N.Y. 1991), *aff'd*, 980 F.2d 165 (2d Cir. 1992)). The court emphasized that the trustee had repeatedly discussed with the second highest bidder his concerns regarding risks, but the second highest bidder was determined to maintain its contingency clauses and walk away provisions, choosing to critique the winning bidder's bid protections as illusory instead. *Id.*

The discussion in *Bakalis* is highly persuasive to this court.  GBH, like the second highest bidder in *Bakalis*, is an eminently sophisticated bidder whose own executive, qualified as an expert by this court, testified that he had been involved in hundreds of retail bankruptcy auctions, many of which were against a going concern bid such as that submitted by Acquisition.  GBH, as the drafter of the agency agreement, was familiar with all of its provisions and could, based on its extensive experience in similar transactions, likely foresee where a seller might perceive risk.

Similar to the trustee in *Bakalis*, the Debtors repeatedly expressed a desire for GBH to provide a minimum value that would be provided to the estate if its bid were chosen as the winning bid.  Instead of submitting a revised bid that would provide a minimum value to the estate, GBH, like the second highest bidder in *Bakalis*, chose to criticize the Acquisition bid as illusory and question the Debtors' business judgment.  This court agrees with the *Bakalis* court.  The Debtors were not required to provide a line-by-line analysis to each bidder.  In fact, by imposing such a condition, this court would be unnecessarily slowing the process, thereby hindering the central purpose of the auction – to generate the highest and best bid for the Debtors' assets through competitive and robust bidding.

The court finds that the Debtors legitimately perceived risks in the GBH bid, many of which were disclosed, that caused the Debtors to deem the GBH bid less attractive despite its purportedly higher dollar amount.  Mr. Dady's testimony revealed that the Debtors engaged in an extensive analysis of the risks and rewards of the bids before, during, and after the auction.  Importantly, at the time the Debtors selected the Acquisition bid as highest and best, GBH and the consignment vendors had yet to agree to treatment of the consignment inventory, which, if excluded, could have significantly reduced the value of the GBH bid.  In addition, the Debtors, likely in response to this court's repeated warnings about administratively insolvent estates, placed great emphasis on the

fact that the Acquisition bid would ensure payment of all administrative expenses. As stressed by the Committee, the GBH bid has no such provision. Instead, GBH advised this court that it believes, based on its estimates, that administrative expenses would likely be satisfied. This is simply not good enough.

Regarding the failure of the Debtors to quantify the going concern nature of the Acquisition bid, the court credits the testimony of Mr. Dady that the Debtors genuinely did not have a dollar amount to provide and did not want to recklessly ascribe one for fear of chilling further bidding. Notably, the bidding procedures provide that the Debtors may, but are not required to, ascribe a liquidation value to certain assets. The bidding procedures provide that if the Debtors "believe that such value would be overly speculative under the circumstances," they may decline to ascribe a value. The Debtors cannot be faulted for seeking guidance from, and relying on, the Bidding Procedures Order entered by this court.

The court also notes that GBH was responsible for suspending the auction on both the first and second day because of its refusal to continue bidding. As the bidding procedures and the acknowledgement signed by all qualified bidders [Dkt. No. 802-6] expressly state, issues regarding the manner in which the auction is conducted shall be reserved for the sale hearing. It was therefore inappropriate for GBH to attempt to challenge the auction without first allowing the bidding to conclude. The Debtors' non-disclosure of certain perceived risks in the GBH bid and their views regarding the superiority of the Acquisition bid were not what ultimately resulted in a flawed auction. Rather, the Debtors made two mistakes during the auction.

