## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:                                                  CHAPTER 11

**FAMILY CHRISTIAN, LLC** *et al.* [1]          **CASE NO. 15-00643-jtg**
                                                        **(Jointly Administered)**
                        Debtors.
                                            /           **HON. JOHN T. GREGG**

### EXPEDITED MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO INCUR POST-PETITION SENIOR SECURED SUPERPRIORITY INDEBTEDNESS; (II) AUTHORIZING THE CONTINUED USE OF CASH COLLATERAL PURSUANT TO THIS COURT'S PRIOR FINAL ORDER; (III) GRANTING POST-PETITION PRIMING AND SENIOR PRIORITY SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) SCHEDULING A FINAL HEARING ON THE MOTION

The above-captioned debtors (the "**Debtors**"), pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, hereby move the Court for the entry of an order authorizing the Debtors to incur post-petition senior secured superpriority indebtedness and to continue their use of cash collateral pursuant to this Court's prior final order approving use of cash collateral.  In further support of this Motion, the Debtors incorporate the *Declaration of Chuck Bengochea In Support Of Chapter 11 Petition And First Day Motions* (the "**Bengochea Declaration**") (Dkt. No. 11) and the findings of fact and conclusions of law set forth in that certain *Final Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363* (the "**Final Cash Collateral Order**")(Dkt. No. 593).  In support hereof, the Debtors respectfully state as follows:

---

[1]    The Debtors are: Family Christian, LLC (Case No. 15-00643-jtg), Family Christian Holding, LLC (Case No. 15-00642-jtg), and FCS Giftco, LLC (Case No. 15-00644-jtg).

## JURISDICTION AND VENUE

1.      On February 11, 2015 (the "**Petition Date**"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330, *et seq.* (the "**Bankruptcy Code**").

2.      The Debtors are continuing in possession of their property and operating and managing their businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      On February 23, 2015, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**").  *See* Dkt. No. 158.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this case is proper under 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested herein are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND

6.      The factual background relating to the Debtors' business and the commencement of these Chapter 11 Cases is set forth in detail in the Bengochea Declaration.

**A.      Description of the Business**

7.      Family Christian Holding, LLC (the "**Holding Company**") is the sole owner and member of Family Christian, LLC (the "**Operating Debtor**"), which operates and runs *Family Christian*® stores, one of the largest retail sellers of Christian books, music, DVDs, church supplies, and other faith based merchandise.  The company has approximately 3,100 employees

and 266 stores in 36 states operating under the name.  Sales are also generated through direct mail catalogs and internet purchases (https://familychristian.com).  In 2014, the Operating Debtor had gross sales approximating $216 million.  The Debtors' headquarters are located in Grand Rapids, Michigan, as too are the roots and origins of the Debtors' business which date back to the 1930's when the "*Zondervan*" stores were first founded in Grand Rapids.

8.      The Debtors operate as non-profit companies.  As a result, any available and legally disposable profits of the Debtors and their collected donations go to supporting "Family Christian Ministries," a non-profit, charitable organization dedicated to sharing and promoting the Christian message and lifestyle, and supporting charitable causes and missionary goals.  A non-exhaustive sampling of such past and present activities include (with the majority of these activities occurring prior to current ownership's acquisition in 2012):

- Bible donations.    To date the company has donated over 120,000 bibles to military members and their families, and over 800,000 bibles to children and students in Latin America and Africa.

- Orphanage / Widow Support.   Since 2003, the company and its employees have raised and donated over $10 million dollars and needed supplies to organizations and ministries that care for orphans and widows or facilitate adoptions in countries across the globe, including China, Haiti, Mexico and the Dominican Republic.   They have likewise raised funds to support ministries aimed at rescuing persons enslaved in the sex trafficking industry.

- Missions.  The company has sent over 1,300 employees on mission trips across the USA and other countries, sharing the Christian faith and distributing needed supplies and goods to many persons, such as building 108 homes for widows and restoring 32 more, while also supplying fuel efficient stoves and water purifiers.

