# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **In re:** | **CHAPTER 11** |
| **FAMILY CHRISTIAN, LLC** *et al.*[1] | **CASE NO. 15-00643-jtg**<br>**(Jointly Administered)** |
| **Debtors.**<br>_____/ | **HON. JOHN T. GREGG** |

### INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, 364, AND 507 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 2002, 4001, AND 9014 (I) AUTHORIZING THE DEBTORS TO INCUR POST-PETITION SENIOR SECURED SUPERPRIORITY INDEBTEDNESS, (II) AUTHORIZING THE CONTINUED USE OF CASH COLLATERAL PURSUANT TO THIS COURT'S PRIOR FINAL ORDER; (III) GRANTING POST-PETITION PRIMING AND SENIOR PRIORITY SECURITY INTEREST AND SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING ON THE MOTION

This matter having come before the Court upon the Motion (the "**Motion**")[2] of Debtors for entry of an interim order (the "**Order**") and a final order (the "**Final Order**"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), seeking, *inter alia*:

(a)    authorization for the Debtors to obtain expedited post-petition debtor-in-possession financing on an interim basis from FC Special Funding, LLC ("**DIP Lender**" and, together with the Debtors, the "**Parties**"), subject and pursuant to the terms of this Order and the executed Commitment Letter (the "**Commitment Letter**") attached hereto as Exhibit A and fully incorporated herein by reference (the "**DIP Credit Facility**");

---

[1] The Debtors are: Family Christian, LLC (Case No. 15-00643-jtg), Family Christian Holding, LLC (Case No. 15-00642-jtg), and FCS Giftco, LLC (Case No. 15-00644-jtg).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(b)    approval of the terms and conditions of this Order and the Final Order (collectively, the "**DIP Orders**");

(c)    authorization for the Debtors to obtain debtor-in-possession financing under this Order, which financing and indebtedness, due and owing by the Debtors to the DIP Lender, shall, pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, be secured by a first priority priming lien and security interest in the Collateral (as defined below);

(d)    modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent reasonably necessary to permit the DIP Lender and the Debtors to implement the terms of this Order;

(e)    authorization for the Debtors, after an expedited interim hearing on July 10, 2015 (the "**Interim Hearing**") on the Motion pursuant to Bankruptcy Rule 4001(c)(2) to obtain from the DIP Lender debtor-in-possession financing up to the maximum amount of $6,000,000, to be disbursed under the terms and conditions as set forth in this Order pending a final hearing on the Motion (the "**Final Hearing**") at which time the Debtors will seek entry of a Final Order approving  post-petition financing as follows:

(i)    upon the entry of this Order, up to $2,500,000 for the calendar week ending July 10, 2015, and continuing thereafter until a "Termination Event," as defined herein, pursuant to and in accordance with the Commitment Letter; and

(ii)    upon the entry of the Final Order, up to an additional amount of $3,500,000, for a maximum amount of $6,000,000 for the calendar week ending July 24, 2015, and continuing thereafter until a "Termination Event," as defined herein;

(iii)    to schedule the Final Hearing; and

(iv)    such other and further relief as the Court deems necessary, appropriate, equitable, proper, and consistent with the terms of this Order and the Motion;

24645439 v1

Upon the record presented at the Interim Hearing and after due deliberation, for good and sufficient cause appearing therefore:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**

A.      On February 11, 2015 (the "**Petition Date**"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330, *et seq.* (the "**Bankruptcy Code**").  The Debtors are continuing in possession of their property and operating and managing their business, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.      On February 23, 2015, the United States Trustee appointed an Official Committee of Unsecured Creditors [Dkt. No. 158] (the "**Committee**") to represent the interests of unsecured creditors of the Debtors.

C.      All findings of fact and conclusions of law set forth in this Order shall be of an interim nature, provided that such findings and conclusions shall be effective and binding to the extent of moneys used, advanced or lent pursuant to this Order.

D.      The Debtors, as borrowers, are indebted to FC Special Funding, LLC, as assignee of JP Morgan Chase Bank, N.A., individually and in its role as agent (the "**Senior Lender**") under a "**Credit Agreement**" dated November 14, 2012 (the "**Working Capital Loan Credit Agreement**") that provides a revolving line of credit up to a maximum amount of $40 million (the "**Working Capital Loan**"), which loan provides working capital for the Operating Debtor's business operations.  The Senior Lender's sole participant in the Working Capital Loan is Jackson Investment Group, LLC ("**JIG**").  Mr. Richard L. Jackson is the CEO of JIG.

