# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:                                          **CHAPTER 11**

**FAMILY CHRISTIAN, LLC** *et al.* [1]          **CASE NO. 15-00643-jtg**
                                                **(Joint Administration)**

                    **Debtors.**

_____/        **HON. JOHN T. GREGG**

---

## DISCLOSURE STATEMENT FOR DEBTORS'
## ~~FIRST~~THIRD AMENDED JOINT PLAN OF LIQUIDATION

---

KELLER & ALMASSIAN, PLC
A. Todd Almassian (P55467)
Greg J. Ekdahl (P67768)
230 East Fulton
Grand Rapids, MI 49503
(616)364-2100

- and -

BURR & FORMAN LLP
Erich Durlacher (Ga Bar No. 235563)
Brad Baldwin (Ga Bar No. 034220)
171 17th Street, N.W. - Suite 1100
Atlanta, Georgia 30363
(404) 815-3000
*Attorneys for the Debtors*

---

[1]   The Debtors are: Family Christian, LLC(Case No. 15-00643-jtg), Family Christian Holding, LLC (Case No. 15-00642-jtg), and FCS Giftco, LLC (Case No. 15-00644-jtg).

**THIS PROPOSED DISCLOSURE STATEMENT <u>HAS BEEN APPROVED ON A PRELIMINARY BASIS</u> BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. <u>ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED TO BE AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A FINAL APPROVAL OF THE DISCLOSURE STATEMENT.</u>  THE BANKRUPTCY COURT'S PRELIMINARY APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN AND DOES NOT CONSTITUTE AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS SOLELY FOR THE BENEFIT OF THEIR CREDITORS AND EQUITY INTEREST HOLDERS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE DEBTORS' PLAN.

GREAT EFFORT HAS BEEN MADE TO PROVIDE INFORMATION AS ACCURATE AND COMPLETE AS POSSIBLE UNDER THE CIRCUMSTANCES, BUT THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, PARTICULARLY SINCE CERTAIN OF THE STATEMENTS CONTAINED IN THIS  DISCLOSURE STATEMENT ARE FORWARD LOOKING FORECASTS AND ARE BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ABSOLUTE GUARANTEE OR COMPLETE ASSURANCE THAT SUCH STATEMENTS WILL REFLECT THE ACTUAL OUTCOME.

THIS STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND CREDITORS AND INTEREST HOLDERS ARE URGED TO REVIEW THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL GOVERN AND CONTROL.

THE DEBTORS MAKE NO REPRESENTATIONS WITH RESPECT TO THE EFFECTS OF TAXATION (STATE OR FEDERAL) ON THE DEBTORS OR ON THE CREDITORS. CREDITORS ARE URGED TO SEEK THE ADVICE OF THEIR OWN PROFESSIONAL ADVISORS SHOULD THEY HAVE ANY QUESTIONS WITH RESPECT TO ANY TAXATION ISSUES.

TABLE OF CONTENTS

Page

ARTICLE I. INTRODUCTION ................................................................................................... 1

ARTICLE II. OVERVIEW OF THE PLAN ............................................................................... 2

    A.     General Structure of the Plan ..................................................................... 2
    B.     Summary Treatment of Claims and Interest .............................................. 2
ARTICLE III. PLAN VOTING INSTRUCTIONS AND PROCEDURES ................................. 5

    A.     Who Votes ................................................................................................... 5
    B.     Voting Procedures, Ballots, and Voting Deadline ..................................... 6
    C.     Deadline For Objections To Confirmation ................................................. 7
    D.     Confirmation Hearing ................................................................................. 7
ARTICLE IV. HISTORICAL INFORMATION ......................................................................... 8

    A.     Overview Of The Debtors' Business .......................................................... 8
    B.     2012 Acquisition Of The Debtors ........................................................... 10
    C.     2014 Assignment of Senior Lenders Revolving Line of Credit Loan ...... 11
    D.     Events Leading To Bankruptcy ................................................................ 12
    E.     Debtors' Officers and Directors ............................................................... 13
    F.     Debtors' Debt Structure ........................................................................... 13
ARTICLE V. CHAPTER 11 CASES ........................................................................................ 14

    A.     First Day Motions .................................................................................... 14
    B.     Cash Collateral ......................................................................................... 15
    C.     Creditors Committee ................................................................................ 15
    D.     Ad Hoc Consortium and the Consignment Lawsuit ................................. 16
    E.     Bar Date Orders ....................................................................................... 17
    F.     Business Operations During Chapter 11 .................................................. 17
    G.     Sale Process Events .................................................................................. 18
ARTICLE VI. DESCRIPTION OF THE PLAN ....................................................................... 21

    A.     General Information .................................................................................. 21
    B.     The Sale .................................................................................................... 21
    C.     Consolidation ........................................................................................... 25
    D.     Classification and Treatment of Claims ................................................... 26
    E.     Select Settlement Payments By The Buyer Pursuant To the Sale ............ 32
    F.     Disposition of Executory Contracts and Unexpired Leases ............... ~~32~~33
    G.     Means of Implementing The Plan ....................................................... ~~33~~34
    H.     Reorganized Capital Structure Of The Ongoing Business ....................... 34
    I.     Release of Claims ............................................................................... ~~34~~35
    J.     Plan Administrator .................................................................................... 35
    K.     Dissolution of the Creditors Committee ~~and~~ Release of the Committee ~~35~~ and Appointment of the Claims Oversight Committee ........................... 36
    L.     Retention of Jurisdiction ..................................................................... ~~35~~36

M.     Buyer Standing and Post-Closing Transfer of Assets .................................. ~~36~~37
N.     Conflicts in Documents ................................................................................. ~~36~~37
O.     Request for Immediate Effectiveness of Plan and Sale .............................. ~~36~~37
P.     Closing of the Bankruptcy Case .................................................................. ~~36~~37
ARTICLE VII. INFORMATION  REGARDING  RELEASED CLAIMS ................................. ~~37~~38

A.     Debtors' Analysis Of The Release of Preference Claims ............................ ~~37~~38
B.     Debtors' Analysis of The Release of Claims Against Officers and Directors ... ~~39~~40
C.     The Committee's Independent Investigation of The Released Claims ......... ~~39~~40
ARTICLE VIII. INFORMATION  REGARDING  CONSIGNMENT CLAIMS ....................... ~~42~~44

A.     General Background ...................................................................................... ~~43~~44
B.     Applicable Law to Consignments ................................................................ ~~43~~44
C.     The "Consignment Lawsuit" ....................................................................... ~~44~~46
D.     Summary of Debtors' Position and Application of Applicable Law ........... ~~45~~46
E.     Proposed Settlement of Consignment Lawsuit / Treatment of Claims ....... ~~46~~47
ARTICLE IX. PLAN CONFIRMATION REQUIREMENTS ........................................... ~~46~~47

A.     General Information About Confirmation .................................................... ~~46~~47
B.     Acceptance .................................................................................................... ~~47~~48
C.     Feasibility ..................................................................................................... ~~47~~48
D.     Best Interests Test ........................................................................................ ~~47~~48
E.     Cramdown Requirements .............................................................................. ~~48~~50
ARTICLE X. CERTAIN RISK FACTORS TO BE CONSIDERED ................................... ~~49~~51

A.     Risks of Non-Confirmation .......................................................................... ~~50~~51
B.     Risks Related to Projections ......................................................................... ~~50~~51
C.     Competitive Nature of the Retail Industry .................................................. ~~50~~51
ARTICLE XI. ALTERNATIVES TO CONFIRMATION OF THE PLAN ........................... ~~50~~51

A.     Liquidation Under Chapter 7 ....................................................................... ~~50~~52
B.     Alternative Plan of Reorganization ............................................................. ~~51~~52
ARTICLE XII. FEDERAL INCOME TAX ..................................................................... ~~51~~52

ARTICLE XIII. RECOMMENDATION ......................................................................... ~~51~~52

# ARTICLE I.
## INTRODUCTION

Family Christian, LLC and its debtor ~~affiliates~~Affiliates (the **Debtors**") submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to disclose adequate information to enable creditors and equity interest to make an informed decision in exercising their rights to accept or reject *Debtors' ~~First~~Third Amended Joint Plan of Liquidation* (the "**Plan**").

<u>Defined Terms and Attachments</u>:   Undefined, capitalized terms used herein have the same meanings given to them in the Plan.  Attached hereto are the following documents:

| | |
|---|---|
| Schedule 1 | List of Consignment Claims Scheduled by Debtors |
| Schedule 2 | Certified UCC Search |
| Schedule 3 | Liquidation Analysis |
| Schedule 4 | Preference Analysis |
| Schedule 5 | 5 year projections and Loan Commitment Letter to Buyer |
| Exhibit A | Plan |
| Exhibit B | Asset Purchase Agreement ("**APA**") |
| Exhibit C | Cure Cost Schedule and List of Executory Contracts and Unexpired Leases to be Assumed or Rejected |
| Exhibit D | Sale Order (proposed form) |
| Exhibit E | Bankruptcy Court's memorandum opinion denying Debtors' motion to sell their assets outside of a plan |
| Other enclosures | Ballot forms for voting on the Plan |

If a Ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtors' claims and balloting agent:

> Epiq Bankruptcy Solution, LLC
> Attn: Family Christian LLC ballot processing center
> 10300 SW Allen Blvd.
> Beaverton, OR 97005
> Email:  tabulation@epiqsystems.com  reference "Family Christian LLC"
> (646) 282-2400

1

## ARTICLE II.
## OVERVIEW OF THE PLAN

**A.      General Structure of the Plan**

The following is an overview of certain material terms of the Plan:

- The Plan will consummate a Sale of the Debtors' assets to Buyer.  The Sale will help implement the Plan and the treatment of various claims.

- The Buyer will continue the business operations of *Family Christian* stores and will retain most of the Debtors' employees;

- The Buyer plans to keep most store locations subject to further review of lease and store economics over the coming months, and paying "cure costs" estimated at approximately $700,000 - $800,000.

- The Buyer will assume the Senior Lender secured claim in full.

- The Buyer will assume $6 million of the Term Lender's secured claims.

- Allowed 503(b)(9) Claims (estimated at approximately $5,600,000) will be paid in full from the Sale (and the undisputed portion of such Claims shall be paid at the Closing regardless if such Claims have been Allowed as of the Closing);

- All other Allowed Administrative Expense Claims, such as post-petition taxes and accounts payable (estimated at approximately $8,500,000) will be paid in full from the Sale.

- Consignment Claims will elect between two treatment options: (1) consignors accepting the Plan will receive partial payment, or (2) consignors rejecting the Plan will retain their claims and the Debtors will either return their consignment goods to them and/or litigate over the parties' rights to the consignment goods, and if the Debtors prevail then the rejecting consignors will be treated as having an Unsecured Claim.

- Unsecured Claims (i) will receive pro rata distributions from a $100,000 payment from the Buyer, and (ii) will receive the Debtors' waiver of any bankruptcy preference claims against unsecured creditors.

- The estimated Administrative Expense claims include Buyer's payment of up to $150,000 for the wind down and dissolution of the Debtors' affairs.

2

### B.    Summary Treatment of Claims and Interest

In a chapter 11 plan, claims generally fall into two categories: claims that are "secured" (i.e., secured by liens upon collateral) and claims that are "unsecured" (i.e. no liens on collateral). Secured claims are classified separately. Unsecured claims are generally classified together, but with some exceptions. Certain unsecured claims are given "priority" over others under the Bankruptcy Code (such as employee wages), or the Bankruptcy Code specifies a particular treatment (such as taxes).

In brief overview, the table below summarizes the Plan's classification and treatment of claims. NOTE, THE ACTUAL AMOUNTS OF ALLOWED CLAIMS COULD BE MATERIALLY HIGHER OR LOWER THAN ESTIMATED AMOUNTS LISTED IN THE TABLE. THE DEBTORS HAVE NOT YET FULLY REVIEWED AND ANALYZED ALL PROOFS OF CLAIM FILED IN THE BANKRUPTCY CASES. Estimated claim amounts are based upon the Debtors' review of their books and records and of certain proofs of claim, and may include estimates of claims that are contingent, disputed, and/or unliquidated.

| UNCLASSIFIED CLAIMS | | |
|---|---|---|
| **Description** | **Summary of Treatment** | **Entitled to Vote** |
| Priority Taxes<br><br>Estimated Amount: $50,000 | Paid in full upon Effective Date or in deferred Cash payments<br><br>Estimated Recovery: 100% | No |
| Admin. Expense Claims for Unsecured Creditors' ~~$~~<u>Allowed</u> 503(b)(9) Claims<br><br>Estimated Amount: $5,600,000 | Paid in full.<br><br>Estimated Recovery: 100% | No |
| Other Admin. Expense Claims<br><br>Estimated Amount: $8,500,000 | Paid in full<br>Estimated Recovery: 100% | No |

| CLASSIFIED CLAIMS | | | |
|---|---|---|---|
| **Class** | **Description** | **Summary of Treatment** | **Entitled to Vote on Plan** |
| 1 | Priority Non-Tax Claims | • <u>Unimpaired</u>:  paid in full<br>• Class consists of priority unsecured claims for wages / benefit plans etc. | No |

3

| | | | |
|---|---|---|---|
| | Estimated Amount: $0 | • Estimated recovery: 100% | |
| 2 | Senior Lender Secured Claim<br><br>Estimated Amount: $23,500,000 | • <u>Impaired</u>: Claim will be assumed and satisfied by Buyer.<br>• Estimated recovery: 100% over time | Yes |
| 3 | Term Lender Secured Claim<br><br>Estimated Amount: $34,200,000 | • <u>Impaired</u>: $6,000,000 of Claim will be assumed at Closing of the Sale; for Plan purposes only, balance of Claim treated as a $28,200,000 Unsecured Claim for Voting and Unsecured Claim distribution rights waived<br><br>• Estimated recovery: 17.5% | Yes |
| 4 | Consignment Claims<br><br>Estimated Amount: $27,600,000 | • <u>Impaired</u>: Class consists of Claims relating to Consignment Goods delivered to Debtors<br>• *Accepting Consignors*: receives either of two partial payment options:<br>    *Treatment Option 1* - payment of <u>Allowed</u> 503(b)(9) claim plus 10% of book value of Consignment Goods sold after June 15, 2015, or<br><br>    *Treatment Option 2* - payment of 35% of book value of Consignment Goods sold after June 15, 2015.<br><br>• *Rejecting Consignors*: Claim Holders retain their rights and claims. Debtors will either (a) return Consignment Goods and/or (b) litigate parties' disputed rights in Consignment Goods and, if Debtors prevail, the Consignors will receive treatment for Unsecured Claims.<br><br>• Estimated recovery: 14.5% for Accepting Consignors; uncertain for Rejecting Consignors. | Yes |
| 5 | Secured Tax Claims<br><br>Estimated Amount: | • <u>Unimpaired</u>: Claimants receive (i) Cash equal to the full amount of the Allowed Secured Claim, (ii) the return of their collateral, or (iii) such other less favorable | No |

| | | | |
|---|---|---|---|
| | $0 | treatment that Claimants may agree to in writing.<br>• Class consists of tax claims of governmental units secured by a lien on Debtors property (such as ad valorem personal property taxes).<br>• Estimated recovery: n/a | |
| 6 | Miscellaneous Secured Claims<br><br>Estimated Amount: $0 or unknown | • <u>Unimpaired</u>: Claimants receive one of following treatments selected by Debtors: (i) Cash equal to the full amount of the Allowed Secured Claim, (ii) Reinstatement of their rights so that such rights are unimpaired, (iii) the return of their collateral, or (iii) such other less favorable treatment that Claimants may agree to in writing.<br>• Class created as a contingency class to cover any miscellaneous secured claims not accounted for by Debtors that may be filed and allowed by the Bankruptcy Court.<br>• Estimated recovery: 100% | No |
| 7 | Unsecured Claims<br><br>Estimated Allowed Amount:<br>$29,800,000<br><br>(est. amount does not include <u>Allowed</u> 503(b)(9) ~~claims~~<u>Claims</u> or Term Lender deficiency claim) | • <u>Impaired</u>.  Unsecured Claims: (i) will receive Debtors' waiver and release from any liability for bankruptcy preference claims and other Avoidance Actions, (ii) pro rata share of $100,000 payment (plus the value of any residual assets, if any, after conversion into cash).<br><br>• Estimated recovery: 0.25%-1%  (recovery increases to 3.0% if estimated "cure costs" paid to unsecured creditors with assumed contracts are included) | Yes |
| 8 | Equity Interests | Equity Interests are cancelled and extinguished and Holders receive nothing<br><br>Estimated recovery: 0% | No |

**ARTICLE III.**
**PLAN VOTING INSTRUCTIONS AND PROCEDURES**

5

### A.    Who Votes

Under the Bankruptcy Code, only classes of claims or equity interest that are <u>impaired</u> under a plan are entitled to vote to accept or reject the plan.   Classes that are unimpaired are "deemed" to have accepted the plan and are not entitled to vote.  Roughly speaking, a class is "unimpaired" if the claims in that class are being paid in full and/or the plan does not otherwise alter the legal, equitable, or contractual rights of the Claims in the class.