First, the Debtors did not account for the value of the insider releases and the avoidance actions being "sold," as discussed in detail below. Regardless of whether this failure is considered a mistake or more properly considered in connection with the valuation of the Debtors' assets in

relation to the purchase price, the Debtors' failure in this regard is fatal, even if the Committee supported the terms of sale. The Debtors' executives testified that an investigation had not been completed as to the value of the releases in the Acquisition APA or the avoidance actions proposed to be sold when the Acquisition bid was selected as the highest and best bid.[37]   Had the investigation been completed, it might have required an adjustment to the bid valuations relied upon by the Debtors to credit the liquidation bids with a greater amount for causes of action left behind in the estate. Moreover, the Debtors were unable to articulate a basis for the granting of such releases, let alone their value, at the sale hearing. This lack of understanding is unacceptable given the insider relationship between Acquisition and the Debtors.[38]

Second, the court is troubled by the *ex parte* telephone call from Mr. Bengochea to Mr. Jackson during the second night of the auction. As an initial matter, this type of *ex parte* contact during an auction is completely inappropriate due to the insider relationship and clear conflict of interest that has infected Chuck Bengochea. Any requests for higher bids should have been placed on the record at the auction or communicated through legal counsel. Moreover, the request should have been made to all qualified bidders, not simply to an insider that has assured the Debtors' CEO of future employment.

The testimony and auction transcript reveal that around the same time that Mr. Bengochea placed the telephone call to Mr. Jackson, Acquisition submitted its final bid, after which it left the auction. Neither Acquisition nor any other party has provided an explanation for Acquisition's departure. The conduct of Mr. Bengochea and the departure of Acquisition leave this court with

---

[37]     The court notes that the parties described the sale of avoidance actions more as an abandonment of the estate's right to pursue such actions, rather than an assignment of the estate's rights to Acquisition.

[38]     Similarly, the Debtors neglected to consider whether Acquisition had the ability to close the transaction and comply with its monetary obligations under the Acquisition APA. However, this may be a moot point after Mr. Minick confirmed that FC Special Funding had agreed to provide a credit facility as evidenced by the commitment letter.

the impression that Mr. Bengochea may have represented to Acquisition that it would be declared as the winning bidder, which it eventually was after a recess and an abrupt closing of the auction. While the court is without sufficient evidence to infer fraud on the part of Mr. Bengochea, the timing of the telephone call, the final Acquisition bid, and the closing of the auction cannot be ignored in light of the heightened scrutiny applied to insider transactions. Mr. Bengochea was, at the very least, reckless.

In sum, although the auction was not as unfair as GBH insists, it was flawed.

C.     *The Debtors Have Failed to Articulate a Sound Business Justification for the Sale to Any of the Bidders*

As noted above, this court concludes that the Debtors have committed mistakes in connection with the auction process. However, even when a bankruptcy court finds the presence of fraud, unfairness or mistake, it retains the "discretion to approve the sale should the estate be so desperate for a buyer that rejection of the offer would be devastating to creditors." *In re Embrace Sys.*, 178 B.R. at 124 (citation omitted).

In order to approve a sale of substantially all of the Debtors' assets outside the ordinary course of business pursuant to section 363(b), the court must find that the Debtors have articulated a sound business justification for the sale. *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986) (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)). The Sixth Circuit has adopted the reasoning of *Lionel* and cited favorably to the following guidance from the Second Circuit:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors, and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the

> proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.  This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Id.* at 389 (quoting *In re Lionel Corp.*, 722 F.2d at 1071).  The list set forth in *Lionel* and adopted by the Sixth Circuit is not exhaustive, however.  Instead, a court must consider the unique facts and circumstances of each case as opposed to applying a "predetermined formula."  *In re Embrace Sys.*, 178 B.R. at 125.

This court finds the following factors previously identified by this court and other courts to be instructive: (i) whether adequate and reasonable notice has been provided to parties in interest, including full disclosure of the sale terms and the debtor's relationship with the purchaser, (ii) whether the sale price is fair and reasonable, and (iii) whether the proposed buyer is proceeding in good faith.  *See*, *e.g.*, *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *In re Medical Software Solutions*, 286 B.R. 431, 439-40 (Bankr. D. Utah 2002); *see also In re Embrace Sys.*, 178 B.R. at 123 (citation omitted) (sale appropriate if in compliance with section 363, bid is fair, and sale is in best interest of debtor's estate and creditors).