- Giving.  In addition to the funds and gifts noted above, the company has given several hundred thousand "shoe box" gifts and gospel tracks to needy families in their annual "Operation Christmas Child."   After Hurricane Alex in 2010, the Debtors' supported ministries and relief efforts to aid squatters' communities in Monterrey, Mexico.  Since 2003, Family Christian Ministries and its ministry partners or predecessor company have impacted over 4.5 million lives.

**B.    Description of the Debt[2]**

9.    The Debtors, as borrowers, are indebted to FC Special Funding, LLC, as assignee of JP Morgan Chase Bank, N.A., individually and in its role as agent (the "**Senior Lender**") under a "**Credit Agreement**" dated November 14, 2012 (the "**Working Capital Loan Credit Agreement**") that provides a revolving line of credit up to a maximum of $40 million (the "**Working Capital Loan**"), which loan provides working capital for the Operating Debtor's business operations.    The Senior Lender's sole participant in the Working Capital Loan is Jackson Investment Group, LLC ("**JIG**").  Mr. Richard L. Jackson is the CEO of JIG.

10.    As collateral security for the Working Capital Loan, the Senior Lender has a properly perfected (a) first priority security interest and lien in and to the Debtors' accounts receivable, inventory, cash, deposit accounts, securities accounts, prepaid expenses, instruments, documents, chattel paper and supporting obligations, all books and records related to the foregoing, and all proceeds of the foregoing (the "**Working Capital Collateral**"), which includes without limitation, all rents, profits, and proceeds derived therefrom which constitute cash collateral within the meaning of Sections 363(a) and 363(c)(2) of the Bankruptcy Code (the "**Cash Collateral**"), and (b) second priority security interest and lien in and to the Debtors' copyrights, domain names, patents, trademarks and licenses, equipment, fixtures, general intangibles, goods, investment property, pledged collateral, letter-of-credit rights and supporting obligations, commercial tort claims, and all books and records related to the foregoing, and all

---

[2] The Working Capital Loan Credit Agreement, the Term Loan Credit Agreement, the Intercreditor Agreement, and the other agreements, documents, and instruments executed in connection with the Working Capital Loan and the Term Loan are collectively referred to as the "**Loan Documents.**" The Debtors will provide copies of the Loan Documents upon request to any party receiving notice of the Motion.

proceeds of the foregoing (the "**Term Loan Collateral**", together with the Cash Collateral and the Working Capital Collateral, the "**Senior Lender Prepetition Collateral**").

11. The Debtors, as borrowers, are indebted to Credit Suisse AG, Cayman Islands Branch, individually and in its role as administrative agent and collateral agent (the "**Term Loan Agent**") for Credit Suisse Loan Funding, LLC, Medley Capital Corporation, Congruent Credit Opportunities Fund II, LP, and Main Street Mezzanine Fund, LP (collectively, the "**Term Loan Lenders**" and together with the **Senior Lender**, the "**Secured Lenders**") under a "**Term Loan Credit Agreement**" dated November 14, 2012 (the "**Term Loan**") for the loan amount of $38 million, which loan provided part of the acquisition financing for the 2012 acquisition.

12. As collateral security for the Term Loan, the Term Loan Lenders have a properly perfected (a) first priority security interest and lien in and to the Term Loan Collateral, and (b) second priority security interest and lien in and to the Working Capital Collateral, which includes without limitation, the Cash Collateral (collectively, the "**Term Loan Lenders Prepetition Collateral**")(the Senior Lender Prepetition Collateral and the Term Loan Lenders Prepetition Collateral are sometimes collectively referred to herein as the "**Prepetition Collateral**").

13. The Term Loan Lenders possessed a properly perfected first-priority security interest in the Term Loan Collateral and subsequently assigned their respective interests to the Senior Lender pursuant to, among other things, multiple Assignment and Acceptance Agreements between the Term Loan Lenders and Senior Lender dated July 1, 2015. Senior Lender further documented the transfer of the Term Loan Lenders' claim with the filing of its Transfer of Claim Other Than for Security [Dkt. No. 952] ("**Claim Transfer**") on July 1, 2015. Senior Lender also possesses a properly perfected first-priority security interest and lien in and to all of the Senior Lender Pre-petition Collateral.