E.      As collateral security for the Working Capital Loan, the Senior Lender has a properly perfected first-priority security interest and lien in and to the Debtors' accounts receivable, inventory, cash, deposit accounts, securities accounts, prepaid expenses, instruments,

24645439 v1

documents, chattel paper and supporting obligations, all books and records, including customer lists and databases, related to the foregoing, and all proceeds of the foregoing (the "**Working Capital Collateral**"), which includes without limitation, all rents, profits, and proceeds derived therefrom which constitute cash collateral within the meaning of Sections 363(a) and 363(c)(2) of the Bankruptcy Code (the "**Cash Collateral**,").

F.       In addition to possessing a first-priority security interest in the Working Capital Collateral, Senior Lender acquired from Credit Suisse AG, Cayman Islands Branch, individually and in its role as administrative agent and collateral agent (the "**Term Loan Agent**") for Credit Suisse Loan Funding, LLC, Medley Capital Corporation, Congruent Credit Opportunities Fund II, LP, and Main Street Mezzanine Fund, LP (collectively, the "**Term Loan Lenders**") a first-priority security position in the Debtors' copyrights, domain names, patents, trademarks and licenses, equipment, fixtures, general intangibles, goods, investment property, pledged collateral, letter-of-credit rights and supporting obligations, commercial tort claims, and all books and records related to the foregoing, and all proceeds of the foregoing (the "**Term Loan Collateral**," together with the Cash Collateral and Working Capital Collateral, the "**Senior Lender Pre-petition Collateral**") with the purchase of the Term Loan Lenders' secured claim that arose as part of a Term Loan transaction dated November 14, 2012 (the "**Term Loan**") in which the Term Loan Lenders made a loan to Debtors in the amount of $38 million pursuant to the terms set forth in a certain Term Loan Credit Agreement (the "**Term Loan Credit Agreement**," together with the Working Capital Credit Agreement, the "**Pre-petition Credit Agreements**").

G.       The Term Loan Lenders possessed a properly perfected first-priority security interest in the Term Loan Collateral and subsequently assigned their respective interests to the Senior Lender pursuant to, among other things, multiple Assignment and Acceptance Agreements between the Term Loan Lenders and Senior Lender dated July 1, 2015.  Senior

4

Lender further documented the transfer of the Term Loan Lenders' claim with the filing of its Transfer of Claim Other Than for Security [Dkt. No. 952] ("**Claim Transfer**") on July 1, 2015. Senior Lender possesses a properly perfected first-priority security interest and lien in and to all of the Senior Lender Pre-petition Collateral, subject in all respects to the Committee's rights to challenge the Senior Lender's claims, liens, and interests, all as more fully set forth in the Final Cash Collateral Order.

H.    As of the Petition Date, the Debtors have acknowledged and stipulated in the Final Cash Collateral Order that the principal amount of the indebtedness owed by Debtors under the Loan Documents to the Senior Lender is approximately $23,500,000 and to the Term Loan Lenders is approximately $34,200,000, which amounts are exclusive of interest, costs, attorneys' fees, and other amounts chargeable to the Debtors under the Loan Documents.

I.    The funds used by the Debtors to operate their business, including cash on hand, collections from accounts receivable and the sale of inventory, and other revenues derived from the Collateral constitute "**Cash Collateral**" within the meaning of Sections 363(a) and 363(c)(2) of the Bankruptcy Code.

J.    Pursuant to the Final Cash Collateral Order, the Debtors previously received authority to use Cash Collateral to meet the ordinary operating expenses of their business, minimize the disruption of the Debtors as a "going concern," and avoid irreparable harm to the Debtors.

K.    The Debtors are no longer able to sustain business operations solely from Cash Collateral and require additional liquidity to finance their current operations.

L.    The authority granted herein to obtain post-petition debtor-in-possession financing and funds pursuant to the DIP Credit Facility is critical to avoid immediate and irreparable harm to the Debtors and their assets, business and business relationships.  The entry

5

of this Order is in the best interests of the Debtors' estates and their creditors as its implementation will, among other things, provide working capital necessary to sustain the operation of the Debtors' existing business and avoid an immediate liquidation, as well as to preserve the going-concern value of the Debtors' assets pending such further disposition as may be appropriate.

M.    The Debtors are presently unable to obtain, in the ordinary course of their business or otherwise, unsecured credit allowable under sections 364(a) or 364(b) of the Bankruptcy Code, or secured credit pursuant to sections 364(c) or 364(d) of the Code, except from the DIP Lender on the terms and conditions contained in this Order.  The DIP Lender has indicated a willingness to provide the Debtors with certain loans as contemplated herein, but solely on the terms and conditions set forth in this Order.  After considering all of the alternatives, the Debtors have concluded, in the exercise of their best and reasonable business judgment, that the interim financing to be provided by the DIP Lender under the terms of this Order represents the best working capital financing available to the Debtors under the circumstances.