*Nonvoting classes*:  The following classes are "unimpaired" under the Plan and deemed to accept the Plan, or are fully impaired and deemed to reject the Plan, and are thus not entitled to vote:

> Class 1 (Priority Non-Tax Claims - unimpaired);
> Class 5 (Secured Tax Claims -  unimpaired);
> Class 6 (Miscellaneous Secured Claims - unimpaired); and
> Class 8 (Equity interests - deemed to reject)

*Voting classes*:  The following classes are "impaired" under the Plan and are thus entitled to vote:

> Class 2 (Senior Lender Secured Claims);
> Class 3 (Term Lender Secured Claims);
> Class 4 (Consignment Claims); and
> Class 7 (Unsecured Claims).

Creditors that hold Claims in more than one impaired class are entitled to vote separately in each class. In such instances, a creditor should fill out and sign a separate ballot for each Class that it is entitled to cast a vote.  A creditor who asserts a Claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

### B.    Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing this Disclosure Statement, the Plan, and the instructions accompanying your ballot, you should indicate your acceptance or rejection of the Plan on the appropriate ballot corresponding to the Class in which you hold a claim, write the name of the Person holding the Claim and voting pursuant to the ballot, and sign the ballot where indicated.

IN ORDER  FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u>   NO LATER THAN ~~JULY    ,~~ **AUGUST 7,** 2015 AT ~~5~~4:00 PM **PREVAILING** EASTERN TIME (THE "**VOTING DEADLINE**") BY THE FOLLOWING:

IF BY FIRST-CLASS MAIL:

FAMILY CHRISTIAN, LLC BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
P.O. BOX 4422
BEAVERTON, OR 97076-4422
PHONE: (646) 282-2400

IF BY HAND-DELIVERY OR OVERNIGHT MAIL:

FAMILY CHRISTIAN, LLC BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
10300 SW ALLEN BLVD
BEAVERTON, OR 97005
PHONE: (646) 282-2400

Unless otherwise provided in the instructions accompanying your ballots, ballots cast by facsimile, email or electronic means will not be accepted. Ballots that are not signed will not be counted.

If you have any questions about (a) the procedures for voting your Claim, (b) the packet of material that you have received, or (c) the amount of your Claim, please contact Epiq Bankruptcy Solutions, LLC, the Voting Agent for the Debtors, at the phone number listed above.

**C.     Deadline For Objections To Confirmation**

Objections to final approval of the Disclosure Statement and Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, and all grounds for the objection. Any such objection must be filed with the Bankruptcy Court on or before ~~_____,~~ **AUGUST 7,** 2015, at ~~4:00 p.m.~~ NOON, Prevailing Eastern Time.

**D.     Confirmation Hearing**

Pursuant to section 1125 and 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(e), the Bankruptcy Court has scheduled a final hearing on approval of the Disclosure Statement and a hearing to confirm the Plan (collectively, the "**Confirmation Hearing**") at the following time and place:

DATE:                    ~~_____~~ **AUGUST 11,** 2015 at 10:00 a.m. (**Prevailing Eastern**)

LOCATION:          U.S. BANKRUPTCY COURT
                         ONE DIVISION  AVENUE, N., 3RD FLOOR,
                         COURTROOM  C
                         GRAND RAPIDS, MICHIGAN

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing.

7

# ARTICLE IV.
## HISTORICAL INFORMATION

### A.    Overview Of The Debtors' Business

The Debtors operate a chain of stores known as *Family Christian*®, one of the largest retailers of Christian books, music, DVDs, church supplies, and other merchandise related to the Christian faith.  The Debtors have approximately 3,100 employees and 266 stores in 36 states operating under the name.  Sales are also generated through direct mail catalogs and internet purchases (https://familychristian.com).  In 2014, the Operating Debtor had gross sales approximating $216 million.  The Debtors' headquarters and primary management offices are located in Grand Rapids, Michigan, at 5300 Patterson Avenue SE, Grand Rapids, MI 49530. The Debtors lease all of their retail store locations.

### 1.    Corporate Structure.

Debtor Family Christian, LLC, a Georgia company (the "**Operating Debtor**") conducts most all the Debtors business operations, and it is wholly owned by debtor Family Christian Holding, LLC (the "**Holding Company**").  The Holding Company does not conduct any business operations, and its sole asset is the ownership of all the membership interests of the Operating Debtor.  The Holding Company is owned 100% by a separate, <u>non-debtor</u> company known as Family Christian Resource Centers, Inc. a/k/a "Family Christian Ministries," ("**FCRC**") a 501(c)(3) tax exempt, non-profit Georgia corporation which is the ultimate parent company that serves as the organization for coordinating and supporting the charitable causes and ministries described herein.   The Operating Debtor wholly owns an inactive company called FCS Giftco, LLC, a Colorado company that currently conducts no business and has no meaningful assets or liabilities.  FCRC also owns a separate, non-debtor company known as iDisciple LLC, a Georgia company ("**iDisciple**") a company that does business with the Debtors. In exchange for the Operating Debtors' promotion of iDisciple's products (applications that can be downloaded to iOS and Android devices) in the Family Christian stores and on its website, a percentage of iDisciple's revenues are shared with the Operating Debtor.

Set forth below is a flow chart summarizing the corporate structure (not intended to be an exhaustive listing of all holdings or interests of FCRC).

8



2. <u>Company history</u>

The business origins of the Debtors date back to 1931 when the "*Zondervan*" stores were first established, and that store chain grew over time and began operating its stores under the name "Family Bookstores."   The business was sold and acquired more than one time and changed its name to Family Christian Stores in the 1990s.   The most recent sale and acquisition occurred in 2012, which is described further below and which resulted in the current ownership structure described above.

3. <u>Charitable causes</u>

The Debtors operate as non-profit companies.  As a result, any available and legally disposable profits of the Debtors and their collected donations go to supporting "Family Christian Ministries," a non-profit, charitable organization dedicated to sharing and promoting the Christian message and lifestyle, and supporting charitable causes and missionary goals.

Since the 2012 acquisition, the Debtors have only paid an approximate amount of $300,000 to FCRC for charitable donations to its missionally-aligned causes (exclusive of any third-party donations collected in the retail stores).  A non-exhaustive sampling of such past and

9

present activities include (with the majority of these activities occurring prior to the current ownership's acquisition in 2012 described below):

- <u>Bible donations</u>.  To date the company has donated over 120,000 bibles to military members and their families, and over 800,000 bibles to children and students in Latin America and Africa.

- <u>Orphanage / Widow Support</u>.  Since 2003, the company and its employees have raised and donated over $10 million dollars and needed supplies to organizations and ministries that care for orphans and widows or facilitate adoptions in countries across the globe, including China, Haiti, Mexico and the Dominican Republic.  They have likewise raised funds to support ministries aimed at rescuing persons enslaved in the sex trafficking industry.

- <u>Missions</u>.  The company has sent over 1,300 employees on mission trips across the USA and other countries, sharing the Christian faith and distributing needed supplies and goods to many persons, such as building 108 homes for widows and restoring 32 more, while also supplying fuel efficient stoves and water purifiers.

- <u>Giving</u>.  In addition to the funds and gifts noted above, the company has given several hundred thousand "shoe box" gifts and gospel tracks to needy families in their annual "Operation Christmas Child."  After Hurricane Alex in 2010, the Debtors' supported ministries and relief efforts to aid squatters' communities in Monterrey, Mexico.  Since 2003, Family Christian Ministries and its ministry partners or predecessor company have impacted over 4.5 million lives.

### B.    2012 Acquisition Of The Debtors

In 2012, the then current owner of the Family Christian Stores business, an unrelated private equity fund, operated the business as a for profit entity.  During 2012, the fund sold the business to an entity called FC Operating, LLC, owned and controlled by Richard L. Jackson, Michael C. Kendrick, and Laurence H. Powell.  The owners of FC Operating, LLC then donated FC Operating, LLC to a nonprofit 501(c)(3) entity.  That nonprofit 501(c)(3) entity subsequently changed its name to Family Christian Resource Center ("FCRC"), the current parent entity of the Debtors, and FC Operating, LLC changed its name to Family Christian, LLC, the current name of the Operating Debtor.

The purchase price paid in 2012 to acquire the Family Christian Stores business was approximately $86 million, which was obtained primarily from the following sources: (i) approximately $25 million was funded as equity from FC Holdings, LLC,  and (ii) the balance was funded from loans obtained from JP Morgan Chase Bank, N.A. ("**Chase**") and Term Lender, described below.

As stated above, FCRC is a nonprofit entity.  It is managed by Richard L. Jackson, Michael C. Kendrick, and Laurence H. Powell, but they have no ownership interest in FCRC.

10

FCRC has no ownership because it is a nonprofit charity considered owned by the public. FCRC is prohibited by law from making equity distributions, because it has no owners.

In connection with the 2012 acquisition, a loan was obtained from Chase under a "Credit Agreement" dated November 14, 2012 (the "**Revolver**") that provides a revolving line of credit up to a maximum of $40 million, which loan provides working capital for the Operating Debtor's business operations. The Revolver is secured by a security interest and lien upon substantially all of the Operating Debtor's assets.

Also in connection with the 2012 acquisition, a term loan was obtained from Credit Suisse AG, Cayman Island Branch, individually and in its role as agent for Credit Suisse Loan Funding, LLC, Medley Capital Corporation, Congruent Credit Opportunities Fund II, LP, and Main Street Mezzanine Fund, LP (together with any successors or assigns that hold the term loan, the "**Term Lender,**" and together with the Senior Lender, the "**Secured Lenders**") in the amount of $38 million, which loan provided part of the funds needed to pay the purchase price for the 2012 acquisition. The term loan is secured by a security interest and lien upon substantially all of the Operating Debtor's assets. As noted further below at Section V.G.3, the term loan was recently assigned to the Senior Lender during the Bankruptcy Case, such that FC Special Funding, LLC ("**FC Special Funding**") is now both the Senior Lender and the Term Lender.

Under an Intercreditor Agreement between the Secured Lenders, the Revolver is secured by a first position lien on the Debtors' working capital assets, and a second position lien on the non-working capital assets, and the term loan is secured by a second position lien on the Debtors' working capital assets, and a first position lien on the non-working capital assets

## C.    2014 Assignment of Senior Lenders Revolving Line of Credit Loan

By 2014, the Debtors failed to meet a financial covenant required under the loan with Chase, and the Debtors were at risk of having the line of credit terminated. In order to preserve the line of credit and maintain the Debtors continued ability to borrow under that line of credit, (a) the Debtors and Chase agreed the maturity of the loan would be shortened to May 2015, and (b) Jackson Investment Group, LLC ("**JIG**"), an entity in which Richard L. Jackson is the CEO, posted a cash deposit of $7 million with Chase as a credit enhancement for the loan. Chase made it clear it would not renew the loan at maturity, and that the Debtors needed to find a replacement lender.

Attempts to locate a replacement lender to take out Chase were not successful, as traditional banks and financial institutions were not interested in entering into a lending relationship with a distressed business like the Debtors. JIG approached Commenda Capital, LLC ("**Commenda**"), a financial advisory firm and merchant bank, to serve as the replacement lender.

Thereafter, FC Special Funding, a special purpose entity formed and owned by Commenda, was created for the purpose of purchasing Chase's loan and position. In exchange for payment of all indebtedness owed by the Debtors to Chase, FC Special Funding purchased at par value (i.e., not at a discount) and was assigned any and all rights under the revolving line of

11

credit loan documents, after which FC Special Funding began advancing funds to the Operating Debtor. In other words, FC Special Funding stepped into the shoes and took over the Chase line of credit, replacing Chase.

JIG is the sole participant in the loan to the Debtors acquired by FC Special Funding from Chase. Richard Jackson is the C.E.O. of JIG, and JIG has the right to purchase the loan from FC Special Funding under certain terms and conditions. JIG is considered an insider of the Debtors because of Richard Jackson's affiliation with both JIG and the Debtors. FC Special Funding takes the position that FC Special Funding, as the owner of the loan, is an independent lender to the Debtors and is not an insider of the Debtors. In other words, FC Special Funding provided a loan to the Debtors, not JIG, and JIG's contractual relationship is directly with FC Special Funding, not the Debtors. The Bankruptcy Court has not ruled on whether or not FC Special Funding is an insider of the Debtors, nor has any party asked for such a ruling.

**D.    Events Leading To Bankruptcy**

The Debtors' sales have been in steady decline since 2008. For fiscal year ending (FYE) 2008, the Operating Debtor's annual sales were $305,000,000. For FYE 2015, the annual sales were $216,000,000.

Some of the factors for the declining sales include the "Great Recession" that started in 2008 and general industry trends in both the music industry and book industry that have resulted in fewer consumer purchases at the retail store level. The declining sales have deprived the Operating Debtor of the liquidity necessary for capital and infrastructure improvements in the retail stores. As a result, the Operating Debtor struggled in meeting staffing needs for some of the Family Christian stores or making certain improvements necessary to update the appearance and appeal of the stores.

Consequently, in late 2014, the Operating Debtor and its management team began evaluating a number of options to respond to their operational and liquidity issues. The Operating Debtor engaged multiple professionals to evaluate the Debtors' business and to propose potential strategies, including but not limited to, the raising of additional capital, a sale of some or all assets, or a restructuring transaction. One of the professionals engaged to serve as a financial advisor to the Operating Debtor was Gary Murphey of Resurgence Financial Services, Ltd. ("**Resurgence Financial**"). Among other activities performed in connection with its engagement, Resurgence Financial evaluated the Operating Debtor's retail business and financial performance to determine if there were alternative business models that could lead to improved financial strength. Resurgence Financial modeled store closings and infrastructure changes to determine if there was a better path to profitability. Their ultimate conclusion was that there was not a better model. The primary issue, per their assessment, was not to close "unprofitable stores" or make additional infrastructure cuts, but rather to reduce the size of the debt load burdening the company

In early 2015, the Debtors missed the deadline in making an approximate $1 million payment owed to the Term Lender under its loan agreement. On or about February 5, 2015, the Term Lender declared the Debtors in default and notified the Debtors of potential collection efforts against the Debtors. In light of such events, the cash flow and debt pressures confronting

the Debtors as described above, and the inability to consensually reduce its debt load, the Debtors sought to reorganize their affairs within the protection of Chapter 11 of the Bankruptcy Code.

### E.    Debtors' Officers and Directors

The Debtors' day to day business operations are managed by the following officers:

- *Charles A. Bengochea*, was appointed Chief Executive Officer in 2014.  More recently, he was President and Chief Executive Officer of The Original Honey Baked Ham Company of Georgia.

- *Kenneth A. Dady*, Vice President of Finance and Assistant Secretary.

- *William T. Polzin*, Treasurer.

- *Paul C. Neitzel*, Secretary and Vice President, Real Estate & Construction.

Overseeing the Debtors' officers is a Board of Managers comprised of the following three (3) individuals, all of whom reside in Atlanta Georgia:  (i) Richard L. Jackson (Chairman), (ii) Michael C. Kendrick, and (iii) Laurence H. Powell.

### F.    Debtors' Debt Structure

As noted above, the Debtors obtained two secured loans.  As of the Petition Date, the Debtors owed approximately $23 million to the Senior Lender and approximately $34 million to the Term Lender.

Shortly before the filing of this Disclosure Statement, FC Special Funding acquired all of the Term Lender's rights with respect to the Term Lender's loans made to the Debtors. Currently, FC Special Funding holds the claims of both Secured Lenders.

Additionally, the Debtors' bankruptcy Schedules reflect owing approximately $36 million on the Petition Date in outstanding debt to its trade suppliers and vendors (the "**Trade Debt**") for goods and services that were purchased on unsecured credit terms (said Trade Debt amount not including the consignment debt amounts noted below).

As of the Petition Date, the Schedules also reflect claims aggregating $27 million with respect to certain supplies, inventory and other  goods the Debtors had received on "consignment" from various vendors (the "**Consignment Inventory**"), with such aggregate claims consisting of (i) approximately $20 million book value of Consignment Inventory in the Debtors' possession as of the Petition Date, and (ii) an additional $7 million owed by the Debtors for Consignment Inventory sold prior to the Petition Date.  Under the consignment agreements, the Debtors generally were not obligated to pay the vendors until the consigned goods had been sold by the Debtors, such that the Consignment Inventory was not generally booked or reflected as an accounts payable until it was sold.