As this court has consistently stated, a debtor must demonstrate that the proposed purchase price is not only the highest offer, but the highest and best offer.  *See*, *e.g.*, *In re Embrace Sys.*, 178 B.R. at 123.  When considering offers for the purchase of assets, the debtor's duty, and the primary concern of the bankruptcy court, is to ensure that the sale maximizes the value of the asset sold.

*Id.* (citing *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992)).

It is again worth noting that nothing within the Bankruptcy Code prohibits insiders from purchasing estate assets. *Sugarloaf Indus. and Mktg. Co. v. Quaker City Castings, Inc. (In re Quaker City Castings, Inc.)*, 337 B.R. 729, 2005 WL 3078607, at *6 (B.A.P. 6th Cir. Nov. 18, 2005) (citing *First of America Bank v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1217-18 (6th Cir. 1996); *In re Bakalis*, 220 B.R. at 537). Rather, the transaction is merely subject to heightened scrutiny. *See In re Exaeris Inc.*, 380 B.R. at 746-47; *In re Tidal Construction Co., Inc*., 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) (applying heightened scrutiny and ultimately approving sale to insider).

Upon consideration of these factors, this court finds that the Debtors have not satisfied their burden under heightened scrutiny, as the insider nature of sale to Acquisition simply does not permit this court to approve the transaction, notwithstanding the overwhelming support from the Debtors' major stakeholders.[39] The court concludes that although the Debtors have satisfied several of the aforementioned criteria, they have not, overall, articulated a sound business justification for seeking to sell substantially all of their assets to Acquisition on the terms in the Acquisition APA.

First, it is uncontroverted that the Debtors' assets are decreasing in value. As the Second Circuit, and the Sixth Circuit by reference, stated, this is perhaps the most important factor. The testimony at the sale hearing from Ken Dady revealed that although the Debtors are currently cash positive, they will experience a liquidity crisis sometime within the next month. The projections

---

[39]     The court gives little, if any, weight to FC Special Funding's support for the Acquisition bid. As part of the sale to Acquisition, FC Special Funding would be the beneficiary of a release that it has valued at $6.3 million. Therefore, FC Special Funding is by no means disinterested.

relied upon by the Debtors at the sale hearing further indicate that their cash reserves are likely to be depleted by mid to late July, absent post-petition financing. It is undisputable that the Debtors are subject to a fairly onerous cash collateral order, which has been extended on a weekly basis [Dkt. Nos. 851, 913]. Finally, as this court has previously noted, the Debtors are experiencing a significant cash burn due to professional fees and other costs directly attributable to these bankruptcy cases. In the event that the Debtors' assets are not sold soon, it is unlikely that the Debtors will be able to continue as a going concern.[40]

Second, the court finds that a sufficient amount of time has elapsed since the petition date. The Debtors have explored their options with assistance from counsel, Resurgence and Brookwood. Since the filing of their petitions, the Debtors have conducted a vigorous marketing campaign, the byproduct of which was robust bidding at an auction.

Third, the Debtors cannot be said to be blindly following the desires of a vocal group of special interest creditors. In other cases this court has placed significant emphasis on the judgment of the debtor, its lenders, and the committee. *See In re Quality Stores, Inc.*, 272 B.R. at 647-48 (court recognized committee and secured lenders' support given great deference because they bore risk if sale not consummated). These cases are no different. The Debtors clearly have support from all of their major stakeholders, the Committee, Credit Suisse, FC Special Funding, and the Ad Hoc Consortium. Absent the insider relationships and lack of notice, the support of these stakeholders may have dictated a different outcome.

Fourth, the Debtors have properly advised this court and other parties in interest that they intend to file a plan of liquidation as soon as reasonably practical as part of an agreement reached

---

[40]     Prof. James J. White, *Harvey's Silence*, 69 AM. BANK. L.J. 467, 474 (1995) ("[T]he largest and most palpable costs of Chapter 11 arise from delay. . . Chapter 11—at least as practiced in large cases—appears to condone and even exaggerate delay and the attendant costs. . . The costs of delay are palpable and indisputable.").

with the UST.  To this end, the Debtors negotiated with at least Acquisition for a sum certain that will be used for the wind down of the Debtors' estates, which presumably includes the filing of a plan after the sale is consummated.  Moreover, at the sale hearing, no parties questioned the Debtors' representatives regarding the material terms of any plan.  In the absence of any such questioning, the court will accept the Debtors' representations and will not require more.  In sum, the Debtors have, through discussions with the UST, responsibly accounted for the need to file a plan of liquidation in the event the sale is approved.