14.     As of the Petition Date, the Debtors have acknowledged and stipulated in the Final Cash Collateral Order that the principal amount of the indebtedness owed by Debtors under the Loan Documents to the Senior Lender is approximately $23,100,000 and to the Term Loan Lenders is approximately $34,200,000, which amounts are exclusive of interest, costs, attorneys' fees, and other amounts chargeable to the Debtors under the Loan Documents.

15.     The funds used by the Debtors to operate their business, including cash on hand, collections from accounts receivable and the sale of inventory, and other revenues derived from the Collateral may constitute "**Cash Collateral**" within the meaning of Sections 363(a) and 363(c)(2) of the Bankruptcy Code.

16.     Pursuant to the Final Cash Collateral Order, the Debtors previously received authority to use Cash Collateral to meet the ordinary operating expenses of their business, minimize the disruption of the Debtors as a "going concern," and avoid irreparable harm to the Debtors.

17.     The Debtors are no longer able to sustain business operations solely from Cash Collateral and require additional liquidity to finance their current operations.

## **RELIEF REQUESTED**

19.     By this Motion, the Debtors request entry of interim and final orders (the "**DIP Orders**") authorizing them to borrow money from the Senior Lender (the "**DIP Lender**") under a revolving credit facility (the "**DIP Financing**") in accordance with the Term Sheet attached hereto as **Exhibit A**[3] embodying the terms of DIP Financing (the "**DIP Credit Facility**") and the DIP Orders.  The following are the salient terms of the proposed DIP

---

[3] To the extent required by the DIP Lender, a definitive credit agreement governing the DIP Facility that incorporates the terms and conditions set forth in the Term Sheet, and is otherwise in form and substance acceptable to the DIP Lender, will be prepared and executed by the parties.

Financing and the proposed order granting this Motion on an interim basis (the "**Interim DIP Order**")[4]:

      a)    <u>DIP Credit Facility Commitment</u>. The Debtors obtain from the DIP Lender loans and credit advances (the "**Loan Advances**") in an aggregate principal sum of (i) up to $2,500,000 upon entry of the Interim DIP Order and (ii) following the entry of the final order approving the Motion (the "**Final DIP Order**"), up to an additional amount of $3,500,000 for a maximum amount of up to $6,000,000 plus accrued interest on the aggregate principal amount and fees and expenses on a revolving basis. *See* Interim DIP Order, ¶ 3.

      b)    <u>Approved Budget</u>. The DIP Credit Facility and the Interim DIP Order impose restrictions on the Debtors' operations by requiring the DIP Credit Facility be used exclusively to (Y) fund working capital, required and approved capital expenses and general corporate purposes relating to post-petition operations, as well as expenses related to any sales process for the Debtors' assets or proposed plan of reorganization or liquidation, and (Z) pay, up to the budgeted amount for the fees, costs, expenses, and disbursements of professionals retained by the Debtors and the Committee, each as approved by the Court, and bankruptcy related charges limited by the amounts set forth in the budget approved by the DIP Lender and the Secured Lenders (the "**Approved Budget**")[5]. Such Loan Advances will be subject to the timing and details of, and to be used in accordance with, the Approved Budget. The Debtors are permitted to use the proceeds of the DIP Credit Facility in accordance with the Approved Budget, and the Debtors are required to submit a forecast of the weekly cash flows of the Debtors delivered on a weekly basis starting on the then prior week and a reconciliation of actual expenses to the Approved Budget. *See* Interim DIP Order, ¶ 4.

      c)    <u>Maturity</u>. The earliest of (a) August 15, 2015, or (b) the closing date of the proposed sale to FCS Acquisition, LLC pursuant to a confirmed plan of reorganization. *See* Interim DIP Order, ¶ 9.

      d)    <u>Interest Rate</u>. The rate of four and one-half percent (4.5%) per annum, which interest shall be payable monthly; upon the occurrence of a default, a rate of six and one-half percent (6.5%) per annum. *See* Interim DIP Order, ¶ 5.

      e)    <u>Termination Events</u>. In addition to the customary events of default for a debtor in possession financing facility set forth in the DIP Credit Facility, the DIP Credit Facility includes the occurrence of one or more of the Termination Events, as provided in the Interim DIP Order. *See* Interim DIP Order, ¶ 9.