N.    Based on the Motion and the record of the Interim Hearing, the terms of the interim post-petition financing authorized hereby are fair and reasonable under the circumstances involved in this case, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

O.    Based on the Motion and the record of the Interim Hearing, good cause has been shown for the entry of this Order, and the Court concludes that entry of this Order is in the best interests of the Debtors, their estates and creditors.  Among other things, entry of this Order will, pending such disposition of the Debtors' assets as may be determined to be appropriate, minimize disruption of the Debtors' business and operations and permit the Debtors to meet

6

payroll and other operating expenses, obtain needed supplies, and retain customer and supplier confidence by demonstrating an ability to maintain normal operations.   The financing arrangement authorized hereunder is vital to the Debtors' estates and operations.  Consummation of such financing therefore is in the best interests of the Debtors' estates.

P.      Based on the Motion and the record of the Interim Hearing, the Court finds that the DIP Lender and the Debtors have negotiated the terms and conditions of this Order in good faith and at arm's length, and any credit extended by the DIP Lender on or after the date of entry of this Order pursuant to the terms herein, shall be and hereby is, deemed to have been extended in "good faith" for purposes of section 364(e) of the Bankruptcy Code.

Q.      All of the Post-Petition Obligations (as defined below) incurred and transfers made pursuant to this Order are made for "fair consideration" and "reasonably equivalent value," as such terms are used in section 548 of the Bankruptcy Code or any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law.

R.      The Debtors have provided adequate and sufficient notice of the Interim Hearing and the relief requested in the Motion by providing notice to (a) the DIP Lender and its counsel; (b) the Senior Lender and its counsel; (c) the Committee and its counsel; (d) the United States Trustee; (e) counsel for the Ad Hoc Consortium (defined herein); and (f) any parties that filed notices of appearance or requests for notice.  Such notice is appropriate, adequate and proper under the circumstances involved in this case, and it complies with the requirements of sections 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001(c).

**BASED ON THE FOREGOING, IT IS HEREBY ADJUDGED, ORDERED AND DECREED:**

24645439 v1

1.      The Motion for interim approval shall be, and hereby is, approved, subject to the terms and conditions set forth in this Order.  Any objections that have not previously been withdrawn are hereby overruled.  This Order shall become effective immediately upon its entry.

2.      Without limiting the foregoing, subject to the terms of (a) this Order, (b) the Commitment Letter, and (c) the Final Cash Collateral Order, the terms of which shall remain in full force and effect other than as set forth in Paragraph 2A below, the Debtors are immediately authorized to borrow money constituting the DIP Credit Facility under and pursuant to the terms of this Order and the Commitment Letter, on an interim basis, and to continue using Cash Collateral.

2.A.    The Cash Collateral Order shall be amended by this Order as follows:

a.      The second sentence of subparagraph "a" of Paragraph 3 of the Final Cash Collateral Order is hereby modified and replaced with the following:

> The Post-Petition Lien shall be subject and junior in priority to: (i) the DIP Liens, (ii) any non-avoidable, perfected pre-petition liens in the Collateral of any other party that are superior in priority to the pre-petition liens of the Secured Lenders in such Collateral, (iii) any pre-petition liens of the Secured Lenders against the Collateral that are subsequently avoided and preserved for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551, (iv) the allowed fees and expenses of Debtors' professional and Committee's professionals as provided for in the budget or any prior Budgets under the Interim Orders, and (v) the Carve-out. [3]

b.      Subparagraph "c" of Paragraph 3 of the Final Cash Collateral Order is hereby deleted in its entirety and replaced with the following:

> In addition to the liens and security interests granted to the Secured Lenders herein, the Senior Lender shall be entitled to an administrative priority claim under Section 507(b) of the Bankruptcy Code (the "**Superpriority Claim**"), which provides that such claim "shall have priority over every other claim

---

[3] All references made to the Secured Lenders in the Final Cash Collateral Order reference the Term Loan Lenders and Senior Lender.  Based on the Claim Transfer and related documents, the Senior Lender assumes the Term Loan Lenders' position.

allowable under such subsection," including all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 364(c), 503(b), 506(c), 507(a), or 726 of the Bankruptcy Code and shall at all times be senior to the rights of the Debtors and any creditors, or claimants in this proceeding or any subsequent proceeding under the Bankruptcy Code, with the exception of the DIP Liens (as defined in the DIP Orders), the allowed fees and expenses of Debtors' professional and Committee's professionals as provided for in the budget or any prior Budgets under the Interim Orders, and the Carve-out.