## ARTICLE V.
## <u>CHAPTER 11 CASES</u>

The Debtors commenced their Bankruptcy Cases on February 11, 2015 (the "**Petition Date**").   Set forth below is a summary of some of the salient events to date that have occurred in the Bankruptcy Cases.

### A.    First Day Motions

To facilitate a smooth entry into Chapter, the Debtors' filed various motions for relief at the early outset of the cases, often referred to as "First Day Motions" since they were filed on either the first day of the Bankruptcy Cases or shortly thereafter.  The Bankruptcy Court entered various orders (called the "**First Day Orders**") granting most of the relief requested in the First Day Motions, including the following:

- Order authorizing the Debtors' continued use of cash on an interim basis [Docket No. 114];

- Order authorizing Debtors to continue using their existing bank accounts, business forms, and cash management system [Docket No. 112];

- Order establishing certain notice, case management and administrative procedures [Docket No. 109];

- Order authorizing Debtors to honor and perform certain customer programs in the ordinary course of business [Docket No. 126];

- Order authorizing the payment of (A) prepetition employee wages, salaries and related items; (B) prepetition contributions under employee benefit plans; and (C) prepetition employee payroll deductions [Docket No. 107];

- Order (A) prohibiting utilities from terminating services to the Debtors, and (B) establishing procedures for resolving disputes relating to adequate assurance requests [Docket No.110];

- Order authorizing debtors to (1) maintain and continue their insurance programs, including workers compensation, and (2) honor and pay the prepetition obligations in respect thereof [Docket No. 113];

- Order authorizing debtors to pay prepetition sales and use taxes, franchise taxes, business license fees, and other trust fund taxes [Docket No. 111];

- Order extending the time for filing Debtors' Schedules and Statement of Financial Affairs [Docket No. 108];

- Order authoring the joint administration of the Debtors' cases [Docket No. 106];

14

24408153v18

At the early outset of the Bankruptcy Cases, the Bankruptcy Court also authorized the Debtors to retain various professionals, including: (i) the retention of Keller & Almassian as bankruptcy counsel [Docket No. 375]; (ii) the retention of Burr & Forman LLP as bankruptcy counsel [Docket No. 376]; (iii) the retention of Resurgence Financial as financial advisors [Docket 445], and (iv) the retention of Brookwood Associates LLC as investment banker [Docket No. 444].

### B.  Cash Collateral

The Secured Lenders assert a lien or security interest in substantially all of the Debtors' assets, including the income generated by the Debtors' property.  Because such asserted "cash collateral" is necessary for the Debtors' business operations, the Debtors filed a motion early on in their Chapter 11 cases (the "**Cash Collateral Motion**") requesting authorization to use cash collateral.  The Bankruptcy Court entered both an interim and final order (collectively the "**Cash Collateral Order**") [Docket Nos. 114 and 593]  with the consent of Secured Lenders and the Committee that allows the Debtors to use cash collateral for its normal business operations pursuant to a budget the ("**Cash Collateral Budget**") that is attached to the Cash Collateral Order and supplemented from time to time.

In exchange for the Secured Lenders' consent to the continued use of cash collateral, the Cash Collateral Order provides certain forms of "adequate protection" to the Secured Lenders, including replacement liens on the Debtors' assets and certain periodic cash payments to or for the benefit of one or both of the Senior Lenders.  Based upon the Debtors' review of the loan documents and determination that the Secured Lenders had legitimate and valid secured liens, the Debtors also stipulated to such liens in the Cash Collateral Order.

### C.  Creditors Committee

Chapter 11 of the Bankruptcy Code provides for the appointment of an Official Committee of Unsecured Secured Creditors (the "**Committee**") to generally represent the interests of unsecured creditors in a bankruptcy case.  Often, Committee members are appointed from creditors holding the largest unsecured claims against the debtor.  A Committee was appointed  in the Debtors' Bankruptcy Cases and comprises the following members:

- John Shearer, HarperCollins Publishers, LLC.
- John Vogelaar, Capitol Christian Distribution
- ~~Denis~~Denise Etris, Dayspring Cards
- Darren Elrod and Scott Knight,  Provident Distribution
- John Seward, ~~Tyndal~~Tyndale House Publishers
- Ken Williams, Word Entertainment
- Bryan Paris, DD Traders, Inc. d/b/a Demdaco

Pursuant to section 1103 of the Bankruptcy Code, the duties of the Committee include, among other things, (1) consulting with the Debtors concerning the administration of the bankruptcy cases, and (2) investigating the acts, conduct, assets, liabilities and financial condition of the Debtors, the operation of the Debtors' business, and the desirability of the

15

continuance of such business, and any other matter relevant to the case or to the formulation of a plan.

Additionally, the Committee is authorized to hire its own professionals to assist the Committee in performing its duties, with such professionals compensated from the Debtors' bankruptcy Estate, and the Committee engaged with the approval of the Bankruptcy Court (i) the Committee's own legal counsel (the two law firms of Fox Rothschild and Miller Johnson), and (ii) the Committee's own financial advisory firm (O'Keefe & Associates Consulting).

### D.    Ad Hoc Consortium and the Consignment Lawsuit

Shortly after the Petition Date, twenty-seven "consignment" vendors banded together to form an "Ad Hoc Consortium of Consignment Vendors" (the "**Ad Hoc Consortium**")[2] .  On March 6, 2015, the Ad Hoc Consortium filed its complaint seeking declaratory and injunctive relief with respect to their consigned goods.  The Ad Hoc Consortium subsequently amended the Complaint three times mainly for the purpose of adding members to its consortium.  See United Methodist Publishing House, Inc. et al. vs. Family Christian, LLC, Adversary Proceeding No. 15-80062, U.S. Bankruptcy Court, Western District of Michigan (the "**Consignment Lawsuit**").

Additionally, the Bankruptcy Court permitted three other groups of consignment vendors to intervene as party-plaintiffs in the Consignment Lawsuit: (1) Provident Distribution LLC, (2) Bridgestone Multimedia Group/Alpha Omega Productions, a division of Glynlyon, Inc., and (3) Swanson Christian Products, Dayspring Cards, Inc., Anchor Distributors (Whitaker Corporation), Angel Star Inspired Products, Inc., Brownlow Gifts, Daywind, Dexsa Company, and Send the Light Distribution, LLC.  The Bankruptcy Court also permitted the Secured Lenders to intervene as party-defendants in the Consignment Lawsuit.  The Bankruptcy Court denied the Committee's request to intervene in the Consignment Lawsuit.

In the Consignment Lawsuit, the plaintiffs assert that their consigned goods are not property of the Operating Debtor's bankruptcy estate by virtue of the underlying transactions being "true consignments" that are not governed by Article 9 of the UCC.  The plaintiffs are seeking a declaratory judgment to this effect, the turnover of their consigned goods, and injunctive relief to prevent the sale of these consigned goods free and clear of their interests.

Article VIII below contains further discussion of the issues pertaining to the consignment goods and the Plan's proposed resolution of the Consignment Lawsuit.

---

[2] The Ad Hoc Consortium initially started with 27 members, but eventually grew to the following 37: United Methodist Publishing House, Inc. d/b/a Abington Press, AMG Publishers, Inc., Baker Book House Co., Barbour Publishing, Inc., Bardin & Marsee Publishing, Cactus Game Design, Inc., Capitol Christian Music Group, Inc., Catholic Book Publishing, Charisma Media, Christian Art Gifts, Christian Brands, Crown Entertainment, Inc., f/k/a Precision Media Group, David C Cook Communications, Inc., Dayspring Cards, Inc., Development Solutions Global Inc., Discovery House Publishers, Eagles Wings, Inc., Foundation Publications, GoBible, LLC, Harrison House, LLC, Hendrickson Publishers, LLC, Intervarsity Christian Fellowship USA d/b/a Intervarsity Press, Kerusso Activewear Inc., Kingstone Media Group, Inc. a/k/a Kingstone Comics, Kregel, Inc., d/b/a Kregel Publications, My Healthy Church, LLC, Destiny Image, Inc. d/b/a Nori Media Group, Pure Flix Entertainment, LLC, Questar, Inc., Rose Publishing, Inc., Simon & Schuster, Inc., Talicor, Inc., The Wee Believers Toy Company f/k/a Troparian Corporation, Universal Designs, Inc., Vision Video, Inc., Wesscott Marketing, Inc., and Word Entertainment, LLC

### E.    Bar Date Orders

By an order entered by the Bankruptcy Court on April 7, 2015 (the "**Bar Date Order**"), the Bankruptcy Court established June 9, 2015 (the "**Bar Date**") as the deadline by which most Persons, other than governmental units, must file their proofs of claim against the Debtors or proofs of interest.   The Bar Date Order also established August 14, 2015 as the deadline by which governmental units must file their proofs of claim against the Debtor.

On April 7, 2015, the Bankruptcy Court entered a separate order (the "**503(b)(9) Bar Date Order**") establishing May 8, 2015 as the deadline for creditors to file 503(b)(9) Claims.

### F.    Business Operations During Chapter 11

The Debtors' sales have suffered as a result of the Bankruptcy Case.  While the Debtors forecasted a 2.5% increase in sales revenue during the current fiscal year (fiscal year 2016 starts February 1, 2015 and ends January 30, 2016), the Debtors have experienced an 11% decrease in sales revenue for fiscal year 2016 through the end of May.  This equates to an approximate 14%, or $9.2 million, decline in sales as compared to budget.

Although various market pressures affect the Debtors' financial performance, there are at least three negative performance drivers directly related to the Bankruptcy Case.  First, there are vendors that stopped doing business with the Debtors during the Bankruptcy Case (e.g., the Debtors' main special orders vendor which has significantly impacted the Debtor's eCommerce business).  Second, the majority of vendors who continued doing business with the Debtors required "cash in advance" for future purchases and stopped offering margin credit support (margin protection on promotions) and "VPS coop" support (a percentage of cost of sales to support Debtors' marketing efforts of products) during the Bankruptcy Case.  The vendors' decisions have resulted in significant out of stock issues and have impacted the Debtors' ability to market and promote their products.  Third, the Debtors have been experiencing a monthly burn rate of $600,000 to $700,000 from bankruptcy-related expenses.  These three factors negatively impacted the Debtors' inventory levels and product mix, which impacted the Debtors' marketing efforts during the historically strong holiday seasons of Easter and Mother's Day. The Debtors' inability to purchase and market the optimal product mix during the Bankruptcy Case resulted in anemic sales performance during these two holiday seasons.

By closing a sale and purchase of the business no later than August (the nadir of the low season), the Buyer will be able to insure that the proper mix and type of products are purchased and marketed for the Christmas holiday season, which is the high season for the Debtors and most retailers.  The Buyer's access to a $50 million working capital line of credit will provide the credit support necessary to resume the purchase of special order goods, to normalize trade terms with vendors, and to resume margin credit support from vendors.  Additionally, the Buyer will not be saddled with a monthly burn rate of $600,000 - $700,000 in bankruptcy-related expenses and may use this liquidity to augment the purchasing power provided by the $50 million working capital line of credit.

24408153v18

### G.    Sale Process Events

A detailed and thorough summary of the sale related events leading up to the Plan are contained in the Bankruptcy Court's *Memorandum Decision Regarding Motion to Sell Substantially All Assets of the Debtors* (the "**Sale Opinion**") (Dkt. No. 931), a copy of which is attached to this Disclosure Statement as Exhibit "D".

### 1.    The Initial Sale Motion

One day after the Petition Date, the Debtors filed a motion seeking to sell substantially all of their assets [Dkt. No. 30] to FCS Acquisition, LLC ("**FCSA**" or the "**Buyer**"), which was identified as a so-called "stalking horse" bidder.  As explained further herein, the Buyer is a newly formed subsidiary of the Debtors' ultimate parent company, FCRC, and the proposed sale transaction is akin to a management purchase of the Debtors' business.  Structuring the transaction in such fashion would allow the non-profit status of the Debtors' business operations to be maintained.

The sale motion noted that the proposed sale was subject to higher and better offers following a marketing and bidding process that the Debtors proposed to undertake.   The sale motion further noted that the Buyer did not request a customary "breakup fee" in the event the Buyers was not the highest bidder following the marketing and auction process.

Objections to the initial sale motion were filed by numerous parties, including the Committee, the Term Lender, the U.S. Trustee, and the Ad Hoc Consortium (who commenced the Consignment Lawsuit to contest the Debtors' ability to sell goods provided to the Debtors allegedly on consignment).  Contained in many of the objections were inaccurate and erroneous allegations that challenged or impugned the motives of Richard Jackson and other management insiders that were affiliated with the Buyer and Debtors.  To avoid becoming an unwarranted distraction to the sale process, the Buyer ultimately withdrew its stalking horse bid, and the Debtors thereby withdrew the sale motion on March 16, 2015 [Dkt. No. 358].

### 2.    The Second Phase of the Sale Process

Several weeks after the initial sale motion was withdrawn, the Debtors filed a second sale motion (the "**Sale Motion**") asking the Court to establish bidding procedures and approve a marketing and sales process that would allow the Debtors to sell substantially all of the Debtors' assets free and clear of any liens, claims, interests and other encumbrances. The Sale Motion did not propose to sell the assets to the Buyer or to any other stalking horse bidder.  Instead, it requested approval for Debtors' investment banker, Brookwood Associates, LLC ("**Brookwood**") to expeditiously and vigorously market the Debtors' assets in order to identify potential bidders.

On April 16, 2015, the Bankruptcy Court entered a consent order establishing certain procedures, deadlines and rights in connection with the bidding and auction process. [Dkt. No. 597] (the "**Bidding Procedures Order**").  Thereafter, Brookwood engaged in a robust and far reaching marketing campaign to solicit the interests of prospective bidders, contacting over 200 prospects, including strategic buyers, liquidators, and financial buyers.

Afterwards, four "qualified bidders" submitted bids as required by the Bidding Procedures Order: (i) Yellen Partners LLC, which presented a liquidation bid, (ii) a joint venture between Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC ("**GBH**"), which presented a liquidation bid, (iii) Great American Group, LLC ("**Great American**"), which presented a liquidation bid, and (iv) FCSA, which submitted a going concern purchase bid.  The liquidation bids submitted by each of Yellen, GBH, and Great American were similar in format and would require the closing of the Debtors' business, and the subsequent conduct of "going out of business" sales whereby the liquidator would serve as the Debtors' liquidation agent to oversee the liquidation sale.

The qualified bidders were invited to an auction that commenced on May 21, 2015 to determine the winning bid.  In addition, the Bidding Procedures provided that the Secured Lenders were deemed qualified bidders also for purposes of attending the auction and potentially submitting "credit bids."

The auction took place over several days and at times was contentious for several aspects.  For one, the Debtors had difficulty placing a firm value on the liquidators' bids, as the bid contracts (which are called "**Agency Agreements**") do not offer a specific, guaranteed dollar amount purchase price, but instead, as described by the Bankruptcy Court, "rely on a complex series of formulas and contingencies to arrive at an estimated amount of value for the Debtors' estates."  Secondly, the Debtors informed the liquidators that the Debtors' placed a premium on a going concern bid like the bid offered by the FCSA, as it would allow the business operations to continue and thereby preserve jobs, relations with customers and vendors, and avoid the termination of numerous real estate leases.  However, the Debtors could not quantify a specific dollar amount for such premium out of concern that doing so would be viewed as a contrived number and artifice for chilling the bidding process.

Ultimately, at the conclusion of the auction process, the Debtors selected the Buyer's bid as the highest and best bid.  GBH objected to that selection, contended that its bid was the higher and better bid, and claimed the auction process had been unfair.

On June 9, 2015, the Court held a hearing on the Sale Motion.  After a lengthy proceeding that stretched late into the night, the Court took the matter under advisement and ultimately denied the Sale Motion by entering the Sale Opinion and corresponding *Order Denying Motion to Sell Substantially All Assets of Debtors* (the "**Sale Order**") (Dkt. No. 932), a copy of which is attached hereto as Exhibit "D".

Although the Court found the auction sale process was not unfair or fraudulent, the Court did find that the Debtors did make two mistakes during the auction that were fatal to the sale process.  First, the Debtors did not account for the value of the director and officer releases and the avoidance actions being sold to Buyer under its winning bid.  At the time of the auction, the Debtors had not completed it valuation of these causes of action, which would have an impact on the different bids submitted during the auction and should have been a consideration in valuing the bids.

Second, the Court was troubled by an ex parte telephone call from the Debtors' chief executive officer, Mr. Chuck Bengochea, to Mr. Richard Jackson and Mr. Larry Powell, who are

directors of the Debtors and Buyer, during the second night of the auction. In the telephone call, Mr. Bengochea requested Mr. Jackson, on behalf of the Buyer, to increase its bid at the auction. The Court stated that any requests for higher bids should have been placed on the record at the auction or communicated through legal counsel and should have been made to all qualified bidders. The need for this transparency was heightened by the fact that Mr. Jackson is an insider of the Debtors and Mr. Jackson, on behalf of the Buyer, had extended an offer of employment to Mr. Bengochea as the future chief executive officer of Buyer.