While the aforementioned factors support a finding that a sound business justification exists for a sale to Acquisition, several other factors weigh heavily against such a sale. Notwithstanding the Debtors' looming liquidity crisis, none of the proponents of the sale to Acquisition have presented this court with evidence upon which the court can make an informed decision regarding the relationship of the sale price to the value of the assets being sold. This court would have expected the Committee to provide evidence as to the value of the releases and avoidance actions that are part of the transaction with Acquisition.  However, no member of the Committee was present to testify at the sale hearing, nor was an affidavit even submitted that could provide this court with an explanation as to the value of these assets and the fairness of the sale price.  Moreover, at the sale hearing, the Debtors confessed that they had yet to complete their analysis of the value of these assets.  The court therefore finds that the Debtors have failed to satisfy their burden in this regard.

The Debtors have also failed to demonstrate, by a preponderance of the evidence, the good faith of Acquisition, an insider who negotiated the terms of the Acquisition APA.  *See also Made in Detroit, Inc. v. Official Comm. of Unsecured Creditors (In re Made in Detroit, Inc.)*, 414 F.3d 576, 581 (6th Cir. 2005) (discussing good faith purchaser status under section 363(m)).  As the

court in *Exaeris* astutely observed, the Committee's involvement in the negotiations between the Debtors and Acquisition would normally lend support to a good faith finding. *In re Exaeris Inc.*, 380 B.R. at 745; *see In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (noting that if both debtor and committee supported sale, court would defer to such judgment). Again however, the Committee provided no evidence as to its role in the negotiations. The court will not find good faith simply because the Committee has emphatically supported the transaction with legal arguments. Instead, given the insider relationships in these cases, the court would expect the Committee to present evidence in support of the alleged good faith nature of the proposed transaction.

With respect to the last factor that this court deems relevant, the court concludes that the proposed sale to Acquisition dictates terms of a future plan of liquidation. *See State of Ohio Dept. of Taxation v. Swallen's, Inc. (In re Swallen's, Inc.)*, 269 B.R. 634, 638 (B.A.P. 6th Cir. 2001) (after proper notice, court cannot bypass requirements of chapter 11 where party in interest objects). The insider nature of the relationship again requires this court to view this attempt to bypass certain requirements of a plan with heightened scrutiny. In their objections, GBH and, to some extent, Bridgestone have asserted that the proposed sale to Acquisition will result in a *sub rosa* plan as discussed many years ago by the Fifth Circuit. *See Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 939-40 (5th Cir. 1983). In *Braniff* the court found that the proposed transaction under section 363 would circumvent creditor protections such as full and complete disclosure, voting rights, and the confirmation requirements of section 1129, among other things. *See id.* at 940.

This court notes that in *Stephens Indus.*, the Sixth Circuit discusses *Braniff*, but does not necessarily adopt it. After independent investigation, this court has been unable to identify any

published decision wherein the Sixth Circuit explicitly recognized a prohibition on "*sub rosa* plans*" or endorsed *Braniff* in the same way it has *Lionel*.   Regardless, this court believes that *Braniff* merits consideration. *See also In re Victoria Alloys, Inc.*, 261 B.R. 918, 921 (Bankr. N.D. Ohio 2001) (addressing but declining to find *sub rosa* plan); *In re Dow Corning Corp.*, 192 B.R. 415, 427-28 (Bankr. E.D. Mich. 1996) (same); *In re Baldwin United Corp.*, 43 B.R. 888, 906-907 (Bankr. S.D. Ohio 1984) (same). In *Stephens Indus*. the Sixth Circuit clearly expressed similar concerns to those at issue in *Braniff* by adopting *Lionel* and instructing bankruptcy courts to consider the effect of the proposed disposition on future plans. *Stephens Indus*., 789 F.2d at 389.