---

[4] All otherwise undefined terms have the meanings set forth in the Interim DIP Order. A copy of the Interim DIP Order is attached hereto as **Exhibit B**.

[5] A copy of the Approved Budget is attached hereto as **Exhibit C**.

f)    <u>DIP Liens and Superpriority Claims</u>.  That the obligations of the Debtors under the DIP Credit Facility (i) be secured by a first-priority priming lien on any and all assets of the Debtors that secure the obligations under the Working Capital Loan Credit Agreement and Term Loan Credit Agreement (the "**Pre-Petition Credit Agreements**") pursuant to section 364(d) subject to the Carve Out (defined below) and amounts required to be paid by Debtors to the United States Trustee during the respective terms of the DIP Orders, (ii) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to exclusive superpriority administrative expense status in the Chapter 11 Cases, (iii) pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a first-priority perfected security interest in all of Debtors' unencumbered assets, including all real and personal property, whether now owned or hereafter acquired, but excluding claims, causes of action, and recoveries arising under Chapter 5 of the Bankruptcy Code, and (iv) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on any specific property of Debtors that is subject to valid, perfected and non-avoidable liens (other than liens arising under the Pre-Petition Credit Agreements)(the "**DIP Liens**").  *See* Interim DIP Order, ¶ 12.

g)    <u>Carve-out</u>.  The Interim DIP Order adopts and modifies the "Carve-out" provisions identical to those set forth in the Final Cash Collateral Order.  *See* Interim DIP Order, ¶ 13.

h)    <u>Stipulations</u>.    The Interim DIP Order incorporates the Final Cash Collateral Order's findings of fact and conclusions of law with respect to Debtors' stipulation to the liens and claims of the Secured Lenders and the Committee's challenge rights with respect to these stipulations.  *See* Interim DIP Order, ¶ 14.

i)    <u>Indemnity</u>.  The Debtors agree to indemnify and hold the DIP Lender and its respective successors, assignees and current and former shareholders, directors, agents, advisers, officers, attorneys, employees, agents, subsidiaries and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether known or unknown, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the DIP Credit Facility, the term sheet, the transactions contemplated hereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether known or unknown, whether or not any of such indemnified persons is a party thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party.  In all such litigation, or the preparation therefor, the DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of such counsel.  *See* Interim DIP Order, ¶ 17.

j)    <u>Section 506(c) Waiver</u>.  Consistent with the Final Cash Collateral Order, upon entry of the Final DIP Order, any right or claim that could be asserted by any party in interest in the case to surcharge the DIP Lender or its collateral under Section 506(c) of the Bankruptcy Code, or otherwise, shall be waived by the Debtors for the estates and barred pursuant to the Final DIP Order.  *See* Interim DIP Order, ¶ 12.

k)    <u>Relief from Automatic Stay</u>.  The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit all acts,

actions and transfers, relating to perfection of interests contemplated herein. During the term of the use of DIP Credit Facility contemplated by this Order, the DIP Lender may file a motion seeking to lift the automatic stay. *See* Interim DIP Order, ¶ 21.

l)      Interim Hearing. Under Bankruptcy Rule 4001, an interim hearing (the "**Interim Hearing**") be held before this Court to consider entry of the Interim DIP Order approving the post-petition financing facility on an interim basis and authorizing the Debtors to obtain, on an interim basis, under the DIP Credit Facility, a sum not to exceed $2,500,000 pursuant to the terms and conditions of the Interim DIP Order,[6] and further requesting a setting for a final hearing on this Motion (the "**Final Hearing**") and establishing notice procedures for the Final Hearing, wherein the Court will consider entry of the Final DIP Order authorizing the DIP Financing.