c.    The Challenge Period set forth in Paragraph 15 of the Final Cash Collateral Order is hereby modified to reflect that any Challenge must be made on or before the next business day following the Final Hearing on the Motion or such later date as may be agreed upon by the Committee and the Senior Lender.  This Order incorporates the Final Cash Collateral Order's findings of fact and conclusions of law with respect to Debtors' stipulation to the liens and claims of the Secured Lenders and the Committee's challenge rights with respect to these stipulations.

d.    Sub-paragraph "e" and "f" of Paragraph 21 of the Final Cash Collateral Order are hereby deleted in their entirety and replaced with the following:

> (e) the failure to close the proposed sale to FCS Acquisition, LLC pursuant to a confirmed plan of reorganization; or (f) August 15, 2015.

e.    The second sentence of sub-paragraph "a" of Paragraph 26 of the Final Cash Collateral Order is hereby deleted in its entirety and replaced with the following sentence:

> S&S has consented to the Operating Debtor's use of the proceeds from the sale of such goods, subject to the Operating Debtor holding a mutually agreed portion of the cost that the Operating Debtor would otherwise be required to pay S&S in connection with such sale under the S&S Consignment Agreement, which such portion shall be held by the Operating Debtor and shall not be used or otherwise distributed pending the agreement of S&S and the Operating Debtor or the entry of an order or judgment of the Court governing the disposition of such proceeds.

24645439 v1

f.     The second sentence of sub-paragraph "b" of Paragraph 26 of the Final

Cash Collateral Order is hereby deleted in its entirety and replaced with the following sentence:

> BBH has consented to the Operating Debtor's use of the proceeds from the sale of such goods, subject to the Operating Debtor holding a mutually agreed portion of the cost that the Operating Debtor would otherwise be required to pay BBH in connection with such sale under the BBH Consignment Agreement, which such portion shall be held by the Operating Debtor and shall not be used or otherwise distributed pending the agreement of BBH and the Operating Debtor or the entry of an order or judgment of the Court governing the disposition of such proceeds.

g.     Sub-paragraph "c" of Paragraph 26 of the Final Cash Collateral Order  is

hereby deleted in its entirety and replaced with the following:

> **c.     Other Consignment Vendors**.  In addition to S&S and BBH, the Operating Debtor has entered into Consignment Agreements with (i) United Methodist Publishing House, Inc. d/b/a Abington Press, AMG Publishers, Inc., Barbour Publishing, Inc., Bardin & Marsee Publishing, Cactus Game Design, Inc., Capitol Christian Music Group, Inc., Catholic Book Publishing, Charisma Media, Christian Art Gifts, Christian Brands, Crown Entertainment, Inc., f/k/a Precision Media Group, David C Cook Communications, Inc., Dayspring Cards, Inc., Development Solutions Global Inc., Discovery House Publishers, Eagles Wings, Inc., Foundation Publications, GoBible, LLC, Harrison House, LLC, Hendrickson Publishers, LLC, Intervarsity Christian Fellowship USA d/b/a Intervarsity Press, Kerusso Activewear Inc., Kingstone Media Group, Inc. a/k/a Kingstone Comics, Kregel, Inc., d/b/a Kregel Publications, My Healthy Church, LLC, Destiny Image, Inc. d/k/a Nori Media Group, Pure Flix Entertainment, LLC, Questar, Inc., Rose Publishing, Inc., Talicor, Inc., The Wee Believers Toy Company f/k/a Troparian Corporation, Universal Designs, Inc., Vision Video, Inc., Wesscott Marketing, Inc., and Word Entertainment, LLC (together with S&S and BBH, the "**Ad Hoc Consortium**"); (ii) Provident; (iii) Bridgestone; and (iv) Swanson Christian Products, Dayspring Cards, Inc., Anchor Distributors (Whitaker Corporation), Angel Star Inspired Products, Inc., Brownlow Gifts, Daywind, Dexsa Company, and Send the Light Distribution, LLC.  The Ad Hoc Consortium have consented to the Operating Debtor's use of the proceeds from the sale of their respective consigned goods, subject to the Operating Debtor holding a mutually agreed portion of the cost that the Operating Debtor would otherwise be required to pay the Ad Hoc Consortium in connection with such sales under the applicable Consignment Agreements, which such portion shall be held by the Operating Debtor and shall not be used or otherwise distributed pending the agreement of the Ad Hoc Consortium and the Operating Debtor or the