Additionally, the Court did not find the Debtors had satisfied their burden under a heightened scrutiny standard for approval of the proposed sale to the Buyer. Although the Debtors satisfied several factors under the analysis for a sound business justification, including without limitation, (1) the Debtors' assets are rapidly decreasing in value, (2) a sufficient amount of time has elapsed since the Petition Date, (3) the Debtors have the clear support from all of their major stakeholders, and (4) the Debtors have properly advised the Court and other parties in interest that they intend to file a plan of liquidation as soon as reasonably practicable, the Court found (a) there was a lack of evidence on the value of the director and officer releases and avoidance actions being sold to the Buyer under its winning bid and (b) there was a lack of evidence on the good faith of the winning bidder, the Buyer, in light of the insider relationships in these cases.

Lastly, the Court was concerned that the proposed sale to the Buyer dictated the terms of a future plan of liquidation. The Court found that the APA contained certain provisions that would be more appropriately included in a plan of liquidation, which would require more significant disclosure to creditors and parties-in-interest in these cases, than as part of a sale transaction to be approved outside of a plan process.

Based upon the foregoing, the Court denied approval of the sale to the winning bidder, the Buyer, but invited the Debtors to proceed down one of two paths: (1) the reopening of the auction with slight modifications to the approved bidding procedures and more robust disclosure of the terms of the winning bid and any proposed settlements, or (2) the filing of a plan "in order to avoid any allegations, or concerns from this court, that any proposed transaction fails to comport with the applicable provisions of the Bankruptcy Code." *Sale Opinion*, p. 48. In order to fully address the Court's disclosure and notice concerns, the Debtors have elected to file a plan of liquidation to implement the terms of the proposed sale to the Buyer in lieu of a renewed auction sale process. The Debtors feel the plan process will provide robust disclosure and notice to all creditors and parties-in-interest of the terms of the proposed sale to the Buyer and the superiority of a going concern sale to a liquidation alternative.

3.    Settlement / Acquisition of the Term Lenders' Claim

On the day of the Sale Hearing described above, a settlement of the Term Lender's potential objections to the Sale was reached whereby the Term Lender would receive payment of $5,475,000 at the Closing of Sale if the Sale were approved. Because the Sale was not approved, a formal settlement was not consummated. However, such discussions led to a subsequent, similar resolution, and shortly prior to the filing of the Plan, the Term Lender assigned its interests in the term loan to the Senior Lender in exchange for the payment of $6,000,000 to the

Term Lender. Accordingly, the Senior Lender owns and holds the loan documents and corresponding Secured Claims pertaining to both the Revolver loan and term loan.

## ARTICLE VI.
## DESCRIPTION OF THE PLAN

### A. General Information

THE FOLLOWING IS A SUMMARY AND DESCRIPTION OF CERTAIN SIGNIFICANT PROVISIONS OF THE PLAN, AND IT IS QUALIFIED ENTIRELY BY REFERENCE TO THE PLAN ITSELF, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT A**. TO THE EXTENT THE DESCRIPTIONS OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT VARY FROM THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL BE CONTROLLING.

In general, the Plan divides claims and equity interests into separate classes, specifies the property or treatment that each class is to receive. The Plan also contains other provisions relating to the proposed reorganization, such as provisions dealing with the treatment of contracts and leases.

### B. The Sale

A central component of the Plan is the Sale of the Debtors' business on a going concern basis to the Buyer (the "**Sale Transaction**"). A copy of the APA pertaining to the Sale is attached hereto as Exhibit "B". A going concern sale means the Debtors business operations will continue forward (as opposed to a forced liquidation where the business operations cease). As such, the Sale minimizes claims against the Debtors estates that would otherwise arise in a true liquidation scenario, such as claims of landlords for rejected store leases, or potential claims of terminated employees for wages or benefits. The Sale also provides the means and funds to implement the Plan, such as obtaining sufficient proceeds to satisfy various claims, and providing for the transfer and assignment of certain contracts and leases to the Buyer.

### 1. The Buyer

Buyer is a Georgia corporation and a wholly owned ~~affiliate~~Affiliate/subsidiary of FCRC. FCRC is considered a public charity with a 501(c)(3) tax status, and it is also the parent entity of the Debtors/Sellers.

Upon the closing of the Sale Transaction, Buyer intends to operate the business in a manner consistent with how it is currently being operated, making such changes and improvements as are necessary to help the business become more productive, efficient and valuable. Buyer's priority will be to ensure a seamless continuation of the existing business.

### 2. Principal Terms of the Sale

The key components of the APA are summarized below. To the extent there are any discrepancies between the following summary and the APA, the APA shall govern and control.

21

a. <u>Assets to be Sold</u>.  The "Assets" to be sold consist of substantially all of the operating assets of the Sellers, as encompassing: those certain real property leases to be scheduled and assumed, operating contracts to be scheduled and assumed, all equipment, all inventory (including "consignment" inventory in the possession of the Sellers as of the Petition Date that is transferred to the Buyer at Closing) rights to intellectual property including licenses, prescribed employee benefit plans, certain prepaid items, cash in stores, books and records.  Such Assets also include the Sellers' business relationship with iDisciple LLC. Certain assets to be retained by the Sellers as "Excluded Assets" include its tax attributes for pre-closing periods, and designated contract rights not assumed by the Buyer.

b. <u>Purchase Price</u>. The aggregate consideration to be provided by the Buyer for the sale of the Assets is estimated between $52,400,000 and $55,700,000 (as projected on Schedule 2.1 of the APA, and inclusive of the Cash Component, as defined in the APA, and the categories of Assumed Liabilities listed on Schedule 2.1, net of Sellers' Cash), plus certain other Assumed Liabilities including related to the Assumed Real Property Leases (collectively, the "Purchase Price").

c. <u>5% Payment to Trade Creditors for Trade Terms</u>.  For purposes of obtaining customary trade credit terms for the ongoing business, the APA provides that the liabilities assumed by the Buyer include the assumption of Seller's obligations to Trade Creditors "equal to five percent (5%) of the amount, after reduction for any such Trade Creditor's Allowed 503(b)(9) Owned Claim and Allowed 503(b)(9) Consignment Claim, (A) set forth in the Sellers' bankruptcy schedules; or (B) of such Trade Creditor's Claim as may otherwise be agreed to by the Buyer and such Trade Creditor, to be paid by December 31, 2015; provided that such Trade Creditor agrees to provide to the Post-Closing Business Trade Terms for no less than one (1) year following the Closing Date."

d. <u>Free and Clear</u>.  The Assets are to be sold free and clear of all liens, claims, encumbrances and interests.

e. <u>Disposition of Debtors' Consignment Inventory</u>.

- *Accepting Consignors*:  receives either of two partial payment options:

  > *Treatment Option 1* - payment of Allowed 503(b)(9) claim plus 10% of book value of Consignment Goods sold after June 15, 2015, or

  > *Treatment Option 2* - payment of 35% of book value of Consignment Goods sold after June 15, 2015.

- *Rejecting Consignors*: Claim Holders retain their rights and claims. Debtors will either (a) return Consignment Goods and/or (b) litigate parties' disputed rights in Consignment Goods and, if Debtors prevail, the Consignors will receive treatment for Unsecured Claims and the Consignment Goods will be treated as Assets purchased by the Buyer.

22

f. <u>Payment for Settlement of certain Consignment Lawsuit claims</u>.  Pursuant to the terms of the APA, Buyer will pay $500,000 to Accepting Consignors that were the initial plaintiffs in the Consignment Lawsuit for purposes of covering legal fees and obtaining dismissal of their claims in the lawsuit, to the extent such amount was not previously paid by the Debtors prior to Closing.

g. <u>Breakup Fee/Expense Reimbursement</u>.  None.

h. <u>Closing</u>. Subject to the Bankruptcy Court approval referenced below, the APA contemplates a closing of the sale and purchase of the Assets on or before August 31, 2015.

i. <u>Assumption of Liabilities</u>. The Buyer agrees to assume various liabilities at Closing.  A complete listing of such Assumed Liabilities is set forth at Section 2.3 of the APA, with a <u>non-exhaustive</u> listing set forth below:

- All liabilities and obligations with respect to the debt owed to Senior Lender, estimated at Closing to be approximately $23.5 million.

- All liabilities and obligations with respect to Allowed 503(b)(9) Owned Claims, paid within ten (10) Business Days after such claim is Allowed, provided the undisputed portion of such ~~claims~~Claims shall be paid at the Closing regardless if such Claims were Allowed as of the Closing.

- All liabilities and obligations as of the Closing Date with respect to the Post-Petition Operating Expenses.

- All liabilities and obligations under the Assumed Real Property Leases and Assumed Contracts that are assumed and assigned to the Buyer in accordance with Section 1.4 of the APA, whether at the Closing or thereafter, including all related Cure Costs, having an estimated value, subject to Section 1.4 of the APA, of $43,000,000.

- All liabilities and obligations with respect to Wind Down Expenses in an amount not to exceed $150,000.

- All liabilities and obligations with respect to any gift cards outstanding on the Closing Date and issued by CardFact, Ltd., and all liabilities with respect to other loyalty programs and customer presells outstanding on the Closing Date.

- All liabilities and obligations with respect to Inventory returned to the Stores after the Closing Date.

- All liabilities and obligations with respect to the debt owed to the Term Lender in the amount of $6,000,000.

24408153v18

- For each "Consenting Consignment Vendor" the portion of the liabilities and obligations regarding Consignment Goods only as follows:

> Payment Option 1 - their Allowed 503(b)(9) Consignment Claim paid within ten (10) Business Days after such claim is Allowed, provided the undisputed portion of any such ~~claim~~Claim shall be paid at the Closing regardless if such Claim has been Allowed as of the Closing, plus an amount equal to ten (10%) percent of the Sellers' book value for such Consenting Consignment Vendor's Consignment Goods that are Transferred Inventory, paid in the month following the month in which such individual items of Transferred Inventory are sold by the Post-Closing Business. In addition, the Buyer will pay ten (10%) percent of the Sellers' book value for such Consenting Consignment Vendor's Consignment Goods that are sold by the Debtors between June 15, 2015 and the Closing Date, paid no later than thirty (30) days following the Closing Date;

> Payment Option 2 - an amount equal to thirty-five (35%) percent of the Sellers' book value for such Consenting Consignment Vendor's Consignment Goods that are Transferred Inventory, paid in the month following the month in which such individual items of Transferred Inventory are sold by the Post-Closing Business. In addition, the Buyer will pay thirty-five (35%) percent of the Sellers' book value for such Consenting Consignment Vendor's Consignment Goods that are sold by the Debtors between June 15, 2015 and the Closing Date, paid no later than thirty (30) days following the Closing Date

j. <u>Lease Designation Rights</u>.  Although the Buyer intends to finalize the majority of its assumption or rejection decisions by the Closing, the Buyer shall have the right to designate any unexpired real property lease or executory contract for assumption or rejection for a period of time not to exceed September 9, 2015 (unless there is agreement with the contract or lease counterparty to extend this deadline).  The Buyer shall reimburse the Sellers for rent, real property taxes and other charges that arise and become due during the ~~designation period~~Designation Period and any applicable ~~post-closing occupancy period~~Post-Closing Occupancy Period.

k. <u>Release of the Directors and Officers</u>. The APA provides that, upon the closing as occurring subject to the Sale Order, each of the Debtors, their Estates, along with any person or entity acting for, derivatively, on behalf of, or claiming through them, including any committee (and it members in their official capacity only) appointed in any of the Cases or prescribed trustee or examiner, along with their ~~affiliates~~Affiliates or advisors as described, unconditionally release the Debtors' directors and officers (and ~~affiliates~~Affiliates) from any past, present and future claims (as defined per custom, in a long-form list of possible items). The releases also include a covenant that the releasing parties will not assert or otherwise participate in or maintain (by themselves or encouragement of others) in any such claim against the foregoing released parties with respect to the released matters.  The releases do not, and are not intended to: (x) include

24

non-consensual releases by third parties of any direct cause of action such third party may have against a released party; or (y) have the effect of releasing any claim or cause of action, if any, arising under the APA, provided that the negotiation of the APA shall not form the basis for any claim or recovery therein.  These release provisions are also included in the Plan.

l.    <u>Representations and Warranties</u>.  The Assets will be sold "AS IS, WHERE IS," and Debtors will not make any representation or warranty as to the Assets to be sold, or their suitability for any particular purpose or merchantability, except as to certain representations or warranties set forth in the APA, as supplemented by Disclosure Schedules, which do not survive the closing.

m.   <u>Bankruptcy Court Approval</u>.  The Sale and the transactions contemplated therein are subject to approval by the Bankruptcy Court pursuant to the entry of a separate order authorizing the sale of assets free and clear of liens pursuant to Sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code and in conjunction with the Plan confirmation process.  The Buyer has required the entry of this separate 363 sale order establishing the free and clear nature of the Sale transaction.  Among other reasons, a 363 sale order is commonly recognized by third parties as establishing the free and clear nature of assets purchased in a bankruptcy transaction.

### 3.    <u>Employment of Debtors' Employees</u>

The Buyer intends to offer employment to a substantial majority of the Debtors' employees, including the Debtors' management.  It is expected that the Debtors' C.E.O., Charles Bengochea, will be the C.E.O. for the Buyer.

### 4.    <u>Buyer's Adequate Assurance of Performance</u>

Buyer intends to operate under a committed line of credit, which is referenced in the 5 year pro forma financial statements as "Revolver," attached hereto as Schedule 5. The Revolver is being funded by the Senior Lender.  As of the date of this Disclosure Statement, the sole participant of the Senior Lender is JIG, of which Richard Jackson is the CEO.  The projections show that "Net Cash from operating activities" remains positive over the next 5 years. Historically, the Debtors did not default on their lease obligations, except to the extent that the filing of the Bankruptcy Cases constituted a technical, unenforceable default.  The Buyer intends to operate the stores consistent with their prior operation and use.  Given these facts, the Debtors and Buyer believe that they will be able to satisfy their obligations under the Bankruptcy Code to assume and assign to Buyer the Debtors' contracts and leases selected by the Buyer. Attached hereto as Exhibit C is the cure cost schedule and list of executory contracts and unexpired leases that may be assumed and assigned to the Buyer, or rejected.

### C.    **Consolidation**

As noted herein, the Debtors consist of three entities: (1) Family Christian LLC, which is the operating entity, (2) Family Christian Holding, LLC (previously defined as "**Holding Company**") which is a holding company with no business activity or assets other than

ownership of the equity interests of Family Christian, LLC, and (3) FCS Giftco, LLC ("**Giftco**"), an inactive company formed years ago to handle potential escheat issues pertaining to gift cards, but a company that no longer has any business purpose or activity. Neither the Holding Company nor Giftco have any assets, and they do not have any creditors except the Secured Lenders, as they were listed in the original loan documents as either a co-borrower or guarantor of the loans with the Secured Lenders.

Based upon the foregoing, and primarily for purposes of administrative convenience, Section 12.2 of the Plan provides that all of the Debtors will be consolidated for purposes of voting, confirmation and any distributions under the Plan.

### D.    Classification and Treatment of Claims

Section 1122 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims and interests of creditors and equity holders. Section 1123 of the Bankruptcy Code specifies that certain claims do not need to be classified, including specifically Administrative Expense Claims and Priority Tax Claims.

"A debtor in bankruptcy has considerable discretion to classify claims and interests in a chapter 11 reorganization plan." *Matter of Wabash Valley Power Ass'n*, 72 F. 3d 1305, 1321 (7th Cir. 1995). "While a debtor may not separately classify claims solely in order to gerry-mander an affirmative vote on reorganization, claims may be classified separately if significant disparities exist between the legal rights of the holder[s of the different claims] which render the two claims not substantially similar." *Id., quoting In re Woodbrook Assocs*., 19 F.3d 312 (7th Cir.1994). "Claims may also be separately classified if there are "good business reasons" to do so or if the claimants have sufficiently different interests in the plan." *Id., citing In re U.S. Truck Co.*, 800 F.2d 581, 583 (6th Cir. 1986).

The Debtors believe the Plan classifies all Claims and Interests in compliance with the Bankruptcy Code. If the Bankruptcy Court determines that a different classification is required in order to confirm the Plan, the Debtors intend to make such reasonable modifications to the Plan's classification scheme in order to permit confirmation and to treat acceptances received for the Plan for purposes of obtaining the approval on any modified or reconstituted Classes of which each accepting Holder is deemed by the Bankruptcy Court to be a member.