In these cases, the Acquisition APA contains provisions which are more appropriately included within the plan of liquidation that the Debtors intend to file, especially in light of the insider relationship between the Debtors and Acquisition.[41]   As a threshold issue and keeping in mind disclosure requirements, none of the proposed agreements from any of the three bidders were served on the matrix in these cases, although they were filed on ECF [Dkt. Nos. 742, 814].  Because the Debtors proposed a bidding process with no stalking horse bidder, creditors have never received notice of the post-auction terms of the proposed transaction.  In light of the extraordinarily broad releases for officers, directors, and insiders of the Debtors included in the Acquisition APA, this court would have had difficulty approving the proposed transaction with Acquisition without more significant disclosure and justification for the releases being granted by the Debtors.  *See In re Exaeris Inc.*, 380 B.R. at 746-47 (citing *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 497 (Bankr. S.D.N.Y. 1991); *see also Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657 (6th Cir. 2002) (discussing factors related to non-debtor releases).  Absent a significant narrowing of the releases, the court doubts that it could

---

[41]   This court makes no determination as to whether these elements might be acceptable under different circumstances and absent the insider relationships which pervade these cases.

approve them outside of a plan. *But see In re Swallen's, Inc.*, 269 B.R. at 638 (suggesting that absent any objection and upon proper notice, the circumstances may allow a court to temper plan requirements).

GBH and Bridgestone also assert that the Acquisition APA improperly violates the absolute priority rule because it purports to pay junior classes of creditors before paying Credit Suisse in full. 11 U.S.C. § 1129(b)(1). GBH points to what it terms a 5% "tip" provided to unsecured trade creditors. This issue may arguably have been resolved by the settlement on the record whereby Credit Suisse agreed to release its claims against the estate after payment of a settlement amount of $5.45 million. However, once again, the court must emphasize its unease with the Debtors' failure to provide notice to creditors and other parties in interest. *See Burtch v. Avnet, Inc.*, 527 B.R. 150, 156 (D. Del. 2015) (release granted by debtor to secured creditor as part of settlement should not have been approved by bankruptcy court without notice to parties); *see also In re Embrace Inc.*, 178 B.R. at 125 n.11 (noting problem when creditors receive insufficient disclosure because sale sought outside chapter 11 plan); *In re General Bearing Corp.*, 136 B.R. 361, 365 (Bankr. S.D.N.Y. 1992) (questioning whether creditors were properly notified of sale).

Finally, as emphasized by the UST and Bridgestone, the Debtors have not undertaken an adequate inquiry as to the value of the avoidance actions or the value of the incredibly broad releases being granted to insiders. This court is extremely mindful that the Sixth Circuit has explained that involuntary releases of third party claims against non-debtors are a "dramatic measure" and should be implemented only in "unusual circumstances." *In re Dow Corning Corp.*, 280 F.3d at 658 (citations omitted). The Sixth Circuit has seemingly inferred that this court should not approve similar releases unless complete disclosure has been made pursuant to a plan and *only* after seven elements are satisfied. *See id.* As such, absent full disclosure to general unsecured

creditors, none of whom have been advised of the proposed releases being provided to insiders or the "sale," abandonment or waiver of avoidance actions (however the Debtors choose to characterize it), this court cannot approve the Acquisition APA.

In addition, the court notes that it cannot approve the sale to GBH, or to FC Special Funding, for that matter. After the settlements were placed on the record, GBH no longer had the support of Credit Suisse. The GBH agency agreement distributes funds to consignment vendors without paying Credit Suisse in full, unlike the Acquisition bid, which resolves the claims of Credit Suisse. According to GBH, such a transaction, at least when proposed by Acquisition, would violate the Bankruptcy Code. Moreover, the GBH agency agreement required the consent of both FC Special Funding, whose support it never had, and Credit Suisse, whose support was withdrawn at the sale hearing. Therefore, the GBH agency agreement does not seem feasible given GBH's requirements and the current alliances in these cases. Even if the GBH agency agreement did not face the aforementioned obstacles, the court would nonetheless decline to approve the sale to GBH. GBH has repeatedly stated that it was prepared to bid more at the auction, but elected not to due to the perceived, although relatively unsupported, concerns regarding fairness. Finally, GBH has failed to provide any firm commitment to this court regarding the payment in full of administrative expenses. The court therefore cannot conclude that the GBH bid is the highest and best bid.