m)      Cash Collateral. That the Court authorizes the Debtors' continued use of the Cash Collateral of the Secured Lenders pursuant to the terms and conditions, including adequate protection, of the previously entered Final Cash Collateral Order and Section 363(c) of the Bankruptcy Code, except as otherwise agreed upon by the parties governed by the Final Cash Collateral Order. The Final Cash Collateral Order shall remain in full force and effect and govern the Debtors' use of Cash Collateral, whether as proceeds of the DIP Credit Facility or the Prepetition Collateral, except as otherwise agreed upon by the parties governed by the order.[7] *See* Interim DIP Order, 2.

## AUTHORITIES AND ARGUMENT

**A.      Debtor-in-Possession Financing**

### i.      Senior Lien on Collateral of Secured Lenders

20.      Section 364(d) of the Bankruptcy Code provides that a debtor may obtain post-petition financing by granting a lien on property of the estate that is senior or equal to liens that already exist on such property, so long as the debtor provides adequate protection of the previous lienholders' interest in such property. Section 364(d) of the Bankruptcy Code provides:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

---

[6] To the extent there is a conflict between the Term Sheet and the Interim DIP Order, the Interim DIP Order shall control.

[7] To the extent there is a conflict between the Final Cash Collateral Order and the Interim DIP Order, the Interim DIP Order shall control.

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

21.     The Debtors satisfy the requirements of section 364(d) of the Bankruptcy Code because (a) the Debtors are unable to obtain credit otherwise, (b) the Secured Lenders are adequately protected and consent to a section 364(d) priming lien, and (c) the proposed DIP Financing is in the best interest of the bankruptcy estates. The Debtors seek to grant a senior lien upon the collateral of the Secured Lenders, subject to the Carve-out (as defined below).  The Secured Lenders have consented to the priming lien being given to the DIP Lender as collateral security for the DIP Credit Facility.

22.     In the Debtors' business judgment, the DIP Credit Facility represents the best financing option to effectuate these purposes and advance the Debtors' reorganization efforts. The terms of the DIP Credit Facility neither (a) tilt the conduct of the Chapter 11 Cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties-in-interest from being decided on their merits.

23.     The superpriority claims and Liens granted to the DIP Lender under the DIP Orders shall be subject to the following "**Carve-out**" provisions, which are identical to those provisions set forth in the Final Cash Collateral Order:

a)     the Debtors' counsel, Burr & Forman LLP and Keller & Almassian, PLC, a "Carve-out" of the Collateral equal to the sum of (i) $150,000 and (ii) all accrued and unpaid amounts set forth in the Budget and any prior Budgets under the Interim Orders for the Debtors' Professional Fees, in the event that (A) any pre-petition retainers held by Burr & Forman LLP and Keller & Almassian, PLC or (B) the amounts paid by the

Debtors in the ordinary course of business in payment of authorized and allowed fees and expenses incurred by the Debtors' counsel are insufficient to fully secure such firm's outstanding fees and expenses;

b)      the Committee's counsel, Fox Rothschild LLP and Miller Johnson, a "Carve-out" of the Collateral equal to the sum of (i) $50,000 and (ii) all accrued and unpaid amounts set forth in the Budget and any prior Budgets under the Interim Orders for the Committee's Professional Fees, in the event that the amounts paid by the Debtors in the ordinary course of business in payment of authorized and allowed fees and expenses incurred by the counsel for such official committee of unsecured creditors are insufficient to fully secure such firm's outstanding fees and expenses; and

c)      any consumer privacy ombudsman appointed under Section 332 of the Bankruptcy Code a "Carve-out" equal to the sum of $25,000 of the Collateral in the event that the amounts paid by the Debtors in the ordinary course of business in payment of authorized and allowed fees and expenses incurred by such consumer privacy ombudsman are insufficient to fully secure such firm's outstanding fees and expenses.