10

entry of an order or judgment of the Court governing the disposition of such proceeds.  With respect to the remaining plaintiffs in the Adversary Proceeding (the "**Intervening Plaintiffs**"), unless the parties otherwise agree, the Operating Debtor may use only that portion of the proceeds from the sale of the Intervening Plaintiffs' consigned goods that is greater than the cost the Operating Debtor is required to pay the respective Intervening Plaintiffs in connection with such sale under the applicable Consignment Agreement, which cost shall be held by the Operating Debtor and shall not be used or otherwise distributed pending the agreement of the applicable Intervening Plaintiff and the Operating Debtor or the entry of an order or judgment of the Court governing the disposition of such proceeds.  Notwithstanding the foregoing, nothing contained herein shall prejudice any party in interest from challenging the purported consignment relationship of any member of the Ad Hoc Consortium or any Intervening Plaintiff (each a "**Plaintiff**" and together the "**Plaintiffs**") with the Debtors or each Plaintiff's claim that it possesses a first-priority security interest in the respective Consigned Inventory and the proceeds thereof.

       h.      Paragraph 27 of the Final Cash Collateral Order is deleted in its entirety.

       i.      Exhibit A to the Final Cash Collateral Order, which contains the Approved Budget (as defined therein), is hereby amended to delete the existing Exhibit A therefrom and to insert in place thereof Exhibit B attached hereto, which contains the replacement and operative Approved Budget (as defined herein).

       3.      The funding of the DIP Credit Facility shall be made to the "**DIP Bank Accounts**" (as such term is defined in paragraph 12 of the Final Cash Collateral Order) and will occur following the entry of the this Order.  Debtors shall be authorized to request and receive disbursements from the DIP Bank Accounts for the purpose of satisfying expenses set forth in the Approved Budget as follows: (a) upon entry of this Order, up to $2,500,000 for the calendar week ending July 10, 2015 and continuing thereafter until a "Termination Event" as defined herein; and (b) upon entry of the Final Order, up to an additional amount of $3,500,000 for a maximum amount of $6,000,000 for the calendar week ending July 24, 2015 and continuing thereafter until a "Termination Event" as defined herein.  Notwithstanding the foregoing, the

Debtors' authority to request and receive disbursements from the DIP Bank Accounts or use Cash Collateral shall immediately cease upon the earliest occurrence of any "Termination Event," as defined herein.

4.      Subject to the terms and conditions contained in this Order, the Debtors may use the DIP Credit Facility to fund the post-petition purchases of inventory from vendors of the Debtors on terms similar to those applicable under the Working Capital Loan Credit Agreement (including cash in advance or cash on delivery terms requested by such vendors) and for other operating expenses and general corporate purposes of the Debtors incurred in the ordinary course of business, payment of amounts due to the DIP Lender, certain other costs and expenses of the administration of this case (including fees of professionals), and fees and expenses in connection with the sale of the assets of the Debtors; *provided*, that the proceeds shall be used strictly in accordance with, and in amounts for each line item in the Approved Budget (as hereinafter defined) that shall not exceed the allotted thresholds set forth in the Final Cash Collateral Order that is specified for each such line item and the aggregate total expenditures during any calendar month.  "**Approved Budget**" shall mean the budget attached hereto as <u>Exhibit B</u>, as such budget may be updated, amended or revised each week with the prior written agreement of the DIP Lender, in its sole discretion.

5.      All loans made to the Debtors on or after the date of entry of this Order pursuant to the DIP Credit Facility and interest thereon, and all fees, costs, expenses, indebtedness, obligations and other liabilities arising or incurred on or after the date of the entry of this Order and owing by the Debtors to the DIP Lender under this Order shall hereinafter be referred to as the "**Post-Petition Obligations**."  Post-Petition Obligations shall: (a)  bear interest at the rate of four and one-half percent (4.5%) per annum, which interest shall be payable monthly; (b) upon default, bear interest at a rate that is equal to six and one-half percent (6.5%) per annum; (c) be

12

secured in the manner specified in this Order; (d) be payable and applied in accordance with the terms of this Order; and (e) comply with and otherwise be governed by the terms set forth in this Order.

6.      A closing fee in connection with the DIP Credit Facility of $10,000 shall be paid in cash by the Debtors to the DIP Lender on the date this Order is entered by the Bankruptcy Court.

7.      A monitoring fee in connection with the DIP Credit Facility of $2,500 shall be paid in cash by the Debtors to the DIP Lender on the date this Order is entered by the Bankruptcy Court.  In the event of a default under the DIP Credit Facility, the monitoring fee described in this Order shall be increased to $7,500 and shall be immediately due and payable.