1.    Treatment of Unclassified Claims

(a)    Administrative Expense Claims

(i)    Definition and Estimates

An Administrative Expense Claim is defined in the Plan as a Claim arising prior to the Effective Date for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code. Administrative Expense Claims include, but are not necessarily limited to, (a) the costs and expenses incurred after the Petition Date for preserving the Debtors' Estate(s) (such as wages, salaries and commissions and payments for inventory, equipment and leased premises), (b) 503(b)(9) Claims, (c) Professional Fee Claims, and (d) DIP Loan Claims.

26

503(b)(9) Claims means ~~an Allowed Claim~~a claim asserted against any of the Debtors pursuant to section 503(b)(9) of the Bankruptcy Code, which provides administrative expense status to "the value of any goods received by the [D]ebtors within 20 days before the commencement of [the Bankruptcy Cases] in which the goods have been sold to the debtor in the ordinary course of such debtor's business."

The amount of the Administrative Expense Claims varies from day to day depending upon the amount of outstanding payroll, invoice purchases and so forth at any given time. Nonetheless, set forth below is the Debtors best reasonable estimate of the amount of certain Administrative Expense Claims  owing as of the Effective Date (excluding Professional Fee Claims and DIP Loan Claims):

- $2,500,000      (employee compensation)

- $5,600,000      (estimated Allowed 503(b)(9) Claims of Unsecured Creditors)

- $6,000,000      (all other: post-petition accounts payable, taxes, etc.)

    $14,100,000    total

        (ii)      Treatment of Administrative Expense Claims

The Plan provides that Each Holder of an Allowed Administrative Expense Claim, other than Professional Fee Claims ~~and,~~ DIP Loan Claims, and the undisputed portion of 503(b)(9) Claims, will, pursuant to the APA, be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash on the later of (i) the Effective Date, (ii) at the time such Claim comes due according to its terms, or (iii) the date such Claim become an Allowed Administrative Expense Claim.

The Debtors, and as applicable the Buyer pursuant to the terms of the APA, intend to pay Administrative Expense Claims that arise in the ordinary course of business and are not disputed as such claims come due without the necessity of the Holder of such Claim filing any request for payment other than the submission of customary invoices to the Debtors.  Notwithstanding the foregoing sentence, however, Holders of an Administrative Expense Claim (other than a Professional Fee Claim or a DIP Loan Claim) must file a motion or notice in the Bankruptcy Case seeking the allowance of any Administrative Expense Claim which has not been paid within 60 days after the Effective Date, unless such Holder previously filed such a request and the request remains pending or was allowed by a prior Order of the Bankruptcy Court.  If a Holder of a 503(b)(9) Claim has timely filed a 503(b)(9) Claim, then such Holder does not need to file another 503(b)(9) Claim or a notice of motion seeking allowance of such Claim.  **Failure to file timely and serve the required motion or notice by the applicable deadline(s) noted above shall result in the Administrative Expense Claim being forever barred and discharged without payment**.

The Plan further provides that Holders of a Professional Fee Claim shall be paid in full pursuant to the APA within three (3) Business Days after such Claims become Allowed. All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court

24408153v18

pursuant to customary final fee applications by the date that is 60 calendar days after the Effective Date.  On or before the Effective Date, the Holder of an Allowed DIP Loan Claim shall receive (i) Cash, equal to the unpaid portion of such Allowed DIP Loan Claim, or (ii) such other less favorable treatment as to which the Holder of the Allowed DIP Loan Claim and the Debtors shall have agreed upon in writing.

(b)    Priority Tax Claims

The Plan provides that Allowed Priority Tax Claims will be paid with funds from the Buyer in accordance with either of the following treatments selected by the Debtors in their discretion: (1) in Cash for the full, unpaid amount on the Effective Date, or as soon thereafter as is reasonably practicable,  (2) in accordance with Section 1129(a)(9)(C), deferred Cash payments over a period not exceeding five (5) years after the Petition Date, plus interest accruing during such time period at the rate determined under nonbankruptcy law applicable to such Claim, or (3) in accordance with such other less favorable treatment to which the Debtors and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

2.    Treatment of Classified Claims

(a)    Class 1: Allowed Priority Non-Tax Claims

The Plan defines Priority Non-Tax Claims as a Claim entitled to priority under the provisions of section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim, a Priority Tax Claim, or a DIP Loan Claim.  These include unsecured claims that arose "prior" to the Petition Date and relating to unpaid wages, salaries, and benefit plan contributions.

The Plan provides that unless a different treatment is agreed upon by the parties that does not conflict with this Plan or the Bankruptcy Code, each Allowed Priority Non-Tax Claim shall be Unimpaired pursuant to section 1124 of the Bankruptcy Code and such Allowed Priority Non-Tax Claim shall be paid in full in accordance with such reinstated rights on the Effective Date or as soon as practically possible thereafter.

Priority Non-Tax Claims are Unimpaired and not entitled to vote on the Plan.

(b)    Class 2: Allowed Senior Lender Secured Claim

Class 2 consists of Allowed Secured Claim of the Senior Lender, which claim arises out of the business loan and revolving line of credit provided to the Debtors under the loan agreements with the Senior Lender.    The Debtors estimate the amount of such claim at $23,500,000.

The Plan provides that unless a different treatment is agreed upon by the parties that does not conflict with this Plan or the Bankruptcy Code, upon the Closing of the Sale, all liabilities and obligations with respect to the Senior Lender Secured Claim shall be assumed and satisfied in full by the Buyer pursuant to the terms of the APA.

28

The Senior Lender Secured Claim is impaired and entitled to vote on the Plan. This Claim is impaired because the Plan does not leave unaltered the Senior Lender's legal, equitable and contractual rights. *See* 11 U.S.C. § 1124(1). Rather, the Buyer is assuming these obligations under a different set of legal, equitable and contractual rights.

(c)    <u>Class 3:  Allowed Term Lender Secured Claim</u>

Class 3 consists of the Allowed Secured Claim of the Term Lender, which claim arises out of the term loan provided to the Debtors. The Term Lender Secured Claim shall be Allowed in the amount of $34,200,000 solely for purposes of the Plan.

The Plan provides that unless a different treatment is agreed upon by the parties that does not conflict with this Plan or the Bankruptcy Code, upon the Closing of the Sale, all liabilities and obligations in the amount of $6,000,000 of the Term Lender Secured Claim shall be an Allowed Secured Claim and assumed and satisfied in full by the Buyer pursuant to the terms of the APA. Any amount of the Allowed Term Lender Secured Claim that exceeds $6,000,000 shall be treated as a general Unsecured Claim in Class 7 for voting purposes only, but not for distribution purposes and any distribution that would be made on account of such deficiency claim is waived. In the event the Cash Component under the APA increases above $100,000, any such increase shall be paid at Closing or thereafter to the holder of the Term Lender Secured Claim.

The Term Lender Secured Claim is impaired and entitled to vote on the Plan. This Claim is impaired because the Plan does not leave unaltered the Term Lender's legal, equitable and contractual rights. *See* 11 U.S.C. § 1124(1). Rather, the Buyer is assuming a portion of these obligations under a different set of legal, equitable and contractual rights.

(d)    <u>Class 4:  Allowed Consignment Claims</u>

The Plan defines Consignment Claims as a Claim arising out of the delivery of goods to the Debtors pursuant to a consignment agreement or consignment arrangement between the Debtors and the Person that delivered such goods to the Debtors. Article VIII below contains further information about the Consignment Claims and potential issues relating to them.

The Plan provides all Holders of Consignment Claims will be entitled ~~to~~ to accept or reject the Plan. Each Holder of an Allowed Consignment Claim that votes to accept the Plan and become a "**Consenting Consignment Vendor**" under the APA has the option of electing one of two options on their Ballot (the failure to select an option results in the Buyer selecting the option for that Consenting Consignment Vendor)

> <u>Payment Option 1</u>: Such Holder shall be entitled to its 503(b)(9) Consignment Claim paid in Cash within ten (10) Business Days after such claim is Allowed, provided the undisputed portion of any such claim shall be paid at the Closing, plus an amount equal to ten (10%) percent of the Debtors' book value for such Consenting Consignment Vendor's Consignment Goods that are Transferred Inventory under the APA, paid in the month following the month in which such individual items of Transferred Inventory are sold by the Post-Closing Business.

29

In addition, the Buyer will pay ten (10%) percent of the Debtors' book value for such Consenting Consignment Vendor's Consignment Goods that are sold by the Debtors between June 15, 2015 and the Closing Date, paid no later than thirty (30) days following the Closing Date.

<u>Payment Option 2</u>: Such Holder shall be entitled to amount equal to thirty-five (35%) percent of the Debtors' book value for such Consenting Consignment Vendor's Consignment Goods that are Transferred Inventory under the APA, paid in the month following the month in which such individual items of Transferred Inventory are sold by the Post-Closing Business. In addition, the Buyer will pay thirty-five (35%) percent of the Debtors' book value for such Consenting Consignment Vendor's Consignment Goods that are sold by the Debtors between June 15, 2015 and the Closing Date, paid no later than thirty (30) days following the Closing Date.

In either case of Option 1 or Option 2 above, Buyer shall have no liability for failure to market or sell any Consignment Goods that are Transferred Inventory, and if any such Consignment Goods remain unsold one (1) year following the Closing Date, the Buyer shall return to each such Consenting Consignment Vendor their respective unsold Consignment Goods that are Transferred Inventory at no further cost or obligation to the Buyer other than the Buyer arranging and paying for shipment to return such Transferred Inventory to the applicable Consenting Consignment Vendor.

Each Holder of an Allowed Consignment Claim that does not vote to either accept or reject the Plan shall be treated as a "Consenting Consignment Vendor" and receive either Payment Option 1 or Payment Option 2 above as chosen by the Buyer.

Each Holder of an Allowed Consignment Claim that either votes to reject the Plan (a "**Rejecting Consignor**") or objects to the Plan including the Sale Transaction shall not be treated as a Consenting Consignment Vendor and shall retain all of its rights, remedies and claims with respect to the Consignment Goods comprising such Claims. Upon Closing of the Sale, the Buyer shall <u>not</u> sell the Rejecting Consignor's Consignment Goods without the written agreement and consent of both the Buyer and the corresponding Rejecting Consignor; <u>provided, however</u>, regardless of any such agreement, in the event the Buyer sells any such Consignment Goods, the Buyer shall hold the Rejecting Consignor's share of the proceeds from such sale pending resolution of the Rejecting Consignor's rights, remedies and claims with respect to its Consignment Goods. The Debtors, with the Buyer's approval, may elect to return to such Rejecting Consignor its Consignment Goods with the underlying consignment agreement between the parties determining which party is responsible for shipping costs associated with the return of the goods. The Debtors may elect to seek a Final Order from the Bankruptcy Court (or such other court of competent jurisdiction) determining the rights of the Debtors in the Consignment Goods received from the Rejecting Consignor. In the event such Final Order determines the applicable Consignment Goods are treated as goods sold to the Debtors, then such Consignment Goods or their proceeds shall be treated as Assets under the APA and transferred by the Debtors, or the Plan Administrator on behalf of the Debtors, to the Buyer without further court order.

The Consignment Claims in Class 4 are impaired and entitled to vote on the Plan.

    (e)    <u>Class 5:  Allowed Secured Tax Claims</u>

The Plan defines Secured Tax Claims as a Claim of a governmental unit for the payment of a tax assessed against property of the Debtors' Estate(s) that is secured by a first priority Lien on such property of the Estate(s).

The Plan provides that unless a different treatment is agreed upon by the parties that does not conflict with this Plan or the Bankruptcy Code, upon the later of thirty (30) days after the Effective Date and the last date that the Secured Tax Claim comes due under applicable law without incurring a penalty, the Holder of such Allowed Secured Tax Claim shall receive (i) Cash equal to the value of its Allowed Secured Tax Claim at the time, (ii) the return of the Holder's collateral securing the Secured Tax Claim, or (iii) such other less favorable treatment as to which the Debtors, the Buyer and such Holder shall have agreed upon in writing.  Any Holders of an Allowed Secured Tax Claim shall retain its Lien in the collateral securing such Claim (or the proceeds thereof to the extent sold by the Debtors free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date until such time as (A) the Holder of such Allowed Secured Tax Claim has received the treatment describe above or (B) such purported Lien has been determined by an order of the Bankruptcy Court to be invalid or otherwise avoidable.   To the extent a Secured Tax Claim exceeds the value of the interest of the Estate in the property that secures such Claim, such Claim shall be deemed disallowed pursuant to Bankruptcy Code section 502(b)(3).

Class 5 Secured Tax Claims are Unimpaired and not entitled to vote on the Plan.

    (f)    <u>Class 6:  Allowed Miscellaneous Secured Claims</u>

The Plan defines Miscellaneous Secured Claims as any Secured Claim other than the Senior Lender Secured Claim, the Term Lender Secured Claim, and the Secured Tax Claims. The Debtors are not aware of any Miscellaneous Secured Claims and have prepared Class 6 merely to address the contingency of any Other Secured Claims being filed against the Debtors and Allowed by the Court

The Plan provides that unless a different treatment is agreed upon by the parties that does not conflict with this Plan or the Bankruptcy Code, each Holder of an Allowed Miscellaneous Secured Claim shall receive, in the sole discretion of the Debtors, the Buyers or the Plan Administrator, as the case may be: (a) Cash equal to the amount of such Allowed Miscellaneous Secured Claim; (b) Reinstatement of such Allowed Miscellaneous Secured Claim; (c) return of the property securing such Miscellaneous Secured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors, the Buyers or the Plan Administrator, as the case may be.  Nothing herein prevents or prohibits the Debtors from challenging the allowance of any Claim as a Miscellaneous Secured Claim or from contending that such Claim constitutes an Unsecured Claim.

Class 6 Miscellaneous Secured Claims are Unimpaired and not entitled to vote on the Plan.

(g)    Class 7:  Allowed Unsecured Claims

The Plan defines Unsecured Claims as any Claim against the Debtors that is not secured by any Lien upon property of the Debtors' Estates and that is not a Secured Claim, a Priority Non-Tax Claim, a Priority Tax Claim, or an Administrative Expense Claim.

The Plan provides that unless a different treatment is agreed upon by the parties that does not conflict with this Plan or the Bankruptcy Code, each Holder of an Allowed Unsecured Claim will receive (i) upon the Effective Date, a release from any liability under Avoidance Actions; plus (ii) a Pro Rata share of Distributions available from the $100,000 Unencumbered Settlement Cash and any other Assets (following liquidation into Cash) that remain property of the Debtors' Estates after the Closing Date of the Sale.

Class 7 Unsecured Claims are Impaired and entitled to vote on the Plan.

(h)    Class 8:  Equity Interests

The Plan defines Interests as all equity securities, membership interests, or other ownership interests in any of the Debtors.

The Plan provides that Interests in the Debtors shall be extinguished and terminated and the Holders of such Interests shall not receive or retain anything on account of such Interests.

Class 8 Interests are Impaired and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Class 8 Interests are not entitled to vote to accept or reject the Plan.

**E.    Select Settlement Payments By The Buyer Pursuant To the Sale**

Separate and apart from the distributions to be made by Debtors under the Plan, the Buyer has assumed the obligation under the APA to make select payments described below:

1.    Payment To Ad Hoc Consortium For Settlement

On account of the Debtors' settlement with the initial plaintiffs in the Consignment Lawsuit, the Debtors shall pay the sum of $500,000 to the Consenting Consignment Vendors that were the initial plaintiffs in the Consignment Lawsuit, to be paid within one (1) Business Day following the first to occur between entry of the Confirmation Order and entry of an order approving the settlement.  To the extent the Debtors have not made this payment as of the Closing, the Buyer shall make this payment in accordance with Section 2.3(a)(iv) of the APA. For convenience, the payment shall be made to the attorney of record for such plaintiffs.

2.    5% Payment To Settle Trade Credit Terms With Trade Creditors

32

Pursuant to Section 2.3(a)(iii) of the APA, the Buyer agrees to pay to each Trade Creditor that portion of the liabilities and obligations owed as of the Petition Date by the Debtors to each Trade Creditor equal to five (5%) percent of the amount, after reduction for any such Trade Creditor's Allowed 503(b)(9) Claim, (A) set forth in the Sellers' bankruptcy schedules; or (B) of such Trade Creditor's Claim as may otherwise be agreed to by the Buyer and such Trade Creditor, to be paid by December 31, 2015; provided that such Trade Creditor agrees to provide to the Post-Closing Business Trade Terms for no less than one (1) year following the Closing Date.