Similarly, the court cannot approve the sale to FC Special Funding because after being privy to certain information as a Consultation Party, FC Special Funding attempted to remove itself from that role and join the auction as a bidder.[42] This court must infer that FC Special Funding gained an unfair advantage by initially participating as one of the Consultation Parties

---

[42] Moreover, at one point during the auction, FC Special Funding recommended a bid in which it would receive a release of any and all claims against it by the Debtors' estates.

and thereafter submitting a bid.  This conduct is similar to insider trading, and cannot be overlooked.  The court also notes that FC Special Funding's bid does not ensure payment in full of all administrative expenses, among other things.  The court will therefore not consider the current bid of FC Special Funding as eligible to be declared as the winning bidder at this time.

In sum, the Debtors have convincingly set forth many compelling reasons for the court to approve the sale to Acquisition.  The Debtors have, in this court's view, properly pursued a sale of substantially all of their assets given their unstable financial condition and extensive marketing efforts, among other things.  However, certain elements in the Acquisition APA are inappropriate in light of the insider relationships in these cases.  In addition, the various settlements (*e.g.*, with consignment vendors and Credit Suisse) require notice to all creditors and parties in interest.

This is not a situation where the court is willing to exercise its discretion to approve the sale to an insider without being provided with any testimony or other evidence as to the value of the releases and, similarly, avoidance actions.  This court is also unwilling to circumvent the due process rights of creditors and other parties in interest who have been denied the opportunity to assess the binding effects of the proposed transactions.  The court therefore finds that the Debtors have not satisfied the standards as required by the Sixth Circuit to sell their assets to GBH, Acquisition or FC Special Funding.

## CONCLUSION

Although the court cannot approve the Sale Motion as presented, the court is cognizant of the consensus that has developed in these cases.  As noted above, the court places great significance on the support from the Debtors' major stakeholders, all of whom favor a sale of substantially all of the Debtors' assets to Acquisition.  Therefore, the Debtors may wish to reopen the auction and resume acceptance of bids from GBH, Acquisition, and any other qualified bidders in accordance

with the court's order denying the Sale Motion entered concurrently herewith.[43]  The court strongly encourages the Debtors, as well as any potential purchaser, to be cognizant of the court's comments regarding the structure of any agreement and the constraints imposed by the Bankruptcy Code, from which this court will not deviate.  The Debtors should further keep in mind that any proposed settlements must comply with the notice requirements of Fed. R. Bankr. P. 9019(a).  *See Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC)*, 728 F.3d 567, 575-76 (6th Cir. 2013) (McKeague, J.) (citation omitted) (identifying four factors to consider when evaluating fairness of bankruptcy settlements).

Lastly, as noted above, the UST requested that it be permitted to attend the auction to generally monitor the fairness of the process.  The court has decided, given the UST's prior request, to expand the UST's role at any reopened auction.  The UST shall monitor <u>all</u> aspects of the auction, including discussions by and among the Debtors and Consultation Parties, and file and serve a written report regarding the fairness of the auction as more fully described in this court's order denying the Sale Motion.

As an alternative to recommencing the auction, the Debtors may simply wish to file a plan of reorganization so as to avoid any allegations, or concerns from this court, that any proposed transaction fails to comport with the applicable provisions of the Bankruptcy Code.

For the foregoing reasons, the Sale Motion is denied.  The court shall enter a separate order consistent with this Memorandum Decision.

---

[43]   Nothing contained in this Memorandum Decision or the related order entered by this court should be construed as requiring Acquisition, GBH, or any other previously qualified bidder to participate at any reopened auction.

**Signed: June 18, 2015**





John T. Gregg
United States Bankruptcy Judge