Upon the occurrence of a Termination Event, the Carve-out granted herein shall be available for fees and expenses incurred following a Termination Event (or such longer period if extended or such period as agreed to in a subsequent DIP Orders), provided, however, the foregoing counsel, Committee members, and consumer privacy ombudsman shall seek payment of such fees and expenses incurred post-termination **first** as administrative priority claims, **second** from unencumbered assets of the Debtors' estate, if any, and, if such post-termination fees and expenses remain unpaid, **third** from any proceeds of the Collateral, and, provided

further, that such Carve-out is not duplicative of the Carve-out set forth in the Final Cash Collateral Order.

If Debtors' counsel, Committee professionals and members of the Committee (for expenses), or any consumer privacy ombudsman appointed in these cases do not receive payment from the Debtors' estates for allowed, accrued, and budgeted fees and expenses incurred prior to a Termination Event from the Debtors' operations and as set forth in the Approved Budget, such allowed, accrued and budgeted fees and expenses shall be paid from Cash Collateral after the occurrence of a Termination Event as if they were due and payable prior to a Termination Event. Further, to the extent there is insufficient Cash Collateral to cover such allowed, accrued and budgeted fees and expenses, the Secured Lenders shall satisfy the allowed, accrued and budgeted fees and expenses for such periods from proceeds of the Collateral, up to the amount of the Carve-out, which includes all amounts set forth in the DIP Orders after a Termination Event.

24.     The Carve-out is fair, reasonable, and appropriate. In this regard, the Carve-out will ensure that the Debtors and the Committee are able to continue with the assistance of counsel, thereby promoting the collective rights and expectations of parties-in-interest.

25.     Likewise, the various fees and charges required under the DIP Credit Facility are reasonable and appropriate under the circumstances.  Indeed, courts routinely authorize similar lender incentives that extend beyond the specific liens and rights specified in section 364 of the Bankruptcy Code.

### ii.    Additional Liens on Unencumbered Assets or Second Liens

26.     Pursuant to Section 364(c) of the Bankruptcy Code, a debtor may also, in the exercise of its business judgment, incur secured debts on the unencumbered assets of the debtor or junior liens on encumbered assets, if the debtor has been unable to obtain unsecured credit and

the borrowing is in the best interests of the estates. Section 364(c) of the Bankruptcy Code provides:

> (c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-
>
>> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>>
>> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3) secured by a junior lien on property of the estate that is subject to a lien.

27.    The Debtors have been unable to procure the required funds in the form of unsecured credit with an administrative priority.  Accordingly, under the circumstances, the Debtors should be authorized to enter into a secured financing arrangement under Section 364(c) of the Bankruptcy Code.

28.    Having determined that financing was available only under Sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Credit Facility at arm's-length and pursuant to their business judgment, which is to be accorded great weight so long as it does not run afoul of the provision of and policies underlying the Bankruptcy Code.  *See, e.g., Bray v. Shenandoah Federal Say. & Loan Assn (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986)(approving debtor-in-possession financing necessary to sustain seasonal business); *In re Ames Dep't Stores,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)(with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

29.     In satisfying the standards of Section 364(c) and (d) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986)("the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.,* 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require [d]ebtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the debtors' approach of only four lenders was sufficient under such circumstances.

30.     The DIP Financing is clearly for the benefit of the Debtors' bankruptcy estates and creditors. The DIP Financing is critical to maintaining the Debtors' operations and, thus, preserving and enhancing the Debtors' going concern value. As evidenced by the Approved Budget, use of Cash Collateral alone is insufficient to pay even the normal operating expenses. With the additional liquidity provided by the DIP Financing, the Debtors will be able to obtain goods and services in connection with maintaining ongoing operations (with the hope of normalizing trade credit terms), thereby permitting them to generate revenues, pay their employees, and operate their businesses for the benefit of all parties-in-interest while pursuing an orderly sale process and plan of reorganization or liquidation.

31.     The terms and conditions of the DIP Credit Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's-length.   Accordingly, the DIP

Lenders should be accorded the benefits of Section 364(c) of the Bankruptcy Code in respect of the DIP Credit Facility.