8.      Debtors shall be responsible for paying on a monthly basis an unused DIP Credit Facility fee equal to one-half percent (0.5%) per annum on the average unused daily balance of the DIP Credit Facility.

9.      The maturity date of the DIP Credit Facility shall be the earliest of (a) August 15, 2015, or (b) the closing date of the proposed sale to FCS Acquisition, LLC pursuant to a confirmed plan of reorganization.  All amounts outstanding under the DIP Credit Facility shall be due and payable in full at Maturity.  The occurrence of any one or more of the Termination Events, as provided in the Final Cash Collateral Order (modified herein) shall constitute a "**Termination Event**" under this Order.  For avoidance of doubt, to the extent the Collateral (as defined in Paragraph 12 in this Order) is liquidated for any reason, DIP Lender will apply the proceeds from the sale of the Collateral to the outstanding indebtedness associated with the DIP Credit Facility by first utilizing the proceeds from the sale of the Senior Lender Pre-petition Collateral, and then the proceeds of the Unencumbered Assets (as defined in Paragraph 12 in this Order), assuming any remaining outstanding indebtedness under the DIP Credit Facility exists.

13

10.     All collections and other proceeds of collateral will be deposited directly into the DIP Bank Accounts.  Debtors shall comply in all respects with the *Order (A) Authorizing Debtors to Maintain Their Existing Bank Accounts, Business Forms and Existing Cash Management Systems* that was entered by the Court on February 19, 2015 [Dkt. No. 112].

11.     [Intentionally Omitted.]

12.     Subject to the Carve-out (as hereinafter defined), all loans and all other obligations under the DIP Credit Facility will be (a) entitled to superpriority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code that is senior to any superpriority claim granted as adequate protection in respect of the Senior Lender and any other claims of any entity, including, without limitation, any claims under Sections 503, 507, 1113, and 1114 of the Bankruptcy Code, (b) secured by a first-priority perfected security interest in and first-priority priming lien on the Senior Lender Pre-petition Collateral pursuant to Section 364(d) of the Bankruptcy Code, (c) secured by a first-priority security interest pursuant to Sections 364(c)(2) of the Bankruptcy Code in all of Debtors' unencumbered assets, including all real and personal property, whether now owned or hereafter acquired, but excluding claims, causes of action, and recoveries arising under Chapter 5 of the Bankruptcy Code ("**Unencumbered Assets**," together with Senior Lender Pre-petition Collateral, the "**Collateral**"), and (d) secured by a perfected junior lien on any specific property of Debtors that is subject to valid, perfected and non-avoidable liens, except for those liens arising under the Pre-petition Credit Agreements, pursuant to Section 364(c)(3) of the Bankruptcy Code (collectively, the "**DIP Liens**").  The security interest will not be subject to Section 551 of the Bankruptcy Code.  The Collateral will not be charged pursuant to Section 506(c) or any other provision of the Bankruptcy Code.

13.     Notwithstanding anything to the contrary in this Order or any financing agreements or documents, (a) with respect to the Debtors' non-residential real property leases

14

that are not presently encumbered by valid liens or security interests of the DIP Lender, no liens or encumbrances shall be granted on or extend to such unencumbered real property leases themselves, but rather, any liens granted shall extend only to the proceeds of such real property leases to the same extent, if any, that the DIP Lender's liens would have extended to such proceeds prior to the Petition Date; and (b) upon a Termination Event, the DIP Lender, or its agents or representatives, may enter onto the leased premises to access and/or liquidate any pre-petition or post-petition collateral; provided, however, that such entry shall be limited to (1) any such rights agreed to in writing by the applicable landlord prior to entry onto the leased premises, (2) any rights that the DIP Lender, or its agents or representatives, have under applicable non-bankruptcy law, or (3) such rights as may be granted by the Court on a separate motion with notice to the applicable landlords of the leased premises and an opportunity for such landlords to respond and be heard.

14.    The term "**Carve-out**" shall refer to the Carve-out set forth in the Final Cash Collateral Order and defined therein and shall not exceed the thresholds set forth in the Final Cash Collateral Order.  DIP Lender will expressly retain the right to object to any professional fees and expenses in this case.  In connection with Paragraph 14 of the Final Cash Collateral Order, none of the (a) Carve-out, or (b) pre-petition or post-petition collateral proceeds or (c) proceeds of loans under the DIP Credit Facility may be used to object to or challenge in any way any claims, liens or Cash Collateral held by or on behalf of the Senior Lender, or to assert any claims or causes of action against the Senior Lender, Working Capital Loan, Term Loan or the DIP Lender.