## F.  Disposition of Executory Contracts and Unexpired Leases

As set forth in Article 5 of the Plan, the Debtors' assumption and assignment and/or rejection of such contracts and leases shall be determined and governed generally by the APA, which are referred to in the APA as the "Assumed Contracts" and the "Assumed Real Property Leases" respectively.  The Buyer plans to keep most locations subject to further review of lease and store economics over the coming months, and the Buyer will designate the treatment of such contracts and leases as of the Closing Date of the Sale.   However, for a limited period time after the Closing Date not to exceed September 9, 2015 (i.e., the Designation Period), the Buyer shall have the ability to designate contracts or leases to be assumed or rejected if such contracts or leases were not already designated as such as of the Closing Date, and the Buyer will pay the obligations first arising during the Designation Period and Post-Closing Occupancy Period for such contracts and leases.

### 1.    Assumption and Assignment / Cure Costs

The Debtors shall assume and assign to Buyer all of the Debtors' Executory Contracts and Unexpired Leases that are designated by the Buyer as Assumed Contracts and Assumed Real Property Leases pursuant to the APA.  The Debtors shall pay and perform the Cure Costs with funds received from the Buyer (or cause the Buyer to pay and perform such Cure Costs) needed to assume and assign the corresponding Assumed Contracts and Assumed Real Property Leases.

Attached  as  <u>Exhibit "C"</u>  to this Disclosure Statement is a summary of the Debtors' Executory Contracts and Unexpired Leases, along with the Debtors' calculation of the Cure Costs corresponding to such contracts and leases (the "Cure Cost Schedule").

Any dispute regarding Cure Costs or other issues regarding assumption and assignment may be resolved consensually by the parties without a hearing or order from the Bankruptcy Court by the filing of a written stipulation by the parties with the Bankruptcy Court; provided nothing shall prohibit the Bankruptcy Court from also entering a consent order resolving the dispute, without a hearing, if it is desired or submitted by the parties.  **Any objection to the proposed Cure Cost amounts listed on the attached Cure Cost Schedule (the "Cure Objection") must be filed with the Bankruptcy Court no later than the deadline for objecting to the confirmation of the Plan.   If no timely Cure Objection is filed,  the Cure Costs listed in the Cure Cost Schedule will be the only amounts necessary under section 365(b) of the Bankruptcy Code to cure the monetary defaults under the contracts and leases set forth in the Cure Cost Schedule.   If a Cure Objection or other objection to the**

33

**assumption and assignment was previously filed in the Bankruptcy Case prior to the date of this Plan by a Person, such Person is not required to re-file such objection.**

2.        Rejection of Contracts / Bar Date for Rejection Damages

The Debtors shall reject all of the Debtors' Executory Contracts and Unexpired Leases that are not designated by the Buyer as Assumed Contracts and Assumed Real Property Leases pursuant to the APA.  The effective date for the rejection of any particular contracts or leases shall be determined by the Sale Order.

Claims arising out of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court no later than thirty (30) days after the Rejection Effective Date. Any Claim not filed within such time period shall be forever barred. The Debtors and the Plan Administrator shall have the right to object to any Claim arising out of the rejection of an executory contract or unexpired lease.  Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be Impaired and treated as Class 7 Unsecured Claims.

### G.        Means of Implementing The Plan

The Closing of the Sale Transaction to Buyer will provide the funds needed to implement and effectuate the Plan.   On or after the Closing, the Buyer's obligations to pay the Purchase Price under the APA will fund the cash needed to pay the distributions to Claims required under the Plan as such Claims are Allowed or come due.

To fund such obligations, the Buyer has obtained a $50 million Line of Credit that will be available as needed to fund Buyer's obligations under the APA, along with the working capital needs of the business.  Additionally, the Buyer will have acquired the Transferred Assets as of the Closing Date, and the ongoing business operations and income derived from the such Transferred Assets will further enable the Buyer to fund the APA obligations.

Pursuant to Section 6.2 of the Plan, upon the Effective Date, all of the Excluded Assets and other possible property of the Debtors not transferred to the Buyer or another Person pursuant to the APA, shall vest in the Estate on the date such property becomes an Excluded Asset, free and clear of all Liens, Claims, encumbrances and interests in accordance with section 1141 of the Bankruptcy Code, but subject to the rights of Holders of Allowed Claims to obtain any distributions provided for in this Plan.

### H.        Reorganized Capital Structure Of The Ongoing Business

The balance sheet for the current Debtors reflect liabilities that far exceed assets.  The post-Closing balance sheet of the Buyer's business will be significantly healthier than the Debtors', as a significant amount of debt will be removed from the balance sheet through the bankruptcy process. As reflected by the pro forma projections attached hereto as Schedule 5, the total assets of the Buyer will exceed total liabilities, and the Buyer is projected to realize positive, net cash flow for the future operations.

24408153v18

## I.    Release of Claims

Pursuant to Section 6.6~~6.7~~ of the Plan, the Debtors and their Estates will waive and release all Avoidance Actions, which includes so-called bankruptcy "preference claims," with the limited exception that the Debtors and their Estates will retain such claims against Persons that are Rejecting Consignors as the Debtors and their Estates may confront litigation with such Persons in the Consignment Lawsuit or otherwise.    (See Article VIII.C for discussion of the Consignment Lawsuit).

The waiver of Avoidance Actions is a meaningful benefit under the Plan for creditors, as it means creditors will not be subject to potential lawsuits for the recovery of preference or similar claims, which are discussed further in Article VII.A below.  The waiver is also an important aspect of the Sale that is required by the Buyer in order to achieve the Buyer's goal of restoring normal business relationships with trade vendors, all of which would be hampered if such trade vendors were subjected to costly lawsuits over preference claims.

Section 6.6~~6.7~~ of the Plan also provides the following additional waiver and release of claims, which are succinctly summarized below with reference to the Plan for the full text of each release:

- Section 6.6~~6.7~~(b): the Debtors and their Estates waive and release any claims against the Secured Lenders and DIP Lender;

- Section 6.6~~6.7~~(c): the Debtors and their Estates waive and release any claims against their Directors and Officers;

- Section 6.6~~6.7~~(d):  the Debtors and their Estates waive and release any claims against the Committee (and its members in their official capacity only);

- Section 6.6~~6.7~~(e):   the ~~Lender~~ Releasing Parties, ~~the D&O Releasing Parties and the Committee Releasing Parties (collectively, the "Releasing Parties"),~~ covenant and agree not to assert any claims against the released parties with respect to the released claims.

The releases and related provisions in subsections 6.6~~6.7~~(b) through 6.6~~6.7~~(e) of the Plan and summarized above do not, and are not intended to: (x) include non-consensual releases by third parties of any direct cause of action such third party may have against a released party; (y) have the effect of releasing any claim or cause of action, if any, arising under the APA, provided that the negotiation of the APA shall not form the basis for any claim or recovery therein; or (z) apply to any Person that is a Rejecting Consignor or to any claim allowance and reconciliation process in the Debtors' Bankruptcy Case.

## J.    Plan Administrator

Because the Debtors will cease business operations after the Sale and have virtually no employees thereafter, a "Plan Administrator" will be appointed pursuant to Section 6.3 of the Plan for varying purposes: (a) to be the representative of the Debtors, (b) to administer and liquidate any residual assets remaining in the Debtors' Estates, including the Excluded Assets,

(c) to make distributions to creditors pursuant to this Plan and the Bankruptcy Code, and (d) to otherwise wind down the Debtors' affairs and close out the Bankruptcy Cases.

The Debtors designate Gary Murphey, a Director at Resurgence Financial Services, LLC and the Debtors' financial advisor in the Bankruptcy Case, as the plan administrator. His compensation will be $375 per hour plus reasonable out of pocket expenses, pursuant to a customary engagement letter to be entered into as of the Effective Date. In the event of the death or resignation of the Plan Administrator, then the designated Plan Administrator shall be Missy Johnson, CPA from Resurgence Financial Service, LLC.

Following the Effective Date, the Debtors will have no other officers, directors or management.

**K.     Dissolution of the Creditors Committee ~~and~~, Release of the Committee and Appointment of the Claims Oversight Committee**

On the Effective Date, (A) the Committee shall be automatically dissolved and all of its members, Professionals and agents shall be deemed released of their duties, responsibilities and obligations, and shall be without further duties, responsibilities and authority in connection with the Debtors, the Bankruptcy Case, the Plan or its implementation, and (B) the Term Lender Complaint filed by the Committee shall be deemed dismissed with prejudice by the Committee. Notwithstanding, the Committee shall continue to exist solely to prosecute any applications for payment of its fees and expenses and reimbursement of member's expenses, and for purposes of filing a dismissal of the Term Lender Complaint.

In addition, Section ~~6.6~~6.7(d) of the Plan provides a general release by the Debtors of any claims against the Committee and its members and representatives.

Prior to dissolution of the Committee pursuant to Section 6.5 of the Plan, the Committee shall designate two of its members to serve on a "Claims Oversight Committee," such committee shall become effective on the Effective Date. Prior to filing an objection to or settling a Claim following the Effective Date, the Plan Administrator shall first provide advance notice (a minimum of five (5) Business Days prior to filing any objections to or settling any Claims), and consult (using reasonable efforts) with the Claims Oversight Committee regarding the Claims Oversight Committee's position and opinion on the merits of such proposed objection or settlement. The Plan Administrator shall have final authority on the filing of objections to or in seeking approval of a settlement of Claims. The Claims Oversight Committee and its members shall serve uncompensated. The Claims Oversight Committee may hire professionals at its own expense.

**L.     Retention of Jurisdiction**

Section 11.1 of the Plan specifies that the Bankruptcy Court will retain jurisdiction over various matters relating to the implementation of the Plan and the wind down of the Debtors' affairs, including but not limited to: (a) adjudication matters regarding creditors' Claims and/or any objections to Claims, (b) hearing any lawsuits brought by or against the Debtors, (c)

resolving any disputes or issues arising with the implementation of the Plan, and (c) entering a Final Decree to close out the Bankruptcy Cases.

### M.    Buyer Standing and Post-Closing Transfer of Assets

Upon the Effective Date, the Buyer shall have the rights of the Debtors and their estates, including derivative standing pursuant to Sections 105 and 1109 of the Bankruptcy Code, with respect to all Assumed Liabilities and Consignment Goods, with the right and power to initiate, prosecute and settle any and all rights, claims, defenses, causes of action and objections related to any and all such Assumed Liabilities and Consignment Goods, and neither the Debtors' nor their estates, nor any other party granted derivative standing thereof, shall settle or otherwise validate or compromise any of the Assumed Liabilities or Consignment Goods without the prior written consent of the Buyer.

Pursuant to the APA, the Debtors shall promptly deliver to the Buyer any Cash, checks, Inventory or other property they may receive or that are determined to be owned by the Debtors after the Closing in respect of the Assets, including the Transferred Accounts Receivable, credit card receipts, Cash and any Consignment Goods that are determined by an Order of the Bankruptcy Court to be owned by the Sellers.

### N.    Conflicts in Documents

Section 12.17 of the Plan provides that in the event that there is a conflict between the terms of the Sale Order, the APA, the Confirmation Order, the Plan, the Disclosure Statement, any other order of the Court, or any other document, the item in the immediately preceding list that is first listed between the two items shall control.

### O.    Request for Immediate Effectiveness of Plan and Sale

The Debtors propose that the  Confirmation Order and the Sale Order shall contain provisions providing that such orders are effective immediately and shall not be stayed by any applicable statute or Bankruptcy Rule, including but not limited to Bankruptcy Rules 3020(e), 6004(h) or 6006(d).

### P.    Closing of the Bankruptcy Case

The Plan provides that the Confirmation Order, subject to the Effective Date, shall act as a final decree pursuant to section 350 of the Bankruptcy Code formally closing the Bankruptcy Cases of Family Christian Holding, LLC and FCS Giftco, LLC; provided, however, that the Bankruptcy Case of Family Christian, LLC shall remain open until such time as the Plan Administrator files with the Bankruptcy Court such documents required by the Bankruptcy Rules and any applicable orders of the Bankruptcy Court to close such Bankruptcy Case.  Upon the Effective Date, counsel for the Debtors shall submit proposed forms of order to the Bankruptcy Court to enter on the docket of Family Christian Holding, LLC and FCS Giftco, LLC to close said Bankruptcy Cases effective on the Effective Date, except for the Bankruptcy Case of Family Christian, LLC.

24408153v18

# ARTICLE VII.
## INFORMATION  REGARDING  RELEASED CLAIMS

### A.    Debtors' Analysis Of The Release of Preference Claims

#### 1.    Preference Claims, Generally

Loosely speaking, the Bankruptcy Code allows a debtor to potentially recover payments the debtor made to creditors within 90 days before the bankruptcy filing.  Such payments are commonly referred to as "preference" payments, and claims to recover such monies are commonly referred to as "preference claims".

More specifically, under section 547(b) of the Bankruptcy Code, a debtor may avoid as a preferential transfer and recover the transfer or the value thereof from the recipient creditor, a transfer or payment by the debtor of an interest in property: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor to the creditor before the payment was made; (3) made while the debtor was insolvent; (4) made within ninety (90) days before the date of the filing of the bankruptcy petition; and (5) enabled the creditor to receive more than the creditor would have received if the debtor was liquidated in Chapter 7. The debtor is presumed insolvent during the 90 days before the date that its bankruptcy petition is filed.

Generally speaking, payments to a secured creditor are not viewed as a preference payment, so long as the payment amount was less than the value of the secured creditor's collateral.   In such situations, element (5) listed above is not satisfied.   Specifically, receipt of the payment did not enable the creditor to receive more than it would have in a Chapter 7 liquidation, because the secured creditor would have received the same amount or more in the Chapter 7 liquidation of its collateral.

Additionally, there are certain defenses to a preference claim. The two (2) defenses that have the greatest likelihood of being applicable to the Debtors' possible preference claims are the ordinary course of business defense and the new value defense. The ordinary course of business defense provides a creditor with a defense if the transfer or payment was made in the ordinary course of business of the debtor and creditor or the transfer was made according to ordinary business terms. The defense can be established on a subjective basis, that is, by analyzing the transaction history between the debtor and creditor or on an objective basis, by analyzing such transactions according to applicable industry standards. The new value defense is available to the creditor if the creditor provides new value in the form of new goods or services after the preferential payment was received. For example, if the debtor receives a $1,000 payment from the creditor within the 90 day preference period and, after the creditor receives the payment, it ships additional goods of $500, then the creditor can offset the $500 shipment against the $1,000 payment, leaving a net preference exposure to the creditor of $500.

38

2.    <u>Debtors' Analysis of Possible Preference Claims</u>

The Debtors requested that an analysis of potential recoveries from preference claims be conducted by the Debtors' financial advisor, Gary Murphey of Resurgence Financial.  Gary Murphey is a CPA who has experience analyzing bankruptcy preference claims in other bankruptcy cases. A written report summarizing that preference analysis is attached to this Disclosure Statement as Schedule 4 (the "**Preference Analysis**").   The Preference Analysis casts doubt on the ability to recover any significant amount of preference claims after the new value defenses and ordinary course defenses are applied.

After the "new value" defense is applied, the Preference Analysis indicates there may be as much as approximately $16.9 million in potential preference claims that "may" be recoverable for the estate.  However, after the ordinary course of business defense is applied, the Preference Analysis suggests that the recoverable preference claims will be minimal and not significant.

To elaborate briefly on such conclusions, the Preference Analysis reflects that approximately $72.7 million in payments were made by the Debtors within the 90-day preference window.  Of that amount, approximately:

(i)    $12.1 million is comprised of small payments to a multitude of creditors that would not be cost-effective to litigate or pursue,

(ii)    $14.5 million constituted loan payments to either the Senior Lender or the Term Lender, and the Debtors do not believe such payments constitute recoverable preference payments since the debts owed to the Secured Lenders are secured by liens upon the Debtors' assets,

(iii)    $8.1 million constitutes priority claims that Debtors were authorized to pay per Court order (e.g., employee payroll),

(iv)    $1.3 million related to either retainer deposits which are not preferences or pass-through of funds (such as charitable donations) not belonging to the Debtors; and

(v)    $19.8 million consists of "new value".

Hence, the maximum potential preference claims appear to approximate $16.9 million, but even those numbers are subject to the ordinary course defense.

With respect to the ordinary course defense, Resurgence Financial evaluated the Debtors' payments made during the preceding 12 month period prior to the 90-day "Preference Period." Of the approximate $16.9 million of net potential preference claims remaining after new value (see above), the Debtors examined vendor payments totaling approximately $3.4 million (approximately 20% of the total) to evaluate the time frame payments were made on invoices during the Preference Period, and compared it to the historical range of time frames that payments were made by Debtors during the preceding 12 months.  Based on the analysis of Resurgence Financial, substantially all payments during the Preference Period fell within the general payment terms and payment time frames that existed during the preceding 12 months.