**B.      The Court Should Authorize the Use of Cash Collateral**

32.      In addition to the need for debtor-in-possession financing, the Debtors' other pressing concern is the need for use of Cash Collateral of the Secured Lenders.  The Debtors require continued use of the Cash Collateral to be able to satisfy payroll and employee benefits, pay taxes, and pay vendors to ensure a continued supply of services and materials essential to the Debtors' continued viability.  If unable to use the Cash Collateral, the Debtors would be unable to operate their business.

33.      The Secured Lenders have previously consented to the use of Cash Collateral under the terms of the Final Cash Collateral Order.

34.      Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors' continued use Cash Collateral in accordance with the terms of the Final Cash Collateral Order.

**C.      Approval of Adequate Protection**

35.      Under Section 361 of the Bankruptcy Code, when adequate protection is required under Section 363 of the Bankruptcy Code to protect against any diminution in value of an interest of an entity in property, a debtor may provide additional or replacement liens to the pre-petition secured creditor. 11 U.S.C. § 361(2).

36.      In exchange for the continuation of the adequate protection already granted to the Secured Lenders under the terms of the Final Cash Collateral Order, the Secured Lenders have agreed to subordinate their superpriority claim to the superpriority claim of the DIP Lender (to

the extent of a diminution in the value of their Collateral) and the other terms of the Interim DIP Order.

**D.      Approval of Modification of the Automatic Stay**

37.      Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The DIP Credit Facility contemplates that the DIP Lender shall have a first-priority lien on the Prepetition Collateral and on the unencumbered assets of the Debtors.

38.      The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit all acts, actions and transfers, relating to perfection of interests contemplated herein.  During the term of the use of DIP Credit Facility contemplated by this Order, the DIP Lender may file a motion seeking to lift the automatic stay

39.      The Interim DIP Order provides that the automatic stay provisions of Section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit all acts, actions and transfers, relating to perfection of interests contemplated herein.

40.      Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim DIP Order.

**E.      The Interim Approval Should Be Granted**

41.      Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 may not be commenced earlier than 15 days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on

the motion and authorize obtaining credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

42.     On an interim basis, the Debtors request that this Court authorize the Debtors to borrow and use up to $2,500,000. The Debtors must have the interim relief requested in order to maintain and operate their business.  Absent the interim relief, the Debtors will be unable to meet their payroll obligations and operations will cease.  The Debtors have inadequate cash collateral to operate and pay necessary expenses of the Chapter 11 Cases and to move forward with a sale process or plan process, absent the proposed DIP Financing being approved on an interim expedited basis.  As a result, the Debtors need the interim DIP Financing to avoid immediate and irreparable harm to the Debtors' bankruptcy estates. Absent the interim DIP Financing, the Debtors' businesses will simply shut down and their 3,100 employees will have to be terminated.

43.     The Debtors request, pursuant to Bankruptcy Rule 4001(c), that the Court authorize the Debtors, from and after the entry of the Interim DIP Order, until an order is entered following the Final Hearing on the Motion, to obtain credit under the DIP Credit Facility. This will enable the Debtors to maintain ongoing operations and the means by which they may avoid immediate and irreparable harm and prejudice to their bankruptcy estates and all parties-in-interest, pending the Final Hearing.

## NOTICE

**A.      Notice With Respect to Interim Hearing on the Motion**

44.     Notice of this Motion has been given by facsimile, electronic mail and/or overnight delivery to the following parties, or in lieu thereof, to their counsel: (a) counsel for the DIP Lender; (b) counsel for the Senior Lender; (c) counsel for the Committee;

(d) the United States Trustee; (e) counsel for the Ad Hoc Consortium; and (g) any parties that filed notices of appearances or requests for notice. The Debtors submit that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

**B.     Notice with Respect to Final Hearing on the Motion**

45.     The Debtors respectfully request that the Court set a final hearing date on the Motion for **July 21 or 22, 2015** and authorize the Debtors to serve a copy of this Motion and the Interim DIP Order which fixes the time and date for filing objections to this Motion, by first class mail upon (a) counsel for the DIP Lender; (b) counsel for the Senior Lender; (c) counsel for the Committee; (d) the United States Trustee; (e) counsel for the Ad Hoc Consortium; and (g) any parties that filed notices of appearances or requests for notice. The Debtors request that the Court deem such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001.