15.    The liens and security interests granted herein for the benefit of the DIP Lender, on account of the DIP Credit Facility, are and shall be valid, perfected, enforceable, nonavoidable and effective by operation of law as of the date of this Order without any further

24645439 v1

action by the Debtors or the DIP Lender and without the execution, filing, or recordation of any financing statements, security agreements, mortgages, or other documents.  If the DIP Lender hereafter requests the Debtors and/or their subsidiaries to execute and deliver to the DIP Lender financing statements, security agreements, collateral assignments, mortgages, or other instruments or documents considered by the DIP Lender to be reasonably necessary or desirable to further evidence the perfection of the liens and security interests granted in this Order, the Debtors are hereby authorized and directed to execute and deliver all such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Lender is hereby authorized to file or record, in its sole discretion, such documents; provided that all such documents shall be deemed to have been filed or recorded as of the date of this Order.

16.     The obligation to provide the initial extension of credit under the DIP Credit Facility shall be subject to the satisfaction of conditions, including, without limitation, the following:

(a)     The Bankruptcy Court shall have entered this Order;

(b)     There shall have occurred no material adverse change in (i) the business, condition, operations, assets or prospects of the Debtors since June 8, 2015 (ii)  the business, condition, operations, assets or prospects of Debtors taken as a whole since June 8, 2015, (iii) the ability of the Debtors to perform their respective obligations under the Loan Documents, or (iv) the ability of the DIP Lender to enforce the Loan Documents and the obligations of the Debtors thereunder; and

(c)     Receipt by the DIP Lender of all fees and expenses payable in connection with the transactions contemplated hereby.

17.     The written consent of the DIP Lender and the Debtors shall be required for amendments and waivers with respect to the DIP Credit Facility, including (1) increase in the

16

24645439 v1

DIP Lender's commitment; (2) decreases in interest rates or fees; (3) changes in final maturity; (4) releases of any substantial portions of the Collateral (other than permitted asset sales and use of Cash Collateral). For the purposes of this Order, the Parties agree that the Committee will serve as a consultation party in connection with any amendment or waiver with respect to the DIP Credit Facility, provided however, the Committee shall not have the authority to amend or waive any conditions with respect to the DIP Credit Facility. Notwithstanding the foregoing, the Committee shall reserve its rights to object to any amendment or waiver with respect to the DIP Credit Facility.

18.     The Debtors agree to indemnify and hold the DIP Lender and its respective successors, assignees and current and former shareholders, directors, agents, advisers, officers, attorneys, employees, agents, subsidiaries and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether known or unknown, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the DIP Credit Facility, the term sheet, the transactions contemplated hereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether known or unknown, whether or not any of such indemnified persons is a party thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party. In all such litigation, or the preparation therefor, the DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of such counsel.

19.     Upon reasonable notice, the Debtors shall provide the DIP Lender and its respective consultants, accountants, agents, representatives, employees, or attorneys access to: (a) all of the Debtors' books and records for the purpose of examining, inspecting, copying, and

24645439 v1

making extracts therefrom; (b) all of the Collateral for the purpose of inspecting same; (c) the Debtors' business premises for purposes of determining whether the Debtors are in compliance with the terms of this Order; and (d) the information contained in the Debtors' books and records related to their business operations.  The Debtors shall cooperate, consult with, and provide to such consultants, accountants, agents, representatives, employees, or attorneys all such information as they may reasonably request for the purposes of determining or verifying compliance by the Debtors with the terms of this Order, examining and verifying the Debtors' financial reports or condition; and auditing or reviewing the Debtors' business operations or appraising and evaluating the Debtors' assets.

20.    Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter modified, vacated or stayed:  (a) such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability, security interest or lien granted or incurred by the Debtors to or for the benefit of the DIP Lender on or after the date of this Order and prior to the effective date of such stay, modification or vacation, or the validity and enforceability of any security interest, lien, priority or right authorized or created hereby; and (b) any indebtedness, obligation or liability incurred by the Debtors to the DIP Lender on or after the date of this Order and prior to the effective date of such stay, modification or vacation shall be governed in all respects by the provisions of this Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits, including the priority, security interests and liens granted herein, with respect to any such indebtedness, obligation or liability.