Accordingly, the Debtors believe that the Ordinary Course Defense would be applicable to substantially all payment recipients and estimate the net value of the preference claims to be de minimis.

Adding together the general costs and uncertainties associated with litigation needed to recover such preference claims, the Debtors believe the waiver and release of the preference claims is in the best interests of creditors and a reasonable requirement for consummating the APA with the Buyer.

**B.     Debtors' Analysis of The Release of Claims Against Officers and Directors**

The Debtors do not believe there are any valid or legitimate claims against the Debtors' officer or directors.     The Debtors' directors do not receive any salary, and no transfers of money have gone to them.   Indeed, the opposite is true, since the three directors, specifically Richard Jackson, Mike Kendrick, and Larry Powell, put $25 million cash equity into the company at the time of the 2012 Acquisition, and an entity affiliated with Richard Jackson posted another approximate $7 million as a credit enhancement with respect to the efforts to save the Debtors' revolving line of credit from any termination by J.P. Morgan Chase Bank. (See discussion at Article IV.C).

Moreover, the Debtors are non-profit companies formed under Georgia law, and Georgia statutes explicitly provide immunity to officers and directors of nonprofit entities in the absence of willful or wanton misconduct.  The relevant portion of the Georgia statute states as follows:

> A person serving with or without compensation as a member, director, or trustee, or as an officer of the board without compensation, of any nonprofit hospital or association or of any nonprofit, charitable, or eleemosynary institution or organization or of any local governmental agency, board, authority, or entity shall be immune from civil liability for any act or any omission to act arising out of such service if such person was acting in good faith within the scope of his or her official actions and duties and unless the damage or injury was caused by the willful or wanton misconduct of such person.

Official Code of Georgia Annotated (O.C.G.A.) § 51-1-20.

It is also customary for  such releases to be contained in asset purchase agreements for similar type transactions, as purchasers do not customarily pay several million dollars for the acquisition of a business without obtaining such a release in exchange.

**C.     The Committee's Independent Investigation of The Released Claims**

At the early outset of the Bankruptcy Cases, the Committee negotiated and obtained standing to challenge each of the Senior Lender's and Term Lender's liens, claims, and interests. Specifically, the Cash Collateral Order provides that "the Committee is hereby granted standing to challenge the Secured Lenders' liens and claims and to file any other potential claims and

40

causes of action of any kind or nature against the Secured Lenders and no further request for standing is or shall be required." [Cash Collateral Order at p. 21, paragraph 15.]

Also, because of the various insider connections in these matters, including FC Special Funding – the Senior Lender – whose sole participant is JIG (led by Richard Jackson), the same Mr. Jackson who is a steward of FCRC, the non-profit parent of the Debtors; and has affiliations with the Buyer and the original stalking horse bidder, the Committee set out to thoroughly and vigorously discharge its duties by investigating all possible claims against both the Secured Lenders and various insiders, including Mr. Jackson.

In this regard, the Committee was able to (i) take the testimony of Chuck Bengochea, Debtors' CEO and Ken Dady, Debtors' VP of Finance, on topics ranging from (a) the original purchase of the Debtors by Mr. Jackson, Mike Kendrick, and Larry Powell – including the cash infusion by these stewards in the amount of $25,000,000; (b) issues relating to cash flow and liquidity problems that eventually led Chase, as senior secured lender to divest itself of its senior loan and lien position; (c) the inability of the Debtors to find replacement financing leading to the eventual loan assignment to FC Special Funding, using JIG as the sole participant in that loan in an effort to maintain operations and not liquidate the Debtors; (d) how the revolver and term loan were utilized both during Chase's tenure and FC Special Funding's tenure; (e) whether Debtors' funds were used to pay insiders; and (ii) rigorously reviewed over eighty (80) categories of documents, including without limitation, historical financials, tax returns, leases, cash flow analysis and forecasts, budgets and bank statements to (a) determine whether Debtors' cash forecasting is/was sound; (b) review transfers (including defenses thereto) to insiders within one (1) year of the Petition Date; (c) review transfers (including defenses thereto) to non-insiders within ninety (90) days of the Petition Date; and (d) all transfers made to FC Special Funding, including timing against historical data points.

As a result of its investigation, the Committee drafted and filed a complaint against the Term Lender, Adversary Proceeding No. 15-80102 (the "**Term Lender Complaint**"), seeking, among other things, a declaratory judgment as to the validity, nature, and extent of liens, secured status of claim, recovery of adequate protection payments, avoidance and recovery of preferential transfers, and disallowance of claim, all as more fully set forth in the Term Lender Complaint. Additionally, the Committee drafted a complaint against FC Special Funding (the "**FC Special Funding Complaint**") seeking, among other things, a declaratory judgment determining the validity, nature, and extent of liens, equitable subordination of claims to equity status, recharacterization of debt to equity, avoidance and recovery of preferential and fraudulent transfers, and disallowance of claims. In conjunction with the auction that took place as part of the second phase of the sale process discussed above, FC Special Funding submitted a bid for the Debtors assets partly in cash and partly as a credit bid of its debt. The cash component included an allocation of $6.3 million to the Debtors to settle and obtain a release of any claims asserted against FC Special Funding. It is the Debtors' understanding that the purpose of the allocation was to provide value to the Estate as such claims were alleged to be unencumbered by either the liens of the Senior Lender (*i.e.*, FC Special Funding) or the liens of the Term Lender, and the amount of $6.3 million was equivalent to the then projected amount of 503(b)(9) Claims such that the Estate would have funds sufficient to satisfy such 503(b)(9) Claims. It is also the Debtors' understanding that any claims asserted against FC Special Funding were not valued at $6.3 million by FC Special Funding. For the reasons set forth below, among others, the FC

41

Special Funding Complaint has not yet been filed and the Challenge Period has been extended and has not expired as of the date of this Disclosure Statement.

After reviewing the facts and law with respect to the above referenced causes of action[3], the Committee, after consulting with its financial advisor, O'Keefe, determined that given the probability of success on the merits of each of the above referenced claims, the complexity and expense of litigation in connection therewith, and the reasonable views of creditors, i.e., the fact that any litigation outcome, even if positive in the first instance (and after payment of all costs in connection therewith), would pale in comparison to the magnitude of unsecured claims filed in the Debtors cases and that the Plan as drafted is a much better result for the estates and its creditors.

Moreover, the Committee investigated possible claims against Mr. Jackson, including, among others, breach of fiduciary duty, usurpation of corporate opportunity and common law fraud.  Aside from Mr. Jackson's personal assets, the Debtors maintain a $10M director and officer liability insurance policy for any breaches of fiduciary duty committed by Mr. Jackson and upon information and belief, any amounts recovered under the policy would not be encumbered. Nevertheless, and without in any way waiving or otherwise discounting any litigation value outside of the Plan context, in this posture, the likelihood of success on these claims requires a finding of willful and wanton misconduct.  Thus, given the high hurdle and the facts as determined by the Committee's investigation, the releases as proposed in the Plan are of inconsequential value.

Also, the Committee investigated a possible cause of action for substantive consolidation wherein the Committee would seek to consolidate non-debtors with the Debtors in an attempt to capture value for the Debtors estates.  These non-debtor entities included "Giving Films" and iDisciple.  After reviewing the facts and law with respect to these causes of action, the Committee, again in consultation with its financial advisor, O'Keefe, determined that even assuming that any amounts brought into the estate in this regard would not be considered collateral under either of the Secured Lenders' loan documents, the ultimate value inuring to the estates and eventually to the unsecured creditors is of inconsequential value.

It bears noting that in connection with the sales process initiated by the Debtors early in these bankruptcy cases, various parties-in-interest asserted objections alleging Mr. Jackson owned and/or individually controlled the Debtors, the Debtors' non-debtor parent FCRC (d/b/a Family Christian Ministries), the Buyer and a lender to the Debtors, FC Special Funding.   See Objection of Creditors Committee, ECF No. 313, at ¶¶ 2, 16, 33 and 53; Objection of United States Trustee, ECF No. 316, at ¶ 131.

As part of the Committee's subsequent investigations, the Committee has determined that Mr. Jackson does not own the Debtors, the Debtors' non-debtor parent Family Christian Resource Centers (d/b/a Family Christian Ministries) or the Buyer because each of these entities are considered public charities not owned by any one individual. Mr. Jackson is one of three board members of such entities and, therefore, he cannot exercise individual control over those

---

[3]  Notwithstanding anything contained herein, if the Plan is not confirmed these statements shall not be construed as an admission or waiver with respect to any claims the Committee has or may assert against any party and all rights are hereby reserved.

24408153v18

entities.  In addition, the Committee has further determined that Mr. Jackson neither has an ownership interest in nor exercises control over nor is a board member or manager of FC Special Funding.

With respect to preferences and fraudulent conveyances, the Committee has undertaken a two-step process.  First, the Committee reviewed the Debtors' books and records to make its initial determination with respect to all transfers from the Debtors to insiders (going back one-year) and non-insiders (going back ninety-days from the Petition Date).  In addition, the Committee prepared a modified new value analysis to provide some context as to the value of the preference claims.  Given the cost to litigate these issues, and based upon extensive experience in preference litigation, the Committee's professionals have determined that preference exposure is of inconsequential value in light of the magnitude of unsecured claims.

Secondly, the Debtors prepared an analysis of preference exposure, including an accounting of the "new value" defense, but not including an analysis of the "ordinary course" defense.  The Debtors' robust preference analysis, including defenses, indicates potential maximum exposure of approximately $16 million, subject to ordinary course defenses.  The Committee's professionals have spent considerable time reviewing the Debtors' analysis and have referenced and cross referenced various portions thereof.  Indeed, the Committee is of the view that, on the whole, i.e., in terms of total exposure, the Debtors' preference analysis is an accurate depiction of total preference claims.

After a thorough investigation, the Committee has determined that the Plan as drafted is the more appropriate path out of bankruptcy than a litigation path and that both the value of the preference claims and releases provided for in the Plan are of inconsequential value given the totality of circumstance presented in this Bankruptcy Case.  Moreover, given the fact that the Buyer is providing the platform for an on-going business in which (i) trade creditors are being incentivized to continue to do business with the Buyer in the form of a five (5%) percent payment on amounts equal to allowed pre-petition claims, (ii) all allowed 503(b)(9) claims will be paid in full, (iii) Buyer will own the assets and conduct operations with a severely trimmed and right-sided capital structure and (iv) a first-lien lender providing a $50 million line of credit moving forward, all but ensures that the Plan as proposed is in the best interests of the estates and its creditors.

Additionally, the Committee believes that if the Plan were not confirmed, the recovery on the above referenced causes of action would need to vastly exceed the potential $16 million maximum suggested by the Preference Analysis in order to replicate the 5% plus return currently set forth in the Plan and APA.  Two reasons yield such conclusions.  First, if the Plan were not confirmed, the potential total amount of unsecured and consignment claims could balloon from $70 million (the approximate current amount of unsecured claims) to as high as $144 million, given that liquidation would likely result in rejection claims of landlords plus claims under 11 U.S.C. § 502(h) and claims of Consignment Vendors.   Second, before proceeds from the Preference Claims could be distributed to the unsecured creditors, the Chapter 7 administrative expenses and the Chapter 11 administrative expenses would have to be paid in full.   The Chapter 11 administrative expenses alone could exceed $14 million when items such as 503(b)(9) claims, employee payroll, and professional fees are included.  Consequently, to even conceive of a 5% distribution to general unsecured claims in a liquidation scenario, the

43

recoveries from any preference claims and other causes of action would need to vastly exceed the potential $16 million maximum suggested by the Preference Analysis.

# ARTICLE VIII.
## INFORMATION REGARDING CONSIGNMENT CLAIMS

### A.    General Background

Prior to the Petition Date, the Debtors purchased or acquired inventory from vendors on both credit "term(s)" and on "consignment." While some vendors would sell exclusively on a "term" or "consignment" basis, some vendors would sell inventory on both bases.

For purchases of "term" inventory, the Debtors would issue a purchase order and the vendor would ship the inventory to the Debtors and issue an invoice for payment to be made after the invoice date, usually within 60 - 90 days but credit terms could vary from vendor to vendor. While the majority of the Debtors' inventory purchases were on a "term" basis, a smaller portion of the Debtors' inventory purchases were made on a "consignment" basis.

For purchases of "consignment" inventory, the Debtors would enter into a standing "consignment inventory agreement" with the vendor pursuant to which certain goods would be shipped to the Debtors and, upon their sale to a retail customer, the Debtors would remit an agreed upon "**cost**" amount back to the vendor. Generally, a "consignment" arrangement allows a vendor to free up warehouse space by storing its slower-moving inventory in the Debtors' stores rent-free, while permitting the Debtors to stock higher levels of inventory in their stores without a resulting liability unless and until such inventory is purchased by a retail customer.

As of the Petition Date, the Debtors possessed approximately $20 million of book value in "consigned" inventory, which had been received from approximately 150-200 vendors, and approximately $44 million of book value in "term" inventory, which had been received from over 500 vendors. The Debtors also owed an another approximate $7 million to consignors for Consignment Inventory sold prior to the Petition Date. The noted inventory amounts are book values only, which are not necessarily reflective of the true fair value or liquidation value of such property.

A listing of "consignment" related claims as of the Petition Date, as reflected in Debtors' Schedules filed with the Bankruptcy Court, is attached hereto as Schedule 1 and incorporated herein by reference. Additionally, as of the Petition Date, only two of the Debtors' consignment vendors, Simon & Schuster, Inc. and Baker Book House Company, had filed UCC-1 financing statements in the appropriate jurisdiction. *See* Schedule 2 attached hereto: Certified Georgia UCC Search Results as of April 23, 2015.

### B.    Applicable Law to Consignments

The law of consignments is now governed almost exclusively by the Uniform Commercial Code (the "**UCC**"), and although it "permits the consignment transaction to continue, it declares that the consignment will be valid as against creditors only if there is some

44

way by which creditors can learn of the consignment." *Id.* The standard approach is to analyze the transaction first under § 9-102(21) of the UCC to determine if it is an Article 9 consignment. *In re G.S. Distribution, Inc.*, 331 B.R. 552, 561 (Bankr. S.D.N.Y. 2005).

Pursuant to UCC § 9-102(a)(21), a "consignment" is defined as "a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:

> (A)    the merchant:
>
>> (i)    deals in goods of that kind under a name other than in the name of the person making delivery;
>>
>> (ii)   is not an auctioneer; and
>>
>> (iii)  is not generally known by its creditors to be substantially engaged in selling the goods of others;
>
> (B)    with respect to each delivery, the aggregate value of the goods is one thousand dollars ($1,000) or more at the time of delivery;
>
> (C)    the goods are not consumer goods immediately before delivery; and
>
> (D)    the transaction does not create a security interest that secures an obligation."

UCC, 9-102(a)(21).

If a transaction falls within the scope of this definition, a consignor's interest in consigned goods is treated as the equivalent of, and exactly as, a purchase money security interest in inventory. *See* UCC, § 9-103(d). This conclusion does not alter the rights vis-à-vis the consignor and the consignee, but the "priority of the consignor's interest as against the rights of lien creditors of the consignee, competing secured parties, and purchasers of goods from the consignee can be determined by reference to the priority rules generally applicable to inventory, such as Sections 9-317, 9-320, 9-322, and 9-324." 11 Anderson U.C.C. § 9-10103.1 [Rev] (3d. ed.), Official Code comment.

Therefore, to obtain priority in consigned goods, a consignor must properly perfect a purchase money security interest in inventory by complying with the requirements of Article 9 of the UCC. These requirements include filing a financing statement and sending an authenticated notification to competing secured creditors. *See* UCC § 11-9-324(b)(1)(2). If a consignor fails to perfect its purchase money security interest in consigned goods, the law makes clear that the goods are subject to the claims of senior secured creditors. *See* UCC, §§ 11-9-317(a) and 11-9-322; *see also In re Valley Media, Inc.*, 279 B.R. 105, 125 n. 36 (Bankr. D. Del. 2002); 9 Anderson U.C.C. § 9-312:21 (3d. ed.) ("Whether a consignment is a true consignment or a disguised security interest, the consignor, to have priority over a previously filed security interest in the debtor's inventory, must give the same type of notice that a purchase money secured party in inventory must give.").