**PRAYER**

**WHEREFORE**, the Debtors respectfully request that the Court enter the Interim DIP Order (a) authorizing, on an interim basis, the Debtors' to borrow up to $2,500,000 under the DIP Credit Facility from the DIP Lender on a superpriority secured and administrative claim basis and to continue using the Secured Lenders' and DIP Lender's cash collateral pursuant to sections 363 and 364 of the Bankruptcy Code and this Court's previously-entered Final Cash Collateral Order; (b) scheduling the Final Hearing on this Motion for approval of the DIP Credit Facility; (c) authorizing, on a final basis, the Debtors to borrow up to $6,000,000 or additional amounts that may be authorized by the DIP Lender not to exceed $6,000,000

under the DIP Credit Facility from the DIP Lender; and (d) for such other and further relief as the Court deems just and proper.

Dated:  July 2, 2015.

Respectfully submitted,

KELLER & ALMASSIAN, PLC

/s/  A. Todd Almassian
A. Todd Almassian (P55467)
Greg J. Ekdahl (P67768)
230 East Fulton Street
Grand Rapids, MI 49503
(616) 364-2100
ecf@kalawgr.com

- and -

BURR & FORMAN LLP
Erich Durlacher (Ga Bar No. 235563)
Brad Baldwin (Ga Bar No. 034220)
171  17th Street, N.W. - Suite 1100
Atlanta, Georgia  30363
Telephone:  (404) 815-3000
Facsimile:  (404) 817-3244

*Attorneys To The Debtors and Debtors-in-Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2015, the foregoing pleading was filed with the clerk of the court using the ECF system, which will send electronic copies of such filing to all ECF participants in this case, and was separately served by e-mail on the following parties:

Allison R. Bach
Dickinson Wright PLLC
500 Woodward Ave., Suite 400
Detroit, MI 48226

*Counsel for Ad Hoc Consortium of Consignment Vendors*

Scott B. Lepene
Thompson Hine LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

*Counsel for FC Special Funding LLC*

John F. Isbell
Thompson Hine LLP
3560 Lenox Road
Suite 1600
Atlanta, GA 30326

*Counsel for FC Special Funding LLC*

John T. Piggins
Rachel L. Hillegonds
Miller Johnson
250 Monroe Ave. NW, Ste. 800
Grand Rapids, MI 49503

*Counsel for the Official Committee of Unsecured Creditors*

Michael C. Hammer
Doron Yitzchaki
Dickinson Wright PLLC
350 S. Main St., Suite 300
Ann Arbor, MI 48104

*Counsel for Ad Hoc Consortium of Consignment Vendors*

Steven L. Rayman
Rayman & Knight
141 E. Michigan Ave., Ste. 301
Kalamazoo, MI 49007

*Counsel for FC Special Funding LLC*

Paul J. Labov
Fox Rothschild LLP
100 Park Ave., 15th Flr.
New York, NY 10017

*Counsel for the Official Committee of Unsecured Creditors*

Michael G. Menkowitz
Jason Manfrey
William Stassen
Fox Rothschild LLP
2000 Market Street, 20th Flr.
Philadelphia, PA 19103-3222

*Counsel for the Official Committee of Unsecured Creditors*

Michael V. Maggio
Office of the United States Trustee
The Ledyard Building
126 Ottawa Avenue, N.W.
Suite 200R
Grand Rapids, MI 49503

**United States Trustee**

Dated:  July 2, 2015.

                                             KELLER & ALMASSIAN,  PLC

                                             /s/  A. Todd Almassian
                                             A. Todd Almassian (P55467)
                                             Greg J. Ekdahl (P67768)
                                             230 East Fulton Street
                                             Grand Rapids, MI 49503
                                             (616) 364-2100
                                             ecf@kalawgr.com
                                             *Attorneys To The Debtors*