21.    The provisions of this Order shall be immediately and fully effective upon entry by the Court and any actions taken pursuant hereto shall survive entry of, and shall take precedence with respect to any conflicting order (a) which may be entered confirming any plan of reorganization or (b) which may be entered dismissing this case or converting this case under

18

chapter 7 of the Bankruptcy Code.  As provided by this Order, the priority of the liens and security interests granted to the DIP Lender and all rights of the DIP Lender and all obligations of the Debtors, shall continue after appointment of any chapter 11 trustee or a trustee in any superseding chapter 7 case under the Bankruptcy Code, and such claims, liens, security interests and rights shall maintain their priority until satisfied and discharged in accordance with the terms of this Order.

22.     The Automatic Stay is hereby modified to the extent necessary to permit all acts, actions and transfers, relating to perfection of interests contemplated herein.  During the term of the use of DIP Credit Facility contemplated by this Order, the DIP Lender may file a motion seeking to lift the automatic stay.

23.     The provisions of this Order shall be binding upon and inure to the benefit of the DIP Lender, on account of the DIP Credit Facility, and the Debtors and their respective successors and assigns (including, without limitation, any chapter 7 or 11 trustee or other fiduciary hereafter appointed for or on behalf of the Debtors or with respect to any of the Debtors' property).  Upon the entry of this Order: (a) the Post-Petition Obligations shall constitute allowed claims in accordance with Section 506(a) of the Bankruptcy Code for all purposes in this case and any subsequent chapter 7 cases, (b) the DIP Lender's liens and security interests in the Collateral, on account of the DIP Credit Facility, shall be deemed to be valid, legal, binding, perfected, not subject to avoidance or subordination (subject only to the Carve-out), and not subject to any other further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto such as a chapter 11 or chapter 7 trustee, and (c) any past or present causes of action, claims, or liabilities arising out of or in connection with the DIP Credit Facility, this Order, the Final Order, or

19

transactions in connection with the implementation of the DIP Credit Facility shall be deemed to have been waived and released.

24.    The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that it may have under this Order or otherwise.   In addition, the rights, claims, liens, security interests and priorities of the DIP Lender arising under this Order are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by the Debtors to the Senior Lender under the Final Cash Collateral Order or Pre-petition Credit Agreements and related loan documents.

25.    In addition, to the extent any of the terms and conditions of any necessary loan documents are in conflict with the terms and conditions of this Order, the provisions and intent of this Order shall control.  The Debtors and DIP Lender are hereby authorized to agree upon and enter into any written amendments or modifications to the Approved Budget without further order of this Court.  Notwithstanding any other provision of this Order, the DIP Lender shall not have any obligations or commitments to extend any advances under the DIP Credit Facility pursuant to this Order until the conditions precedent provided for herein have been satisfied.  For the purposes of this Order, the Parties agree that the Committee will serve as a consultation party in connection with any amendment or modification to the Approved Budget, provided however, the Committee shall not have the authority to amend or modify the Approved Budget. Notwithstanding the foregoing, the Committee shall reserve its rights to object to any amendment or modification to the Approved Budget.

26.    Within three (3) business days after the entry of this Order, the Debtors shall, by written notice, by United States mail, send a copy of this Order to the following parties: (a) counsel for the DIP Lender; (b) counsel for the Senior Lender; (c) counsel for the Committee; (d)

20

the United States Trustee; (e) counsel for the Ad Hoc Consortium; and (f) all parties who have filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002.

27.     **NOTICE IS HEREBY GIVEN that a FINAL hearing in respect of the Motion is scheduled for July 28, 2015, at 1:00 p.m.** (the "**Final Hearing**").  Any creditor or other party in interest who objects to the entry of a further order in respect to the Motion, or who objects to the terms and provisions of this Order, shall file and serve, by no later than three (3) business days before the Final Hearing, a written indication of same containing a showing of good cause therefor, upon (a) counsel for Debtors, (b) counsel for the DIP Lender, (c) counsel for the Senior Lender, (d) counsel for the Committee, (e) the Office of the United States Trustee, and (f) counsel for the Ad Hoc Consortium.

**END OF ORDER**

*Order prepared and submitted by:*

A. Todd Almassian (P55467)
Greg J. Ekdahl (P67768)
Keller & Almassian, PLC
230 East Fulton Street
Grand Rapids, MI 49503
(616) 364-2100
ecf@kalawgr.com

− and –

Erich Durlacher (Ga Bar No. 235563)
Brad Baldwin (Ga Bar No. 034220)
Burr & Forman LLP
171 17th Street, N.W. – Suite 1100
Atlanta, Georgia 30363
Telephone:  (404) 815-3000
edurlacher@burr.com
bbaldwin@burr.com
***Attorneys to the Debtors***

**Signed: July 10, 2015**





John T. Gregg
United States Bankruptcy Judge