### C.    The "Consignment Lawsuit"

On May 8, 2015, the Debtors filed their Answer to the Consignment Lawsuit, which included a counterclaim.  The Debtors dispute the plaintiffs' allegations that the underlying transactions are "true consignments" not governed by Article 9 of the UCC.  The Debtors assert the underlying transactions fall squarely within the UCC's definition of "consignment" and, therefore, are governed by Article 9 of the UCC.  By virtue of the plaintiffs' failure to file UCC-1 financing statements (with the sole exception of Simon & Schuster, Inc. and Baker Book House Company), the Debtors seek to avoid the plaintiffs' putative interests in the consigned goods pursuant to the Debtors' strong arm powers in Section 544 of the Bankruptcy Code.  With respect to Simon & Schuster, Inc. and Baker Book House Company's putative interests in their consigned goods, the Debtors are seeking a declaratory judgment that these interests are junior and subordinate to the property perfected and senior security interests of the Secured Lenders.

At the Bankruptcy Court's invitation, the plaintiffs and defendants have agreed to mediate the Consignment Lawsuit.  The mediation has been postponed several times and is presently scheduled for July 28, 2015.

### D.    Summary of Debtors' Position and Application of Applicable Law

Based on allegations in the Third Amended Complaint, the plaintiffs have essentially ceded the existence of all of the UCC elements for a "consignment" with one exception: whether the Debtors are "not generally known by its creditors to be substantially engaged in selling the goods of others."  UCC, § 9-102(a)(21)(A)(iii).

The leading case addressing this issue is *In re Valley Media, Inc.*, 279 B.R. 105 (D. Del. 2002).  In that case, the debtor filed a motion to sell consigned inventory at auction.  A group of consignment creditors who had not filed UCC-1 financing statements opposed the motion and argued that the consigned inventory should be returned to them.  As all of the other requirements of UCC 9-102(a)(21) were satisfied, the central issue in the case was whether or not the consignment creditors could prove that the debtor was generally known by its creditors to be substantially engaged in selling the goods of others.  *Id.* at 122.  If it was, then the consignment creditors' failure to file a UCC-1 financing statement would not be fatal to their alleged rights in the inventory as the transactions would not be "consignments," would not be governed by the UCC and financing statements would not be required to perfect the consignors interests.

As an initial matter, the court noted that "[p]roving that the deliveree is generally known by its creditors to be substantially engaged in the selling of goods of others is ultimately the burden of the consignor."  *Id.* at 124, *citing In the Matter of High-Line Aviation, Inc.*, 149 B.R. 730, 738 (Bankr. N.D. Ga. 1992); *In re BRI Corp.*, 88 B.R. at 74-75.

The court then noted that "[t]o satisfy the 'generally known' prong of the test, the [consignors] must prove that a majority of the debtor-consignee's creditors were aware that the consignee was substantially engaged in the selling of goods of others, i.e. consignment sales."  *Id. citing In re BRI Corp.*, 88 B.R. at 75.  "That majority is determined by the number of creditors, not the amount of creditor claims."  *Id. citing In re Wichaco Mach. Corp.*, 49 B.R. at 344 (holding that one fifth of creditors knowing of consignment relationship does not satisfy general

46

knowledge requirement, notwithstanding that such creditors represented 63% of claims against debtor). Further, the *Valley Media* court noted that "[t]estimony as to general knowledge in the industry is insufficient to prove knowledge by a majority of creditors." *Id. citing In re Wedlo Holdings*, 248 B.R. at 341-341.

In order to meet their burden in the *Valley Media* case, the consignors only came forward with evidence that other consignors and one secured creditor knew that Valley Media was engaged in consignment sales. *Id.* Based upon this analysis, the *Valley Media* court held in favor of the debtor and allowed the auction of the consigned goods to proceed, concluding: "The Objecting Vendors have not demonstrated that a majority of Valley's creditors in number knew that Valley was substantially engaged in selling the goods of others." *Id.* at 131. The court specifically noted that "there was no evidence offered as to the actual knowledge of the vast majority of Valley's creditors including equipment vendors, travel agents, and insurance carriers, etc." *Id.* at 132.

The plaintiffs in the Consignment Lawsuit face an extremely challenging and expensive burden in proving the Debtors were generally known by the majority of its creditors to be substantially engaged in selling the goods of others. The Debtors have scheduled close to 3,000 creditors in these cases, including utility companies, third party suppliers and various lessors of real and personal property. The plaintiffs will bear the burden to prove approximately 1,500 of these creditors had actual knowledge that the Debtors were substantially engaged in selling the goods of others. The Debtors assert the plaintiffs will not be able to meet this heavy burden of proof.

### E.    Proposed Settlement of Consignment Lawsuit / Treatment of Claims

Notwithstanding the Debtors' confidence in their position, the Debtors' probability of success in the Consignment Lawsuit is uncertain at this stage. The legal and factual support for the Debtors' position would need to be developed through discovery, briefs, and ultimately trial. The prosecution and defense of the Consignment Lawsuit will be time-consuming and expensive, which are two luxuries that are not firmly within the Debtors' control.

Recognizing these litigation realities, the Debtors and the Ad Hoc Consortium have engaged in substantive settlement negotiations over the past few months to compromise and settle the claims and causes of action in the Consignment Lawsuit. The Debtors and the Ad Hoc Consortium have reached an agreement on these proposed settlement terms, which are reflected in the Plan's proposed treatment of Class 4 Consignment Claims. Another plaintiff, Provident Distribution, LLC, has also agreed to settle on these same terms and conditions. These same settlement terms are being offered to all Holders of Consignment Claims against the Debtors.

### ARTICLE IX.
### PLAN CONFIRMATION REQUIREMENTS

### A.    General Information About Confirmation

At the Confirmation Hearing, the Bankruptcy Court shall confirm the Plan if the Plan satisfies all requirements of Bankruptcy Code § 1129(a). The requirements for confirmation of

the Plan under Bankruptcy Code § 1129(a) include the following: (1) the Plan must be "accepted" by all impaired classes, (2) the Plan must be feasible, and (3) with respect to each holder of a Claim or Equity Interest that does not vote to accept the Plan (even if such holder is a member of a Class that as a whole votes to accept the Plan), the Plan must be in the "best interest" of such holder in that the Plan provides for a distribution to the holder that is not less than the amount such holder would receive in a hypothetical Chapter 7 liquidation of the Debtor.

If all impaired classes do not vote to accept the Plan, a Plan may still be confirmed under § 1129(b) -- a so-called "Cram Down" confirmation -- if (a) at least one impaired class votes to accept the Plan, (b) all other requirements of Bankruptcy Code § 1129(a) are satisfied, and (c) the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired class that does not accept the Plan.

The foregoing confirmation requirements are discussed further below.

### B.    Acceptance

For the Plan to be accepted by an impaired class of Claims or Equity Interest, it must be accepted by the Holders of Claims or Equity Interest in such Class that hold at least two-thirds in dollar amount and one-half in number of the Claims or Equity Interest in such Class held by creditors that actually vote.

As noted at Article III.A above, the following classes are impaired and entitled to vote on the Plan:  Classes 2, 3 ,4 and 7.   Class 8 does not vote as the Class is deemed to have rejected the Plan under § 1126(g) because the members of the Class do not receive or retain anything under the Plan.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization.  Such requirement is referred to as the "feasibility test".

The Debtors submit the Plan is feasible because the Sale will enable the Debtors to fulfill each of the provisions and requirements of the Plan.  Additionally, the Debtors do not believe the Plan will likely be followed by further reorganization of the Debtors.  First, the Debtors themselves will be dissolved and cease doing business, hence a reorganization of the Debtors will not occur.  Second, the Debtors do not believe a liquidation or reorganization of the Buyer will occur as (i) the Buyer will have a dramatically improved balance sheet with total assets exceed the total debt, and (ii) the Buyer will have exit financing allowing for the Buyer to meet its operational and working capital requirements.

### D.    Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that the Plan (i) be accepted by each holder of a claim in an impaired class or (ii) that each holder of claim in the class will receive property under the Plan that is not less than the amount of property that such holder would

24408153v18

receive if a hypothetical liquidation of the Debtors occurred in Chapter 7. In other words, if one or more members of an impaired class vote to reject the Plan, the Bankruptcy Court will confirm the Plan only if the distribution to such members is not less than the distribution they would receive in a Chapter 7 liquidation of the Debtor. That requirement is called the so-called "best interests" test.

In a hypothetical liquidation under Chapter 7, the proceeds from liquidation of assets are distributed pursuant to priority scheme required by the Bankruptcy Code. That priority scheme is summarized as follows:

- First, proceeds from property encumbered by a lien must be distributed to the lienholder(s), in accordance with the priority of their liens, until their secured debts are paid.

- Second, any proceeds remaining, including any proceeds from assets not encumbered by any liens, must be paid to satisfy the administrative expense claims incurred in the Chapter 7 case, including the legal fees and expenses of the Chapter 7 Trustee.

- Third, any proceeds still remaining must be paid to satisfy the administrative expense claims incurred in the Chapter 11 case, including any unpaid post-petition trade debts of the Debtors, the unpaid, allowed fees incurred by the professional fees of the Debtors and the Committee, and 503(b)(9) claims which are accorded the status of an administrative expense claims.

- Fourth, any proceeds still remaining would be paid to general unsecured creditors.

A hypothetical Chapter 7 liquidation analysis is attached hereto as Schedule 3 (the "**Liquidation Analysis**"). The Liquidation Analysis was prepared by the Debtors' independent financial advisor, Resurgence Financial. The Liquidation Analysis reflects that unsecured creditors would likely receive nothing in a Chapter 7, primarily because most all of the Debtors' assets are encumbered by liens of the Secured Lenders, and the claims of the Secured Lenders exceed the reasonable value of the Debtors' assets. Although there are certain limited assets not encumbered by liens, such as bankruptcy preference claims and other so-called bankruptcy "Avoidance Actions", the estimated liquidation value of such assets is far less than the estimated administrative and priority expenses in a Chapter 7 liquidation and the pending Chapter 11 case that must be paid before any distribution can occur to general unsecured creditors.

Hence, considering the liquidation value of the Debtors' assets, the Liens of the Secured Lenders, the cost of liquidation under Chapter 7, the adverse impact that a liquidation under Chapter 7 would have on the value of the Debtors' assets, the estimated administrative expenses of the Bankruptcy Cases, the Debtors believe that the Plan provides for a larger distribution to individual unsecured creditors than under a Chapter 7 liquidation of the Debtor.

Accordingly, the Debtors submit that the Plan meets the best interest test

### E.    Cramdown Requirements

If, as noted above, the Plan is feasible and satisfies the "best interests" test, but yet the Plan is not accepted by all of the impaired classes, then the Plan can only be confirmed if it satisfied the "cram down" requirements of § 1129(b) of the Bankruptcy Code. To satisfy the cram down test, Bankruptcy Court must find that the Plan (i) does not discriminate unfairly and (ii) is fair and equitable with respect to each impaired class that rejects the Plan.

### 1.    Unfair Discrimination

A Plan does not discriminate unfairly with respect to a non-accepting Class if it protects the rights of such Class in a manner consistent with the treatment of other Classes with similar rights.  The unfair discrimination test does not require that similarly situated Classes be treated in exactly the same way.  The test requires that such Classes be treated substantially similarly <u>or</u>, if not treated substantially similarly, that differences in treatment be fair.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured).   The Bankruptcy Code establishes "fair and equitable" tests as follows for secured claim, unsecured claims, and equity holders:

(a)    Secured Creditors.  Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens or proceeds is as provided in clauses (i) or (ii) above.

(b)    Unsecured Creditors.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c)    Interest Holders.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

The Debtors believe that the Plan does not discriminate unfairly, and that it is fair and equitable as to all Classes, and will demonstrate that further as needed at the Confirmation Hearing.  Accordingly, the Debtors believe the Plan may be confirmed on a non-consensual basis pursuant to the cram down requirements of § 1129(b) of the Bankruptcy Code.

## ARTICLE X.
## CERTAIN RISK FACTORS TO BE CONSIDERED

In considering whether or not to accept the Plan, Holders of Claims should carefully consider the following factors, together with all other information contained in this Disclosure Statement.

### A.    Risks of Non-Confirmation

If the Plan were not confirmed, either as a result of the failure to obtain a sufficient amount of acceptances for the Plan or as a result of the Bankruptcy Court's determination the Plan did not meet the statutory conditions to confirmation,  then it is unclear whether a reorganization could be implemented or what holders of Claims and Interests would ultimately receive.  The possible alternatives to confirmation are discussed in Article XI below, but it is possible that the only available alternative would be the termination of the Debtors' business operations and the forced liquidation of their assets.  Such event could materially and adversely impact the recoveries for creditors.

### B.    Risks Related to Projections

The Debtors management has prepared the financial projections attached hereto as Schedule 5 for the post-Closing operations of the business (the "**Business**") acquired by the Buyer.  Such projections represent the best estimates of the results of the Business following the Effective Date.  Although such estimates are considered reasonable by management as of the date hereof, they are subject to inherent uncertainty and business risks that could cause actual performance results to differ materially from projected results, including, among others (1) seasonality of the Debtors' business, (2) the potential refusal of vendors and suppliers to provide customary trade terms and credit terms to the Business which could adversely impact liquidity, and (3) the possible lingering effects the Bankruptcy Cases may have on the Buyer's relationships with customers, suppliers, landlords, and employees.

### C.    Competitive Nature of the Retail Industry

The retail industry within which the Debtors' Business is situated is subject to change by many factors that are difficult to predict with precision, including consumer tastes, demographic trends, discretionary spending patterns, weather conditions, and changing industry trends.  For example, many "brick and mortar" retail business have faced competitive pressures from the increasing growth of e-commerce and internet retail sales.  Large retailers that failed to adapt to such industry changes have gone out of business in past years.  There can be no assurance that the Business will be able to respond successfully to any current or future competitive changes or pressures that may confront the retail industry.

## ARTICLE XI.
## ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed and consummated, the theoretical alternatives include: (a) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code; or (b) an alternative plan of reorganization.

## A.    Liquidation Under Chapter 7

If the Bankruptcy Court does not confirm a plan of reorganization, the Court may convert the Debtors' case to a case under chapter 7 of the Bankruptcy Code.  Under Chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  Without limitation, secured Claims would be paid in full before any distribution to either Chapter 11 administrative claims, to 503(b)(9) claims, or to general unsecured creditors.  As virtually all of the Debtors' assets are encumbered, and substantial administrative claims exist, the Debtors believe that liquidation of the Debtors' assets under Chapter 7 would result in little to no distributions to unsecured creditors.

## B.    Alternative Plan of Reorganization

If the Plan is not confirmed, theoretically, creditors might elect to vote for other plans which may be proposed later.  Practically, however, the Debtors do not believe they can effectively reorganize under any plan not involving the sale of the assets given (a) the amount of debt saddling the Debtors and (b) the liquidity pressures facing them in bankruptcy, as the Debtors do not believe they would have access to sufficient DIP Financing or cash collateral to provide the significant amount of time needed for a second plan process to occur.

## ARTICLE XII.
## FEDERAL INCOME TAX

NOTHING STATED IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS TAX ADVICE TO ANY CREDITOR OR CLAIMANT.

No rulings have been requested, and none will be sought, from the Internal Revenue Service in respect of any aspect of the Plan.  Accordingly, holders of Claims and Interests are urged to consult their tax advisors concerning the individual tax consequences of the transactions contemplated by the Plan, including state and local tax consequences.

## ARTICLE XIII.
## RECOMMENDATION

The Debtors believe that the confirmation and implementation of the Plan is preferable to the alternative described above because the Plan will provide greater recoveries to all claimants than those available in a Chapter 7 liquidation.  In addition, any other alternative plan would probably not be feasible and would involve significant delay, uncertainty, and substantial additional administration.  Accordingly, the Debtors recommend that all parties entitled to vote on the Plan accept the Plan and that the Court confirm the Plan.

24408153v18

Dated: July 9.13, 2015

Respectfully submitted,

FAMILY CHRISTIAN, LLC (for itself and on behalf of the other Debtors)

/s/ Charles Bengochea

By:_____

Name: Charles Bengochea
         President and CEO

KELLER & ALMASSIAN, PLC
A. Todd Almassian (P55467)
Greg J. Ekdahl (P67768)
230 East Fulton
Grand Rapids, MI 49503
(616)364-2100

- and -

BURR & FORMAN LLP
Erich Durlacher (Ga Bar No. 235563)
Brad Baldwin (Ga Bar No. 034220)
171  17th Street, N.W. - Suite 1100
Atlanta, Georgia  30363
(404) 815-3000
*Attorneys for the Debtors*

24408153v18

Document comparison by Workshare Compare on Monday, July 13, 2015
2:13:21 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMSUS/US2008/7258576/12 |
| Description | #7258576v12<US2008> - Disclosure Statement - Family Christian_(24408153)_(2) |
| Document 2 ID | interwovenSite://DMSUS/US2008/7258576/16 |
| Description | #7258576v16<US2008> - July 13 Disclosure Statement Third Amended Plan - Family Christian |
| Rendering set | _Firm |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 100 |
| Deletions | 72 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 172 |